UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DCCC,<br><br>                    Plaintiff,<br><br>          v.<br><br>PETER S. KOSINSKI, in his official capacity as Co-Chair of the State Board of Elections; DOUGLAS A. KELLNER, in his official capacity as Co-Chair of the State Board of Elections; ANDREW J. SPANO, in his official capacity as Commissioner of the State Board of Elections; ANTHONY J. CASALE, in his official capacity as Commissioner of the State Board of Elections; TODD D. VALENTINE, in his official capacity as Co-Executive Director of the State Board of Elections; and KRISTEN ZEBROWSKI-STAVISKY, in her official capacity as Co-Executive Director of the State Board of Elections,<br><br>                    Defendants. | Case No. _____<br><br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

Plaintiff DCCC, on its own behalf, and on behalf of its members, constituents, and voters, by and through its undersigned attorneys, files this Complaint for Injunctive and Declaratory Relief against PETER S. KOSINSKI, in his official capacity as Co-Chair of the State Board of Elections; DOUGLAS A. KELLNER, in his official capacity as Co-Chair of the State Board of Elections; ANDREW J. SPANO, in his official capacity as Commissioner of the State Board of Elections; ANTHONY J. CASALE, in his official capacity as Commissioner of the State Board of Elections; TODD D. VALENTINE, in his official capacity as Co-Executive Director of the State Board of Elections; and KRISTEN ZEBROWSKI-STAVISKY, in her official capacity as Co-Executive Director of the State Board of Elections (collectively, "Defendants"). In support, Plaintiff alleges the following:

## INTRODUCTION

1.      In a report issued just a few months ago, the New York State Senate Elections Committee recognized that "New York's system of election administration has routinely fallen short in ways that have shaken public confidence, limited participation, and even disenfranchised voters." 2021 S. Elections Comm. Rep. at 1.[1] "Rather than one-off incidents of malfeasance or incompetence, recent incidents in New York point to structural flaws[.]" *Id*. "These structural flaws tend to have a disproportionate impact on communities most at risk of being disenfranchised, such as people of color, low-income voters, voters with physical disabilities, or voters whose primary language is not English." *Id*. Such voters are among DCCC's core constituencies, and DCCC brings this action to address these severe, perpetual threats to its ability to elect its candidates and enfranchise its voters.

2.      It is axiomatic that New York must administer its voting laws in a manner consistent with the protections of the U.S. Constitution and federal law. *See, e.g.*, *Goldberg v. Kelly*, 397 U.S. 254, 262 (1970); *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1338 (N.D. Ga. 2018). This includes the fundamental principle that a voter should not be disenfranchised due to an error made or induced by election officials. *See, e.g.*, *Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77 (2d Cir. 2005) (holding board violated the Fourteenth Amendment by not counting ballots when it "at least arguably" misled the voters into not filing new absentee applications); *Hoblock v. Albany Cnty. Bd. of Elections*, 487 F. Supp. 2d 90, 98 (N.D.N.Y. 2006) ("Plaintiffs were eligible voters whose votes are now, by action and order of the State, being discarded without being counted. . . . That is an unacceptable result."); *Gallagher v. N.Y. State Bd. Of Elections*, 477 F.

---

[1]  *Report and Findings of the New York State Senate Elections Committee* (Nov. 15, 2021), https://nysenate.gov/sites/default/files/press-release/attachment/elex1115_vfinal.pdf (hereinafter, "2021 Senate Elections Committee Report" or "2021 S. Elections Comm. Rep.").

Supp. 3d 19, 42–49 (S.D.N.Y. 2020) (holding New York's policy of rejecting otherwise valid ballots due to mail service's error-ridden postmarking practices likely violated due process, the right to vote, and equal protection); *see also, e.g.*, *N.E. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 597 (6th Cir. 2012) (citing *Griffin v. Burns*, 570 F.2d 1065 (1st Cir. 1978)).

3.      Yet, in election after election, New York falls short of this standard. Consistent, systemic problems with the State Board of Elections' (the "State Board") election administration regularly result in the rejection of significant numbers of ballots cast by lawful New York voters for technical errors, and even errors that are no fault of the voters' own. New York recognizes the unfairness inherent in this occurrence, as reflected by state laws that expressly establish that *some* errors facilitated or induced by election officials should not result in the voter's disenfranchisement. Still, other voters are systemically penalized for officials' errors, and no justifiable ground supports the fundamentally unfair disparate treatment.

4.      A prime example is New York's treatment of "Wrong Church Ballots," i.e., ballots cast by voters who present at a polling place other than the one to which they are assigned. New York law requires election officials to redirect those voters to their correct polling place. *See* N.Y. Election Law § 8-302(3)(e). Yet, officials regularly instead instruct these voters to cast provisional, i.e., "affidavit," ballots at the incorrect polling place. If the voter follows the officials' instructions and casts their ballot in the wrong place, it is rejected in its entirety—even in circumstances where the voter is clearly eligible to vote in some of the races on the ballot. In 2020 alone, more than 13,800 registered voters were disenfranchised entirely because they cast a Wrong Church Ballot.

5.      New York acknowledges that this treatment is unjust in its laws governing ballots affected by a variation of this issue, sometimes referred to as "Wrong Pew Ballots." When a voter is assigned to a polling place that houses multiple election *districts* (typically at separate tables),

but mistakenly presents at the wrong district within the polling place and is not properly redirected, New York law requires that their ballot be counted. *See id.* § 9-209(7)(d). Even then, however, officials sometimes erroneously reject such ballots.

6.     New York also routinely and unfairly disenfranchises absentee voters who return their ballots to official locations outside of their county. Instructions provided to voters (including printed on or delivered with the absentee ballots themselves) state that voters may return their ballots to *any* drop-off location in the state. Yet, hundreds of voters who have timely done so have been disenfranchised recently, either because officials where the ballots were deposited did not forward them to the voters' home counties in time for them to be counted (or, in rarer cases, forward them at all), or because officials in the voters' home counties deemed the forwarded ballots untimely when they received them.

7.     New York also systematically disenfranchises absentee voters on the basis of a common error made by the United State Postal Service ("USPS"). USPS frequently fails to postmark absentee ballot envelopes before delivering them to election officials, but New York only considers ballot envelopes that are missing a postmark timely if they are received by the day after the election. Experiences from 2020 and other recent elections confirm that the ballots of eligible voters that were mailed on or before election day will often arrive in the days that follow, yet New York maintains a policy disenfranchising those voters. Even though these voters fully complied with New York law, and even though the deficiency is caused entirely by USPS's error, the ballots are rejected in mass without any opportunity for the voters to prove they complied with the law. Such voters are not allowed to "cure" this deficiency (i.e., by signing an affirmation form), even though the state affords voters who submit ballot envelopes containing other technical deficiencies such an opportunity. *See* N.Y. Elec. Law § 9-209(3).

8.      Finally, New York routinely rejects thousands of timely mailed absentee ballots for trivial technical defects that have no bearing on whether the voter is qualified to vote. While New York law provides that officials must notify voters and provide them an opportunity to cure any absentee ballot flagged for rejection because of certain enumerated technical defects, election officials often fail to provide voters with the notice and cure opportunity to which they are entitled. Additionally, many other trivial ballot defects that could be cured using the same or similar procedures are arbitrarily excluded from the list of deficiencies that are considered curable, including ballots that are mistakenly returned in a housemate's outer envelope, ballots that are returned in unofficial outer envelopes, and potentially many others among the ballots that are rejected every cycle for unidentified reasons. The result is that some voters who make minor mistakes when casting an absentee ballot are treated differently than others similarly situated without any justifiable grounds for the disparate treatment, often simply because their ballots were handled by different election officials.

9.      The injuries imposed by these systemic issues (collectively, the "Ballot Rejection Practices") do not fall equally upon all voters. For example, certain voters are far more likely to be disenfranchised because of election official error (or election official induced error) than others. These include New York's young, Black, and Hispanic voters in particular. *See also* 2021 S. Elections Comm. Rep. at 1 (noting the persistent structural issues with election administration in New York "tend to have a disproportionate impact on communities most at risk of being disenfranchised," including non-white voters and voters for whom English is a second language); *id.* at 35 (recognizing New York's "long history of discrimination against racial, ethnic, and language minority groups in voting" that has resulted in a "persistent gap between white and non-white New Yorkers in political participation and elected representation"). Similarly, whether a

ballot with a superficial defect is rejected often turns on where a voter lives, with some officials reaching different conclusions than others when deciding whether to count or to allow voters to cure ballots with a specific defect.

