UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DCCC,

                    Plaintiff,

         v.

PETER S. KOSINSKI, in his official capacity as
Co-Chair of the State Board of Elections;
DOUGLAS A. KELLNER, in his official capacity
as Co-Chair of the State Board of Elections;
ANDREW J. SPANO, in his official capacity as
Commissioner of the State Board of Elections;
ANTHONY J. CASALE, in his official capacity
as Commissioner of the State Board of Elections;
TODD D. VALENTINE, in his official capacity
as Co-Executive Director of the State Board of
Elections; and KRISTEN ZEBROWSKI-
STAVISKY, in her official capacity as Co-
Executive Director of the State Board of
Elections,

                    Defendants,

and

REPUBLICAN NATIONAL COMMITTEE,
NATIONAL REPUBLICAN CONGRESSIONAL
COMMITTEE, and NEW YORK REPUBLICAN
STATE COMMITTEE,

                    Intervenor-Defendants.

No. 1:22-cv-01029 (RA)

---

## PLAINTIFF DCCC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS .................................................................................................... 2

    A.   Wrong Church Ballots cast due to official error are rejected in their entirety. ............... 2

    B.   Wrong County Ballots are rejected. ............................................................................ 4

    C.   Absentee ballots missing a USPS Postmark are also rejected. ....................................... 5

    D.   Many otherwise valid absentee ballots are rejected for technical deficiencies................ 6

ARGUMENT ......................................................................................................................... 7

    I.   Plaintiff is substantially likely to succeed on the merits. ................................................. 7

    A.   The Ballot Rejection Practices violate due process. ....................................................... 7

        1.   The Ballot Rejection Practices violate substantive due process................................. 8

            a.   The Ballot Rejection Practices are fundamentally unfair.................................... 8

        2.   The Ballot Rejection Practices also violate procedural due process. ........................ 11

    B.   The Ballot Rejection Practices unduly burden the right to vote. ................................... 16

    C.   The Ballot Rejection Practices violate the Equal Protection Clause............................. 21

    D.   The Ballot Rejection Practices violate the Civil Rights Act. ....................................... 24

    II.   Plaintiff will suffer irreparable harm absent an injunction. .......................................... 26

    III.   The balance of the equities and public interest favor an injunction............................... 26

CONCLUSION..................................................................................................................... 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Armstrong v. Manzo*,
  380 U.S. 545 (1965)..................................................................................13

*Bd. of Regents of State Colls. v. Roth*,
  408 U.S. 564 (1972)..................................................................................12

*Bennett v. Yoshina*,
  140 F.3d 1218 (9th Cir. 1998) .....................................................................8

*Bush v. Gore*,
  531 U.S. 98 (2000)................................................................................21, 22

*City of Chi. v. Morales*,
  527 U.S. 41 (1999)....................................................................................10

*Coates v. City of Cincinnati*,
  402 U.S. 611 (1971)..................................................................................11

*Common Cause/N.Y. v. Brehm*,
  432 F. Supp. 3d 285 (S.D.N.Y. 2020)......................................................16, 21

*Conn. Dep't of Env't Prot. v. Occupational Safety & Health Admin.*,
  356 F.3d 226 (2d. Cir. 2004)......................................................................26

*Democracy N.C. v. N.C. State Bd. of Elections*,
  476 F. Supp. 3d 158 (M.D.N.C. 2020) ............................................... *passim*

*Fish v. Schwab*,
  957 F.3d 1105 (10th Cir. 2020), *cert. denied*, 141 S. Ct. 965 (2020)..............17, 18

*Fla. Democratic Party v. Detzner*,
  No. 4:16-cv-607-MW/CAS, 2016 WL 6090943 (N.D. Fla. Oct. 16, 2016)..........17

*Fla. State Conf. of NAACP v. Browning*,
  522 F.3d 1153 (11th Cir. 2008) ..................................................................24

*Frederick v. Lawson*,
  481 F. Supp. 3d 774 (S.D. Ind. 2020) ..........................................................11

*Ga. Muslim Voter Project v. Kemp*,
  918 F.3d 1262 (11th Cir. 2019) (Pryor, J., concurring)...........................14, 15, 16

*Gallagher v. N.Y. State Bd. of Elections*,
  477 F. Supp. 3d 19 (S.D.N.Y. 2020)............................................................ *passim*

*Griffin v. Burns*,
  570 F.2d 1065 (1978)........................................................................................8, 9

*Hadley v. Junior Coll. Dist. of Metro. Kan. City*,
  397 U.S. 50 (1970)................................................................................................21

*Hoblock v. Albany Cnty. Bd. of Elections*,
  422 F.3d 77 (2d Cir. 2005)....................................................................................9

*Hoblock v. Albany Cnty. Bd. of Elections*,
  487 F. Supp. 2d 90 (N.D.N.Y. 2006)......................................................7, 9, 21

*Hunter v. Hamilton Cnty. Bd. of Elections*,
  635 F.3d 219 (6th Cir. 2011) ..............................................................................9

*Kaluczky v. City of White Plains*,
  57 F.3d 202 (2d Cir. 1995)...................................................................................8

*League of Women Voters of Fla., Inc., v. Detzner*,
  314 F. Supp. 3d 1205 (N.D. Fla. 2018)...........................................................17

*League of Women Voters of N.C. v. North Carolina*,
  769 F.3d 224 (4th Cir. 2014), *cert. denied*, 135 S. Ct. 1735 (2015)..................17, 26

*League of Women Voters of Ohio v. Brunner*,
  548 F.3d 463 (6th Cir. 2008) ............................................................................21

*Martin v. Crittenden*,
  347 F. Supp. 3d 1302 (N.D. Ga. 2018)..............................................................24

*Martin v. Kemp*,
  341 F. Supp. 3d 1326 (N.D. Ga. 2018)...................................................... *passim*

*Mathews v. Eldridge*,
  424 U.S. 319 (1976)..............................................................................................13

*Merrill v. Milligan*,
  142 S. Ct. 879 (2022) (Kavanaugh, J., concurring) ......................................27

*Nat'l Coal. On Black Civic Participation v. Wohl*,
  498 F. Supp. 3d 457 (S.D.N.Y. 2020)................................................................26

*Ne. Ohio Coal. for Homeless v. Husted*,
  696 F.3d 580 (6th Cir. 2012) ...................................................................... *passim*

*New York v. U.S. Dep't of Homeland Sec.*,
    969 F.3d 42 (2d Cir. 2020).................................................................7, 21

*Raetzel v. Parks/Bellemont Absentee Election Bd.*,
    762 F. Supp. 1354 (D. Ariz. 1990) ...........................................................12

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
    140 S. Ct. 1205 (2020)...............................................................................27

*Reynolds v. Sims*,
    377 U.S. 533 554–55 (1964)......................................................................14

*Rivera-Powell v. N.Y.C. Bd. of Elections*,
    470 F.3d 458 (2d Cir. 2006)................................................................13, 14

*Roe v. Alabama*,
    43 F.3d 574 (11th Cir. 1995) ................................................................8, 10

*Saucedo v. Gardner*,
    335 F. Supp. 3d 202 (D.N.H. 2018)................................................12, 13, 14

*Schwier v. Cox*,
    340 F. 3d 1284 (11th Cir. 2003) ...............................................................24

*Self Advoc. Sols. N.D. v. Jaeger*,
    464 F. Supp. 3d 1039 (D.N.D. 2020)...........................................7, 11, 13, 14

*Taylor v. Louisiana*,
    419 U.S. 522 (1975).................................................................................18

*Tenney v. Oswego Cnty. Bd. of Elections*,
    71 Misc. 3d 400, 142 N.Y.S.3d 288 (N.Y. Sup. Ct. 2021) .........................5, 10, 23

