UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DCCC,

                                        Plaintiff,

              -against-

                                                              NO: 22-CV-1029 (RA)

PETER S. KOSINSKI, in his official capacity
as Co-Chair of the State Board of Elections;
DOUGLAS A. KELLNER, in his official
capacity as Co-Chair of the State Board of
Elections; ANDREW J. SPANO, in his official
capacity as Commissioner of the State Board of
Elections; ANTHONY J. CASALE, in his
official capacity as Commissioner of the State
Board of Elections; TODD D. VALENTINE,
in his official capacity as
Co-Executive Director of the State Board of
Elections; and KRISTEN ZEBROWSKI
STAVISKY, in her official capacity as Co-
Executive Director of the State Board of
Elections,

                                        Defendants.

                     and

REPUBLICAN NATIONAL COMMITTEE,
NATIONAL REPUBLICAN
CONGRESSIONAL COMMITTEE, and
NEW YORK REPUBLICAN STATE
COMMITTEE,

                          Intervenor-Defendants.

## STATE DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

LETITIA JAMES
Attorney General
State of New York
*Attorney for State Defendants*
28 Liberty Street
New York, NY 10005
(212) 416-8029

Seth J. Farber
Special Litigation Counsel
*Of Counsel*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ......................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................... 1

FACTUAL BACKGROUND .......................................................................................................... 5

      a. The Functions of the State and Local Boards of Elections ................................. 5
      b  Absentee Balloting in New York .......................................................................... 5
      c  Plaintiff's Claims .................................................................................................. 6

STANDARD OF REVIEW .......................................................................................................... 6

ARGUMENT ................................................................................................................................ 7

POINT I - PLAINTIFF IS UNLIKELY TO SUCCEED ON ITS CLAIMS .................................. 7

   A.  Plaintiff Lacks Standing to Pursue Its Highly Speculative Claims ................................. 8

      i.  *Plaintiff Does Not Allege Certainly Impending Injuries* ......................................... 9

      ii  *Plaintiff's Prior Injuries Do Not Establish Standing for Prospective Claims* ...................... 12

      iii. *The 2020 Election Reforms Further Decreased the Likelihood of Potential Injury* .............. 12

   B.  Plaintiff's Alleged Injuries are not Traceable to the State Defendants ...................... 13

   C.  Plaintiff's Claims Are Not Ripe for Review .................................................................. 13

   D.  Plaintiff Has Not Sued the Correct Parties ................................................................. 14

   E.  Plaintiff Has Not Established a Clear Likelihood of Success on its Due Process
      Claim .......................................................................................................................... 15

   F.  Plaintiff Has Not Established a Clear Likelihood of Success on its First Amendment
      ("Right to Vote") Claim .............................................................................................. 19

      i.  *The burden imposed by the State is reasonable and non-discriminatory* ................... 20

      ii  *The challenged measures serve important State interests* ...................................... 22

   G.  Plaintiff Has Not Established a Clear Likelihood of Success on its Equal Protection
      Claim .......................................................................................................................... 23

H.  Plaintiff Has Not Established a Clear Likelihood of Success on its Statutory [Voting Rights Act] Claim ........................................................................................ 25

POINT II  -  PLAINTIFF HAS NOT DEMONSTRATED IRREPARABLE HARM .................... 25

POINT III -  THE PUBLIC INTEREST WEIGHS AGAINST INJUNCTIVE RELIEF .............. 26

CONCLUSION ............................................................................................................................ 27

# TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*Amidax Trading Grp. v. S.W.I.F.T. SCRL,*
No. 08-cv-5689 PKC, 2012 WL 868691 (S.D.N.Y. Mar. 13, 2012) ...............................26

*Anderson v. Celebrezze,*
460 U.S. 780 (1983) .............................................................................................................19

*Bisnews AFE (Thailand) Ltd. v. Aspen Research Group Ltd.,*
437 Fed. App'x 57 (2d Cir. 2011) ....................................................................................26

*Brnovich v. Democratic Nat'l Comm.,*
141 S.Ct. 2321 (2021).........................................................................................................22

*Burdick v. Takushi,*
504 U.S. 428 (1992).............................................................................................................19

*Bush v. Gore,*
532 U.S. 98 (2000)...............................................................................................................24

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013).....................................................................................................8-9, 13

*DaimlerChrysler Corp. v. Cuno,*
547 U.S. 332 (2006).............................................................................................................12

*Daniels v. Williams,*
474 U.S. 327 (1986).............................................................................................................15

*Davis v. Fed. Election Comm'n,*
554 U.S. 724 (2008).............................................................................................................12

*Dekom v. New York,*
2013 WL 3095010 (E.D.N.Y. June 18, 2013) *aff'd*, 583 F. App'x 15 (2d Cir. 2014) ......................25

*Deshawn E. by Charlotte E. v. Safir,*
156 F.3d 340 (2d Cir. 1998) ..............................................................................................12

*Dhinsa v. Krueger,*
917 F.3d 70 (2d Cir. 2019) ..................................................................................................8

*Elmsford Apartment Assocs., LLC v. Cuomo,*
No. 20-CV-4062 (CM), 2020 WL 3498456 (S.D.N.Y. June 29, 2020) ...........................7

*Ex Parte Young,*
209 U.S. 123 (1908)............................................................................................................14

iii

*Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton,*
  841 F.3d 133 (2d Cir. 2016) ..................................................................................................7

*Gagliardi v. Vill. of Pawling,*
  18 F.3d 188 (2d Cir.1994) ....................................................................................................24

*Gallagher v. N.Y.S. Bd. of Elections,*
  496 F.Supp. 3d 842 (S.D.N.Y. 2020)............................................................................ 18, 22

*Gold v. Feinberg,*
  101 F.3d 796 (2d Cir.1996) ..................................................................................................23

*Hayden v. Pataki,*
  No. 00-CIV-8586 (LMM), 2004 WL 1335921 (S.D.N.Y. June 14, 2004), *aff'd on
  other grounds,* 449 F.3d 305 (2d Cir. 2006) ......................................................................25

*Heindel v. Andino,*
  359 F. Supp. 3d 341 (D.S.C. 2019), *judgment vacated, appeal dismissed,* No. 19-1204,
  2019 WL 7781470 (4th Cir. Nov. 5, 2019) ..........................................................................9

*In re Khan,*
  No. 10-46901-ESS, 2014 WL 10474969 (E.D.N.Y. Dec. 24, 2014)................................14

*Jimenez v. Junius Real Estate,*
  2017 WL 9534737 (S.D.N.Y. June 7, 2017) ........................................................................25

*Kelly v. New York Civil Serv. Comm'n,*
  632 F. App'x 17 (2d Cir. 2016)............................................................................................14

*Krull v. Oey,*
  2019 WL 1207963 (N.D.N.Y. Mar. 14, 2019) ....................................................................25

*Landes v. Tartaglione,*
  No. 04-cv-3163, 2004 WL 2415074 (E.D. Pa. Oct. 28, 2004), *aff'd,* 153 F. App'x
  131 (3d Cir. 2005)....................................................................................................................9

*Lewis v. Casey,*
  518 U.S. 343 (1996)................................................................................................................12

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992)...................................................................................................8-9, 13, 14

*Moore v. Consol. Edison Co.,*
  409 F.3d 506 (2d Cir. 2005) ...................................................................................................6

*Murray v. Cuomo,*
  No. 1:20-cv-03571-MKV, 2020 WL 2521449 (S.D.N.Y. May 18, 2020) ......................6, 7

*Nat'l Org. for Marriage, Inc. v. Walsh*,
714 F.3d 682 (2d Cir. 2013) ............................................................................ 13-4

*New York ex rel. Schneiderman v. Actavis PLC*,
787 F.3d 638 (2d Cir. 2015) ..................................................................................7

*Powell v. Power*,
436 F.2d 84 (2d Cir.1970) ............................................................................. 15-16