10.     It would be one thing, perhaps, if these issues were few and far between. But every election cycle, errors that could be easily avoided with clear guidance, errors that could be easily cured by the voter if given the opportunity, and errors that are encouraged—and in some cases directly caused—by election officials, lead to the disenfranchisement of thousands of lawful New York voters. "In the last 18 months alone, New Yorkers have witnessed numerous confidence-shaking incidents where [the state's] elections have fallen far short of the standards we must expect." *Id*. at 3. While "[t]he debacles keep happening," "leaders of [New York's] elections agencies have responded by declaring themselves 'models of efficiency.'" *Id*. "A history of incompetence, errors, and failures is described [by the State Board] as having 'fundamentally worked for more than 100 years,'" *id*. (quoting *To Review Elections Admin. and Voting Rights in N.Y. State*: *Hearing Before the S. Standing Comm. on Elections*, 2021 Leg. (N.Y. Sept. 21, 2021) (second written testimony of the New York State Board of Elections)), and thus these issues persist year after year.[2]

11.     In such a system, against such a history, New York has put its thumb on the scale to tip the balance of many New Yorkers' most fundamental right toward disenfranchisement. The Constitution demands the opposite. Whether voters' ballots are counted should not depend on their location within the state, the communities to which they belong (including whether they are young,

---

[2] The Legislature and State Board have recently taken some steps toward remedying New York's historic issues with impeding the right to vote, specifically as it relates to curing absentee ballots that are flagged for rejection due to technical defects. But the changes did not go far enough. As the 2020 election proved—and the 2021 Senate Elections Committee Report details—New York persists in unconstitutionally burdening and even disenfranchising significant numbers of lawful voters.

people of color, or residentially mobile), or the official who counts their ballot. *See Gallagher*, 477 F. Supp. 3d at 46 (holding New York's policy of determining ballot eligibility on the basis of arbitrary postmarking practices violated equal protection because it "subject[ed] absentee voters across the state to unjustifiable differences in the way that their ballots are counted"); *see also, e.g.*, *Jones v. United States Postal Serv.*, 488 F. Supp. 3d 103, 134 (S.D.N.Y. 2020) ("An equal protection violation occurs when arbitrary disparities in voting mechanisms make it less likely that voters in certain areas will cast votes that count."). The State Board *could* fix these issues and ensure that New York's voters are not subject to arbitrary disenfranchisement, but it has not done so, and these problems persist.

12.     DCCC accordingly seeks declaratory and injunctive relief to protect the fundamental right to vote by ordering Defendants to (a) direct the local election boards to count absentee ballots that are timely submitted to an election office, polling location, drop box, or other official location outside of the voter's county and/or district of registration, (b) direct the local election boards to count (or, as appropriate, permit the cure of) otherwise valid ballots that were rejected due to errors facilitated or caused by an election official, (c) direct the local election boards to count (or, as appropriate, permit the cure of) timely returned and otherwise valid absentee ballots that are missing a postmark (d) direct the local election boards to give all voters who submit ballots with technical deficiencies notice and a pre-rejection opportunity to cure where the established cure procedure would adequately protect the state interested served by the violated ballot specification, and (e) implement guidance and training to ensure that the canvass of absentee and affidavit ballots is consistent throughout the state and otherwise complies with federal law.

## JURISDICTION AND VENUE

13.     Plaintiffs bring this action pursuant to 52 U.S.C. § 10101 and 42 U.S.C. §§ 1983 and 1988 to redress the deprivation, under the color of state law, of their rights under the Civil Rights Act and the First and Fourteenth Amendments to the U.S. Constitution.

14.     This Court has subject matter jurisdiction to hear Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1343.

15.     Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the transactions, events, and omissions giving rise to this action occurred in this judicial district.

16.     This Court has the authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202. Further, this Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure.

## PARTIES

17.     Plaintiff DCCC is the national congressional campaign committee of the Democratic Party as defined by 52 U.S.C. § 30101(14). Its mission is to elect Democratic candidates to the U.S. House of Representatives, including from New York's congressional districts. DCCC works to accomplish its mission by, among other things, assisting state parties throughout the country, including in New York. In 2020, DCCC made contributions and expenditures in the millions of dollars to persuade and mobilize voters to support Democratic congressional candidates. DCCC funds and organizes voter registration drives, door-knocking, phone and text banking events, distributions of campaign literature, and the engagement of voters through various other means. DCCC intends to do the same in future elections, including in 2022

in New York. DCCC brings these claims on its own behalf, as well as on behalf of its members, constituents, and voters.

18.     The Ballot Rejection Practices directly injure DCCC. Democrats and those who vote for Democratic congressional candidates, including DCCC's members, constituents, and voters, often vote by absentee and affidavit ballot in New York. To combat the burdens of the Ballot Rejection Practices on their members and constituents, DCCC has had to and will continue to have to divert and expend funds and resources it would otherwise devote to programs aimed at locating, contacting, persuading, and mobilizing voters in New York and elsewhere. For example, in 2020, DCCC funded and organized ballot cure programs in several districts throughout the state. Through these programs, volunteers contacted voters whose absentee ballots had been flagged for rejection due to a technical deficiency and helped those voters correct the issue so that that the votes could be counted. DCCC is investigating similar programs to assist voters in 2022. If the requested relief is not granted, DCCC will be forced to expend more resources educating voters about the disenfranchising effects of the Ballot Rejection Practices and mobilizing volunteers to assist those who may be at risk—resources that would otherwise be spent on engaging and mobilizing voters. As a result, the Ballot Rejection Practices frustrate DCCC's mission of electing Democratic candidates to the U.S. House in New York and across the United States.

19.     The Ballot Rejection Practices also directly injure DCCC and its members' competitive interests in New York elections. Not only do the practices make it inevitable that some number of voters who would support DCCC's candidates will have their ballots rejected, but the disenfranchising effects of the Ballot Rejection Practices also tend to fall more heavily on voters within communities that are historically more likely to support Democratic candidates, including

young voters and voters of color. When such voters are disenfranchised, it is harder for DCCC and its candidates to compete in New York elections.

20.    DCCC's members, constituents, and voters are also directly harmed by each of the Ballot Rejection Practices. Many have voted by absentee and affidavit ballots and/or will do so in future elections. Given that Democratic Party voters make up more than half of the registered voters in New York, it is certain that some of DCCC's members, constituents, and voters have been disenfranchised by the Ballot Rejection Practices in past elections and—absent a change— will be again in the future.

21.    Defendants Peter S. Kosinski, Douglas A. Kellner, Andrew J. Spano, Anthony Casale, Todd D. Valentine, And Kristen Zebrowski-Stavisky are members of the New York State Board of Elections and are sued in their official capacities for actions taken under state law. The State Board is a bipartisan administrative agency within the executive department of the state government vested with the responsibility for the administration and enforcement of all laws relating to elections. N.Y. Elec. Law § 3-102. The State Board alone has the authority, through its commissioners and directors, to direct the actions of all local boards of elections. It is responsible for "issu[ing] instructions and promulgat[ing] rules and regulations relating to the administration of the election process." *Id*. The State Board is specifically empowered to oversee and promulgate binding rules governing the counting of absentee and affidavit ballots. *Id*. § 9-209; *see also Gallagher I*, 477 F. Supp. 3d at 36–37. It is also responsible for creating election districts for the purposes of registration and voting. N.Y. Elec. Law § 3-100(2). The State Board also provides training to local boards of elections. *Id*. § 3-412(5). Beyond these direct regulatory powers over the state's elections, the State Board is also empowered to independently investigate and enforce violations of the state's election code. *Id*. §§ 3-102, 3-107.

<u>STATEMENT OF FACTS AND LAW</u>

I.    **New York systematically disenfranchises thousands of voters due to election official error, including when voters are induced to commit errors by election officials themselves.**

22.    The State Board is failing to protect lawful New York voters against the arbitrary and unconstitutional rejection of their ballots in unacceptable numbers. This includes ballots of lawful voters who correctly follow all applicable directions and are unfairly penalized for election officials' mistakes that are no fault of their own.

23.    The 2021 Senate Elections Committee Report detailed an extraordinary breadth of errors by New York election officials that have impeded the right to vote—in many cases, fully disenfranchising lawful voters—over the last several years. These included, but were not limited to: delays in officials' mailing out large numbers of requested absentee ballots in the 2020 primary, "creating situations where it was unlikely or impossible that voters would receive ballots in time to legally return them," including a whopping 34,000 ballots that officials did not mail until the day before the election, 2021 S. Elections Comm. Rep. at 11; officials' sending absentee ballots to voters with an incorrect name and address printed on the return envelope—itself reason to reject the ballot, *id*. at 11–12; failures by officials to timely process voter registration applications, *id*. at 17; officials' rejecting ballots without giving campaigns a chance to review them (as required by New York law), *id*.; officials' giving students erroneous information about which address they should use on their return ballots, which caused their disenfranchisement, *id*. at 17–18, 20; officials' incorrectly instructing students about the polling place at which they should vote, resulting in their ballots' being rejected during the New York 22nd congressional district post-election proceedings in 2020, *id*. at 20; and myriad problems with officials' inconsistently counting affidavit ballots, which were often "invalidated for a host of reasons not expressed to the voter[s]," *id*.

24.    The State Board's consistent and ongoing failure to prevent such wide-ranging disenfranchisement of lawful voters due to these systemic errors, as well as those further detailed below, violates the principles of fairness and due process embodied in the U.S. Constitution.