*United States v. Berks Cnty.*,
    250 F. Supp. 2d 525 (E.D. Pa. 2003) .......................................................18

*Wesberry v. Sanders*,
    376 U.S. 1 (1964).................................................................................7, 14

*Williams v. Salerno*,
    792 F.2d 323 (2d Cir. 1986).....................................................................26

*Yang v. Kosinski*,
    960 F.3d 119 (2d Cir. 2020).......................................................................7

*Yick Wo v. Hopkins*,
    118 U.S. 356 (1886).............................................................................7, 14

*Zessar v. Helander*,
No. 05 C 1917, 2006 WL 642646 (N.D. Ill. Mar. 13, 2006) ......................................11, 13, 15

**Statutes**

52 U.S.C. § 10101(a)(2)(B) ................................................................................................24

Cal. Elec. Code § 14310(a)(3) ...........................................................................................15

N.Y. Elec. Law § 5-102 ......................................................................................................25

N.Y. Elec. Law § 5-102.2 ...................................................................................................25

N.Y. Elec. Law § 5-104 ......................................................................................................25

N.Y. Elec. Law § 5-106 ......................................................................................................25

N.Y. Elec. Law § 8-302(2).....................................................................................................2

N.Y. Elec. Law § 8-302(3)(e).............................................................................................9, 12

N.Y. Elec. Law § 8-302(e)(ii) ...............................................................................................2

N.Y. Elec. Law § 8-410 .........................................................................................................4

N.Y. Elec. Law § 8-412 .......................................................................................................4, 5

N.Y. Elec. Law § 8-412(1).....................................................................................................5

N.Y. Elec. Law § 9-209(3)..................................................................................................6, 23

N.Y. Elec. Law § 9-209(3)(b)...............................................................................................6

N. Y. Elec. Law § 9-209(7)(d) .............................................................................................14

**Other Authorities**

Hearing Before the S. Standing Comm. on Elections, the S. Standing Comm. on
Local Gov., the Assembly Standing Comm. on Election Law, and the
Assembly Standing Comm. on Local Govs., 2020 Leg. (N.Y. Aug. 11, 2020) .......................4

N.M. Admin. Code § 1.10.22.9(H)-(N) ................................................................................15

N. Y. Comp. Codes R. & Regs. tit. 9, § 6210.21 ..................................................................6

<u>**PRELIMINARY STATEMENT**</u>

"New York's system of election administration has routinely fallen short in ways that have shaken public confidence, limited participation, and even disenfranchised voters." *Rep. & Findings of the N.Y. State Senate Elections Comm.* (Nov. 15, 2021) at 1, attached as Ex. A. Voters harmed the most include those marginalized in the state—voters of color, low-income voters, voters with disabilities, and non-English speaking voters. In election after election, New York disenfranchises thousands of lawful voters for trivial ballot-related defects that have no bearing on whether the voter is qualified to vote and are often caused by election officials themselves. DCCC seeks a preliminary injunction forbidding the State from rejecting four specific categories of ballots in the upcoming elections:

- ***Wrong Church Ballots***, which are provisional ("affidavit") ballots cast at the wrong polling place as a result of election official error, leading to rejection of the full ballot—even if the voter is eligible to vote in some of the races on the ballot;

- ***Wrong County Ballots***, which election officials in the voters' home counties often reject as untimely based on the date the home county receives the ballots, even if the voter timely returns the ballot to an authorized location;

- ***Absentee Ballots Without Postmarks***, which election officials presume to be timely only if received by the day after the election, even though postmarking and mail delivery speed issues are entirely outside voters' control; and

- ***Absentee Ballots Flagged for Rejection for Technical Defects*** that have no bearing on whether the voter is qualified to vote, such as ballots mistakenly returned in a housemate's, roommate's, or unofficial outer envelope.

The rejection of these ballots (the "Ballot Rejection Practices") violates the right to due

process, the right to vote, equal protection, and the Civil Rights Act of 1965. The Ballot Rejection Practices heavily disenfranchise and burden identifiable subgroups—in particular, minority voters, young voters, and voters who live in urban areas of the state—further aggravating their constitutional infirmities. These subgroups are among DCCC's core constituency in New York.

Because all relevant factors counsel in favor of relief, DCCC respectfully requests that the Court preliminarily enjoin New York's continued implementation and enforcement of the Ballot Rejection Practices in advance of the 2022 primary and general elections.

## STATEMENT OF FACTS

The Ballot Rejection Practices disenfranchise qualified, registered voters across the state.

### A. Wrong Church Ballots cast due to official error are rejected in their entirety.

Under New York law, when a voter presents at a polling location other than the one to which they are assigned, election officials must inquire as to the voter's address.[1] N.Y. Elec. Law § 8-302(2). If the voter's address is within the polling location's election district, officials may direct the voter to cast a provisional ("affidavit") ballot which will be counted. *Id.* § 8-302(e)(ii). If the address is in a different election district, officials are *required* to direct the voter to their correct polling place. *Id.* Official guidance on these rules is not always clear, and they are not consistently followed. The Basic Poll Worker Manual issued by the New York City Board of Elections, for example, instructs poll workers to offer a voter an affidavit ballot if they are unable to locate the voter's name in the pollbook, not clarifying until the following page that the poll workers should first determine the voter's correct polling location and direct the voter to it as required by law. New York City Board of Elections, Basic Poll Worker Manual at 58, attached as

---

[1] Every registered voter in New York is assigned to vote in an election district and every election district is then assigned to vote at a specific poll site. Multiple election districts are often assigned to vote at the same poll site.

Ex. B. As a consequence of this and other errors, every election numerous voters who mistakenly present at a polling place outside of their assigned district are not directed to the correct location, but are instead instructed to cast an affidavit ballot at the wrong location. Decl. of Dr. Marc Meredith at 17-24, attached as Ex. C; Decl. of Rochelle Cohen ¶ 6, attached as Ex. D; Decl. of James Burke ¶¶ 6-8, attached as Ex. E. When those "Wrong Church" ballots are canvassed, they are rejected in their entirety—including for races in which the voter is eligible to vote (and that would have appeared on their ballot at their assigned polling location). *Id.*

Voters are more likely to be disenfranchised in this way if they live in densely populated, urban areas of the state. "About 94 percent of the ballots rejected for being cast in the wrong poll site in the 2020 presidential election were cast in one of the 15 most densely populated counties in New York," despite the fact that only approximately 77% of the total ballots cast in that same election were cast in those counties. Ex. C at 35. Urban areas are more likely to experience residential turnover, and voters residing in urban areas are also more likely to reside at an address that is close to the boundary for their election district, making it more likely to mistakenly present at an incorrect polling location. *Id.* at 27, 32. In the 20 State Assembly districts with the most Wrong Church Ballot rejections, only 25% of housing units are occupied by the owner of the unit, compared to 59% of housing units in the remaining 130 districts. *Id.* at 31. Voters residing in urban areas are also more likely to reside at an address that is close to the boundary for their election district, increasing the odds that they mistakenly present at the wrong polling location. *Id.* at 32.

Minority voters are more likely than white voters to be disenfranchised for casting a Wrong Church Ballot. In the 20 State Assembly districts with the highest number of Wrong Church Ballots cast in the 2020 election, only 17% of the population is white, while in the remaining 130 districts, 64% of the population is white. *Id.* at 30. Minority voters are more likely to reside in

districts where several election districts are assigned to the same polling location, further increasing the likelihood that they will be impacted by Wrong Church Ballot rejections.[2] *Id.* at 30-31.