*Price v. New York State Bd. of Elections*,
540 F.3d 101 (2d Cir. 2008) ................................................................................19

*Purcell v. Gonzalez*,
549 U.S. 1 (2006) .................................................................................................26

*Red Earth LLC v. United States*,
657 F.3d 138 (2d Cir. 2011) ..................................................................................7

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
140 S. Ct. 1205 (2020) (per curiam) ............................................................. 22, 26

*Rivera–Powell v. N.Y. City Bd. of Elections*,
470 F.3d 458 (2d Cir.2006) .................................................................................23

*Schulz v. Kellner*,
No. 1:07-cv-0943 (LEK) (DRH), 2011 WL 2669456 (N.D.N.Y. July 7, 2011) ...............................8

*Shannon v. Jacobowitz*,
394 F.3d 90 (2d Cir. 2005) ............................................................................ 15, 22

*Spokeo, Inc. v. Robins*,
136 S. Ct. 1540 (2016) ...........................................................................................8

*Thomas v. New York City Bd. of Elections*,
898 F. Supp. 2d 594 (S.D.N.Y. 2012)...................................................................7

*Thurman v. Bun Bun Music*,
No. 13-cv-5194 (CM) (MHD), 2015 WL 2168134 (S.D.N.Y. May 7, 2015) ...................78

*Timmons v. Twin Cities Area New Party*,
520 U.S. 351 (1997).............................................................................................20

*Tiraco v. New York State Bd. of Elections*,
963 F. Supp. 2d 184 (E.D.N.Y. 2013)..................................................................23

## CONSTITUTIONS

First Amendment.............................................................................................. 3, 20, 24

Fourteenth Amendment ....................................................................................................6, 20

U.S. Const.
  art. III, § 2 .................................................................................................................... 8

**FEDERAL STATUTES**

42 U.S.C.
  § 1983....................................................................................................................6, 25

52 U.S.C.
  § 10101 ........................................................................................................... 4, 7, 26

Civil Rights Act ..................................................................................................................2, 4

Cure Law ........................................................................................................................... 13

Voting Rights Act ............................................................................................................6, 26

**STATE STATUTES**

N.Y. Election Law
  § 8-302(3)(e) ............................................................................................................. 18
  § 8-302(e) ........................................................................................................... 22, 25
  § 8-312 ...................................................................................................................... 13
  § 8-412 ......................................................................................................6, 21, 24, 26
  § 8-412(1) .................................................................................................................... 1
  § 9-202 ......................................................................................................................... 5
  § 9-209 ........................................................................................................... 2, 13, 26
  § 9-209(3) .................................................................................................................... 1
  § 9-209(3)(b) ...................................................................................................... 12, 23

**STATE REGULATIONS**

National Conference of State Legislatures, Voting Outside the Polling Place Report:
  Table 11 ....................................................................................................................22

**RULES**

Fed. R. Civ. P. 19 ...............................................................................................................15

**MISCELLANEOUS AUTHORITIES**

2021 Leg. (N.Y. 2021) ..........................................................................................................6

Compl. "Prayer for Relief", §§ (b), (d), (f) and (i) ...............................................................7

Presidential Election Result, State Board website,
    https://www.elections.ny.gov/2020ElectionResults.html (last retrieved on June
    7, 2022) ................................................................................................................................................18

Receipt and Postmark Deadlines for Absentee Ballots, *available at*
    https://www.ncsl.org/research/elections-and-campaigns/vopp-table-11-receipt-
    and-postmark-deadlines-for-absentee-ballots.aspx ...........................................................22

State Board of Elections Website, Absentee Voting, *available at*
    https://www.elections.ny.gov/VotingAbsentee.html.........................................................20

Defendants PETER S. KOSINSKI, in his official capacity as Co-Chair of the State Board of Elections; DOUGLAS A. KELLNER, in his official capacity as Co-Chair of the State Board of Elections; ANDREW J. SPANO, in his official capacity as Commissioner of the State Board of Elections; ANTHONY J. CASALE, in his official capacity as Commissioner of the State Board of Elections; TODD D. VALENTINE, in his official capacity as Co-Executive Director of the State Board of Elections; and KRISTEN ZEBROWSKI STAVISKY, in her official capacity as Co-Executive Director of the State Board of Elections, (collectively, "State Defendants"), respectfully submit this memorandum of law, together with the Declaration of Thomas Connolly ("Connolly Decl.") and the exhibits annexed thereto, dated June 10, 2022, in opposition to Plaintiff's motion for a preliminary injunction (ECF Nos. 78 and 79).

## PRELIMINARY STATEMENT

Plaintiff DCCC ("Plaintiff") is the national congressional campaign committee of the Democratic Party. (Complaint (ECF No. 1, "Compl.")). It seeks a mandatory preliminary injunction to override existing provisions of New York's Election law to address what it terms "ballot rejection practices" (Compl., *passim*), hereinafter, "the challenged measures." Plaintiff's claims are all based on issues that arose *during the 2020 election*, which resulted in the rejection of ballots for various reasons. But Plaintiff admits that, since the 2020 election, New York has enacted various changes addressing a number of these issues.[1] In its effort to shoehorn policy preferences that it believes would have helped it gain votes in a prior election, Plaintiff asks the Court for an extraordinary injunction[2]

---

[1] The Compl. recites some of these reforms, including the amendment to Election Law §9-209(3) providing for the opportunity to cure certain facial defects in absentee ballot submissions (Compl., ¶¶ 77-82) and an amendment to Election Law § 8-412(1) to permit absentee ballots received one day after the election without postmarks to be canvassed (Compl. ¶63).

[2] Specifically, Plaintiff seeks a preliminary injunction (ECF No. 78) "requiring [State] Defendants to: (1) direct the local boards of elections to (a) refrain from enforcing practices or policies that require the rejection of absentee ballots timely submitted to an official poll place location outside of the voter's county of registration; (b) implement policies, regulations, guidance and procedures by which county election officials must canvas and count those ballots cast when a voter appears in the correct county and a polling place that includes their correct assembly district, even if the voter casts their ballot at a polling place for which they are not assigned; (c) count absentee ballots submitted in envelopes that the

amounting to a substantial rewriting of New York's Election law and micromanaging of its primary and general elections, just as New York's State Board and county boards of election are preparing for two separate primaries and the general election.

As set forth herein, Plaintiff fails to meet its heavy burden to warrant the extraordinary remedy of a preliminary injunction, let alone one requiring this Court to ostensibly rewrite significant portions of state law.

Simply put, Plaintiff cannot meet any of the requisite elements on its motion:

*First*, Plaintiff cannot show a likelihood of success on its claims that the challenged measures violate either the Constitution or the Civil Rights Act. As a threshold matter, Plaintiff lacks standing to pursue its highly speculative claims because (1) it does not allege certainly impending injuries, (ii) the recently enacted statutory reforms substantially decreased the likelihood of potential injury in any event, and (iii) prior injuries do not establish standing for prospective claims. Further, Plaintiff's alleged injuries are not traceable to State Defendants, its claims are not ripe for review, and it has not sued the correct parties.

Also, Plaintiff cannot show a likelihood of success on its substantive claims. For its substantive due process claim, Plaintiff contends that the challenged measures are fundamentally unfair. This conclusion, however, requires disregarding facts in the record that Plaintiff has offered here. The "wrong church ballot" argument requires accepting the premise that local election officials improperly direct voters to cast affidavit ballots, even though the only facts in the record relevant to

---

United States Postal Service fails to postmark or, in the alternative, give voters who submit such ballots the same notice and pre-rejection opportunity to cure as other technical deficiencies currently deemed curable; (d) implement procedures by which eligible voters who submit absentee ballots that are rejected for any reason that could be cured but that is not currently defined as "curable" under state law be given the same notice and pre-rejection opportunity to cure their ballots presently available to voters who submit ballots with technical defects that are currently designated "curable"; and (2) implement mandatory guidance and training for local boards of elections to ensure that the canvass of absentee and affidavit ballots under N.Y. Elec. Law § 9-209 is conducted consistent with federal law and any orders of this Court; and (3) for such other and further relief as the Court deems just and proper."