**A.  "Wrong Church" Affidavit Ballots**

25.    A prime example of New York voters' being disenfranchised for following erroneous directions from election officials has come to be known as the "Wrong Church Ballot" issue.

26.    When a voter arrives to vote in person at their polling place, two election officials must ask the voter for their name and address. N.Y. Elec. Law § 8-302(1). If the voter's registration cannot be verified, but the address provided by the voter falls *within* the election district, the voter must be permitted to vote an affidavit ballot, which is a ballot that a voter casts after subscribing an "affidavit . . . in a form prescribed by the state board of elections" swearing that the voter is registered to vote and "remains a duly qualified voter in [the] election district." *Id.* § 8-302(3)(e)(ii). To be clear, the law specifies that the election official may provide a voter such an affidavit *only* if the address they provided "is in such election district." *Id.*

27.    On the other hand, if the voter's registration cannot be verified and the voter's address falls *outside* the election district, "a poll clerk or election inspector shall consult a map, street finder or other description of all of the polling places and election districts within the political subdivision in which said election district is located and if necessary, contact the board of elections to obtain the relevant information and *advise the voter of the correct polling place and election district for the residence address provided by the voter* to such poll clerk or election inspector." *Id.* § 8-302(3)(e) (emphasis added). In other words, New York law requires that election officials direct voters who attempt to vote at the wrong polling place to their correct polling places, and it prohibits officials from giving these voters affidavit ballots.

12

28.    Despite these requirements, election officials throughout New York consistently instruct voters who provide an address *outside* of the election district to cast an affidavit ballot at the wrong polling location. Upon completing an affidavit ballot at the erroneous instruction of election officials, voters reasonably believe that they have properly cast their vote and it will be counted. Not so.

29.    When such Wrong Church Ballots are later canvassed, they are rejected in their entirety—including for any races that the voter was actually qualified to vote in and that would have been on the voter's ballot had they voted in their proper polling location. The result is that these voters are completely disenfranchised for following election officials' instructions to vote a ballot doomed to be rejected. *See, e.g.*, *Tenney v. Oswego Cnty. Bd. of Elections*, 71 Misc. 3d 400, 408 (N.Y. Sup. Ct. 2021) (holding affidavit ballots cast in an unassigned polling place must be rejected even if the voter relied on a poll worker's instruction, citing *Matter of Panio v. Sunderland*, 4 N.Y. 3d 123 (2005)).[3]

30.    The rejection of Wrong Church Ballots amounts to far more than isolated instances of harmless election official error. In the 2020 general election alone, more than 13,800 registered New York voters were disenfranchised statewide as a result of the state's policy of rejecting such

---

[3] New York law states that the local board of elections must count an affidavit ballot that was submitted by a registered voter where a "ministerial error" by an election official caused the "ballot envelope not to be valid on its face." *Id.* § 9-209(7)(c). However, in *Matter of Panio v. Sunderland*, 4 N.Y. 3d 123 (2005), the Court of Appeals held that ballots cast in the wrong polling place must be rejected even if a poll worker incorrectly advised a voter because a "voters' error of going to the wrong polling place cannot be attributed to the ministerial error of election workers." *Id.* at 128. In 2009, the Legislature amended section 8-302(e) to explicitly specify that election officials *must* direct voters to their proper voting location and may *only* provide a voter with an affidavit ballot after verifying that the voter's address is in the election district. Despite this change, state courts continue to hold that such poll worker error does not require counting the ballot under state law, *see Tenney*, 71 Misc. 3d at 408 ("[E]ven though poll workers are now required to advise voters of their correct polling site on election day, the *Panio* rule still stands"), and thousands of voters are disenfranchised each election cycle because their ballots are discarded due to the rule.

ballots, despite the law's mandate that election officials direct voters to the proper site rather than provide an affidavit ballot that will not be counted.[4]

31.     The number of Wrong Church Ballots that are thrown out is in some cases large enough to be decisive. In the election for New York's 22nd Congressional District, for instance, even after several voters attested to relying on poll workers' instructions in casting an affidavit ballot at the incorrect polling place, at least 128 Wrong Church Ballot voters—more than the ultimate 109-vote margin of victory in that race—were disenfranchised. Many, if not all, of these voters would have been eligible to vote in that congressional election, but for the fact that they cast ballots in the "Wrong Church."

32.     Under the current law, election officials are required to provide voters a means to determine whether their affidavit ballots are counted or rejected. *See* N.Y. Elec. Law § 9-212(4) (requiring election officials to establish "a free access system" for voters to ascertain whether their votes were counted, and if not, the reason why); *id.* § 802(3-c) (requiring officials to provide voters who cast affidavit ballots "written information" about the free access system). But such voters are *not* provided any opportunity to cure Wrong Church Ballots or otherwise ensure that they are not completely disenfranchised.

33.     State law already implicitly recognizes the unjust logic in rejecting Wrong Church Ballots. Election officials are affirmatively required to count so-called Wrong Pew Ballots, which occur when a single polling place is the voting site for multiple election districts—typically at different tables in the same room—and ballots are cast in the correct *polling place*, but the wrong *district*. N.Y. Elec. Law § 9-209(7)(d) ("If the central board of canvassers determines that a person

---

[4] Rachel Landy and Jarret Berg, *Impact of New York's 'Wrong Church' Ballot Disqualification Rule in the 2020 Election*, VoteEarlyNY (May 20, 2021), https://www.voteearlyny.org/reports/. All but two counties in the state were able to provide researchers data on Wrong Church Ballot rejections. *Id.*

was entitled to vote at such election, the board shall cast and canvass such affidavit ballot if such board finds that the voter appeared at the correct polling place, regardless of the fact that the voter may have appeared in the incorrect election district . . . ."). Even so, election boards sometimes mistakenly reject Wrong Pew Ballots. During the post-election proceedings for the 22nd Congressional District, at least three improper rejections of Wrong Pew Ballots were identified.

34.     The state's policy of rejecting Wrong Church ballots disproportionately burdens and disenfranchises the state's minority voters—including the state's Black and Hispanic voters—at a staggering rate. In the 2020 general election, the Bronx accounted for only 7% of the state's population, but 17% of the Wrong Church Ballot rejections. The population of the Bronx is 44% Black and 56% Hispanic (compared to the statewide population of 18% and 19%, respectively). And New York City as a whole—where the population is 24% Black and 29% Hispanic—accounted for only 42% of the state's population, but 69% of the Wrong Church Ballot rejections.[5]

35.     Several factors contribute to the discriminatory burden imposed by this practice. First, a voter is far more likely to appear at an unassigned polling location in the most densely populated (and diverse) areas of the state because there are more election districts within geographically compact jurisdictions. Thus, polling locations are often situated in ways that sow greater confusion among voters. For instance, a polling place may be within eyeshot of a voter's house or apartment but across an election district line. This is simply less common in more rural areas of the state.

36.     Second, voters in New York's population-dense communities are also far more likely to rent their homes and frequently move from one address to another. For example, more than 80% of all residents in the Bronx (where only 9% of residents identify as white and non-

---

[5] Landy and Berg, *supra* note 4.

Hispanic) are renters. Greater residential mobility is linked to a greater likelihood of voters unknowingly presenting at an unassigned polling location because these voters must constantly reeducate themselves on their proper election district and polling location(s).[6] Even a short move in the same neighborhood may put a voter out of the precinct in which they have previously voted or where their neighbors vote.

37.     Ultimately, the result of the state's policy of rejecting Wrong Church Ballots is not only to unfairly disenfranchise thousands of voters as a direct result of poll-worker error, but also to impose a severe and disparate impact on the right to vote in the state's minority communities.

**B.  Absentee Ballots Returned Outside of a Voter's Home County**

38.     A similar issue, but for absentee voters, occurred during the November 2020 General Election when voters followed official directions advising them that they could drop off their absentee ballots at authorized locations outside of their county of registration as long as they did so by election day. 2021 S. Elections Comm. Rep. at 18.

39.     New York law states that after an absentee voter has completed their ballot, the ballot may be returned before the close of polls on election day by either placing it in the mail or delivering it to the board of elections of the county or city in which the voter resides. N.Y. Elec. Law §§ 8-410, 8-412.

40.     The law does not specify who must place the ballot in the mail or deliver it to the voter's county or city board, *see id.*, and election officials across the state have interpreted the statute to allow *other local election boards* to accept out-of-county voters' ballots and forward them to their home counties' boards of election.

---

[6] Often, voters in these areas will also be assigned to multiple polling locations for a single election cycle, with their polling places changing between the primary election, early voting period, and election day.

41.     During the 2020 election, this procedure was explicitly authorized in the absentee ballot instructions provided to voters—on the inner affidavit envelopes themselves—throughout the state, which stated that absentee ballots "can be returned to *any* Early Voting or Election Day poll site, or to [the voter's] local Board of Elections by 9:00 pm on Election Day" (emphasis added).