### B.  Wrong County Ballots are rejected.

Once an absentee voter completes their ballot, the ballot may be returned either by mail or hand delivery to the boards of election before the close of polls at 9:00 p.m., on election day. N.Y. Elec. Law §§ 8-410, 8-412. Election officials across the state, including Defendants, interpret the law to allow local election boards to accept out-of-county voters' ballots and forward them to their home counties' boards of election. *See* Decl. of David Gilbert ¶ 7, attached as Ex. F; Elections in a Pandemic: A Review of the 2020 Primaries: Joint Hearing Before the S. Standing Comm. on Elections, the S. Standing Comm. on Local Gov., the Assembly Standing Comm. on Election Law, and the Assembly Standing Comm. on Local Govs., 2020 Leg. (N.Y. Aug. 11, 2020) (written testimony of Douglas A. Kellner, Andrew Spano, and Robert A. Brehm) at 7, attached as Ex. G ("Anyone can drop off a voted absentee ballot envelope by delivering it to any poll site on election day, by delivering it to any early voting site during early voting hours, or to any office of any board of elections."); Ex. A at 24 ("By law, voters may return their completed absentee ballots to any polling place in New York State."). This practice is explicitly authorized in absentee ballot instructions provided to voters throughout the state. *See* Absentee Ballot Envelope Sample, attached as Ex. H ("Your ballot can be returned to any Early Voting or Election Day poll site in your county, or to your local Board of Elections by 9:00 p.m. on Election Day, if delivered in person, or be postmarked by Election Day and received not later than seven days following the

---

[2] When a voter is assigned to a polling place that houses multiple election districts (typically at separate tables) but presents at the wrong district and are not redirected to the right district, state law requires that these ballots be counted. New York often refers to ballots in this scenario as Wrong Pew Ballots. Compl. ¶ 5. But officials sometimes fail to follow the law in this scenario as well.

election.").

Despite this, election officials routinely reject ballots timely returned to another county's polling or ballot drop-off locations, including drop boxes, deeming them untimely for one of two primary reasons: (1) the *home county* did not receive the ballots by 9:00 p.m. on election day, or (2) the home county considered the post-election day postmark affixed when an election official forwards the ballot to be noncompliant with the requirement that absentee ballots sent by mail be postmarked by election day. *See* N.Y. Elec. Law § 8-412(1). In 2020, the election for New York's 22nd Congressional District ("NY 22") was decided by only 109 votes, yet in that race alone at least 51 absentee voters suffered the "harsh result" of disenfranchisement because their home counties refused to count ballots that the voters timely returned to another authorized location. *Tenney v. Oswego Cnty. Bd. of Elections*, 71 Misc. 3d 400, 412, 142 N.Y.S.3d 288, 298 (N.Y. Sup. Ct. 2021). In the 2020 general election, Suffolk County rejected 598 ballots because they were "not delivered to Suffolk County," and Ulster County reported rejecting 87 ballots because they were "DROPPED OFF AT OTHER COUNTY BOE." Ex. C at 57. Unless Defendants are required to put an end to this practice, lawful voters will continue to be disenfranchised. *See id.* at 53-59.

### C. Absentee ballots missing a USPS Postmark are also rejected.

Despite the "the long-standing policy" of the USPS to "ensure that every ballot returned by mail by a voter receives a postmark," this "protocol doesn't always get followed, and sometimes the postmark on the absentee ballot is illegible." *Id.* at 45-46; *see also* Ex. G at 7. Under current New York law, absentee ballot envelopes that are not postmarked are presumed valid only if the ballot arrives within one day of election day. *See* N.Y. Elec. Law § 8-412. This rule has caused hundreds of ballots lawfully cast on or before election day to be rejected in past elections. *See* Ex. C at 49-52. The delivery standard for a vast majority of mail ballots in New York is two days.

United States Postal Service, Quarterly Performance for Single-Piece First-Class Mail, attached as Ex. I. And, as the State has acknowledged, operational changes and ongoing issues at the USPS have caused the agency to fail to meet this two-day standard. Multistate Statement of Position Before the Postal Regulatory Commission, First-Class Mail and Periodicals Service Standard Changes, 2021, at 7, attached as Ex. J (explaining how recent USPS changes slow down election mail).

### D. Many otherwise valid absentee ballots are rejected for technical deficiencies.

Prior to the 2020 general election, New York did not provide an opportunity for absentee voters to cure trivial errors on absentee ballot envelopes. After thousands of ballots of lawful voters were rejected in the 2020 primary, Defendants issued regulations requiring election officials to provide voters with notice and an opportunity to cure certain deficiencies. *See* N. Y. Comp. Codes R. & Regs. tit. 9, § 6210.21. Those regulations have since been codified in N.Y. Elec. Law § 9-209(3) (the "Notice and Cure Law").[3] All other errors that cause an absentee ballot to be rejected require the voter to cast a new ballot by election day for the vote to count. *Id.* If the absentee ballot is received after election day with an uncurable defect, it is not counted. *See id.* As a result, those voters are treated differently than other voters who submit ballots with the same defect based only on the identity of the election official who has handled their ballots. A substantial number of additional valid ballots cast by registered voters would be counted if other technical, non-material errors were permitted the same notice and cure opportunities. Ex. C at 43-44.

---

[3] Under the law, six technical errors trigger a mandatory notice and cure process: (1) an unsigned affirmation envelope; (2) the signature on the envelope does not match the registration signature; (3) no witness to a mark made in lieu of a signature; (4) a missing affirmation envelope; (5) the envelope is signed by the person assisting the voter but not the voter; (6) the affirmation envelope is signed only by a third party. N.Y. Elec. Law § 9-209(3)(b).

## ARGUMENT

A preliminary injunction is appropriate when a plaintiff establishes: (1) a likelihood of success on the merits, (2) irreparable harm absent injunctive relief, (3) the public interest weighs in favor of the injunction, and (4) the balance of equities tips in the movant's favor. *Yang v. Kosinski*, 960 F.3d 119, 127 (2d Cir. 2020). When a plaintiff seeks relief that a court deems "affirmative" rather than "prohibitory," they must make a "strong showing" of irreparable harm and demonstrate a "clear or substantial likelihood of success on the merits." *Id.* at 128.

Each of the factors weighs in favor of issuing a preliminary injunction here. DCCC is likely to succeed on the merits—and on the specific issue for which the relief it seeks could be deemed affirmative (Wrong Church Ballots), that likelihood is clear or substantial. It makes a strong showing of irreparable harm, the public interest weighs in favor of protecting the ballots of lawful voters from being rejected due to these arbitrary and unfair practices, and the balance of equities similarly tips in favor of issuing the injunction. *See New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 86 (2d Cir. 2020) (the final two factors merge when the government is the opposing party).

## I.      Plaintiff is substantially likely to succeed on the merits.

### A.      The Ballot Rejection Practices violate due process.

Without the right to vote, all other rights and liberties are illusory. *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964); *see also Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886) (recognizing right to vote as "fundamental" as it is "preservative of all rights"). Thus, voting rights are a liberty interest protected by the Due Process Clause. *See Hoblock v. Albany Cnty. Bd. of Elections*, 487 F. Supp. 2d 90, 98 (N.D.N.Y. 2006). The protections are two-fold. First, substantive due process prohibits fundamental unfairness in election processes. *Id.* at 95-96. Second, procedural due process requires the government to utilize procedures that adequately guard against erroneous disenfranchisement. *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 229

(M.D.N.C. 2020); *Self Advoc. Sols. N.D. v. Jaeger*, 464 F. Supp. 3d 1039, 1052–53 (D.N.D. 2020); *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1338 (N.D. Ga. 2018). The Ballot Rejection Practices violate both substantive and procedural due process.