*upcoming elections* shows that any such situation is likely the result of voters' demands. The "wrong county" argument requires the speculative assumption that state and local officials are "encouraging" voters to personally deliver absentee ballots to polling places and county boards of election outside of their home county, even though the record shows that the State Board of Elections ("State Board") website and absentee ballot instructions now direct voters to return ballots *to their own home counties*. With respect to the "missing postmark" issue, the record establishes that the State Board ~~voters are encouraged~~ encourages voters to mail in absentee ballots well before election day precisely because the mail is controlled by a third-party, i.e. the United States Postal Service; that some voters who wait until the last possible moment to cast their ballot may risk their ballot not being counted hardly constitutes fundamental unfairness.

Plaintiff's procedural due process claim contends that the challenged measures fail to apprise voters of notice and an opportunity to object to state action depriving them of their vote. But a claim for procedural due process does not lie in the voting context, and even if it did, New York's voters certainly have notice of their correct polling place and the date and time that ballots must be cast personally (or absentee ballots returned to county boards of election), and voters are clearly informed of requirements to complete and return absentee ballots. Further, New York's "cure" provisions are among the most permissive in the United States.

Plaintiff's First Amendment "right to vote" claim contends that the challenged measures cause disenfranchisement while serving no legitimate state interest. But requiring voters to vote in the proper precincts (and county), and at the proper time, or to cast absentee ballots pursuant to lawful requirements, is hardly burdensome, and the State has a compelling interest in requiring voters to vote in the correct locations, and that voters cast their ballots before the close of elections, to maintain the integrity of elections.

Plaintiff's Equal Protection claim contends that New York is subjecting voters to "varying standards" as to whether their ballot is counted or not. But there is no evidence in the record that the State Defendants have engaged in differential treatment, or that the rules requiring voters to vote in the correct precinct (and county) and cast absentee ballots in the time and manner provided by State law are not consistently applied across the State.

With respect to Plaintiff's Civil Rights Act claim, Plaintiff does not have a private right of action under 52 U.S.C. Section 10101. Even if it did, Plaintiff's contention that the challenged measures do not reflect "material" errors or omissions concerning voting misses the mark. The State has a compelling interest in requiring votes to be cast in the correct location, at the correct time, and in the manner provided by State law.

*Second*, Plaintiff's motion fails because it has not shown that it will suffer irreparable injury absent the requested injunctive relief. Plaintiff alleges that voters will somehow be improperly disenfranchised unless the challenged measures are enjoined. However, Plaintiff's arguments arise from extrapolating events from *prior* elections, most notably the 2020 election that featured both the high turnout of a Presidential election and an unprecedented number of absentee ballots because of the COVID-19 pandemic. In light of statutory reforms and other changes in election practices, Plaintiff cannot show that it is entitled to *prospective* relief because the record does not support its contentions concerning the upcoming elections.

*Third*, Plaintiffs cannot establish that the balance of the equities or the public interest weighs in its favor. The requested injunction would impose serious changes on election rules shortly before an election and undermine New York's ability to ensure the security and integrity of its elections. The State's efforts to maintain the integrity of its elections is a compelling public interest, and Plaintiff cannot reasonably argue otherwise.

Accordingly, Plaintiff's motion for a preliminary injunction should therefore be denied in its

entirety.

## FACTUAL BACKGROUND

A more detailed statement of facts is contained in the accompanying Connolly Decl.

### a. The Functions of the State and Local Boards of Elections

Pursuant to the New York Election Law, elections in New York are administered by local boards of elections at the county level. Connolly Decl. ¶¶ 6,8. In New York City, there is one local New York City Board of Elections, which has jurisdiction over the five boroughs. *Id.* ¶ 6. The 58 local boards of elections throughout the State open and count absentee ballots, in accordance with the express requirements of the Election Law. *Id.* ¶. The State Board's role in the canvassing process is limited to aggregating the results transmitted to it by the local boards of elections, pursuant to Election Law § 9-202. *Id.* ¶ 8. For this reason, candidates who seek to determine the validity of ballots cast generally file an action in state Supreme Court against their local board of election, not the State Board. *Id.*

### b. Absentee Balloting in New York

Under New York Election Law, absentee voting is normally a limited exception to in-person voting, available to voters who cannot attend the polls for one of several specified reasons. *Id.* ¶ 9. In response to the COVID-19 pandemic, then Governor Cuomo issued several Executive Orders expanding access to absentee voting for the June 2020 Primary. *Id.* ¶ 9. This access was expanded through the 2022 primaries and general election. *Id.*; *see also* S.7565, 2021 Leg. (N.Y. 2021). A voter who chooses to utilize the absentee ballot process receives an absentee ballot and an "Affirmation Envelope" from their local board of elections. *Id.* ¶ 10. All absentee ballot votes must be cast on or before close of polls on election day. Absentee ballots must: (1) be received by the voter's local board of elections before the close of polls on election day, or (2) if received by mail at the voter's

local board of elections within seven days of election day, the Affirmation Envelope must bear a postmark dated on or before election day. *Id.*[3]

### c. **Plaintiff's Claims**

Plaintiff characterizes the challenged measures as "wrong church ballots," "wrong county ballots," "missing postmark" ballots and "curable ballots."[4]

Plaintiff asserts four claims for relief (styled as counts) in the Compl., sounding in (1) denial of due process; (2) undue burden on the [constitutional] right to vote; (3) violation of the equal protection clause; and (4) violation of the Voting Rights Act.[5]

## STANDARD OF REVIEW

"Preliminary injunctive relief . . . is an 'extraordinary and drastic remedy' that is 'unavailable except in extraordinary circumstances.'" *Murray v. Cuomo*, No. 1:20-cv-03571-MKV, 2020 WL 2521449, at *8 (S.D.N.Y. May 18, 2020) (quoting *Moore v. Consol. Edison Co.*, 409 F.3d 506, 511 (2d Cir. 2005)). Where "a preliminary injunction 'will affect government action taken in the public interest

---

[3] Until June of 2020, Election Law § 8-412 required absentee ballots to be postmarked by the day before election day. The legislature amended the statute as of June 7, 2020, to provide absentee voters with an extra day to obtain the postmark. NY LEGIS 91 (2020), 2020 Sess. Law News of N.Y. Ch. 91 (S. 8130-D) (McKINNEY'S).

[4] Plaintiff's claims are that (1) notwithstanding New York law requiring election officials to direct voters who appear at an incorrect voting precinct to go to the correct precinct, such voters are nonetheless being provided with affidavit ballots that are frequently not counted in alleged violation of plaintiff's federal rights (so called "wrong church" ballots) (Compl., ¶¶25-37); (2) notwithstanding clear instructions that voters may return absentee ballots to any polling place, early voting polling place or Board of Elections office *in their home county*, ballots returned by voters to other counties are frequently not counted in alleged violation of plaintiff's federal rights (so called "wrong county" ballots) (*id.,* ¶¶38-61); (3) notwithstanding clear New York law requiring ballots to be returned no later than 9:00 p.m. on Election Day, ballots bearing postmarks on or before Election Day may be counted up to seven days past Election Day and new legislation permitting absentee ballots returned not bearing a postmark to be counted if received by boards of election up to one day past Election Day, not counting such ballots not bearing a postmark received by boards of election more than one day past Election Day violates Plaintiff's federal rights (*id.,* ¶¶ 62-66); and (4) notwithstanding New York's enumerating certain facial defects in absentee ballots that may be cured by voters, Plaintiff's federal rights are violated unless an opportunity to cure is provided for *an unspecified group of additional* facial defects (*id.,* ¶¶ 67-93).