> **Instructions to voter:**
>
> 1. First mark your ballot, then fold it and place it in this envelope, and then seal this envelope.
> 2. Sign and date the statement on the reverse side of this envelope. Your signature will be compared to the signature on file with the board of elections to verify your identity.
> 3. Place this envelope in the return envelope.
> 4. Your ballot can be returned to any Early Voting or Election Day poll site, or to your local Board of Elections by 9:00 pm on Election Day, if delivered in person, or be postmarked by Election Day and received not later than seven days following the election.
>
> If you have an application for an absentee ballot, do not place it in this envelope. Instead, place it in the return envelope along with this sealed envelope.

42.     The State Board's website echoes these instructions; as of filing, it still states: "You may return the ballot in any of the following ways" including explicitly, "[b]ringing it to an early voting poll site," or "[b]ringing it to a poll site" without regard to which county the sites are located in. New York State Board of Elections, Absentee Voting, https://www.elections.ny.gov/VotingAbsentee.html (last visited Jan. 19, 2022). The 2021 Senate Elections Committee Report concurs: "By law, voters may return their completed absentee ballots to *any polling place in New York State*." 2021 S. Elections Comm. Rep. at 24 (emphasis added).[7]

---

[7] These instructions also applied to ballots that voters deposited in "drop boxes" outside their county of residence. In September 2020, then-Governor Cuomo issued an executive order requiring the boards of election to set up a system for voters to drop off their voted absentee ballots without having to wait in line at their board offices, at early voting sites (which are open from the tenth day before the election until the second day before the election), and at all polling locations on election day. This also authorized the use of drop boxes. For example, the New York City Board, placed drop boxes at all of the borough offices, early voting sites, and at all 1,300 voting sites on election day. Absentee ballot drop boxes were also available in 2021.

43.     This option for voting was further endorsed and encouraged in statements by election officials, including members of the State Board. In testimony submitted to the New York Legislature in August 2020 regarding the shortcomings of the June primary, Defendants Robert Brehm, Douglas Kellner, and Andrew Spano emphasized that, "[a]nyone can drop off a voted absentee ballot envelope by delivering it to *any* poll site on election day, by delivering it to *any* early voting site during early voting hours, or to *any* office of any board of elections."[8]

44.     That voters should be able to return their ballot to "any Early Voting or Election Day poll site," not limited to locations within the voter's county of registration, is both logical and prudent. Many voters who vote absentee do so because they are outside their county of residence on election day. Permitting them to return their ballots to voting locations outside that county simply makes sense.

45.     Problems abounded, however, once voters followed those instructions. Despite the state's assurances and the instructions on the ballots themselves, hundreds of voters who timely dropped their ballot envelopes off at authorized locations outside of their counties of registration were disenfranchised during the November 2020 General Election.

46.     In some instances, local boards failed to forward the ballots *at all*. A voter named Bonnie Nelson "reported that she returned her 97-year-old mother-in-law's absentee ballot to an early voting site in Brooklyn, despite living in Manhattan. [The New York City Board of Elections'] online absentee ballot tracking system never updated the ballot's status from 'Out For Delivery' and Ms. Nelson testified that the Board of Elections office advised that she should not

---

[8] *Elections in a Pandemic: A Review of the 2020 Primaries*: *Joint Hearing Before the S. Standing Comm. on Elections*, *the S. Standing Comm. on Local Gov., the Assembly Standing Comm. on Election Law, and the Assembly Standing Comm. on Local Govs.,* 2020 Leg. (N.Y. Aug. 11, 2020), available at https://www.nysenate.gov/sites/default/files/nysboe_comm._kellner_comm._spano_and_co-executive_director_brehm_written_statement_joint_senate_and_assembly_hearing_on_ele.pdf    (written testimony of Douglas A. Kellner, Andrew Spano, and Robert A. Brehm) (emphases added).

have returned the ballot to a different borough than the one she resided in. Several other voters also noted that the tracker reflected their ballots were 'out for delivery' even though they were never delivered or arrived." 2021 S. Elections Comm. Rep. at 24.

47.    Even among the ballots that *were* forwarded, hundreds were rejected by the voters' county boards as *untimely*, not because the voter failed to drop off the ballot at an authorized location by 9:00 p.m. on election day, but because (a) the voters' counties of registration did not receive the ballots by that time (as they were in transit from the receiving counties), and (b) the voters' counties of registration considered the post-election-day postmark affixed when   an *election official forwarded* the ballot to be noncompliant with the requirement that absentee ballots sent in the mail be postmarked by election day. *See* N.Y. Elec. Law § 8-412(1).

48.    This issue came to a head in *Tenney v. Oswego Cnty. Bd. of Elections*, 71 Misc. 3d 400, 412 (N.Y. Sup. Ct. 2021), the court post-election proceedings of New York's 22nd congressional district, in which the court found that the ballots must be rejected. The court interpreted the statute to require that, in "order to be timely . . . the envelope forwarding a ballot that a voter delivered to an [out-of-county] polling site or Board of Elections must still be postmarked no later than election day."

49.    The court acknowledged that the State Board's absentee ballot instructions "potentially mislead voters into erroneously delivering their absentee ballots to polling sites outside of the county of their residence," but it nevertheless held that the "harsh result" of disenfranchisement of those voters was required because of New York's "strict deadlines for the submissions and receipts of ballots." *Id.* at 415 n. 2, 412.

50.    Fifty-one voters who had been identified in the *Tenney* proceeding alone were disenfranchised as a result of this issue. Never mind that they were misled by multiple sources of

state guidance to their own detriment, or that—as the Senate Elections Committee noted—voters have no control over whether and when USPS postmarks a ballot, *see* 2021 S. Elections Comm. Rep. at 11, nor do voters have control over the actions of election officials to whom they timely delivered their ballots.

51.    The disenfranchisement in *Tenney* was not unique. By way of another example, Ulster County reported to the U.S. Election Assistance Commission that it rejected 87 absentee ballots in the 2020 general election because the ballots were "DROPPED OFF AT OTHER COUNTY BOE."

52.    Even beyond the fact that these rejections are induced by election official error, the flat-out rejection of ballots that are timely returned to an authorized location imposes a severe and unjustifiable burden on the state's absentee voters, especially in light of New York's large commuter and college student population.

53.    Many New Yorkers need to vote absentee because they commute to, visit, or temporarily live in counties outside their county of registration, most often for work or to attend school. In some locations, this amounts to a majority of the population.

54.    For example, in Putnam County, approximately 60.6% of commuters worked outside their county of residence and approximately 11% left for work between 12:00 a.m. and 6:00 a.m.—before polls open. More than 50% of commuters in Bronx, Queens, Schuyler, and Rensselaer counties work outside their county of residence. With average commute times just shy of 45 minutes, most of their days and work weeks—including the hours that polls are open—are spent in counties other than their county of residence, making drop boxes or polling locations outside their county of residence far more accessible than in-person voting.

20

55.    In-state college students attending institutions outside their county of residence are often faced with the same problem when attempting to exercise their right to vote. With many students' schools located hours away from their county of residence, limiting the students' drop-off options to only locations within their county of registration leaves them to choose between traveling hours to drop off their ballot or relying on an ever-slowing mail system which they reasonably may not trust.

56.    USPS's ongoing problems and their impact on election-related mail are well documented and have themselves been the subject of extensive litigation. Beginning in early 2020, newly installed Postmaster General Louis DeJoy directed USPS to implement significant operational changes nationwide that resulted in great slowdowns and mail often being left undelivered. The new policies particularly impacted election mail, and between July 29, 2020, and July 31, 2020, the General Counsel of USPS sent letters to 46 states, including New York on July 30, warning them of a mismatch between the states' deadlines related to mail-in voting and USPS's likely delivery times.

57.    On August 25, 2020, a multi-state and -city coalition, including New York, sued USPS to block and reverse the changes. *See* Complaint, *New York v. Trump*, No. 1:20-cv-02340, 2020 WL 5018176 (D.D.C. Aug. 25, 2020). The suit alleged that the USPS had "been thrown into chaos" and was "set to undermine a federal election." *Id.* at 2. The states succeeded in winning a preliminary injunction preventing the USPS from enforcing the changes. *See New York v. Trump*, 490 F. Supp. 3d 225, 231 (D.D.C. 2020), *order clarified*, No. 20-CV-2340(EGS), 2020 WL 6572675 (D.D.C. Oct. 22, 2020), *appeal dismissed*, No. 20-5352, 2021 WL 672390 (D.C. Cir. Feb. 10, 2021), *and appeal dismissed*, No. 20-5352, 2021 WL 672390 (D.C. Cir. Feb. 10, 2021).

58.    In April 2021, USPS leadership announced that, beginning October 1, 2021, there would be an *additional* slow down to first class mail service, resulting in delivery speeds equivalent to those of the 1970s.

59.    New York and other states immediately protested the announced changes. *See* Press Release, *New York Attorney General, Attorney General James Leads Coalition Calling for USPS to Stop Further Service Cuts* (June 21, 2021), https://ag.ny.gov/press-release/2021/attorney-general-james-leads-coalition-calling-usps-stop-further-service-cuts.