### 1.    The Ballot Rejection Practices violate substantive due process.

### a.    The Ballot Rejection Practices are fundamentally unfair.

"Substantive due process protects against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense." *Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d Cir. 1995). "[A]n election is a denial of substantive due process if it is conducted in a manner that is fundamentally unfair." *Bennett v. Yoshina*, 140 F.3d 1218, 1226 (9th Cir. 1998). Fundamental fairness dictates that voters are entitled to rely on official instruction, and due process prohibits disenfranchisement as a consequence of "state actions that induce voters to miscast their votes." *Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 597 (6th Cir. 2012). It is immaterial whether a voter relies on an official statement that accurately represents state law, or an election official's mistaken view of the law. *Id*. Either way, voters may not constitutionally be disenfranchised when they follow official instructions. *See id*. (holding after the-fact "substantial changes to state election procedures and/or the implementation of non-uniform standards run afoul of due process") (citing *Warf v. Bd. of Elections of Green Cnty., Ky.*, 619 F.3d 553, 559 (6th Cir. 2010)); *accord Roe v. Alabama*, 43 F.3d 574, 582 (11th Cir. 1995).

In *Griffin v. Burns*, for example, election officials advertised the fact that voters could vote by absentee ballot in a state-run city council primary election and issued absentee ballots to voters who applied for them. 570 F.2d 1065, 1066-67 (1st Cir. 1978). When, after the election, the state Supreme Court ruled that state law did not allow absentee voting in primary elections, a candidate and two voters brought a federal suit to block election officials from disqualifying votes cast by absentee ballot. *Id.* at 1068. A federal district court ordered a new election, and the First Circuit

affirmed, stating it could "not see how an election conducted under these circumstances can be said to be fair." *Id.* at 1076. "[V]oters were doing no more than following the instructions of the officials charged with running the election," and it would be "unreasonable[]" to "expect[] a voter to have questioned" those instructions. *Id.* The court concluded that it would violate substantive due process to disenfranchise voters for state officials' errors. *Id.*; *see also Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 98 (2d Cir. 2005) ("[W]hen election officials refuse to tally absentee ballots that they have deliberately (even if mistakenly) sent to voters, such a refusal may violate the voters' constitutional rights."); *Gallagher v. N.Y. State Bd. of Elections*, 477 F. Supp. 3d 19, 45 (S.D.N.Y. 2020) ("When voters have been provided with absentee ballots and assured that their votes on those ballots will be counted, the state cannot ignore a later discovered, systemic problem that arbitrarily renders those ballots invalid."). Many of the Ballot Rejection Practices are fundamentally unfair in much the same way.

*Wrong Church Ballots.* New York law requires that election officials direct voters who present at a polling place outside of their district to their correct polling place. N.Y. Elec. Law § 8-302(3)(e); *see also Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 243 (6th Cir. 2011) ("Ohio . . . delegates to poll workers the duty to ensure that voters, provisional and otherwise, are given the correct ballot and vote in the correct precinct."). New York election officials, however, routinely misapply this law, instead giving these types of voters affidavit ballots that are doomed to be rejected in their entirety. Ex. C at 21-22. In doing so, New York puts voters in a position where their "franchise extend[s] only so far as placing [their] ballot in the ballot box." *Hoblock*, 487 F. Supp. 2d at 98. Those voters reasonably rely on official instruction, only to have their ballots rejected as a result. *See id.*; *Griffin*, 570 F.2d at 1076. Due process prohibits disenfranchising these voters—who, in the 2020 general election numbered more than 13,800. *Id.*; *see also Hunter*, 635

F.3d at 243 ("To disenfranchise citizens whose only error was relying on poll-worker instructions appears to us to be fundamentally unfair."); *Husted*, 696 F.3d at 597 (holding due process likely violated where "poll-worker error cause[d] thousands of qualified voters to cast" ballots in wrong district that state declined to count).

**Wrong County Ballots.** Similarly, it is fundamentally unfair for New York to reject as untimely absentee ballots that voters return to election boards outside their counties of registration during the final days of the election. New York election officials have repeatedly assured voters that this procedure is authorized and that such ballots will be counted. The official absentee ballot instructions reflect this guidance, clearly stating: "Your ballot can be returned to *any* Early Voting or Election Day poll site . . . by 9:00 pm on Election Day." Ex. H (emphasis added). Once the votes are cast, however, New York routinely disenfranchises many voters who complied with these official instructions. *See Tenney*, 71 Misc. 3d at 412 n.2 (noting the ballot instructions "potentially misleading voters into erroneously delivering their absentee ballots to polling sites outside of the county of their residence" but concluding the "harsh result" of disenfranchisement was required by New York law). New York's instructions to voters fail to mention that ballots returned outside a voter's home county will not be counted unless the *foreign county* mails the ballot to the voters' home county prior to the close of polls. Voters thus have no notice of and no opportunity to take appropriate steps to ensure their ballots are received by their home counties on time. *Cf. City of Chi. v. Morales*, 527 U.S. 41, 58 (1999) (holding due process prohibits laws that fail to give "fair notice" of what is required so as "to enable the ordinary citizen to conform his or her conduct to the law"); *Roe*, 43 F.3d at 582 (finding due process violated by retroactive absentee ballot rule change because had candidates and voters known the rules in advance they would have acted differently).

*Unpostmarked Ballots and Other Issues with Third-Party Handling.* In addition to disenfranchising voters who follow official directions, several of the Ballot Rejection Practices separately offend Due Process because they penalize voters for the actions of third parties that are beyond the voters' control. A voter has no power to predict or influence if and when an out-of-county election official chooses to forward a ballot to the voter's home county, nor whether USPS postmarks or delivers a ballot when it is deposited in the mail. *Cf. Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971) (holding prohibition that turned on the independent actions of third parties that could not be predicted or controlled violated due process). These practices constitute arbitrary and "non-uniform standards" that result in the ballots of similarly situated voters being handled differently without any justification for the distinction. *Husted*, 696 F.3d at 597. Two ballots dropped off or mailed at the same time could be treated differently—one timely, the other not—based solely on when local election officials forward the respective ballots and whether USPS postmarks and delivers them. *Cf. Gallagher*, 477 F. Supp. 3d at 49 (finding a probable constitutional violation where "systemic postmarking issues have been revealed, and the effect is that [the postmark requirement] requires identically situated ballots to be counted or invalidated based on random chance"). Moreover, election officials often fail to notify voters who submit ballots with curable defects and give them an opportunity to cure, despite voters having that right under state law. This further contributes to unconstitutional arbitrary and "non-uniform" standards. *Husted*, 696 F.3d at 597. Individually and collectively, the Ballot Rejection Practices undermine the essential fairness of election processes in New York, violating substantive due process.

## 2. The Ballot Rejection Practices also violate procedural due process.

Separately, procedural due process requires that states provide voters with notice and an opportunity to object to state action that deprives them of their right to vote. *See Frederick v. Lawson*, 481 F. Supp. 3d 774, 793 (S.D. Ind. 2020); *Democracy N.C.*, 476 F. Supp. 3d at 229; *Self*

*Advocacy Sols. N.D.*, 464 F. Supp. 3d at 1052–53; *Martin*, 341 F. Supp. 3d at 1338; *Zessar v. Helander*, No. 05 C 1917, 2006 WL 642646, at *6 (N.D. Ill. Mar. 13, 2006); *Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1358 (D. Ariz. 1990). Rights subsidiary to voting, such as voting by a particular method, are likewise protected so long as the voters have "a legitimate claim of entitlement to" them. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). This entitlement may arise by statutory scheme. Thus, "[w]hile there is no federal constitutional right to vote by absentee ballot, . . . once a state creates an absentee voting regime, they must administer it in accordance with the Constitution." *Democracy N.C.*, 476 F. Supp. 3d at 229 (cleaned up) (collecting cases); *see also Saucedo v. Gardner*, 335 F. Supp. 3d 202, 217 (D.N.H. 2018) ("Having induced voters to vote by absentee ballot, the State must provide adequate process to ensure that voters' ballots are fairly considered and, if eligible, counted.").