[5] Specifically, Plaintiff refers to its claims in the Compl. as (1) "Denial of Due Process in Violation of the 14th Amendment, 42 U.S.C. § 1983;" (Compl., ¶¶ 114-120); (2) "Undue Burden on the Right to Vote in Violation of the First and Fourteenth Amendments, 42 U.S.C. § 1983;" (*id.,* ¶¶121-124); (3) "Disparate Treatment in Violation of the Right to Equal Protection under the Fourteenth Amendment, 42 U.S.C. § 1983;" (*id.,* ¶¶125-131); and (4) "Rejection of Ballots for Immaterial Defects in Violation of 52 U.S.C. § 10101;" (*id.,* ¶¶ 132-139). In the Compl Plaintiff seeks declaratory and injunctive relief that is substantially identical with that sought in the present motion. *See* Compl. "Prayer for Relief", §§ (b), (d), (f) and (i).

pursuant to a statute or regulatory scheme,' the moving party must demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction." *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 143 (2d Cir. 2016) (quoting *Red Earth LLC v. United States*, 657 F.3d 138, 143 (2d Cir. 2011)). Where a plaintiff "seeks a mandatory injunction against the government that would change the status quo existing when the case was filed," a heightened standard applies in which the plaintiff "must show "a 'clear' or 'substantial' likelihood of success on the merits." *Murray*, 2020 WL 2521449, at *8 (quoting *Thomas v. New York City Bd. of Elections*, 898 F. Supp. 2d 594, 597 (S.D.N.Y. 2012)). This heightened standard also applies where "the injunction will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits." *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) (internal quotation omitted). Here, the heightened standard applies because Plaintiff seeks an order changing the status quo by overturning rules pertaining to ballots found in the Election Law and directing all local boards of election in New York, and because the relief it seeks here is the ultimate relief in the case.

To meet its burden of establishing all of the required elements, a plaintiff must introduce evidence supporting each element of the claim to the relief requested. *See Elmsford Apartment Assocs., LLC v. Cuomo*, No. 20-CV-4062 (CM), 2020 WL 3498456, at *10 n.5 (S.D.N.Y. June 29, 2020) ("the plaintiffs bore the burden to introduce such evidence as might be necessary to support their legal arguments"); *Thurman v. Bun Bun Music*, No. 13-cv-5194 (CM) (MHD), 2015 WL 2168134, at *4 (S.D.N.Y. May 7, 2015) ("a plaintiff seeing injunctive relief must justify that application by evidentiary submissions").

## ARGUMENT
### POINT I
### PLAINTIFF IS UNLIKELY TO SUCCEED ON ITS CLAIMS

**A. Plaintiff Lacks Standing to Pursue Its Highly Speculative Claims.**

Article III of the Constitution "limits the federal courts' power to the resolution of 'Cases' and 'Controversies.'" *Dhinsa v. Krueger*, 917 F.3d 70, 77 (2d Cir. 2019) (citing U.S. Const. art. III, § 2). A litigant who invokes federal jurisdiction therefore "must demonstrate standing to sue," consisting of three elements: "the individual initiating the suit 'must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Id.* (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)). Standing "evaluates a litigant's personal stake as of the outset of litigation." *Id.* (internal quotation omitted). The injury in fact requirement may only be satisfied by an injury that is "concrete, particularized, and actual or imminent . . . ." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal citation omitted). Where "there is no actual harm, . . . its imminence (though not its precise extent) must be established." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 n.2 (1992). The "threatened injury must be *certainly impending* to constitute injury in fact," and, thus, "[a]llegations of *possible* future injury are not sufficient." *Clapper*, 568 U.S. at 409 (internal quotation marks and citations alterations omitted) (emphasis in original).

The plaintiff "bear[s] the burden of pleading and proving concrete facts showing that the defendant's actual action has caused the substantial risk of harm," and may not "rely on speculation about 'the unfettered choices made by independent actors not before the court.'" *Id.* (quoting *Lujan*, 504 U.S., at 562). In the context of election lawsuits, courts routinely dismiss complaints based on predictions that possible error might cause the plaintiff's vote to not be counted. *See, e.g.*, *Schulz v. Kellner*, No. 1:07-cv-0943 (LEK) (DRH), 2011 WL 2669456, at *7 (N.D.N.Y. July 7, 2011) (allegations that "machine error and human fraud resulting from Defendants' voting procedures" would cause

votes to not be counted accurately were "merely conjectural and hypothetical and do not demonstrate a concrete or particularized injury to Plaintiffs").[6]

i.    *Plaintiff Does Not Allege Certainly Impending Injuries.*

The allegations in the Complaint and the present motion are based on speculation about possible future errors by local voting officials, USPS and voters, resulting in a number of convoluted sequences of events that it argues will end in disenfranchisement of the voter.

For example, with respect to the "missing postmark" claim, Plaintiff alleges that some voters plan to vote by absentee ballot, and *might* suffer an injury *if* the following conditional events were to occur: (1) they choose to return their absentee ballot by USPS mail, as opposed to the other available methods to return an absentee ballot; (2) a new systemic postmarking error occurs at USPS; (3) that error affects the voters' return envelopes; and (4) their ballots arrive at the local board of elections between two and seven days after election day. While that precise series of events could result in some ballots being invalidated under existing law (which was recently amended by the Legislature to permit even ballots without postmarks to be counted if received as late as one day after the election), this is hardly a certain or substantially likely outcome.[7] It also "rel[ies] on speculation about 'the unfettered choices made by'" USPS, an "'independent actor[] not before the court.'" *Clapper*, 568 U.S. at 414 (quoting *Lujan*, 504 U.S., at 562).

---

[6] *See also Heindel v. Andino*, 359 F. Supp. 3d 341, 357 (D.S.C. 2019), *judgment vacated, appeal dismissed,* No. 19-1204, 2019 WL 7781470 (4th Cir. Nov. 5, 2019) ("Plaintiffs 'merely speculate and make assumptions about whether their' votes will be inaccurately counted as the result of a potential hack" of voting machines) (quoting *Clapper*, 568 U.S. at 411); *Landes v. Tartaglione*, No. 04-cv-3163, 2004 WL 2415074, at *3 (E.D. Pa. Oct. 28, 2004), *aff'd,* 153 F. App'x 131 (3d Cir. 2005) (allegation that voting machines were vulnerable to "manipulation or technical failure" insufficient for standing because "[i]f plaintiff's vote and the votes of all other voters in the upcoming election are correctly recorded, plaintiff will suffer no injury").

[7] *Compare Landes*, 2004 WL 2415074, at *3 ("Plaintiff's reliance on the terms 'if' and 'may' to couch her allegations of harm is a clear indication that the harm she alleges is merely speculative"), *with* Plaintiffs' Memorandum in Support of Preliminary Injunction Motion, "Mem.", ECF No. 79, at 19 ("… voters who return their absentee ballot on Election Day will have their ballots rejected *if they have the bad luck* of not receiving a postmark or receiving an illegible postmark") (emphasis added).

Similarly, Plaintiff's "wrong church ballot" scenario requires (1) a voter presenting himself or herself at an incorrect polling place, (2) an election official deciding not to direct the voter to the correct polling place as required by law, and, instead, (3) providing an affidavit ballot to that voter that (4) is rejected during the course of vote canvassing. Of course, the only direct evidence in the record provided by Plaintiff as to upcoming elections is contained in the Declaration of Dustin Czarny, "Czarny Decl." (Mem., Ex. K, ECF No. 79-11), a commissioner of elections for Onondaga County. In his declaration (*id.* at ¶¶6-7), Mr. Czarny describes[8] why Plaintiff's hypothetical scenario is not only unlikely, but that when voters presenting at the wrong precinct are provided with affidavit ballots, it is possibly if not probably because of the voter's insistence.