60.    Less than a week after the new USPS plan took effect, a coalition of 20 states— again including New York—filed an administrative suit with the Postal Regulatory Commission seeking to invalidate the changes. Breanne Deppisch and Reuben Jones, *20 states file joint complaint against USPS over recent changes*, SPECTRUM NEWS NY 1 (Oct. 7, 2021), https://www.ny1.com/nyc/all-boroughs/national-international/2021/10/07/new-usps-changes-could-cause-worst-mail-delays-in-decades-.

61.    Against this backdrop, it is unsurprising that many voters may feel that they must drop their ballots off in person in order to ensure that their ballots are counted, rather than trust that the mail service will deliver them in time. Yet, many of these absentee voters who timely returned their ballots to authorized out-of-county locations, trusting official assurances that their votes would be counted (including assurances from the directions printed on their ballot envelopes themselves), were unjustifiably disenfranchised, their ballots rejected as untimely.

### C.  Absentee Ballots That USPS Fails to Postmark

62.    USPS's ongoing problems pose additional problems for New York voters because New York also systemically disenfranchises large swaths of voters entirely because USPS— through its own error—fails to postmark their absentee ballots.

63.    Following the 2020 primary, in which thousands of eligible voters were disenfranchised because their ballots arrived with a missing postmark, the Legislature amended state law to require election officials to "presume" that ballots that are missing a postmark are timely if they are received by the day after the election. *See* N.Y. Elec. Law § 8-412(1). But many such ballots are not delivered by then—particularly when they are mailed by the voter close to or on election day (as state law permits).

64.    Many voters who submit a ballot to USPS by election day—in full compliance with New York law—but whose ballots are not received by the day after election day are arbitrarily disenfranchised because USPS fails to postmark them, though voters have no control over whether and when USPS postmarks a ballot. *See* 2021 S. Elections Comm. Rep. at 11.

65.    This Court has already recognized the fundamental unfairness in this circumstance. In *Gallagher v. New York State Board of Elections*, when a group of candidates and voters sued to prevent the disenfranchisement of voters in the June 2020 primary, this Court found that the policy of rejecting otherwise valid and timely ballots due to USPS's failure to postmark them is a violation of due process, the right to vote, and equal protection, and it ordered the State Board to require local boards of election to count ballots received up to *two* days after the election—a day longer than the Legislature's "fix" allows. *See* 477 F. Supp 3d at 45–46 (recognizing that several hundreds of ballots missing a postmark in two June 2020 primary races alone arrived later than the day after the election).[9]

---

[9] Prospective relief for the 2020 *general* election was denied on standing grounds because none of the voters or candidates in the case had alleged that they had voted or would vote in a way that the postmark rule would injure them, or that their races would be impacted. *See Gallagher v. New York State Bd. of Elections*, 496 F. Supp. 3d 842, 845 (S.D.N.Y. 2020). DCCC, by contrast, alleges that this practice is certain to injure it and its constituents in future elections.

66.     Although the available data is far from complete, at least several hundred ballots were rejected due to a missing postmark in the 2020 general election alone, even with the Legislature's revision to New York's postmark rule in place. Unfortunately, the risk of disenfranchisement is likely even *greater* now because, as discussed above, USPS is experiencing significant and historic slowdowns in mail delivery speeds.

### D.  Absentee Ballots Flagged for Rejection Due to Technical Defects

67.     While New Yorkers' reliance on absentee voting had been steadily increasing for years, the COVID-19 pandemic has driven a dramatic spike in absentee voting. In the November 2016 general election, 400,660 New Yorkers voted by absentee ballot. In the November 2020 general election, that number was nearly four-and-a-half times greater—more than 1.8 million, accounting for about 14% of the ballots cast in that election. New York City alone accounted for more than 662,000 of those absentee ballots, a full 22% of the votes cast in the city.

68.     New York will continue to see significant rates of absentee voting in future elections. While New York voters may only vote absentee if they qualify by statute, the Legislature has authorized any voter to cast an absentee ballot due to the risks posed by the pandemic through at least 2022.[10]

69.     Moreover, while the state's marked increase in absentee ballot use in 2020 was due in part to the fact that many more New Yorkers were suddenly eligible to vote absentee, the

---

[10] Under New York law, voters who (a) will be absent from their county (or, if a resident of New York City, absent from the five boroughs) on election day, (b) are suffering from or caring for a person with a temporary or permanent illness or disability, (c) are a resident of a Veterans Health Administration Hospital, or (d) are incarcerated awaiting trial or following conviction for a non-felony offense, have a right to vote absentee. N.Y. Elec. Law § 8-400(1). In August 2020, the Legislature amended the provision to temporarily define the term "illness" to include "instances where a voter is unable to appear personally . . . because there is a risk of contracting or spreading a disease-causing illness to the voter or to other members of the public." 2020 Sess. Laws of N.Y. Ch. 139 (S. 8015-D). The Legislature recently passed legislation to extend the definition until the end of 2022. *See* S7565, 2021 Leg. (N.Y. 2021).

pandemic also drove many voters who were *already* eligible to vote absentee to learn about and utilize that method for the first time, and it is likely that they will continue to do so even when expanded eligibility ends.

70.     As the 2021 Senate Elections Committee Report concluded, "absentee ballots have become an essential part of voting infrastructure." 2021 S. Elections Comm. Rep.  at 24.[11]

71.     But one of the results of the large number of absentee ballots cast in 2020 was to starkly expose the shortcomings of the state's absentee voting system, including the ways in which it disenfranchises massive numbers of lawful voters for trivial errors in how they filled out and submitted their absentee ballot envelopes that do not concern their eligibility.[12]

72.     In the June 2020 Primary, for example, election officials invalidated tens of thousands of absentee ballots for technical issues—most often relating to the inner affirmation envelope.

73.     The most common reasons absentee ballots were invalidated included a missing signature or an incorrect or missing date or address on the inner affirmation envelope, elections officials' deeming the signature on the inner envelope not to "match" the signature on file for the voter, a missing inner envelope, a missing or illegible postmark on the return envelope, or a ballot's

---

[11] Even if New York voters were to return to their pre-pandemic rates of absentee voting after the 2022 election, if the 2020 rejection rates for absentee ballots remain steady, it would mean thousands of lawful voters' ballots being rejected every election. As noted, in the 2016 general election, 400,660 voters cast absentee ballots. At 2020 rejection rates, the ballots of over 14,400 voters statewide would have been rejected.

[12] Under New York law, absentee ballots are returned with three essential components: (1) the outer return envelope, (2) the inner affirmation envelope, and (3) the ballot itself. *See* N.Y. Elec. Law § 7-122(3). After a voter completes their ballot, they must place the ballot in the inner affirmation envelope, seal it, fill out the required identifying information on its exterior (if their county requires it), sign it, and then place the inner affirmation envelope in the outer return envelope before depositing the ballot in the mail or delivering it to a drop-off location in person. *Id.* §§ 7-122, 8-410.

being returned without an official outer return envelope. Rejections for various other technical errors were also widespread.

74.     In New York City alone, a staggering 84,000, or *21%* of the roughly 403,000 absentee ballots returned by voters in the June Primary were rejected. As the 2021 Senate Elections Committee Report noted, "[s]ome 30,000 absentee votes were disqualified in Brooklyn alone." 2021 S. Elections Comm. Rep. at 11.

75.     In the vast majority of these cases, voters were not provided any notice or an opportunity to cure these defects and, consequently, their votes were not counted.

76.     In response, the national and New York chapters of the League of Women Voters and an individual New York voter filed a lawsuit in July 2020 against the State Board, alleging that the state's systematic failure to provide opportunities to cure absentee ballots that are rejected by elections officials violated due process, the right to vote, and equal protection. Compl., *League of Women Voters v. Kosinski*, No. 1:20-cv-05238 (S.D.N.Y. filed July 8, 2020). The lawsuit pointed out that the state at the time did not have *any* standardized procedure for a voter to cure an absentee ballot that was flagged for rejection due to a technical deficiency. *Id.*

77.     Shortly thereafter, the Legislature moved to enact a handful of proposals aimed at preventing disenfranchisement among absentee voters, including a measure requiring election officials to provide voters with notice and an opportunity to cure certain enumerated deficiencies related to their absentee ballots. *See* 2020 Sess. Laws of N.Y. Chs. 139 (S. 8015-D), 141 (S. 8370-B).

78.     In enacting this legislation, the Legislature explicitly recognized the state's duty to "safeguard the constitutional right of absentee voters to have their votes counted." 2020 Sess. Laws of N.Y. Ch. 141 (S. 8370-B).

79.    Recently, the Legislature has again amended the election code to specify the defects on absentee ballot envelopes that are "curable" by the voter. 2021 Sess. Law News of N.Y. Ch. 763 (S. 1027-A); N.Y. Elec. Law § 9-209(3) (the "Notice and Cure Law").[13] Under the law, six technical defects trigger a mandatory notice and cure process: (1) an unsigned affirmation envelope; (2) a signature on an affirmation envelope's not matching a registration signature; (3) there being no witness to a mark in lieu of signature; (4) there being no affirmation envelope in the return envelope; (5) the affirmation envelope's being signed by the person assisting the voter but not the voter; (6) the affirmation envelope's being signed by only a third party. N.Y. Elec. Law § 9-209(3).