Several of the Ballot Rejection Practices constitute state action that erroneously deprives voters of voting-related rights, up to and including the right to vote itself, without due process. Consider Wrong Church Ballots. There, voters who present at the incorrect polling place are statutorily entitled to be directed to their correct polling place so that they may cast a valid ballot. N.Y. Elec. Law § 8-302(3)(e). By giving them affidavit ballots that will not be counted, election officials deprive these voters of this statutory right and, ultimately, of their right to vote. The same is true for Wrong County Ballots. Voters who mail or return absentee ballots outside their county of registration before the close of polls have a valid expectation that their votes will be counted. The rejection of these ballots due to an untimely or missing postmark deprives these voters of this protected interest.

These practices amount to erroneous deprivations of rights to which voters have a "legitimate . . . entitlement," and New York violates the Due Process Clause by failing to provide

these voters notice and an opportunity to object. *Roth*, 408 U.S. at 577. The Constitution requires New York to provide an adequate process for voters to either prevent these deprivations or obtain a sufficient after-the-fact remedy. Because the right to vote is at stake, after-the-fact remedies are inherently insufficient.[4] *Self Advoc. Sols. N.D.*, 464 F. Supp. 3d at 1052 ("Because there is no possibility of meaningful post[-]deprivation process when a voter's ballot is rejected . . . sufficient pre[-]deprivation process is the constitutional imperative" (citing *Winegar v. Des Moines Indep. Cmty. Sch. Dist.*, 20 F.3d 895, 901 (8th Cir. 1994))); *see also Zessar*, 2006 WL 642646, at *9 ("Once rejected, the ballot cannot be rehabilitated and cast after a post-deprivation hearing."). New York, therefore, must count the ballots that are disqualified by the Ballot Rejection Practices, or provide a method by which voters may object prior to their ballots being rejected. *See Saucedo*, 335 F. Supp. 3d at 217; *Democracy N.C.*, 476 F. Supp. 3d at 228; *Self Advocacy Sols. N.D.*, 464 F. Supp. 3d at 1053; *Martin*, 341 F. Supp. 3d at 1338.

The details of the process New York must provide are dictated by the balancing test set forth by the Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). The inquiry requires weighing (1) "the private interest that will be affected by the official action," (2) "the risk of an erroneous deprivation of such interest through the [current] procedures used," and (3) "the probable value, if any, of additional or substitute procedural safeguards," against (4) "the Government's interest" in maintaining the present procedures, "including the function involved

---

[4] When deciding whether a state must provide pre-deprivation or post-deprivation process, courts distinguish between "(a) claims based on established state procedures and (b) claims based on random, unauthorized acts by state employees." *Rivera-Powell v. N.Y.C. Bd. of Elections*, 470 F.3d 458, 466 (2d Cir. 2006) (quoting *Hellenic Am. Neighborhood Action Comm. v. City of N.Y.*, 101 F.3d 877, 880 (2d Cir. 1996)). Generally, "[w]hen the state conduct in question is random and unauthorized," procedural due process requires that the state provide a "meaningful post-deprivation remedy." *Id.* But due process always requires that notice, an opportunity to object, and—when warranted—a remedy "be granted at a meaningful time and in a meaningful manner," *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965), and to be meaningful, the process and remedy for a wrongful deprivation of voting-related rights must be provided in time for voters' ballots to be counted, *before* they are deprived of their right to vote.

and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Rivera-Powell v. N.Y.C. Bd. of Elections*, 470 F.3d 458, 466 (2d Cir. 2006) (quoting *Mathews*, 424 U.S. at 335). Here, each factor weighs in favor of requiring New York to—at minimum—provide these voters an opportunity to cure their ballots.

*First*, there is no reasonable debate that the fundamental right to vote is among the most important interests protected by the Constitution. *Yick Wo*, 118 U.S. at 370, *Wesberry*, 376 U.S. at 17; *Reynolds v. Sims*, 377 U.S. 533 554–55 (1964). Courts have thus often accorded the first *Mathews* factor "significant weight" when voting rights are at stake. *Saucedo*, 335 F. Supp. 3d at 217; *accord Democracy N.C.*, 476 F. Supp. 3d at 228; *Self Advocacy Sols. N.D.*, 464 F. Supp. 3d at 1053; *Martin*, 341 F. Supp. 3d at 1338. Here, the erroneous deprivation at issue is either the direct denial of a voter's right to vote, or the denial of a subsidiary right that almost inevitably results in the vote not being counted. The first factor therefore weighs heavily in favor of providing additional procedural protections. *Cf. Ga. Muslim Voter Project v. Kemp*, 918 F.3d 1262, 1270-71 (11th Cir. 2019) (Pryor, J., concurring) (weighing first factor heavily when considering Georgia's rejection of absentee ballots because "the interest in voting by absentee ballot implicates the fundamental right to vote, [which] lends it more than modest weight").

*Second*, the rates at which voters are deprived of their rights under the current procedures demonstrate that the risk of such deprivation is quite high. Each of the Ballot Rejection Practices have been shown to wrongfully disenfranchise a substantial number of voters in past elections and is likely to do so again. *See supra*, Statement of Facts. The probable value of additional or substitute procedures is likewise substantial. Where New York can count these ballots instead of

rejecting them, doing so would prevent erroneous disenfranchisement.[5]

*Third*, the evidence establishes that, when additional steps on the part of the voters are needed for their ballots to be cured and counted, voters tend to take those steps if given the opportunity. Ex. C at 41-42. Accordingly, the second and third *Mathews* factors weigh against New York's current failure to provide a remedy. *See Martin*, 341 F. Supp. 3d at 1339 (weighing these factors in favor of additional procedures despite relatively low ballot rejection rates because "permitting an absentee voter to resolve an alleged signature discrepancy nevertheless has the very tangible benefit of avoiding disenfranchisement"); *Zessar*, 2006 WL 642646, at *9 ("[T]he probable value of an additional procedure is likewise great in that it serves to protect the fundamental right to vote.").

*Finally*, the burden to the State of providing sufficient procedures is slight. In some instances, it would require only that the officials count otherwise entirely valid ballots rather than reject them. Several states routinely count the votes on Wrong Church Ballots in the races in which the voter is eligible to vote; there is no reason New York could not adopt similar procedures.[6] In fact, New York has *already* developed a process to partially count ballots cast in the right polling place but wrong election district (sometimes called "Wrong Pew" ballots), which it could use for Wrong Church Ballots. Decl. of Dustin Czarny, Election Comm'r for Onondaga Cnty. ¶ 10, attached as Ex. K; *see Ga. Muslim Voter Project*, 918 F.3d at 1273 (Pryor, J., concurring)

---

[5] Recently, the Legislature passed a law amending N. Y. Elec. Law § 9-209(7)(d) to allow some Wrong Church Ballots to be counted. The new law, which goes into effect January 1, 2023, addresses those instances where a voter is disenfranchised for inadvertently appearing to vote in the wrong polling place, but in the correct county and in a polling place that includes their assembly district.