Plaintiff's so-called "wrong county" ballot contention is also speculative. Plaintiff argues that "New York instructs voters that they may return absentee ballots to any drop-off location in the state, but ballots that are not forwarded by election officials to the voter's home county by election day are rejected. The date by which an election official forwards such ballots is immaterial to the voter's qualifications." (Mem. at 25). In fact, while some election officials may have suggested that voters could return absentee ballots to any polling place or County Board of Elections in the State *for the 2020 election*, New York State law has always required absentee ballots to be returned only to County Boards of Election or polling places in the voter's home county (Election Law § 8-412). Not only is there nothing in the present record to indicate that officials are giving improper instructions

---

[8] In his declaration, Mr. Czarny states: "During their training, poll workers and other election officials are instructed that if a voter's name or current address are not included in the poll book, they are required to manually look up the polling place associated with the address the voter provides. If the voter's address is outside the election district, the officials are directed to give the voter either a printed receipt indicating the voter's correct poll site or, alternatively, send the voter a text message through the electronic poll book software that directs the voter to the correct poll site.

The Attorney General's Office has provided guidance to county election officials concerning Wrong Church Ballots. Specifically, the Attorney General requires that *if a voter presents at the wrong poll site and insists on voting there despite being directed to the correct poll site, election officials should provide the voter with an affidavit ballot.* (emphasis supplied)."

to voters to return ballots outside of the voter's own county, the record shows *the complete opposite*. *See* Mem. Ex. H (ECF No. 79-8) (actual absentee ballot instruction from the 2021 election, providing "Your ballot can be returned to any Early Voting or Election Day poll site *in your county*, or to *your local Board of Elections* by 9:00 p.m. on Election Day, if delivered in person, or be postmarked by Election Day and received not later than seven days following the election.") (emphasis supplied); and Mem. Ex. L (ECF NO. 79-12) at 3 ("For the August 23 Primary Election: (1) Put it in the mail ensuring it receives a postmark no later than August 23rd. (2) Bringing it to *your* County Board of Elections Office no later than August 23rd by 9 p.m. (3) Bringing it to an early voting poll site *in your county* between August 13th and August 21st. (4) Bringing it to *a poll site in your county* on August 23rd by 9 p.m.") (emphasis supplied).

Finally, with respect to so-called "trivial defects" in returned absentee ballots, New York's "cure law" (Election Law § 9-209(3)(b)) provides significant opportunities to "cue" defects in absentee ballots. *See* Connolly Decl. at ¶¶ 23-43. Significantly, Plaintiff does not assert what "trivial defects" it complains of in the Mem., although in the Compl. (at ¶ 8), it suggests "trivial defects" might include "ballots that are mistakenly returned in a housemate's outer envelope, ballots that are returned in unofficial outer envelopes, and potentially many others among the ballots that are rejected every cycle for unidentified reasons." But the State is entitled to protect the integrity and security of its elections by assuring that the absentee ballot is returned by the same voter to whom it was transmitted, a key function of the use of the return envelope provided for that purpose (and as set forth in the Connolly Decl. at ¶ 32, the circumstance described might even be curable). Plaintiff's argument on this point constitutes nothing more than vague speculation as to potential injuries.

In short, Plaintiff's various speculations are just too attenuated and uncertain to establish standing, even if they were accurate. But Plaintiff's "predictions" are not only unsupported by specific allegations or evidence in the record, as shown above, the record actually contradicts them.

*Plaintiff's Prior Injuries Do Not Establish Standing for Prospective Claims.*

Plaintiff's Compl. and its present motion, although purporting to seek prospective injunctive and declaratory relief, are based entirely on discrete acts that took place in prior elections or practices that have been modified by statute (if they ever occurred at all). This is simply not a sufficient basis for Plaintiff to establish standing. Standing "is not dispensed in gross." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (quoting *Lewis v. Casey,* 518 U.S. 343, 358, n. 6 (1996)). "'[A] plaintiff must demonstrate standing for each claim he seeks to press' and 'for each form of relief' that is sought." *Id.* (quoting *DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 352 (2006)). Further, a plaintiff "seeking injunctive or declaratory relief cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he or she will be injured in the future." *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998).

In effect, Plaintiff is "fighting the last war" and raising arguments concerning the challenged measures based on carefully curated incidents arising from the extremely unusual 2020 election. That election is long completed, and it involved situations where state law and/or established practices have significantly changed since that election as a result of legislative and executive reform.

Because Plaintiff has failed to demonstrate that future injury is likely to itself (or to voters), it does not have standing to pursue claims for prospective relief.

iii.     *The 2020 Election Reforms Further Decreased the Likelihood of Potential Injury.*

New York has taken action to further decrease the already small chance that a systemic postmark error will invalidate absentee ballots. Since the 2020 elections, New York has passed a number of changes to the Election Law that address issues raised by Plaintiff herein. *See* Connolly Decl, at ¶ 22. These include a provision now allowing a ballot to be counted if it is received as late as one day after Election Day (Election Law 8-312), as well as an expanded "Cure Law" (Election Law 9-209) allowing a voter an opportunity to "cure" certain enumerated technical defects on their ballot.

In addition, the Legislature recently passed a bill permitting the canvassing of certain "wrong church" ballots (if at least cast in the same county and Assembly District as the voter's residence) for elections after January 1, 2023. *See* Connolly Decl., ¶48. Further, as indicated above, absentee ballot instructions on the State Board's website and on ballot instructions themselves make clear that absentee ballots can be returned either by mail or by hand to a polling place or board of elections office *in the voter's home county. Id.*, ¶¶44-46.

**B. Plaintiff's Alleged Injuries are not Traceable to the State Defendants.**

As noted above, Plaintiff cannot establish an injury in fact based on "speculation about 'the unfettered choices made by independent actors not before the court.'" *Clapper*, 568 U.S., at 414 (quoting *Lujan*, 504 U.S., at 562). Likewise, a plaintiff must show "a causal connection between the injury and the conduct complained of—the injury has to be fairly trace[able] to the challenged action of the defendant, and not th[e] result [of] the independent action of some third party not before the court." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal citation omitted). Here, Plaintiff's alleged injuries are the result of purported future independent actions of third parties not before the Court: USPS workers failing to post-mark ballot envelopes, or of local election officials not following state law (or more likely, just following the insistence of individual voters) and giving erroneous advice concerning "wrong church" or "wrong county" ballots, or of voters themselves not following directives of state officials or failing to follow state law with respect to completion of absentee ballots.

In any event, none of the claimed injuries are fairly traceable to any existing act or omission by the State Defendants.

**C. Plaintiff's Claims Are Not Ripe for Review.**

For similar reasons to those regarding standing, the claims asserted in the Compl. and the relief demanded in the present motion are not ripe for adjudication. *See Nat'l Org. for Marriage, Inc. v.*

*Walsh*, 714 F.3d 682, 688 (2d Cir. 2013) ("to say a plaintiff's claim is constitutionally unripe is to say the plaintiff's claimed injury, if any, is not 'actual or imminent,' but instead 'conjectural or hypothetical'") (quoting *Lujan,* 504 U.S., 560).

### D. Plaintiff Has Not Sued the Correct Parties.

Another threshold issue is that Plaintiff has sued the wrong parties. Under the doctrine established by *Ex Parte Young*, 209 U.S. 123 (1908), a plaintiff may sue "state officers acting in their official capacities" only to "seek prospective injunctive relief to prevent a continuing violation of federal law." *Kelly v. New York Civil Serv. Comm'n*, 632 F. App'x 17, 18 (2d Cir. 2016). Here, Plaintiff alleges no continuing act or omission by *any* of the State Defendants that is violating its rights or the rights of voters. Rather, at bottom, its claim is that absent third parties— local election officials who allegedly direct "wrong church voters" to vote via affidavit ballot or officials who accept "wrong county" ballots from voters who deliver them to county boards outside of their own counties but then fail to count those votes, or USPS employees who erroneously failed to apply postmarks to certain absentee ballot envelopes timely mailed on or before election day—are engaging in acts resulting in disenfranchisement.