80.    The process requires the local board, within one day of discovering a curable defect on an absentee ballot envelope that it receives, to mail the voter "a notice explaining the reason for such rejection and the procedure to cure the rejection." *Id.* § 9-209(3)(c). The local board must also contact the voter by either email or phone, if such information is available. *Id.*

81.    The "voter may cure the aforesaid defects" by filing a signed affirmation attesting to the same information that is required when a voter initially returns their absentee ballot envelope, and "attesting that the signer of the affirmation is the same person who submitted [the] ballot envelope." *Id.* § 9-209(3)(d). The voter's affirmation must be "filed with the board no later than seven business days after the board's mailing of such curable rejection notice or the day before the election, whichever is later." *Id.* § 9-209(3)(e).

---

[13] While the Notice and Cure Law was passed in 2021, its list of curable defects and notice and cure process mirror the State Board's implementing regulations for the previous version of the law, which were initially promulgated as part of a stipulated consent order in the *League of Women Voters* litigation, and which were in effect for the 2020 general election. *See also* N.Y. State Bd. of Elections, "Notice and Cure Process," https://www.elections.ny.gov/NYSBOE/download/Voting/CuresProcess2021Guidance.pdf.

82.    The Notice and Cure Law also identifies other technical issues—including an undated or incorrectly dated voter signature, a misplacement of the signature, the use of an incorrect type of writing utensil, and the inclusion of extraneous marks—that do not require a cure. In other words, these ballots should be counted despite the defect, without requiring any further voter action.[14]

83.    Prior to the Notice and Cure Law, in 2019, the Legislature had also passed a law requiring that elections officials count absentee and affidavit ballots whenever the voter "substantially complie[s]" with the provisions of the Election Law. N.Y. Elec. Law § 9-209(7)(f).

84.    Despite these reforms, New York has maintained a disproportionately high ballot rejection rate: more than 66,746 of the 1.8 million absentee ballots voters cast during the 2020 general election, or 3.6%, were rejected. This was the third highest absentee ballot rejection rate in the country in 2020. In New York City, the number was even greater, with around 5% rejected. Even with the substantial compliance measure and notice and cure procedures in place, widespread avoidable disenfranchisement has persisted in New York.

85.    In many instances, local boards have failed to offer any notice or opportunity to cure to voters who should have been guaranteed it. Several such examples were identified during recent litigation related to the post-election proceedings for New York's 22nd congressional seat in 2020. *See*, *e.g.*, *Tenney v. Oswego Cnty. Bd. of Elections*, 70 Misc. 3d 680, 688 (N.Y. Sup. Ct.

---

[14] In full, the law provides that absentee ballot "envelopes are not invalid and do not require a cure if: (i) a ballot envelope is undated or has the wrong date, provided it is postmarked on or prior to election day or is otherwise received timely by the board of elections; (ii) the voter signed or marked the ballot affirmation envelope at a place on the envelope other than the designated signature line; (iii) a voter used a combination of ink (of any color) or pencil to complete the ballot envelope; (iv) papers found in the ballot envelope with the ballot are materials from the board of elections, such as instructions or an application sent by the board of elections; (v) an extrinsic mark or tear on the ballot envelope appears to be there as a result of the ordinary course of mailing or transmittal; or (vi) the ballot envelope is partially unsealed but there is no ability to access the ballot." *Id.* § 9-209(g).

2020) (explaining that then-Representative Brindisi's campaign alone had identified 12 voters with curable defects who were offered no notice or opportunity to cure in Chenango County).

86.    Among these voters in New York who were not given notice and an opportunity to cure were qualified voters who inadvertently returned their otherwise valid, voted ballot in a housemate, family member, or partner's ballot envelope.[15] While the Notice and Cure Law—and the State Board's regulations, which were in effect at the time of the 2020 election—state that if "someone other than the voter" signs the voter's affirmation envelope, the voter must be offered a cure, some voters caught in this position received no notice or cure opportunity. N.Y. Elec. Law § 9-209(3)(b); *see also*, *supra*, n.13.

87.    In many other cases, ballots were rejected for reasons that are not curable under current law. Of the 66,746 total absentee ballots that were rejected during the 2020 general election, only around 20,000 were invalidated for one of the six defects for which the law presently permits a cure; in other words, up to 50,000 absentee ballots were rejected for reasons New York presently deems uncurable. Many of these were immaterial technical defects that voters could cure if given the opportunity, and the present notice and cure procedures, or ones very similar, would fully protect any state interests that the violated ballot envelope specification protect.

88.    Of the around 20,000 ballots that were rejected for reasons that the local election board determined entitled the voter to notice and an opportunity to cure, data shows that 9,200 voters received notice and attempted to cure their ballot, with nearly all—8,700—of those attempts

---

[15] It is understandable that during the process of completing and returning absentee ballots, some voters accidentally swap affirmation envelopes. In addition, similar problems have also arisen as a result of clear administrative errors on the part of election officials. For example, in advance of the 2020 general election, approximately 100,000 Brooklyn voters erroneously received affirmation envelopes with different voters' names already printed on them. Similarly, voters in Rochester erroneously received incorrect ballots during the primary election which listed candidates in a neighboring Senate district race. According to the Monroe County Board of Elections, around 200 voters were impacted by the issue.

resulting in a successfully counted ballot. In other words, voters who have notice and an opportunity to cure, do so in significant numbers; but tens of thousands more did not receive the same treatment and were not given that chance.

89.    In New York City, even though well over 30,000 absentee ballots were rejected, officials sent only 6,950 cure notices to voters, leaving more than 23,000 voters unaware that their votes would not be counted and without any opportunity to cure the defect.

90.    The precise extent to which ballots are rejected by the boards is difficult to ascertain due to the State Board's failure to ensure minimal reporting standardization and compliance among the counties. Court proceedings and experiences by political parties, campaigns, and voters in previous elections have revealed stark disparities in the counties' collection and preservation of ballot rejection data, including the reasons for rejection.

91.    Data from the U.S. Election Assistance Commission also reveals that officials rejected more than 7,000 voters' ballots for some "other reason." More than 6,000 of these ballots were in New York City, and nearly 5,000 from Kings County (Brooklyn) alone. It is impossible to tell from available data how many of these "other reason[s]" were defects that should have afforded the voters notice and an opportunity to cure their ballots.

92.    Now that substantially more voters have experience using absentee voting in the pandemic, it is reasonable to expect that many more who are eligible will seek to use the same method of voting again in future elections.

93.    Unless the State Board is ordered to address these systemic issues, New York stands to continue to severely burden and disenfranchise thousands of lawful absentee voters in future elections.

II.    **New York has no adequate state interests to justify the Ballot Rejection Practices.**

94.    New York's Ballot Rejection Practices are not supported by any state interest adequate to justify their burden on the right to vote.

95.    First, there is no adequate state interest in the policy of rejecting Wrong Church Ballots. As already explained, virtually all such rejections are based on the error of a poll worker.

96.    To the extent that the state has interests in maintaining an election-district based voting system for in-person voters, those interests are wholly separate and do not justify the wholesale rejection of ballots that are cast by otherwise lawful voters as a result of faulty instructions by election workers themselves.

97.    Other courts have already reached this conclusion. In a case challenging Ohio's practice of disenfranchising voters who cast ballots in the wrong precinct, the Sixth Circuit held that none of the following state interests were sufficient to justify the practice, which had disenfranchised around 14,000 voters in 2008 and another 11,000 in 2010: "(1) capping the number of voters at a polling location; (2) limiting the precinct ballot to the applicable federal, state, and local elections a citizen may vote in, which has the result of (3) making the precinct ballot less confusing; (4) simplifying election administration and oversight, so as to minimize election fraud; and (5) enabling the state to place polling locations closer to voter residences." *Husted*, 696 F.3d at 587.

98.    It would not impose an undue administrative burden to partially count Wrong Church Ballots, honoring the portions of the ballot containing races in which the voter is eligible

to vote. At least twenty states already partially count ballots that were cast outside of the voter's precinct.[16]

99.     The policy of rejecting absentee ballots timely returned by voters to drop boxes, early voting sites, or other polling locations outside of the voters' county of registration similarly cannot be justified by any countervailing state interest.

100.     To the extent the state has an interest in enforcing its election deadlines, voters who find themselves in this circumstance have complied with those deadlines. Any delay in the voters' home counties in receiving the ballots, or delays in the transfer of ballots, are beyond the voters' control and should not result in their votes being invalidated as untimely.