[6] Some states use a hand tally procedure whereby officials determine the precinct in which a Wrong-Church-Ballot voter is qualified to vote and add the votes in races that appear on that precinct's ballot to the precinct's total tally. *See, e.g.*, N.M. Admin. Code § 1.10.22.9(H)-(N). Others use a duplication method, whereby officials duplicate the votes cast on the Wrong Church Ballot in the races that also appear on the correct ballot before tabulating it with the precinct's other ballots. *See, e.g.*, Cal. Elec. Code § 14310(a)(3).

(concluding failure to allow curing for signature mismatch rejections violated procedural due process in part because cure "procedures are already statutorily in place for absentee ballot application and absentee ballot defects other than signature mismatches" and extending them would "not require the creation of a new system"). New York likewise could treat all ballots timely submitted to an authorized location as timely—as it tells voters it will—and forbid rejection due to out-of-county election officials' delay in forwarding the ballots to the voters' home county. As for ballots mailed by voters that (due to no fault of the voter) USPS fails to postmark, New York could utilize the same affidavit-based cure process that state law currently affords to voters whose ballots contain curable defects with limited additional burden to election officials.[7] Ex. C at 28; Ex. K ¶ 15; *See Ga. Muslim Voter Project*, 918 F.3d at 1273 (Pryor, J., concurring).

### B.    The Ballot Rejection Practices unduly burden the right to vote.

The Ballot Rejection Practices are unconstitutional because they cause disenfranchisement of lawful voters—often at no fault of the voter—without furthering legitimate, much less compelling state interests. "Voting is a fundamental right, and is protected by the Fourteenth Amendment's guarantee of 'equal protection under the laws.'" *Common Cause/N.Y. v. Brehm*, 432 F. Supp. 3d 285, 309 (S.D.N.Y. 2020) (quoting *Reynolds*, 377 U.S. at 561-62) (holding practice of omitting names of inactive voters from poll books on election day violated the right to vote). Challenges to voting laws and procedures under the Fourteenth Amendment are generally evaluated using the *Anderson-Burdick* test, which "requires courts to 'weigh 'the character and magnitude of the asserted injury to the . . . rights that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,'

---

[7] New York could also extend the postmark presumption date to match what is known about USPS mail delivery speeds such that voters are not disenfranchised for issues outside of their control.

taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Id.* at 309–10 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788-89 (1983), and *Burdick v. Takushi*, 504 U.S. 428, 433-34 (1992)). "Under this framework, election laws that impose no burden on the right to vote are subject to rational-basis review," and "[l]aws that severely burden the fundamental right to vote, such as a poll tax, trigger strict scrutiny, and must be narrowly drawn to advance a state interest of compelling importance." *Id.* at 310 (citations omitted). Most cases, however, fall between these extremes, and are subject to a more "flexible" standard under which courts must carefully "weigh the State's justification against the burden imposed." *Id.* 309–10 (quoting *Price v. N.Y. State Bd. of Elections*, 540 F.3d 101, 109 (2d Cir. 2008)). Even if an asserted interest is "legitimate in the abstract," the state must demonstrate specifically why the interest makes it "*necessary* to burden voters' rights." *Fish v. Schwab*, 957 F.3d 1105, 1133 (10th Cir. 2020) (emphasis added), *cert. denied*, 141 S. Ct. 965 (2020). Here, the severe burdens imposed cannot be justified by any sufficient state interest.

 **_Wrong Church Ballots._** Rejecting all Wrong Church Ballots imposes a severe burden on the right to vote. Nearly 14,000 eligible, registered voters were disenfranchised during the last major election, and the evidence demonstrates that, at least a similar number will be disenfranchised this year, absent an injunction. Ex. C at 27; *e.g.*, Ex. D ¶ 6; Ex. E ¶ 6-8. This alone constitutes a severe burden. *See Gallagher*, 477 F. Supp. 3d at 43 (burden is "exceptionally severe" where a "large number of ballots will be invalidated, and consequently, not counted based on circumstances entirely out of the voters' control").[8] That burden does not fall equally on all voters:

---

[8] *Accord League of Women Voters of N.C. v. North Carolina ("LOWV of N.C.")*, 769 F.3d 224, 244 (4th Cir. 2014) ("even one disenfranchised voter . . . is too many"), *cert. denied*, 135 S. Ct. 1735 (2015); *Fla. Democratic Party v. Detzner*, No. 4:16-cv-607-MW/CAS, 2016 WL 6090943, at *6 (N.D. Fla. Oct. 16, 2016) ("If disenfranchising thousands of eligible voters does not amount to a severe burden on the right to vote, then this Court is at a loss as to what does."); *see also Husted*, 696 F.3d 580, 593–95 (6th Cir. 2012) (burden "substantial" with thousands of ballots rejected, even if small percentage of total).

certain groups of voters, including racial minorities and voters who live in urban areas, are more likely to be disenfranchised as a result of this practice. Ex. C at 29-37; *see, e.g.*, *League of Women Voters of Fla., Inc., v. Detzner*, 314 F. Supp. 3d 1205, 1216 (N.D. Fla. 2018) ("Disparate impact matters under *Anderson-Burdick.*"). And because voters cast these ballots at official direction, the burden is even further heightened under the *Anderson-Burdick* analysis. *See*, *e.g.*, *Husted*, 696 F.3d at 593; *Gallagher*, 477 F. Supp. 3d at 43.

New York has no interest, much less a compelling one, to justify the rejection of Wrong Church Ballots. While states have an interest in making sure that only ballots cast by voters who are eligible for particular races are counted, rejecting Wrong Church Ballots goes far beyond what is necessary to protect this interest. Indeed, voters are typically eligible for almost all the races that appear on their Wrong Church Ballot. *See, e.g.*, Ex. C at 26. And in light of the mass disenfranchisement it causes, a desire to avoid administrative burdens is not sufficient to justify the rule. *E.g.*, *Fish*, 840 F.3d at 755 ("There is no contest between the mass denial of a fundamental constitutional right and the modest administrative burdens to be borne by . . . state and local offices involved in elections."); *accord Taylor v. Louisiana*, 419 U.S. 522, 535 (1975); *United States v. Berks Cnty.*, 250 F. Supp. 2d 525, 541 (E.D. Pa. 2003); *Husted*, 696 F.3d at 595-96. Further, even if administrative burdens were to be considered, implementing a system to partially count otherwise valid ballots would impose a minimal burden, because New York already has a system to count ballots that were cast in the correct polling place but the wrong *district*. Ex. C at 28.

***Wrong County Ballots.*** The policy of rejecting otherwise valid absentee ballots that were returned outside of a voter's county of registration and deemed untimely as a result also severely burdens the right to vote with no corresponding interest to justify its burdens. Even though the State *encourages* voters to return their ballots by hand to any polling place in the state, at least

several hundred voters were disenfranchised on this basis in the few counties for which data from the 2020 general election is available. Ex. C at 57-58; Ex. D ¶¶ 7-9; Ex. F ¶ 7-8. This systemic issue threatens to disenfranchise significant numbers of voters, Ex. C at 58-59, amounting to a severe burden on the right to vote. *E.g.*, *Gallagher*, 477 F. Supp. 3d at 45. The practice further burdens voters by effectively eliminating a critical means for many to return their ballots. In fact, New York voters—in particular, college voters and commuters—are increasingly relying on options (such as drop boxes) to deliver their completed absentee ballots directly to officials outside of their county. Ex. C at 53-56. Indeed, it would require a "substantial informational campaign" to slow this trend. *Id.*

The State cannot justify these burdens. There is *no* evidence that these types of ballots are fraudulent. And because absentee ballots are specifically assigned to particular voters, there is no risk of voters casting votes in races for which they are not eligible. Any other possible state interest in refusing to count absentee ballots timely returned to election officials outside of their home county—especially in light of the State's direction that voters may return their ballots *anywhere*—cannot compare to the disenfranchisement that results from rejecting such ballots.