Furthermore, even if the State Defendants were proper parties to this action, there are still multiple missing necessary parties who must be joined before this action may continue because "the court cannot accord complete relief among [the] existing parties" in their absence. Fed. R. Civ. P. 19. Necessary parties "are those proper parties who are so closely related to the action that their absence may be damaging to them or to the defendant." *In re Khan*, No. 10-46901-ESS, 2014 WL 10474969, at *58 (E.D.N.Y. Dec. 24, 2014). Indeed, there are *at least* three sets of missing necessary parties here. First, USPS is the entity that allegedly may perform the action or omission that could cause Plaintiff's alleged "missing postmark" injury. Second, New York's 58 county board of elections (including the New York City Board of Elections, which acts as a county board of elections for all

five boroughs of New York City) are the local entities that actually process and count individual ballots, Connolly Decl. at ¶¶ 6, 8, and which therefore will be the entities subject to any order by the Court directing that ballots to be counted by a method other than the one required by State law. Neither the State Board nor other named State Defendants play a direct role in the process of opening and canvassing absentee ballots. *Id.* ¶ 8. Moreover, any number of candidates who will appear on the ballot for the August 2022 primary (and November general) election may be affected by the last-minute change in Plaintiff's requested canvass procedures. These individuals also have a direct interest in this matter and may be prejudiced by being excluded. Each of these parties must be joined before complete relief may be obtained. By failing to join them, Plaintiff has failed to show likelihood of success.

### E. Plaintiff Has Not Established a Clear Likelihood of Success on its Due Process Claim.

To state a due process claim, a plaintiff must allege intentional conduct by a state actor. *Shannon v. Jacobowitz,* 394 F.3d 90, 94 (2d Cir. 2005). "'[T]he Due Process Clause is simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty, or property.'" *Id.* (quoting *Daniels v. Williams,* 474 U.S. 327, 328 (1986)) (emphasis in original). In the elections context, this means that "'the due process clause . . . offer[s] no guarantee against errors in the administration of an election'" that are not the result of intentional conduct by a state actor. *Id.* (quoting *Powell v. Power,* 436 F.2d 84, 85–86 (2d Cir.1970)). In *Shannon*, the Second Circuit applied this principle to a due process claim that was based on an allegation that a voting machine malfunction led to the failure to count between 69 and 139 votes in an election that was decided by a margin of 25 votes. *Id.* at 91-92. The missing votes represented as much as 2.4% of all votes cast in the election. *Id.* (final tally was 2,936 for one candidate and 2,911 for the other). The court found that in that circumstance, there was no due process violation, holding that "[a] voting machine malfunction is the paradigmatic example of a 'garden variety' election" irregularity that does not rise

to the level of a federal due process claim because there has been no allegation of intentional State conduct. *Id.* at 96.[9] The Second Circuit warned that federal courts must draw this line because to hold otherwise "would be to invite federal intervention into every negligent disruption of a local election," which is "'in the exclusive cognizance of the state courts.'" *Id.* at 97 (quoting *Powell*, 436 F.2d at 86).

So too here, (a) Plaintiff's "missing postmark" allegation that USPS may mistakenly fail to postmark some unknown number of absentee ballot envelopes, (b) its "wrong church ballot" claim that some local election officials may erroneously fail to advise the voter of the correct polling place and instead provide provisional affidavit ballots to voters who present at the wrong polling place (or more likely, as the record here shows, honoring the voter's demand for such ballots), or (c) its "wrong county" claim that some local election officials may erroneously accept absentee ballots personally delivered to a county other than the voter's own (and as the record shows, this is despite the clear instructions to voters that they should deliver such ballots to the voter's own county), represent *unintended* garden variety election irregularities. Further, the allegedly negligent conduct that may occur is not, and any past similar conduct was not, due to any policy or practice of any of the State Defendants. Accordingly, these allegations simply do not state a federal due process claim against the State Defendants.

Plaintiff, of course, ignores the due process requirement of intentional conduct, and argues that the challenged measures violate substantive due process because they are "fundamentally unfair" (Mem., 8-11) and violate procedural due process because they fail to "provide voters with

---

[9] Citing cases, the Second Circuit listed other examples of "garden variety" irregularities that do not state a federal due process claim, including "human error resulting in miscounting of votes and delay in arrival of voting machines," "allegedly inadequate state response to illegal cross-over voting," "mechanical and human error in counting votes," "technical deficiencies in printing ballots," "mistakenly allowing non-party members to vote in a congressional primary," and "arbitrary rejection of ten ballots." *Id.,* (internal citations omitted).

notice and an opportunity to object to state action that deprives them of their right to vote." (Mem., 11-16). Plaintiff fails to show a likelihood of success with respect to either contention.

Each of the allegations of "fundamental unfairness" carefully select some isolated fact from the 2020 election and argue that the upcoming elections will suffer from the same flaw necessitating a statewide injunction. But each of these contentions is belied by the record of this motion. Hence (*see also* Section I.A.i, *supra*), Plaintiff alleges that "wrong county" ballots are "unfair" because "New York election officials have repeatedly assured voters that this procedure is authorized and that such ballots will be counted" (Mem. at 10). But even assuming *arguendo* that this were true for the 2020 election, *the record* shows that *since the 2020* election, both the absentee ballot instructions themselves and the State Board website now make clear that absentee ballots must be returned to a polling place or board of elections *in the voter's own home county*. *See* Mem., Exs. H and L.

Similarly, with respect to "wrong church" ballots, Plaintiff alleges that "New York election officials… routinely misapply this law [Election Law 8-302(3)(e)], instead giving these types of voters affidavit ballots that are doomed to be rejected in their entirety." (Mem. at 9). But once again, even if this had been the case for some fraction of the more than 8.6 million votes cast in the 2020 election,[10] *the record* shows that poll workers (per the Czarny Decl.) are trained and instructed to provide voters at the wrong polling place with the location of the correct polling place but will provide an affidavit ballot *at the request of the voter* (Mem., Ex. K, ECF No. 79-11). In other words, rather than potentially hold up a line of voters arguing with a voter about their correct polling place, an affidavit ballot is provided to a voter who demands one in such circumstance. This is hardly a substantive due process violation.

---

[10] *See* Presidential Election Result, State Board website, https://www.elections.ny.gov/2020ElectionResults.html (last retrieved on June 7, 2022)

Plaintiff's "missing postmark" argument ("[t]wo ballots dropped off or mailed at the same time could be treated differently- one timely, the other not- based solely on when local election officials forward the respective ballots and whether USPS postmarks and delivers them," Mem. at 11) assumes an extraordinary one-off event of USPS failing to postmark a large number of absentee ballots, an event that even the *Gallagher* court (where this very issue was previously litigated) declined to find was imminent or likely to recur. 496 F.Supp. 3d 842, 850-1 (S.D.N.Y. 2020) (possibility that USPS would fail to postmark voters' mail-in absentee ballots in timely manner not sufficiently certain to warrant injunction barring application of state law requiring mail-in absentee ballots to be postmarked by election day).

Finally, Plaintiff argues that "election officials often fail to notify voters who submit ballots with curable defects and give them an opportunity to cure, despite voters having that right under state law" (*id.*) But the "cure" provision was enacted into law after the 2020 election, and there is no "evidence" in the record that local election officials will fail to follow state law and fail to advise voters of their cure opportunity in the upcoming primary and general elections.

With respect to the procedural due process claim, Second Circuit precedent is "not entirely clear on the question of whether voters may assert a freestanding Due Process claim based on alleged unfairness in election procedures . . . ." *Gallagher v. N.Y.S. Bd. of Elec.*, 477 F.Supp.3d at 42, n.3. To the extent a separate procedural due process claim is even viable, voters already have notice of where and when they are required to vote, and absentee ballot instructions are clear that voters are to return their ballot to their home counties or by mail. Further undermining Plaintiff's contentions, the State Board has repeatedly informed the public that voters who return their absentee ballots by mail on election day must be aware of USPS final collection times. For example, the "Absentee Voting" portion of the State Board's website contains the following guidance: "Voters who mail in their ballots on Election Day *must be aware of the posted collection times on collection*

*boxes* and at the Postal Service's retail facilities, and that *ballots entered after the last posted collection time will not be postmarked until the following business day*."[11] The State Board has consistently encouraged voters not to wait until election day to send their absentee ballot by mail, much less the very end of the day. Furthermore, voters must now request an absentee ballot at least fifteen days before the election, in order to allow adequate time for mailing and to encourage early mailing to permit ballots to reach boards of election in a timely manner. *See* Connolly Decl. at ¶¶ 21, 22. State Defendants do not control the mail, and have taken all reasonable steps to inform voters who chose to vote by mail of the steps they can take to ensure their ballot is received in a timely manner. Plaintiff cannot show a likelihood of success on its due process claim.