101.     Nor is there any significant administrative burden in ensuring that absentee ballots received outside of the voter's county of residence by election day are counted. New York already requires the acceptance of absentee ballots returned to voters' home counties by USPS, other federal government agencies, or a foreign mail carrier up to seven days after the election as long as they are postmarked by election day. N.Y. Elec. Law § 8-412.[17]

102.     New York's ongoing policy of rejecting otherwise valid and timely ballots due to USPS's failure to postmark them—including where the affidavit completed by the voter on the ballot indicates the ballot was cast by election day, and there are no indices that it was not mailed

---

[16] For example, some states, such as New Mexico, use a hand tally procedure whereby officials determine the precinct in which the voter was qualified to vote, and marks on a tally sheet for that precinct the votes cast for each eligible office. See N.M. Admin Code 1.10.22.9(H)–(N). Other states, such as California, use a duplication method, whereby officials determine the precinct in which the voter was registered, obtains a new paper ballot for the correct precinct, and duplicates the votes cast on for the correct precinct. See Cal. Elec. Code § 14310(a)(3).

[17] By way of comparison, California, home to Los Angeles County, the largest voting jurisdiction in the nation, accepts absentee ballots postmarked by election day and received no later than 17 days after. Illinois allows 14 days, while Alaska, the District of Columbia, Maryland, and Ohio allow ten.

by election day—also cannot be justified by any state interest. Such issues are not indicative of voter eligibility and bear no indicia of fraud.

103.    There would also be no significant administrative burdens or costs associated with counting additional, *valid* ballots that USPS failed to postmark in the days after election day.

104.    Such voters could, at minimum, alternatively be provided an opportunity to "cure" the deficiency under a procedure already provided for other technical defects on absentee ballot envelopes (i.e., submitting an additional affirmation form swearing under penalty of perjury that they mailed by ballot by election day), but New York does not presently permit them to do so.[18]

105.    These and other of the Ballot Rejection Practices are caused by errors on the part of governmental officials, and there is no possible state interest sufficient to justify the policy of disenfranchising eligible voters who have done everything they have been told to do, only to have their ballots rejected for reasons entirely out of the voters' control.

106.    At the same time, those errors—as well as the consistent widespread rejection of ballots of lawful voters based on technical defects—broadly serve to undermine voter confidence in New York's elections. As the Senate Elections Committee noted: "The need for public confidence in our elections is greater than ever before. Yet it seems that each year, New York's system of election administration demonstrates it is not up to the task." 2021 S. Elections Comm. Rep. at 3; *see also id*. at 12 (noting that while concerns about "voter fraud" are often used to justify restrictive voting measures, those concerns are based in fantasy: "The more concerning 'fraud' is an elections administration system that doesn't respect voters, doesn't expand voter access, and routinely mismanages elections.").

---

[18] As discussed, the Notice and Cure Law allows some voters to cure technical defects associated with their absentee ballot envelopes, but those rules do not cover voters whose ballots are rejected due to a missing postmark. *See* N.Y. Elec. Law § 9-209(3)(b).

107.    There is also no state interest sufficient to justify the inconsistent treatment of technical defects unrelated to eligibility, and certainly none sufficient to outweigh the risk of disenfranchisement to and actual disenfranchisement of New York voters from its operation.

108.    The vast majority of the ballots routinely rejected by New York are cast by registered, eligible voters and could be cured in the same manner as the deficiencies already covered in the Notice and Cure Law—by asking the voter to resubmit an affirmation.

109.    Requiring notice and allowing voters the opportunity to cure these ballots in the same way that voters may cure ballots with other technical defects would impose, at most, a slight administrative burden, the weight of which cannot justify the burden—disenfranchisement—that the current practices impose on the right to vote.

110.    The state has already promulgated a procedure for voters to correct six technical deficiencies and has specified several others that require no cure at all. The administrative burden of extending these same procedures to other technical, immaterial, curable errors is thus minimal at most. Moreover, local election boards have no interest in failing to comply with the cure procedures currently in place.

111.    New York's failure to allow voters whose ballots are flagged for rejection for other curable defects this same protection also does not ensure election integrity or prevent voter fraud. Instead, the state's failure to count ballots submitted by otherwise eligible voters, or at least to provide voters a notice and an opportunity to cure, *compromises* the integrity of the election process, which depends on every eligible voter's vote being counted.

112.    The State Board must be compelled to provide, at the least, a notice and cure process for all rejected ballots where the deficiency could be cured by the voter in time for the ballot to be counted, as well as to take further steps to ensure compliance by the local boards of

elections. Especially in light of the ongoing systemic errors in reviewing, counting, and canvassing absentee ballots, such voters must be given a meaningful opportunity to have their vote counted.

113.    In short, the Ballot Rejection Practices do not improve election administration, ensure election integrity, or serve any state interest that could justify the burdens that they impose on the rights of lawful voters. Instead, they serve to "institutionalize[] a more insidious form of fraud: administrative disenfranchisement of eligible voters." 2021 S. Elections Comm. Rep. at 12.

## CLAIMS FOR RELIEF

### COUNT I
### (Denial of Due Process in Violation of the 14th Amendment; 42 U.S.C. § 1983)

114.    Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs as though fully set forth herein.

115.    The right to vote is the most precious liberty interest, as all other rights and liberties are illusory without it. *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964); *Reynold v. Sims*, 377 U.S. 533, 554–55 (1964); *see also Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 667 (1966). Access to the franchise is a "fundamental political right" as it is "preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). Thus, the Due Process Clause protects against fundamentally unfair election procedures that deprive voters of their right to vote. *See, e.g.*, *Hoblock*, 487 F. Supp. 2d at 95–97.

116.    To determine whether a plaintiff has been denied procedural due process in violation of the Fourteenth Amendment's Due Process Clause, a court asks first whether a constitutionally protected liberty interest is at stake; if one is, the court must determine whether the procedural protections provided are sufficient by examining "[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural

safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

117.    The Due Process Clause further protects against voting restrictions that render the voting system "fundamentally unfair." *E.g.*, *Husted*, 696 F.3d at 597 (quoting *Warf v. Bd. of Elections of Green Cnty., Ky.,* 619 F.3d 553, 559 (6th Cir. 2010)). "'[G]arden variety election irregularities' do not rise to that level . . . but substantial changes to state election procedures and/or the implementation of non-uniform standards run afoul of due process if they 'result in significant disenfranchisement and vote dilution.'" *Id.* (citing *Griffin,* 570 F.2d at 1076; *Warf*, 619 F.3d at 559. So too do state actions that induce voters to miscast their votes. *Griffin*, 570 F.2d at 1074, 1078–79 (holding that Rhode Island's post-election invalidation of absentee ballots violated due process, because voters relied on state directives allowing such ballots); *see also Gallagher*, 477 F. Supp. 3d at 45 ("When voters have been provided with absentee ballots and assured that their votes on those ballots will be counted, the state cannot ignore a later discovered, systemic problem that arbitrarily renders those ballots invalid.").

118.    Notwithstanding fundamental Due Process Clause protections, Defendants' enforcement of the Ballot Rejection Practices causes arbitrary, severe, and irreparable harm. They deprive eligible voters of their most fundamental right due to minor defects or errors that are no fault of their own without pre-deprivation notice or an opportunity to cure.

119.    In particular, New York's systemic disenfranchisement of voters because of government error violates due process because it deprives voters of their fundamental right to vote due to either the unilateral actions of officials or faulty official directives or guidance. To comply with due process, the State Board's absentee and affidavit ballot counting and cure procedure must

include a process to ensure that any absentee ballot that is deemed deficient as a result of election official or poll worker error is counted, and any voter whose absentee ballot is deemed deficient as a result of a technical error unrelated to eligibility to vote is permitted notice and an opportunity to cure. Without such protection, there is a substantial risk that eligible voters will continue to be erroneously deprived of their right to vote.

120.    Because the Ballot Rejection Practices deprive voters of their due process rights without justification, additional or substitute procedural safeguards are necessary to appropriately tailor New York's absentee and affidavit ballot counting regime, and it would impose little additional burden on the state to provide them.

### COUNT II
### (Undue Burden on the Right to Vote in Violation of the First and Fourteenth Amendments; 42 U.S.C. § 1983)

121.    Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs as though fully set forth herein.

122.    "[V]oting is of the most fundamental significance under our constitutional structure." *Burdick v. Takushi*, 504 U.S. 428, 433–44 (1992) (quoting *Ill. Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979)). A court considering a challenge to a state election law on the grounds that it imposes an undue burden on the right to vote in violation of the First and Fourteenth Amendments must carefully balance the character and magnitude of injury to the rights that the plaintiff seeks to vindicate against the justifications put forward by the state for the burdens imposed by the rule. *Id.* at 434; *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). "However slight that burden may appear . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling op.) (cleaned up).

37

123.    The Ballot Rejection Practices individually and collectively place severe burdens on the right to vote by mandating disenfranchisement for defects that are unrelated to eligibility, and no legitimate, much less compelling, state interests justify them.

124.    Because the Ballot Rejection Practices place an unduly severe burden on the right to vote without a sufficient state justification, they violate the First and 14th Amendments.

### COUNT III
### (Disparate Treatment in Violation of the Right to Equal Protection under the Fourteenth Amendment, 42 U.S.C. § 1983)

125.    Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs as though fully set forth herein.

126.    The Equal Protection Clause of the Fourteenth Amendment prohibits states from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1.