***Ballots That Are Not Postmarked.*** The policy of rejecting otherwise valid absentee ballots lacking postmarks that arrive more than one day after election day violates the right to vote. At least several hundred voters who timely returned their ballots were disenfranchised on this basis in the 2020 general. *Id.* at 46; Ex. G at 6-7. The burden is especially severe because these voters are disenfranchised due to no fault of their own. Ex. C at 52 (under "many, if not all, of the voters who return their absentee ballot on Election Day will have their ballots rejected if they have the bad luck of not receiving a postmark or receiving an illegible postmark"); *see also Husted*, 696 F.3d at 593–95 (burden more substantial when caused by official error). Even under USPS's two-

day delivery service standard, ballots mailed on election day are not likely to arrive within one day. Ex. C at 51. The most recent service performance data shows that USPS fails to meet even the *two-day* standard for a significant percentage of First-Class deliveries in New York. Ex. I. As a result, ballots mailed *days before* election day may not arrive by the day after the election.[9] Finally, USPS estimates that around 4% of absentee voters are outside of this range, meaning one would expect that any ballot they mailed close to election day would arrive after the one-day deadline. Ex. J at 7.

New York cannot establish any interest sufficient to justify the burdens imposed by this policy. There is virtually no risk that ballots received two days after the election were mailed *after* election day. *Gallagher*, 477 F. Supp. 3d at 43; *see also* Ex. C at 51. The policy, therefore, is extremely "overinclusive" because it guarantees rejecting valid ballots that were mailed prior to the election. *Gallagher*, 477 F. Supp. 3d at 43, and affected voters have no opportunity to save their ballots from rejection.

***Trivial Defects.*** New York's restriction of the absentee ballot cure process to just six technical envelope errors also violates the right to vote. The burden imposed by the practice is severe. Although it is difficult to determine the exact number of ballot rejections that result from this practice due to limitations in the State's data collection, thousands of ballots were reported as rejected due to various minor errors that are not currently classified as "curable" in the 2020 election. Ex. C at 40, 43-44. This is certain to persist. *See id.* But the risk of disenfranchisement extends beyond these outright rejections. For example, if a defective ballot arrives far enough

---

[9] USPS and the Board clearly recognize this problem, as they have recommended that voters mail their ballot *seven* days ahead of the election. New York State Board of Elections, Absentee Voting Website at 2, attached as Ex. L ("When mailing your completed ballot, the USPS recommends that voters allow enough time for ballots to be returned to the Board, which is **generally seven days ahead of the general election**" (emphasis in original)).

before the election, officials must notify the voter of ways they can cast a new ballot (e.g., in person) prior to election day—but voters are far less likely to successfully cast a *new* ballot than they would be to successfully *cure* their rejected ballot. *Id.* at 42-44 (explaining it is more burdensome to cast a new ballot than to cure a ballot, and that the cure process, unlike casting a new ballot, remains available in the days after the election); *see also Common Cause/N.Y.*, 432 F. Supp. 3d at 311 (explaining "ripple effects" causing fewer people to vote may constitute a "substantial burden"). The State has no interest sufficient to justify the rejection of thousands of otherwise valid absentee ballots. There is no reason New York cannot simply extend *existing* cure procedures to other deficiencies. For all these reasons, the Ballot Rejection Practices fail *Anderson-Burdick* scrutiny and are therefore unconstitutional.

> ### C.   The Ballot Rejection Practices violate the Equal Protection Clause.

Under the "one person, one vote" principle, courts must "[e]nsure that each person's vote counts as much, insofar as it [i]s practicable, as any other person's." *Hadley v. Junior Coll. Dist. of Metro. Kan. City*, 397 U.S. 50, 54 (1970). "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104-05 (2000). The "right to vote is protected in more than the initial allocation of the franchise"— "[e]qual protection applies as well to the manner of its exercise." *Id.* at 104; *see also, e.g.*, *Hoblock*, 487 F. Supp. 2d at 96 ("More than just the act of voting . . . the counting of said vote is also guarded."). Applying these principles, courts have held that laws subjecting voters across the state to "varying standards" with respect to whether their ballot is counted or not, violate equal protection.[10]

---

[10] Courts sometimes apply *Anderson-Burdick* to equal-protection claims involving vote-counting procedures, but some cases have also separately applied *Bush v. Gore* to hold that equal protection prohibits "varying standards" in the implementation of election procedures. *E.g.*, *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 477 (6th Cir. 2008) (recognizing "district courts have found [*Bush*'s] analysis applicable in challenges to voting systems");

In *Bush v. Gore*, the controversy revolved around how to count ballot cards designed to be punched by a stylus, but which were not punctured with sufficient precision for a machine to register the vote. 531 U.S. at 105. The Florida Supreme Court ordered that election officials discern and honor the intent of the voter for such ballots. *Id.* The U.S. Supreme Court found that, while the command was "unobjectionable as an abstract proposition and a starting principle," the problem was "the absence of specific standards to ensure its equal application." *Id.* at 106. And a court in this District held that the previous version of New York's postmark law (which called for the rejection of all ballots received after election day that were missing a postmark) violated equal protection because—especially in light of USPS's arbitrary postmarking practices—it subjected "absentee voters across the state to unjustifiable differences in the way that their ballots are counted." *Gallagher*, 477 F. Supp. 3d at 49. Here, the Ballot Rejection Practices—including the new iteration of the postmark provision—are similarly deficient, "treat[ing] an arbitrary voting system with insufficient 'guarantees of equal treatment.'" *Id.* at 48 (quoting *Bush*, 531 U.S. at 107).

**Ballots Without Postmarks.** The State's treatment of ballots missing a postmark continues to violate equal protection. Consider the following: a voter who timely drops off a ballot the day before the election will have their ballot counted, but a voter who timely mails their ballot on election day will not because USPS requires a minimum of two days to deliver mail in virtually all circumstances. *See* Ex. C at 51. Thus, even assuming perfect adherence to service standards, New York's system for counting ballots that are missing a postmark is certain to subject voters who timely return their ballots to "unjustifiable differences" in the way their ballots are counted. *See Gallagher*, 477 F. Supp. 3d at 49. And, as noted above, the evidence shows that several factors

---

*Gallagher*, 477 F. Supp. 3d 19 at 47-49; *see also Bush*, 531 U.S. at 107 (noting "[a]n early case in our one-person, one-vote jurisprudence arose when a [s]tate accorded arbitrary and disparate treatment to voters in its different counties").

exacerbate USPS's ability to timely deliver mail ballots, increasing the likelihood of arbitrary disenfranchisement of voters who submit ballots in the days before the election.

***Wrong Church Ballots.*** The State's refusal to count Wrong Church Ballots violates equal protection because it arbitrarily subjects voters across the state to differential treatment with respect to whether their vote is counted based on whether election officials do as they are supposed to and tell voters when they are in the wrong location. Considering the "systemic" provision of erroneous instructions voters receive the State's decision to disqualify ballots on this basis subjects "voters across the state to unjustifiable differences in the way that their ballots are counted," violating equal protection. *Id.* at 49.