## F. Plaintiff Has Not Established a Clear Likelihood of Success on its First Amendment ("Right to Vote") Claim.

When considering whether a state election law infringes on the Constitutional protection for voting rights, courts apply a test derived from *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992). Under this test, the court "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789). If the court determines that "the plaintiffs' rights are severely burdened, the [challenged law] is subject to strict scrutiny." *Price v. New York State Bd. of Elections*, 540 F.3d 101, 109 (2d Cir. 2008) (citing *Burdick,* 504 U.S. at 435). If, however, "the burden is minor, but non-trivial, *Burdick*'s balancing test is applied. Under this balancing test, the State's reasonable and nondiscriminatory restrictions will generally be sufficient to uphold the statute if they serve important state interests."

---

[11] State Board of Elections Website, Absentee Voting, *available at* https://www.elections.ny.gov/VotingAbsentee.html (emphasis added).

*Id.* This review is "quite deferential, and [courts] will not require 'elaborate, empirical verification of the weightiness of the State's asserted justifications.'" *Id.* (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 364 (1997).

Here, once properly understood given the factual circumstances, the burden imposed by the State on voters is reasonable (if not minimal) and non-discriminatory, and it serves the important state interests of ensuring that all votes are properly cast in the correct precinct or county and before the polls close on election day. Plaintiff's argument (Mem. at 16-21) is that the challenged measures "cause disenfranchisement of lawful voters- often at no fault of the voter- without furthering legitimate, much less compelling state interests." Plaintiff is wrong.

     i.     <u>*The burden imposed by the State is reasonable and non-discriminatory.*</u>

The burden imposed by the State on Plaintiff is reasonable, non-discriminatory, and no more severe than that imposed on voters (whether in person or by absentee ballots) by the election laws of every other state in the country. The challenged measures ("wrong church ballots," "wrong county ballots," absentee ballots missing a postmark and received more than one day after election day and absentee ballots with "technical defects") are governed by various laws, a number of which have been amended since the 2020 election.

With respect to "wrong county" and "missing postmark" ballots, New York Election Law § 8-412 provides that absentee ballots must either: (1) be received by the voter's local board of elections before the close of polls on election day, or (2) if received by the voter's local board of elections within seven days of election day, be enclosed in an envelope containing a postmark indicating that the ballot was received by USPS, another federal agency, or a foreign country's postal service, on or before election day. Significantly, the Legislature expanded the rule by permitting absentee ballots received via the USPS but not bearing a post-mark to be received as late as one day after election day. This is a clear rule that does nothing more than require documentation that voters

have submitted their absentee ballot to the correct board of elections or polling place (within their own county) on or before election day. Further evidence of the reasonable, non-discriminatory nature of this rule is that New York's absentee ballot rules are, in fact, *more permissive* than those found in the majority of other states. Thirty-four states have election laws that require absentee ballots to arrive on or before election day, meaning that every ballot received after election day is considered invalid, even if it was postmarked on or before election day.[12] State Defendants are aware of no other state that has adopted Plaintiff's preferred rule, in which absentee ballots would be accepted if they arrive after election day, *even if the ballots fail to contain a postmark*. Accepting Plaintiff's theory that New York's absentee ballot deadline rule imposes a severe burden on absentee ballot voters necessarily means finding that *every other state's* absentee ballot rules also impose severe burdens triggering strict scrutiny. *See also Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205 (2020) (per curiam) (ensuring that ballots are cast on or before election day is important state interest).

With respect to "wrong church" ballots, Election Law 8-302(e)[13] provides that where a voter's name does not appear to be on the voter roll at a polling place, the election official is supposed to look up their correct polling place and so advise the voter. In that circumstance, the voter can only vote in the election district in which they presented themselves in by obtaining an

---

[12] *See* National Conference of State Legislatures, Voting Outside the Polling Place Report: Table 11: Receipt and Postmark Deadlines for Absentee Ballots, *available at* https://www.ncsl.org/research/elections-and-campaigns/vopp-table-11-receipt-and-postmark-deadlines-for-absentee-ballots.aspx ("The most common state deadline for election officials to receive absentee or mail ballots is on Election Day when the polls close. Some states, however, accept and count a mailed ballot if it is received after Election Day but postmarked prior to the election.").

[13] Section 8-302(e) provides in relevant part that when a "voter presents himself or herself and offers to cast a ballot, and he or she claims to live in the election district in which he or she seeks to vote but no registration poll record can be found for him or her in the poll ledger or his or her name does not appear in the computer generated registration list or his or her signature not appear next to his or her registration poll record or the computer generated registration list does not show him or her to be enrolled in the party in which he or she claims to be enrolled, a poll clerk or election inspector shall consult a map, street finder or other description of all of the polling places and election districts within the political subdivision in which said election district is located and if necessary, contact the board of elections to obtain the relevant information and advise the voter of the correct polling place and election district for the residence address provided by the voter to such poll clerk or election supervisor."

appropriate court order, or by filling out an affidavit [provisional] ballot. It is well-established that the State has a compelling interest in having voters vote in the correct precinct. Requiring voters to appear in the correct polling place is hardly an undue burden. *Brnovich v. Democratic Nat'l Comm.*, 141 S.Ct. 2321, 2343-4 (2021) (sustaining Arizona's rule that voters who choose to vote in person on election day must do so in their assigned precincts.)

Similarly, that New York has chosen to limit the number of bases upon which an otherwise facially defective absentee ballot may be "cured" (*see* Election Law § 9-209(3)(b)) does not constitute a violation of anyone's right to vote: casting a facially valid absentee ballot is hardly an undue burden. *See also Brnovich*, 141 S.Ct. at 2346 ("A State indisputably has a compelling interest in preserving the integrity of its election process.")

As to the "missing postmark" claim, while it is possible that some postal workers may fail to apply postmarks to some unknown number of absentee ballots mailed on or before the upcoming primaries and general election, or with respect to "wrong church" or "wrong county" ballots, that an election official may give a voter erroneous advice, these are, at worst, "garden variety" election irregularities, and while unfortunate, generally do not create a federal constitutional claim. *See Shannon*, 394 F.3d at 96 (collecting cases); *See also Gallagher v. N.Y.S. Bd. of Elections*, 496 F.Supp. 3d 842, 850-1 (S.D.N.Y. 2020) (rejecting claim ostensibly identical to Plaintiff's "missing postmark" claim here).

ii.     *The challenged measures serve important State interests.*

New York's voting statutes, rules and requirements serve the important State interest of ensuring election security and integrity. For example, with respect to the "missing postmark" and "wrong county" issues, a universal, fundamental feature of elections is that the results of the balloting must remain unknown until voting is complete for everyone. Connolly Decl. ¶ 15. This principle ensures that all votes are given equal weight and deters fraud and disorder. *Id.* Like every

other state in the country, New York requires voters to submit their ballots on or before the close of

polls on election day. As noted above, as to absentee voters, most states enforce this requirement by

only accepting absentee ballots actually received on or before election day. New York goes further,

accepting ballots received after election day. But Election Law § 8-412 nevertheless ensures the

election day deadline for casting a vote by requiring that the ballot be postmarked on or before

election day. Every other state with a similar rule likewise imposes a postmark requirement. *See*

National Conference of State Legislatures Table 11, *supra* n.4.