127.    This constitutional provision prohibits the state from subjecting voters to arbitrary or disparate voting practices and regulations that value the vote of one over another. *See Bush v. Gore*, 531 U.S. 98, 104-05 (2000). Indeed, the Equal Protection Clause applies to "the manner" of voting, and "once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Id.* Principles of equal protection thus ensure "the equal weight accorded to each vote and the equal dignity owed to each voter," and require "specific rules designed to ensure uniform treatment" in order to prevent "arbitrary and disparate treatment to voters" based on the county or local jurisdiction in which they vote. *Id.* at 104–06.

128.    "The principle of 'one person, one vote' requires that courts seek to 'ensure that each person's vote counts as much, insofar as it is practicable, as any other person's.'" *Gallagher*, 477 F. Supp. 3d at 46 (quoting *Hadley v. Junior Coll. Dist. of Metro. Kan. City*, 397 U.S. 50, 54

(1970)) (cleaned up). Thus, "a voting process where arbitrary factors lead the state to valuing one person's vote over that of another [is] the kind of process specifically prohibited[.]" *Id.*, at 48 (holding that "inconsistent treatment of ballots that [are] timely cast" violates equal protection).

129.    The State Board's Ballot Rejection Practices violate equal protection because they guarantee the ongoing, non-uniform treatment of voters with no justifiable basis for the distinctions.

130.    In particular, the State Board's failure to ensure that any absentee ballot that is deemed deficient because of poll worker or election official error is counted violates the Equal Protection Clause because it guarantees non-uniform treatment of voters based on the instructions or directives they happened to receive or the officials who happen to handle their ballots.

131.    In these circumstances, where the votes of "two voters—who cast their votes in precisely the same manner. . . ." could be treated differently, "whether either vote is counted depends entirely" on arbitrary factors beyond the voters' control, in violation of the Equal Protection Clause. *Id*. at 47–48.

## COUNT IV
### (Rejection of Ballots for Immaterial Defects in Violation of 52 U.S.C. § 10101)

132.    Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs as though fully set forth herein.

133.    Section 1971 of the Civil Rights Act of 1964 provides:

> [n]o person acting under color of law shall . . . deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not *material* in determining whether such individual is qualified under State law to vote in such election.

52 U.S.C. § 10101(a)(2)(B) (emphasis added).[19]

134.    The provision was intended to "address the practice of requiring unnecessary information for voter registration with the intent that such requirements would increase the number of errors or omissions on the application forms, thus providing an excuse to disqualify potential voters." *Schwier*, 340 F.3d at 1294; *see also id.* at 1296 ("the focus of the text is [on] the protection of each individual's right to vote").

135.    The plain text of the Act, however, is not limited to voter registration; it extends to "any act requisite to voting." 52 U.S.C. § 10101(a)(2)(B). In *Martin v. Crittenden*, 347 F. Supp. 3d 1302, 1308 (N.D. Ga. 2018), for instance, the court held that the plaintiffs had a substantial likelihood of prevailing on their Civil Rights Act Materiality Claim because "a voter's ability to correctly recite his or her year of birth on the absentee ballot envelope [was] not material to determining said voter's qualifications under Georgia law." *Id.* at 1308–09. The same logic applies to the Ballot Rejection Practices.

136.    Under New York law, individuals who meet the following criteria are eligible to vote: (1) be a U.S. citizen; (2) be at least 18 years old on the day of the election in which he or she is voting; (3) be a resident of New York for at least 30 days prior to the election;[20] (4) not be imprisoned for a felony (or any crime that would constitute a felony under New York state law) at

---

[19] Plaintiff is aware of limited, unpublished caselaw among federal district courts in New York suggesting that some courts have held that there is no right of action for private plaintiffs under 52 U.S.C. § 10101. *See Dekom v. New York*, No. 12-CV-1318 JS ARL, 2013 WL 3095010, at *18 (E.D.N.Y. June 18, 2013) (dismissing claim on other grounds), *aff'd*, 583 F. App'x 15 (2d Cir. 2014); *see also Hayden v. Pataki*, No. 00-CIV-8586 (LMM), 2004 WL 1335921, at *5 (S.D.N.Y. June 14, 2004), *aff'd on other grounds*, 449 F.3d 305 (2d Cir. 2006). The Second Circuit, however, has never addressed the issue, and the Eleventh Circuit has held—after thorough briefing and consideration—that such a right exists. *Schwier v. Cox*, 340 F.3d 1284 (11th Cir. 2003).

[20] N.Y. Election Law § 5-102.1 (McKinney 2021). New York law waives the durational requirement attached to residency in the event the voter is a U.S. citizen and is casting a ballot for president and vice president. *Id.* § 5-102.2.

the time of the election; (5) not be adjudged incompetent at the time of the election; and (6) not be in receipt or offer of valuable consideration in exchange for his or her vote or upon the outcome of the election.

137.    Many of the Ballot Rejection Practices call for a ballot to be rejected for reasons immaterial to the determination of whether the voters are qualified to vote under New York law.

138.    Indeed, errors introduced by poll workers and other election officials are typically immaterial to the voters' actual eligibility to vote in the election at issue. Obviously, a ballot returned to an unassigned polling place or an election board outside the voter's county of residence does not indicate that the voter is legally unqualified to vote in the voter's county of residence. Nor does a missing postmark so suggest.

139.    Trivial defects, which are often introduced by election officials themselves, have no bearing on the voter's eligibility. The State Board's refusal to require that ballots that are valid aside from such deficiencies be counted therefore deprives voters of the rights secured to them by the Civil Rights Act of 1964.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter the following judgment:

a.  Declare that the policy or practice of rejecting an absentee ballot that was timely submitted to an election office, polling location, drop box, or other official location outside of the voter's county and/or district of registration violates the First and Fourteenth Amendments to the U.S. Constitution, as well as 52 U.S.C. § 10101;

b.  Order the Defendants, along with their respective agents, officers, employees, and successors to direct the local boards of elections to refrain from enforcing practices or

policies that reject absentee ballots timely submitted to an official location outside of the voter's county of registration;

c.  Declare that the policy or practice of rejecting ballots submitted by eligible voters due to an error or deficiency facilitated or caused by an election official violates the First and Fourteenth Amendments to the U.S. Constitution, as well as 52 U.S.C. § 10101;

d.  Order the Defendants, along with their respective agents, officers, employees, and successors to direct local boards of elections to implement a procedure by which voters whose ballots are rejected because they relied on the error or inducement of an election officials to have their ballot counted for the races in which they are eligible to vote, or to cure any purported deficiency;

e.  Declare that the policy or practice of rejecting a timely returned and otherwise valid absentee ballot because the envelope is missing a postmark violates the First and Fourteenth Amendments, as well as 52 U.S.C. § 10101;

f.  Order the Defendants, along with their respective agents, officers, employees, and successors to direct local boards of elections to count absentee ballots submitted in envelopes that USPS fails to postmark or, in the alternative, to allow voters who submit such ballots to be given the same notice and pre-rejection opportunity to cure as other technical deficiencies as defined by the State Board;

g.  Order the Defendants, along with their respective agents, officers, employees, and successors to implement mandatory guidance and training of local election boards to ensure that the canvass of absentee and affidavit ballots under N.Y. Elec. Law § 9-209 is conducted consistent with federal law and any orders of this court;

h.  Declare that the practice of rejecting an absentee ballot for any reason that could be remedied by an eligible voter but that is not defined as "curable" by state law without providing the voter the same notice and pre-rejection opportunity to cure their ballot as other technical deficiencies that are defined as "curable" by state law violates the First and Fourteenth Amendments to the U.S. Constitution, as well as 52 U.S.C. § 10101;

i.  Order Defendants, along with their respective agents, officers, employees, and successors to direct the local election boards of elections to implement a procedure by which eligible voters who submit an absentee ballot that is rejected for any reason that could be cured but that is not defined as "curable" by state law be given the same notice and pre-rejection opportunity to cure their ballot as other technical deficiencies as defined by the State Board;

j.  Award Plaintiffs their costs, expenses, and reasonable attorneys' fees, pursuant to 42 U.S.C. 1988, and any other applicable law;

k.  Grant such other and further relief as the Court deems just and proper.


Dated: February 4, 2022                    Respectfully Submitted,


**EMERY CELLI BRINCKERHOFF**
**ABADY WARD & MAAZEL LLP**
Andrew G. Celli, Jr.
Nairuby L. Beckles
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

Marc E. Elias*
Elisabeth C. Frost*
Haley Costello Essig*
Joshua Harris*
Graham White*
Spencer McCandless*

43

Tyler Bishop*
**ELIAS LAW GROUP LLP**
10 G Street NE, Suite 600
Washington, DC 20002
Phone: (202) 968-4513
Facsimile: (202) 968-4498
melias@elias.law
efrost@elias.law
hessig@elias.law
jharris@elias.law
gwhite@elias.law
smccandless@elias.law
tbishop@elias.law

*Attorneys for Plaintiffs*

*\*Pro Hac Vice Applications to be filed*