***Wrong County Ballots***. Similarly, the State's failure to ensure that absentee ballots returned to authorized locations outside of their home county are counted violates equal protection. A voter can do everything right, yet the ballot's validity turns entirely on what election officials do with the ballot once it is in their custody. In some cases, voters are disenfranchised because an official fails to forward their ballot to their home county. In other cases, absentee ballots are rejected because officials in the voters' home counties deem them untimely due to when they were forwarded—not when the voter returned them. *See*, *e.g.*, *Tenney*, 71 Misc. 3d at 408. This is a system that arbitrarily subjects identically situated voters to differential treatment with respect to whether their vote counts. *See Gallagher*, 477 F. Supp. 3d at 48. This violates equal protection. *Id.*

***Trivial Defects.*** Finally, the State's failure to ensure that all eligible absentee voters whose ballots are flagged for rejection due to a trivial defect have notice and opportunity to cure the defect violates equal protection. The current list of what types of issues will trigger notice and cure is incomplete and guarantees that many lawful voters' ballots will be rejected. N.Y. Election Law § 9-209(3); Ex. C at 43. Absent relief, New York's Notice and Cure law will continue to result in a

voting process by which arbitrary factors lead the State to value one absentee voter's vote over that of another in violation of equal protection.

### D.    The Ballot Rejection Practices violate the Civil Rights Act.

The Materiality Provision of the Civil Rights Act provides that, "[n]o person acting under color of state law shall[] . . . deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B). The Materiality Provision asks "whether, accepting the error as true and correct, the information contained in the error is material to determining the eligibility of the applicant." *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1173 (11th Cir. 2008).

While the Materiality Provision was intended to address voter registration requirements, *see Schwier v. Cox*, 340 F. 3d 1284, 1294 (11th Cir. 2003), its plain text extends to any "other act requisite to voting." 52 U.S.C. § 10101(a)(2)(B). For example, in *Martin v. Crittenden*, 347 F. Supp. 3d 1302 (N.D. Ga. 2018), plaintiffs alleged that a practice of rejecting absentee ballots based on an omitted or incorrect birth year on the ballot envelope violated the Materiality Provision. The court held that the plaintiffs were likely to succeed on the merits and ordered county officials to count the ballots in question. *Id.* at 1311. The court observed that "the only *qualifications* for voting in Georgia are U.S. Citizenship, Georgia residency, being at least eighteen years of age, not having been adjudged incompetent, and not having been convicted of a felony." *Id.* at 1308-09 (quoting *Schwier,* 340 F.3d at 1297). And it concluded that "a voter's ability to correctly recite his or her year of birth on the absentee ballot envelope is not material to determining said voter's qualifications under Georgia law" because "elections officials have already confirmed such voters' eligibility through the absentee ballot application process." *Id.* at 1308-09.

Under New York law, a person is eligible to vote if they are (1) a U.S. citizen; (2) at least 18 years old on election day; (3) a resident of New York for at least 30 days prior to the election;[11] (4) not imprisoned for a felony at the time of the election; (5) not adjudged incompetent at the time of the election; and (6) not be in receipt or offer of valuable consideration in exchange for their vote or upon the outcome of the election. *See* N.Y. Elec. Law §§ 5-102, 5-104, 5-106 (McKinney 2021). The Ballot Rejection Practices violate the Materiality Provision because they are immaterial to determining whether a voter meets these qualifications:

***Wrong Church Ballots.*** New York discards Wrong Church Ballots in their entirety—even where the voter is eligible to vote in some of the races on the ballot (i.e., for president, vice president, or statewide office). Under such circumstances, the act of voting at an incorrect polling location is immaterial to determining a voter's qualifications.

***Wrong County Ballots***. New York instructs voters that they may return absentee ballots to any drop-off location in the state, but ballots that are not forwarded by election officials to the voter's home county by election day are rejected. The date by which an election official forwards such ballots is immaterial to the voter's qualifications.

***Absentee Ballots Without Postmarks***. New York refuses to count ballots that are not postmarked by USPS if they are received more than a day after election day. A missing postmark does not indicate the voter is legally unqualified to vote.

***Trivial Defects***. New York rejects thousands of timely absentee ballots. Ex. C at 43-44. As in *Crittenden*, such trivial defects on the absent ballot envelope are immaterial to determining whether the voter meets the requirements for eligibility under New York law.

---

[11] New York waives the durational requirement attached to residency in the event the voter is a U.S. citizen and is casting a ballot for president and vice president. N.Y. Elec. Law § 5-102.2.

## II.    Plaintiff will suffer irreparable harm absent an injunction.

It is unquestionable that "the alleged violation of a constitutional right triggers a finding of irreparable injury." *Conn. Dep't of Env't Prot. v. Occupational Safety & Health Admin.*, 356 F.3d 226, 231 (2d. Cir. 2004). "Given the fundamental nature of the right to vote, if potential members of the electorate" are injured "such that their right to vote freely is abridged, or altogether extinguished, Plaintiff[s] would be irreparably harmed." *Nat'l Coal. On Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 474 (S.D.N.Y. 2020) (alteration in original). That is because "once the election occurs, there can be no do-over and no redress" for voters whose rights were violated. *LOWV of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014). Courts thus "routinely deem restrictions on fundamental voting rights irreparable injury." *Wohl*, 498 F. Supp. 3d at 473 (quoting *LOWV of N.C.*, 769 F.3d at 247); *see also Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986). The same is true here.

Early voting for the primary begins on August 13, with the primary itself to be held on August 23. If New York conducts the primary with the Ballot Rejection Practices in place, it will infringe upon New Yorkers' fundamental right to vote—a violation for which there is no adequate remedy. *See id.*; *LOWV of N.C.*, 769 F.3d at 247. DCCC also will be harmed as it will need to devote and divert resources to educate voters of these issues such that their votes will count. Preliminary injunctive relief must issue to protect against irreparable injury in the 2022 election.

## III.    The balance of the equities and public interest favor an injunction.

The balance of the equities and the public interest, decisively favor injunctive relief. Plaintiff seeks to vindicate an interest of the highest importance, as "[n]o right is more sacred in a democracy than the right to vote freely." *Wohl*, 498 F. Supp. 3d at 488.  Defendants, in contrast, will suffer no comparable harm. Preliminary injunctive relief will not "alter the election rules on

the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020). To the contrary, and consistent with the expectations of voters and candidates alike, the requested relief would require election officials to count (or, as appropriate, permit the cure of) ballots that were rejected due to trivial defects or errors facilitated or caused by election officials themselves. *See Gallagher*, 477 F. Supp. 3d at 50 (balance of equities and public interest "tips decisively in [plaintiffs'] favor" where "requested relief would prevent boards of elections from disregarding timely filed absentee ballots"). Such relief is "feasible before the election without significant cost, confusion, or hardship," *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring), and there is no concern of "judicially created confusion" in the run-up to Election Day. *Republican Nat'l Comm.*, 140 S. Ct. at 1207.

## <u>CONCLUSION</u>

For all of the reasons explained above, Plaintiff respectfully requests that the Court preliminarily enjoin Defendants' enforcement of the Ballot Rejection Practices for the 2022 August primary and November general elections.

Dated: May 27, 2022

Respectfully Submitted,

*/s/ Aria C. Branch*
Marc E. Elias*
Aria C. Branch*
Haley Costello Essig**
Joshua L. Harris*
Graham White*
Spencer McCandless*
Daniela Lorenzo
**ELIAS LAW GROUP LLP**
10 G Street NE, Suite 600
Washington, DC 20002
Phone: (202) 968-4513
Facsimile: (202) 968-4498
melias@elias.law

abranch@elias.law
hessig@elias.law
jharris@elias.law
gwhite@elias.law
smccandless@elias.law
dlorenzo@elias.law

Andrew G. Celli, Jr.
Nairuby L. Beckles
**EMERY CELLI BRINCKERHOFF**
**ABADY WARD & MAAZEL LLP**
600 Fifth Avenue, 10th Floor
New York, New York 10020

*Attorneys for Plaintiff DCCC*
*\*Admitted Pro Hac Vice*
*\*\* Pro Hac Vice Forthcoming*