It is similarly important (with respect to "wrong church ballots" and "wrong county ballots")

that voters vote in the correct polling place and district. Of course, limiting the "cure" provision to

certain items as enumerated by the Legislature in order to ensure the security and integrity of

absentee ballots and the election process advances a critical state interest.

In short, because the challenged measures present minimal burdens that serve important

State interests, Plaintiff's First Amendment right to vote claim fails the *Anderson-Burdick* test, and

Plaintiff cannot show a likelihood of success on this claim.

### G. Plaintiff Has Not Established a Clear Likelihood of Success on its Equal Protection Claim.

A plaintiff who brings a federal § 1983 action "to remedy errors in the election process

allegedly violating the equal protection clause" must establish that "the state action constituted

intentional or purposeful discrimination." *Tiraco v. New York State Bd. of Elections*, 963 F. Supp. 2d

184, 199 (E.D.N.Y. 2013) (quoting *Gold v. Feinberg,* 101 F.3d 796, 800 (2d Cir.1996)). "Thus, to state

an equal protection claim, Plaintiff must allege that the [board of elections] intentionally

discriminated against him, 'either by adopting out of [discriminatory] animus policies which are

facially neutral but have a . . . discriminatory effect, or by applying a facially neutral policy in a . . .

discriminatory manner.'" *Id.* (quoting *Rivera–Powell v. N.Y. City Bd. of Elections,* 470 F.3d 458, 470 (2d

Cir.2006)). "'To establish such intentional or purposeful discrimination, it is axiomatic that a plaintiff

must allege that similarly situated persons have been treated differently.'" *Id.* (quoting *Gagliardi v. Vill. of Pawling,* 18 F.3d 188, 193 (2d Cir.1994)).

For its part, Plaintiff argues (Mem. at 21-24) that the challenged measures violate equal protection because the challenged measures "[subject] voters across the state to 'varying standards' with respect to whether their ballot is counted or not."[14]

But Plaintiff has not established a clear likelihood of success on this claim because the challenged measures treat all voters in exactly the same way. With respect to so-called "wrong church ballots," pursuant to Election Law 8-302(e), voters who present themselves to an incorrect polling place are to be advised of the correct polling place. If the voter insists on casting a ballot at that location, an affidavit ballot will be provided, and can still be counted to the extent that the voter's correct precinct is located at that polling location (albeit at a different table). Similarly, with respect to both "wrong county" and "missing postmark" contentions, pursuant to Election Law § 8-412, *all* absentee ballots must either be received by the local board of elections before the close of polls on election day or be postmarked by election day and received within seven days of the election (or within one day of the election if not postmarked). And pursuant to Election Law 9-209, affidavit ballot envelopes that are defective on their face may be cured only if they meet certain well-enumerated criteria that the Legislature determined are appropriate to maintain the integrity and security of elections.

These are reasonable and neutral requirements, common to many states' election laws around the country, that apply to all voters. While offering conjecture, Plaintiff has not provided facts in the record demonstrating that these rules will be applied in a discriminatory manner, and its

---

[14] Plaintiff's reliance on *Bush v. Gore,* 532 U.S. 98, 104-5 (2000) for the proposition that a State may not "by later arbitrary and disparate treatment, value one person's vote over that of another" is peculiarly ironic here where it is Plaintiff that seeks to change the State's established canvassing rules at this late point in the election cycle. Further, *Bush v. Gore* involved a situation where there was no prior rule concerning how election officials were to "discern and honor the intent of the voter," whereas here, the standards at issue are quite clear and well-established.

24

arguments and evidence concerning alleged disparate impact are at best speculative and attenuated, and in no event establish a likelihood of success on its equal protection claim.

For example, even if some USPS postal workers mistakenly fail to apply postmarks to some isolated number of absentee ballots, or an affidavit ballot is provided to a "wrong church" voter by an election official, those acts simply do not raise a claim of intentional or purposeful discrimination *by the State Defendants*. Plaintiff offers nothing beyond speculation that a systemic postmarking problem will recur, or that it will affect particular voters. At bottom, there is no support for the assertion that voters will be subject to differential treatment.

### H. Plaintiff Has Not Established a Clear Likelihood of Success on Its Statutory [Voting Rights Act] Claim.

Plaintiff does not have a private right of action under 52 U.S.C. § 10101. *Jimenez v. Junius Real Estate*, 2017 WL 9534737 at *5 (S.D.N.Y. June 7, 2017); *Dekom v. New York*, 2013 WL 3095010 at *18 (E.D.N.Y. June 18, 2013) *aff'd*, 583 F. App'x 15 (2d Cir. 2014); *Hayden v. Pataki*, No. 00-CIV-8586 (LMM), 2004 WL 1335921, at *5 (S.D.N.Y. June 14, 2004), *aff'd on other grounds*, 449 F.3d 305 (2d Cir. 2006). Even if Plaintiff had a private right of action, it still cannot show a likelihood of success on this claim for the reason it cannot do so with respect to its constitutional "right to vote" claim or its due process or equal protection claims.

### POINT II

### PLAINTIFF HAS NOT DEMONSTRATED IRREPARABLE HARM

While "[g]enerally an alleged violation of a constitutional right creates a presumption of irreparable harm," a plaintiff seeking "prospective injunctive relief . . . must show a likelihood of either future harm or continuing harm." *Krull v. Oey*, 2019 WL 1207963, at *10 (N.D.N.Y. Mar. 14, 2019). A plaintiff seeking to satisfy the irreparable harm requirement must demonstrate that "absent a preliminary injunction [he or she] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to

resolve the harm." *Bisnews AFE (Thailand) Ltd. v. Aspen Research Group Ltd.*, 437 Fed. App'x 57, 58 (2d Cir. 2011). As discussed above, Plaintiff fails to allege *any* redressable Article III injury at all, much less an imminent injury causing irreparable harm. *See Amidax Trading Grp. v. S.W.I.F.T. SCRL*, No. 08-cv-5689 PKC, 2012 WL 868691, at *2 (S.D.N.Y. Mar. 13, 2012) ("because . . . the plaintiff lacks standing, the plaintiff also has failed to establish irreparable harm"). Moreover, any speculative harms based on extrapolation from the unique circumstances of the 2020 election are either not reasonably likely or have already been addressed by New York's legislative and executive changes.

## POINT III

## THE PUBLIC INTEREST WEIGHS AGAINST INJUNCTIVE RELIEF

The balance of the equities and the consideration of the public interest weigh in favor of the State Defendants. The Supreme Court has stated that "federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm.*, 140 S. Ct. at 1207. *See also Purcell v. Gonzalez*, 549 U.S. 1 (2006) (same rule). The injunction requested by Plaintiff is not in the public interest. It would alter the rules of a primary election that is now, as of the date of the filing of this brief, just two and a half months away and counting. Further still, the relief requested here—such as Plaintiff's demand that local boards create and implement a last-minute notice and cure process for ballots with missing postmarks and for so-called "trivial defects" that Plaintiff does not even bother identifying—would require a substantial diversion of resources at a time when the State Board and local boards are intensely preparing for two major primaries and the General Election (especially troubling given that this case has been pending since February). None of this is in the public interest where Plaintiff has presented no evidence or specific allegations supporting its prediction that "systemic postmark errors" (or "wrong county" or "wrong church" balloting) will occur, and where the State Defendants have taken aggressive steps to expand and protect the voting process for the upcoming elections and beyond.

**CONCLUSION**

For all of the foregoing reasons, Plaintiff's motion for a preliminary injunction should be denied in its entirety, together with such other relief as the Court may award.

Dated: New York, New York
June 10, 2022

LETITIA JAMES
Attorney General
State of New York
*Attorney for the State Defendants*
28 Liberty Street
New York, New York 10005

By: **/s/ Seth J. Farber**
Seth J. Farber
Special Litigation Counsel
(212) 416-8029
Seth.Farber@ag.ny.gov