**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

DCCC,

                    Plaintiff,

        v.

PETER S. KOSINSKI, in his official capacity
as Co-Chair of the State Board of Elections;
DOUGLAS A. KELLNER, in his official ca-
pacity as Co-Chair of the State Board of Elec-
tions; ANDREW J. SPANO, in his official ca-
pacity as Commissioner of the State Board of
Elections; TODD D. VALENTINE, in his of-
ficial capacity as Co-Executive Director of the
State Board of Elections; and KRISTEN
ZEBROWSKI-STAVISKY, in her official ca-
pacity as Co-Executive Director of the State
Board of Elections,

                    Defendants,

and

REPUBLICAN NATIONAL COMMITTEE,
NATIONAL REPUBLICAN CONGRES-
SIONAL COMMITTEE, and NEW YORK
REPUBLICAN STATE COMMITTEE,

                    Intervenor-Defendants.

Case No. 1:22-cv-1029-RA

**INTERVENORS' OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION**

# TABLE OF CONTENTS

Table of Authorities ............................................................................................................................. ii

Introduction .......................................................................................................................................... 1

Background ............................................................................................................................................ 3

Argument ............................................................................................................................................... 4

    I.   Plaintiff is not likely to succeed on the merits. ............................................................... 4

        A.  Right to vote ............................................................................................................... 4

        B.  Procedural due process ........................................................................................... 13

        C.  Substantive due process ......................................................................................... 15

        D.  Equal protection ...................................................................................................... 17

        E.  Materiality statute .................................................................................................... 17

    II.  Under the *Purcell* principle, the equities alone defeat Plaintiff's motion. ................... 21

Conclusion ........................................................................................................................................... 25

Certificate of Service .......................................................................................................................... 26

# TABLE OF AUTHORITIES

**Cases**

*A. Philip Randolph Inst. of Ohio v. Larose,*
  831 F. App'x 188 (6th Cir. 2020) .................................................................. 2

*Alabama v. U.S. Dep't of Com.,*
  546 F. Supp. 3d 1057 (M.D. Ala. 2021) ......................................................... 24

*Alpha Phi Alpha Fraternity Inc. v. Raffensperger,*
  2022 WL 633312 (N.D. Ga. Feb. 28) ............................................................. 22

*Andino v. Middleton,*
  141 S. Ct. 9 (2020) ......................................................................................... 2

*Ariz. Democratic Party v. Hobbs,*
  18 F.4th 1179 (9th Cir. 2021) ................................................................. passim

*Ariz. Democratic Party v. Hobbs,*
  976 F.3d 1081 (9th Cir. 2020) ........................................................................ 2

*Bennett v. Yoshina,*
  140 F.3d 1218 (9th Cir. 1998) ...................................................................... 16

*Bi-Metallic Inv. Co. v. State Bd. of Equalization,*
  239 U.S. 441 (1915) ...................................................................................... 15

*Brnovich v. DNC,*
  141 S. Ct. 2321 (2021) ............................................................................ passim

*Burdick v. Takushi,*
  504 U.S. 428 (1992) ............................................................................ 5, 11, 14

*Bush v. Gore,*
  531 U.S. 98 (2000) ........................................................................................ 17

*Carducci v. Regan,*
  714 F.2d 171 (D.C. Cir. 1983) ...................................................................... 11

*City of Boerne v. Flores,*
  521 U.S. 507 (1997) ...................................................................................... 18

*City of Rancho Palos Verdes v. Abrams,*
  544 U.S. 113 (2005) ................................................................................ 19, 20

*Clarno v. People Not Politicians Ore.,*
  141 S. Ct. 206 (2020) ..................................................................................... 2

*Coal. on W. Valley Nuclear Wastes v. Chu,*
  592 F.3d 306 (2d Cir. 2009) .......................................................................... 11

*Coalition for Good Governance v. Kemp (CGG),*
  2021 WL 2826094 (N.D. Ga. July 7) ....................................................... 24, 25

*Common Cause Ind. v. Lawson,*
  978 F.3d 1036 (7th Cir. 2020) ........................................................................ 2

*Conservative Party of N.Y. State v. N.Y. State Bd. of Elections*,
  2010 WL 4455867 (S.D.N.Y. Oct. 15) ............................................................ 4, 23, 24

*Crawford v. Marion Cnty. Election Bd.*,
  553 U.S. 181 (2008) ......................................................................................... 5, 11, 12

*Curling v. Sec'y of State of Ga.*,
  2020 WL 6301847 (11th Cir. Oct. 24) .................................................................. 3

*DCCC v. Ziriax*,
  487 F. Supp. 3d 1207 (N.D. Okla. 2020) ......................................................... 8, 9

*Dekom v. New York*,
  2013 WL 3095010 (E.D.N.Y. June 18) ................................................................ 20

*Deutsch v. N.Y. State Bd. of Elections*,
  2020 WL 6384064 (S.D.N.Y. Oct. 30) ................................................................. 8

*DNC v. Bostelmann*,
  488 F. Supp. 3d 776 (W.D. Wis. 2020) ......................................................... 14, 15

*DNC v. Bostelmann*,
  977 F.3d 639 (7th Cir. 2020) .......................................................................... 3, 8

*DNC v. Hobbs*,
  948 F.3d 989 (9th Cir. 2020) (en banc) .......................................................... 5, 6

*DNC v. Reagan*,
  329 F. Supp. 3d 82 (D. Ariz. 2018) ..................................................................... 8

*DNC v. Wis. State Legislature*,
  141 S. Ct. 28 (2020) ................................................................................... 8, 9, 21

*Donald J. Trump for President, Inc. v. Boockvar*,
  493 F. Supp. 3d 331 (W.D. Pa. 2020) .......................................................... 15, 17

*Friedman v. Snipes*,
  345 F. Supp. 2d 1356 (S.D. Fla. 2004) ............................................................... 19

*Gallagher v. N.Y. State Bd. of Elections (Gallagher I)*,
  477 F. Supp. 3d 19 (S.D.N.Y. 2020) .................................................................. 16

*Gallagher v. N.Y. State Bd. of Elections (Gallagher II)*,
  496 F. Supp. 3d 842 (S.D.N.Y. 2020) ............................................................. 9, 16

*Green Party of N.Y. v. Weiner*,
  216 F. Supp. 2d 176 (S.D.N.Y. 2002) ................................................................ 17

*Griffin v. Burns*,
  570 F.2d 1065 (1st Cir. 1978) ............................................................................ 16

*Hayden v. Pataki*,
  2004 WL 1335921 (S.D.N.Y. June 14) ............................................................... 20

*Hoblock v. Albany Cnty. Bd. of Elections*,
  422 F.3d 77 (2d Cir. 2005) .................................................................................. 16

*Hu v. City of N.Y.*,
  927 F.3d 81 (2d Cir. 2019) .................................................................... 15

*Husted v. Ohio State Conference of NAACP*,
  573 U.S. 988 (2014) ............................................................................ 22

*Jones v. Gov'r of Fla.*,
  975 F.3d 1016 (11th Cir. 2020) (en banc) ........................................... 14

*Kishore v. Whitmer*,
  972 F.3d 745 (6th Cir. 2020) ............................................................... 24

*League of Women Voters of Fla., Inc. v. Fla. Sec'y of State (LWVF)*,
  2022 WL 1435597 (11th Cir. May 6) ............................... 2, 21, 22, 23

*League of Women Voters of Ohio v. Brunner*,
  548 F.3d 463 (6th Cir. 2008) ............................................................... 14

*League of Women Voters of Ohio v. LaRose*,
  489 F. Supp. 3d 719 (S.D. Ohio 2020) ............................................... 17

*Lecky v. Va. State Bd. of Elections*,
  285 F. Supp. 3d 908 (E.D. Va. 2018) ............................................ 1, 17

*Libertarian Party of Conn. v. Lamont*,
  977 F.3d 173 (2d Cir. 2020) .................................................................. 5

*Little v. Reclaim Idaho*,
  140 S. Ct. 2616 (2020) .......................................................................... 2

*Martin v. Crittenden*,
  347 F. Supp. 3d 1302 (N.D. Ga. 2018) ............................................... 18

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) ............................................................................ 21

*Memphis A. Phillip Randolph Inst. v. Hargett*,
  482 F. Supp. 3d 673 (M.D. Tenn. 2020) ............................................. 14

*Merrill v. Milligan*,
  142 S. Ct. 879 (2022) ..................................................................... passim

*Merrill v. People First of Ala.*,
  141 S. Ct. 190 (2020) ............................................................................ 2

*Merrill v. People First of Ala.*,
  141 S. Ct. 25 (2020) .............................................................................. 2

*Migliori v. Cohen*,
  2022 WL 1701850 (3d Cir. May 27 ..................................................... 20

*New Ga. Proj. v. Raffensperger*,
  976 F.3d 1278 (11th Cir. 2020) ..................................................... passim

*Nielsen v. Desantis*,
  2020 WL 5552872 (N.D. Fla. June 24, 2020) ....................................... 8

*North Carolina v. League of Women Voters of N.C.,*
  574 U.S. 927 (2014) ..........................................................................................22

*Ohio Democratic Party v. Husted,*
  834 F.3d 620 (6th Cir. 2016) ...............................................................................7

*Org. for Black Struggle v. Ashcroft,*
  493 F. Supp. 3d 790 (W.D. Mo. 2020) ...............................................................18

*Panio v. Sunderland,*
  14 A.D.3d 627 (App. Div. 2005) .........................................................................24

*Penn. Democratic Party v. Boockvar,*
  238 A.3d 345 (Pa. 2020)................................................................................ 12, 13

*Priorities USA v. Nessel,*
  978 F.3d 976 (6th Cir. 2020) ................................................................................ 2

*Purcell v. Gonzalez,*
  549 U.S. 1 (2006).............................................................................4, 21, 22, 25

*Reynolds v. Sims,*
  377 U.S. 533 (1964) ...........................................................................................22

*Richardson v. Tex. Sec'y of State,*
  978 F.3d 220 (5th Cir. 2020) ..................................................................... 2, 13, 14

*Ritter v. Lehigh Cnty. Bd. of Elections,*
  2022 WL 16577 (Pa. Commw. Ct. Jan 3) ...........................................................19

*Ritter v. Migliori,*
  No. 21A772 (U.S. June 9, 2022) .........................................................................20

*RNC v. DNC,*
  140 S. Ct. 1205 (2020) ....................................................................................2, 9

*Roe v. Ala. ex rel. Evans,*
  43 F.3d 574 (11th Cir. 1995) ..............................................................................16

*Rosario v. Rockefeller,*
  410 U.S. 752 (1973) .............................................................................................8

*SAM Party of N.Y. v. Kosinski,*
  987 F.3d 267 (2d Cir. 2021)..................................................................................5

*SEIU Loc. 1 v. Husted,*
  698 F.3d 341 (6th Cir. 2012) ....................................................................... 6, 7, 8

*Shannon v. Jacobowitz,*
  394 F.3d 90 (2d Cir. 2005)............................................................................ 16, 23

*Shelby Advocs. for Valid Elections v. Hargett,*
  947 F.3d 977 (6th Cir. 2020) ................................................................................ 1

*Silberberg v. Bd. of Elections of N.Y.,*
  216 F. Supp. 3d 411 (S.D.N.Y. 2016) ........................................................ 4, 23, 24

*Storer v. Brown,*
  415 U.S. 724 (1974) ...................................................................................... 4

*Tenney v. Oswego Cnty. Bd. of Elections,*
  142 N.Y.S.3d 288 (Sup. Ct. 2021) .................................................... passim

*Tex. Democratic Party v. Abbott,*
  961 F.3d 389 (5th Cir. 2020) ...................................................................... 2

*Texas All. for Retired Ams. v. Hughs,*
  976 F.3d 564 (5th Cir. 2020) ...................................................................... 2

*Thompson v. Dewine,*
  959 F.3d 804 (6th Cir. 2020) ...................................................................... 2

*Turner Broad. Sys., Inc. v. FCC,*
  520 U.S. 180 (1997) .................................................................................... 11

*United States v. Classic,*
  313 U.S. 299 (1941) ...................................................................................... 4

*Velez v. Levy,*
  401 F.3d 75 (2d Cir. 2005) ........................................................................ 16

*Votevets Action Fund v. Detzner,*
  2018 WL 11254567 (N.D. Fla. Nov. 16) ................................................ 10

*Wilson v. Birnberg,*
  667 F.3d 591 (5th Cir. 2012) .................................................................... 15

**Statutes**

2 U.S.C. §1 .......................................................................................................... 9

2 U.S.C. §7 .......................................................................................................... 9

3 U.S.C. §1 .......................................................................................................... 9

42 U.S.C. §1983 ................................................................................................ 19

52 U.S.C. §10101 ............................................................................... 18, 19, 20

N.Y. Elec. Law §10-108 .................................................................................. 22

N.Y. Elec. Law §16-106 .................................................................................. 12

N.Y. Elec. Law §17-132 .................................................................................... 3

N.Y. Elec. Law §4-100 ...................................................................................... 3

N.Y. Elec. Law §4-117 ...................................................................................... 6

N.Y. Elec. Law §5-100 .................................................................................... 19

N.Y. Elec. Law §5-102 .................................................................................... 19

N.Y. Elec. Law §5-104 .................................................................................... 19

N.Y. Elec. Law §5-106 .................................................................................... 19

N.Y. Elec. Law §5-208 ...................................................................................... 7

N.Y. Elec. Law §7-122 .................................................................................... 3, 7, 11

N.Y. Elec. Law §8-302 ........................................................................................ 3, 6

N.Y. Elec. Law §8-400 ............................................................................................ 7

N.Y. Elec. Law §8-410 ........................................................................................ 3, 7

N.Y. Elec. Law §8-412 ............................................................................................ 3

N.Y. Elec. Law §8-414 .......................................................................................... 11

N.Y. Elec. Law §8-600 ...................................................................................... 7, 22

N.Y. Elec. Law §9-209 .................................................................................. passim

## Other Authorities

11A Fed. Prac. & Proc. Civ. §2955 (3d ed.) ........................................................... 1

Fed. R. Civ. P. 65(d) ............................................................................................ 11

*First-Class Mail*,
   USPS, bit.ly/3QaRJYq .................................................................................... 10

H.R. Rep. No. 88-914 (Nov. 20, 1963) ................................................................ 18

*Voting and Registration in the Election of November 2020* tbl. 4a,
   U.S. Census Bureau (Apr. 2021), bit.ly/3NCa9iT .............................................. 6

## INTRODUCTION

Plaintiff is opaque about what, exactly, it wants this Court to do. At times, Plaintiff seems to want an order forcing county officials to follow *existing* state law. It claims that New York "election officials themselves" are making mistakes that harm voters. Mot. (Doc. 79) 1. For example, it says that officials sometimes ignore New York's law requiring them to direct voters who show up to the wrong polling place to the right one. And it says that, even though New York law allows officials to forward ballots sent to the wrong county to the right one, those ballots are sometimes not forwarded. As a remedy, Plaintiff asks this Court to order more "guidance" and more "training" for "local boards of election." Am. Notice (Doc. 87-1) 2.

If Plaintiff wants this Court to stop local officials from making mistakes, then its motion has all sorts of problems. In terms of Article III standing, the prediction that voters and election officials will make "mistakes" in the next election "does not create a cognizable imminent risk of harm," even if they've made those same mistakes in the past. *Shelby Advocs. for Valid Elections v. Hargett*, 947 F.3d 977, 981-83 (6th Cir. 2020). The State also did not *cause* county officials to violate its laws, and Plaintiff did not sue the local officials who allegedly did. *See id.* at 981 (finding no standing where the state defendants did not "orde[r] the election workers to make any such mistakes"). And because county officials are making mistakes despite the State's existing laws, guidance, and training, Plaintiff does not explain how still more guidance and training would *redress* their injuries. On the merits, neither "accidental mistakes on the part of election officials" nor the "'violation of a state statute by an election official'" can "'give rise to a constitutional claim and an action under Section 1983.'" *Lecky v. Va. State Bd. of Elections*, 285 F. Supp. 3d 908, 919 (E.D. Va. 2018). And this Court cannot issue an injunction instructing officials to better "obey the law." *See* 11A Fed. Prac. & Proc. Civ. §2955 (3d ed.) (injunctions that "simply order defendants to 'obey the law' uniformly are found to violate the specificity requirement" of Rule 65(d)).

What concerns Intervenors most, though, is that Plaintiff also wants this Court to *change* the law—to declare certain statutes enacted by the New York legislature unconstitutional. New York law disqualifies ballots cast at the wrong polling place, but Plaintiff wants this Court to make New York partially count them. New York law disqualifies ballots submitted to the wrong county, but Plaintiff wants this Court to make New York fully count them. And New York law allows voters to cure some defects with their absentee ballots, but Plaintiff wants this Court to make New York create a cure process for *all* defects. Tellingly, as relief, Plaintiff asks this Court to order New York to "refrain from enforcing" certain laws, to "count" certain ballots that are currently invalid under state law, and to "implement procedures" that allow voters to cure defects that are "not currently defined as 'curable' under state law." Am. Notice 2.

This Court should not alter or suspend any election law passed by the New York legislature. The statutes in question could not be more routine. They easily satisfy the governing *Anderson-Burdick* test. And Plaintiff's late-breaking injunction could not be a plainer violation of *Purcell*. Plaintiff wants New York to drastically overhaul its election code while it administers a statewide primary where voting is currently ongoing, another statewide primary where voting starts in a few days, and a general election where voting starts in a few months. Intervenors are not aware of any district court that has ever granted such an extreme request. The courts that came close all had their orders quickly stayed on appeal.[*] This Court should deny Plaintiff's extraordinary request.

---

[*] *See, e.g., League of Women Voters of Fla., Inc. v. Fla. Sec'y of State* (*LWVF*), 2022 WL 1435597 (11th Cir. May 6); *Merrill v. Milligan*, 142 S. Ct. 879 (2022); *RNC v. DNC*, 140 S. Ct. 1205 (2020); *Tex. Democratic Party v. Abbott*, 961 F.3d 389 (5th Cir. 2020), *application to vacate stay denied*, 140 S. Ct. 2015; *Thompson v. Dewine*, 959 F.3d 804 (6th Cir. 2020), *application to vacate stay denied*, 2020 WL 3456705 (U.S.); *Merrill v. People First of Ala.*, 141 S. Ct. 190 (2020); *Little v. Reclaim Idaho*, 140 S. Ct. 2616 (2020); *Ariz. Democratic Party v. Hobbs*, 976 F.3d 1081 (9th Cir. 2020); *Clarno v. People Not Politicians Ore.*, 141 S. Ct. 206 (2020); *Merrill v. People First of Ala.*, 141 S. Ct. 25 (2020); *Andino v. Middleton*, 141 S. Ct. 9 (2020); *A. Philip Randolph Inst. of Ohio v. Larose*, 831 F. App'x 188 (6th Cir. 2020); *Texas All. for Retired Ams. v. Hughs*, 976 F.3d 564 (5th Cir. 2020); *Richardson v. Tex. Sec'y of State*, 978 F.3d 220 (5th Cir. 2020); *Priorities USA v. Nessel*, 978 F.3d 976 (6th Cir. 2020); *Common Cause Ind. v. Lawson*, 978 F.3d 1036 (7th Cir. 2020);

Plaintiff's claims touch on many election laws that were duly enacted by the New York legislature. These statutes are workaday election rules that exist in most States. In essence, they require voters to vote in certain places, at certain times, with certain security precautions.

1. **Vote in the Right Place**: New York is divided into "election districts." N.Y. Elec. Law §4-100(1). Voters must register and vote in their assigned district. When New Yorkers vote in person, they must go to their designated polling place. *See* §17-132(3); §8-302(3)(e); §9-209(7)(d). And when New Yorkers vote by mail, they must send their ballot to "the board of elections of the county or city of [their] residence." §8-410. Ballots that are never cast in the right place cannot be counted. *Tenney v. Oswego Cnty. Bd. of Elections*, 142 N.Y.S.3d 288, 295-96 (Sup. Ct. 2021).

2. **Vote on Time**: When New Yorkers vote absentee, they must submit their ballots by election day. N.Y. Elec. Law §8-412(1). Ballots are considered timely if they arrive within one day after the election or, if the postmark shows that they were mailed by election day, within seven days after the election. *Id.* Untimely ballots cannot be counted. *Tenney*, 142 N.Y.S.3d at 298.

3. **Vote Securely**: Voters who cast absentee ballots must follow certain requirements that help confirm voters' identities and protect the secrecy of their votes. For example, absentee voters must avoid abnormal marks or writing, fill out the blanks on the envelope (date, name, residence, etc.), sign the oath on the envelope, place their ballot in an inner secrecy envelope, place that inner envelope in an outer envelope, and "seal" it. N.Y. Elec. Law §8-410; §7-122. The voter's signature must match the signature on file. §9-209(2)(c). And, of course, voters cannot vote twice. §17-132(3); §9-209(2)(b), (d), (h). Violations of some of these requirements do not affect the validity of the ballot. *See* §9-209(3)(g) (no date, wrong date, signature in wrong place, voter used both pen and pencil, extraneous official

<hr />

*New Ga. Proj. v. Raffensperger*, 976 F.3d 1278 (11th Cir. 2020)*Curling v. Sec'y of State of Ga.*, 2020 WL 6301847 (11th Cir. Oct. 24); *DNC v. Bostelmann*, 977 F.3d 639 (7th Cir. 2020), *application to vacate stay denied*, *DNC v. Wis. State Leg.*, 141 S. Ct. 28.

materials, normal marks or tears, partial unsealing). Violations of some of these requirements are curable, meaning the board of elections will notify voters of the defect and give them seven days to fix it. *See* §9-209(3)(b) (no signature, no witness, no inner secrecy envelope, wrong signature). But other violations, including curable violations that are not timely cured, render the ballot invalid. *See Tenney*, 142 N.Y.S.3d at 297-302.

## ARGUMENT

Preliminary injunctions are an "'extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Silberberg v. Bd. of Elections of N.Y.*, 216 F. Supp. 3d 411, 416 (S.D.N.Y. 2016). Plaintiff cannot get one here unless, at a minimum, it is likely to succeed on the merits, it faces irreparable harm, the balance of equities favors it, and an injunction would further the public interest. *Id.* In "election cases" like this one, courts also must consider the *Purcell* principle. *Milligan*, 142 S. Ct. at 880 (Kavanaugh, J., concurral) (citing *Purcell v. Gonzalez*, 549 U.S. 1 (2006)). And Plaintiff's burden is "particularly high" here because it "seek[s] not just to preserve the status quo but rather to require a government agency to alter it in the face of a contrary statute." *Conservative Party of N.Y. State v. N.Y. State Bd. of Elections*, 2010 WL 4455867, at \*2 (S.D.N.Y. Oct. 15). Plaintiff cannot carry this heavy burden, either on the merits or the equities.

## I.     Plaintiff is not likely to succeed on the merits.

Plaintiff's arguments implicate numerous statutes, most of which Plaintiff doesn't even cite. Plaintiff challenges these statutes under five theories: substantive due process, procedural due process, the right to vote, equal protection, and the materiality provision of the Civil Rights Act. All fail. Because Plaintiff's right-to-vote claims drive the rest of the analysis, Intervenors will start there.

### A.     Right to vote

The constitutional right to vote, according to the Supreme Court, is protected by a combination of Article I, §2; the First Amendment; and the Fourteenth Amendment. *Storer v. Brown*, 415 U.S. 724, 729 (1974); *United States v. Classic*, 313 U.S. 299, 314 (1941). But unlike other fundamental rights,

laws that restrict voting are not automatically subject to strict scrutiny. *SAM Party of N.Y. v. Kosinski*, 987 F.3d 267, 274 (2d Cir. 2021). The Constitution recognizes States' authority to regulate elections, States have exercised that authority throughout our history, and "'substantial'" state regulation is essential if elections are to be "'fair,'" "'honest,'" and "'order[ly].'" *Burdick v. Takushi*, 504 U.S. 428, 433 (1992).

Unless the burden is "severe," courts evaluate restrictions on voting under "what has become known as the *Anderson-Burdick* framework." *SAM Party*, 987 F.3d at 274. They weigh the burdens on voters against the interests of the State, considering how necessary the interests make the burdens. *Id.* This balancing is "'quite deferential'" to the State, and "no 'elaborate, empirical verification' is required." *Id.* So when the challenged law is "'reasonable'" and "'nondiscriminatory,'" the State "'generally'" wins because its "'important regulatory interests'" are sufficient to justify the burdens. *Libertarian Party of Conn. v. Lamont*, 977 F.3d 173, 177 (2d Cir. 2020). This case is the general one.

**1.** New York's laws requiring voters to vote in the right place are constitutional. With respect to in-person voters going to the right district, an indistinguishable requirement was recently upheld in *Brnovich v. DNC*. "Having to identify one's own polling place and then travel there to vote," the Supreme Court explained, "does not exceed the 'usual burdens of voting.'" 141 S. Ct. 2321, 2344 (2021) (quoting *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 198 (2008) (op. of Stevens, J.)). Such laws have a "long pedigree in the United States," remain "widespread," and are "quintessential examples" of lawful regulations. *Id.* at 2346, 2344 (citing *DNC v. Hobbs*, 948 F.3d 989, 1072-88 (9th Cir. 2020) (en banc) (Bybee, J., dissenting)). The burdens they impose are "unremarkable" and "modest." *Id.* at 2344, 2346. Plaintiff's suggestion that, whenever a law prevents *anyone* from voting it imposes a "'severe'" burden, is "just not" the law. *New Ga. Proj.*, 976 F.3d at 1281; *Ariz. Democratic Party v. Hobbs*, 18 F.4th 1179, 1188-89 (9th Cir. 2021); *cf.* Mot. 17.

New York "reduce[s]" any burdens further by, among other things, sending voters an advance notice and by requiring officials to redirect voters to the correct polling place. *Brnovich*, 141 S. Ct. at 2344; *see* N.Y. Elec. Law §4-117; §8-302(e). Even if these safeguards aren't foolproof, it is not unreasonable to task voters with "responsibility for voting in the … correct polling place." *SEIU Loc. 1 v. Husted*, 698 F.3d 341, 344 (6th Cir. 2012). "[R]egardless of what the poll worker did, it was still the voter's error in going to the wrong polling site in the first place that resulted in her casting in invalid ballot." *Tenney*, 142 N.Y.S.3d at 296. Tellingly, even by Plaintiff's estimation, the number of voters who cast ballots in the wrong district is "small"—only 0.16% of "all ballots" cast in 2020. *Brnovich*, 141 S. Ct. at 2344. *Compare* Mot. 17 (nearly 14,000 "wrong church" ballots cast in New York's 2020 presidential election), *with Voting and Registration in the Election of November 2020* tbl. 4a, U.S. Census Bureau (Apr. 2021), bit.ly/3NCa9iT (8.6 million total ballots cast that election). And voters who are worried about finding the right district on election day have "other easy ways to vote," including early and by mail. *Brnovich*, 141 S. Ct. at 2344.

These miniscule burdens are easily justified by New York's "important state interests." *Id.* at 2345. "Not counting" ballots cast in the wrong place "induces compliance" with the requirement that voters go to the right place. *Id.* And forcing voters to go to one designated place "helps to distribute voters more evenly," "reduces wait times," lets the State "put polling places closer to voter residences," and decreases voter confusion by ensuring that ballots contain "only the candidates and public questions on which [each voter] can vote." *Id.* at 2345. The Constitution does not require New York—or the 26 other States with similar laws—to partially count ballots cast in the wrong place. *Hobbs*, 948 F.3d at 1064 (Bybee, J., dissenting). Partial counting has "obvious disadvantages." *Brnovich*, 141 S. Ct. at 2346. It "would complicate the process of tabulation and could lead to disputes and delays." *Id.* And it would "encourage voters who are primarily invested in only national and state-wide elections to vote in whichever place is most convenient." *Id.* Contrary to Plaintiff's assertion, Mot. 18, this

"perverse incentive" does "not exist with right-place/wrong-[district] voters," since "voters who make the effort to arrive at the correct polling place would have no reason to miscast their vote at the wrong table or in the wrong line." *SEIU*, 698 F.3d at 345. And Plaintiff's arguments all assume a rigorous means-ends fit that *Anderson-Burdick* doesn't require. *See Ohio Democratic Party v. Husted*, 834 F.3d 620, 632 (6th Cir. 2016) (when a law is "minimally burdensome," *Anderson-Burdick* has courts "apply a deferential standard of review akin to rational basis").

Similar reasoning applies to New York's law requiring absentee voters to submit their ballots to the county where they reside. N.Y. Elec. Law §8-410. If "having to identify one's own polling place and then travel there" is a minor burden, then having to identify one's own county board of elections (and *not* travel there) is only more minor. *Brnovich*, 141 S. Ct. at 2344. That same board is where the voter should have sent his absentee-ballot application, N.Y. Elec. Law §8-400(2)(b), where the ballot that he is trying to vote came from, §8-400(2)(d), and where the return envelope is preaddressed to, §7-122(3). Even when New Yorkers move, their voter registrations are transferred with them. §5-208. If a voter still sends his ballot to the wrong place, counties mitigate the problem by forwarding the ballot to the right place. *Tenney*, 142 N.Y.S.3d at 298. Plaintiff claims that these forwarded ballots sometimes arrive too late, but that lateness is partly the fault of the voters who submitted their ballot to the wrong county close to the deadline.

Plaintiff admits that it has "no information" about how many voters this issue affects. Ex. C (Doc. 79-3) ¶57. The numbers it does cite seem statistically indistinguishable from zero. *See* Mot. 5. If voters are worried about mail delays, they can still deliver their ballots in person or vote during the nine days of early voting. N.Y. Elec. Law §8-600. But forcing New York to count wrong-county ballots would "encourage" voters to send ballots anywhere, overburdening certain counties and "delay[ing]" tabulation. *Brnovich*, 141 S. Ct. at 2346. And it would "complicate the process of tabulation" by, for example, forcing counties to tabulate and report results for elections happening elsewhere. *Id.*

While *Brnovich* was technically a case about §2 of the Voting Rights Act, the Supreme Court's analysis also controls the constitutional questions presented here. *Brnovich* interpreted §2 to require courts to consider "the size of the burden" and "the strength of the state interests"—the same questions that matter under *Anderson-Burdick*. 141 S. Ct. at 2338-39. In weighing those factors, the Court relied mostly on its decision in *Crawford*, which was an *Anderson-Burdick* case. *See id.* at 2338, 2344, 2346. And the district court in *Brnovich* applied *Anderson-Burdick* and upheld Arizona's ban on out-of-precinct voting under that test as well. *See DNC v. Reagan*, 329 F. Supp. 3d 824, 856-62 (D. Ariz. 2018). A panel of the Ninth Circuit affirmed that analysis, 904 F.3d 686, 724-29 (9th Cir. 2018); the Supreme Court relied on that analysis, 141 S. Ct. at 2344; and after the Supreme Court's decision, the full Ninth Circuit affirmed that analysis again, 9 F.4th 1218 (9th Cir. 2021) (en banc). Other courts have likewise upheld these kinds of laws. *E.g.*, *SEIU*, 698 F.3d at 344. Plaintiff cites no case invalidating one.

**2.** New York's deadline for receiving mail ballots is also plainly constitutional. Federal courts consistently upheld similar laws, even during the height of the pandemic. *E.g.*, *DCCC v. Ziriax*, 487 F. Supp. 3d 1207, 1231-33 (N.D. Okla. 2020); *Deutsch v. N.Y. State Bd. of Elections*, 2020 WL 6384064, at *5 (S.D.N.Y. Oct. 30); *New Ga. Proj.*, 976 F.3d at 1281-82; *Bostelmann*, 977 F.3d at 642-43; *Nielsen v. Desantis*, 2020 WL 5552872, at *1 (N.D. Fla. June 24, 2020). "[R]easonable deadlines" for submitting absentee ballots "generally raise no federal constitutional issues under the traditional *Anderson-Burdick* balancing test." *DNC v. Wis. State Legislature*, 141 S. Ct. 28, 33 (2020) (Kavanaugh, J., concurring). All "[e]lections must end sometime," and "States have always required voters 'to act in a timely fashion if they wish to express their views.'" *Id.* at 28 (Gorsuch, J., concurring). Unless a deadline is unreasonably short, voters have no one to blame but themselves for voting too late. *Rosario v. Rockefeller*, 410 U.S. 752, 758 (1973). And far from unreasonably short, New York's receipt deadline—seven days after the election day—is unusually generous. *See Wis. State Legislature*, 141 S. Ct. at 33 (Kavanaugh, J., concurring) ("[M]ost States … require absentee ballots to be *received* by election day, not just *mailed* by election

day.'"). Voters who fear mail delays can deliver their absentee ballot in person or simply vote in person. *DCCC*, 487 F. Supp. 3d at 1231-32; *New Ga. Proj.*, 976 F.3d at 1281.

New York's deadline is amply justified by important state interests. The interests behind these laws include "conducting an efficient election, maintaining order, quickly certifying election results, and preventing voter fraud." *New Ga. Proj.*, 976 F.3d at 1282. Plaintiff homes in on New York's decision to count ballots that are missing a postmark if they arrive within one day of the election (Plaintiff says it should be two days). *See* Mot. 20. But voters can "avoi[d]" this problem "altogether" by mailing their ballots far enough "in advance … to ensure that they arrive at their Local Board before election day." *Gallagher v. N.Y. State Bd. of Elections* (*Gallagher II*), 496 F. Supp. 3d 842, 850-51 (S.D.N.Y. 2020). As Plaintiff admits, both New York and the U.S. Post Office recommend that "voters mail their ballot *seven* days ahead of the election" for this very reason. Mot. 20 n.9. And the Post Office's policy is to postmark all ballots; the odds that any ballot would be missing a postmark and would arrive two days after the election (but not one) are low. Plaintiff does not quantify how often it occurs. And the problems it cites from Brooklyn during the 2020 primary, as this Court has explained, were isolated and later resolved. *See Gallagher II*, 496 F. Supp. 3d at 851-52.

Regardless, "[f]ederal courts have no business" overriding the legislature's choice of one day because they "believe that later deadlines would be better." *Wis. State Legislature*, 141 S. Ct. at 34 (Kavanaugh, J., concurral). Plaintiff does not dispute that New York has an interest in preventing people from casting ballots *after* election day—an unprecedented practice that would invite gamesmanship, destroy voter confidence, and violate federal law. *See RNC*, 140 S. Ct. at 1207; *DCCC*, 487 F. Supp. 3d at 1221; 3 U.S.C. §1; 2 U.S.C. §1; §7. As its evidence explains, "A universal, fundamental feature of elections is that the result of all votes remain unknown until voting is completed for everyone." Ex. G (Doc. 79-7) 6-7. New York's choice of one day instead of two is thus rational. Because the Post Office says that first-class mail can be delivered in one day, New York cannot be sure that nonpostmarked

ballots arriving two days after the election were cast by election day. *See First-Class Mail*, USPS, bit.ly/3QaRJYq (last visited June 10, 2022). Setting the deadline at one day after the election allows New York to be sure. Other States might be comfortable with a cutoff of two days, "[b]ut a later or more lenient deadline in other states may not a constitutional violation make." *Votevets Action Fund v. Detzner*, 2018 WL 11254567, at *2 (N.D. Fla. Nov. 16).

**3.** New York's decision to let some errors be cured, but not others, is also constitutional—though, Plaintiff has not adequately briefed this claim. Plaintiff contends that New York should let voters cure "trivial" errors that stop absentee ballots from being counted. Mot. 20-21. Though Plaintiff explains what defects *are* curable under New York law, it never specifies what defects *aren't* curable or even *cites* the laws that contain the requirements they claim to be challenging. (Those laws aren't cited in the complaint either.) In its motion, Plaintiff asks this Court to require New York to count "absentee ballots that are rejected for *any* reason that could be cured." Am. Notice 2 (emphasis added); *accord* Mot. 6 ("all other errors"). But those "reasons" span a wide array of laws, from bans on double voting to laws requiring voters to write their names on the envelope. Those laws impose different burdens and further different state interests and must be analyzed separately. Nor does Plaintiff explain which of these laws create requirements that "could be cured" and which do not. Am. Notice 2. Does New York need to let double voters come in and pick a candidate, even *after* election day? And how can violations of ballot *secrecy* ever be cured once the cat is out of the bag? Plaintiff doesn't say.

This Court should reject Plaintiff's vague challenge to all uncurable requirements as underdeveloped. Plaintiff has not told the Court what laws it thinks are unconstitutional. The only example Plaintiff provides anywhere in its brief—"ballots mistakenly returned in a housemate's, roommate's, or unofficial outer envelope"—is mentioned only once in the introduction with no further explanation or citation to any statute. Mot. 1. Without a basic identification of the challenged laws and an explanation of their burdens, it is impossible to assess the State's interests or apply the governing legal

standard. And an injunction ordering New York to allow curing of "any" defect that "could be cured," as Plaintiff requests, would be too vague to satisfy the Rules. Am. Notice 2; *see* Fed. R. Civ. P. 65(d).

"'The premise of our adversarial system is that [federal] courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them.'" *Coal. on W. Valley Nuclear Wastes v. Chu*, 592 F.3d 306, 314 (2d Cir. 2009) (quoting *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983) (Scalia, J.)). This Court *could* go through New York's statutes, identify each law that affects the validity of absentee ballots, figure out whether violations of that law "could be cured," and weigh the burdens against the state interests for each law— "but not without altering the character of [this] institution." *Carducci*, 714 F.2d at 177. Because Plaintiff has not given this Court "information about the operation of, and justifications for, the [challenged laws] on which to base an informed determination," this Court should decline to enter a preliminary injunction on this claim. *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 223 (1997).

No matter what laws are being challenged, they are all "'reasonable, nondiscriminatory'" regulations that are justified by "'the State's important regulatory interests.'" *Burdick*, 504 U.S. at 434. The burdens imposed by these laws could not be more minimal: Filling out the papers provided by the State and placing ballots in the envelope provided by the State do not exceed the "usual burdens" of absentee voting. *Crawford*, 553 U.S. at 198 (op. of Stevens, J.); *see Ariz. Democratic Party*, 18 F.4th at 1188 (signature requirement "imposes only a small burden"). New York reduces any burden further by providing voters with detailed instructions on how to submit a lawful ballot. *See* N.Y. Elec. Law §7-122. And it reduces the burden further by notifying voters that their ballot has a uncurable defect and either sending them a new ballot or instructing them how they can vote by other means. §9-209(3)(h)-(i), (7)(i). Voters can also inform themselves by using New York's online ballot tracker. §8-414.

And despite Plaintiff's repeated refrain about election-worker errors, New York will count ballots that are invalid due to a "ministerial error by the board of elections." §9-209(2)(f); *accord* §16-

106(1). New York also counts ballots that have not complied with New York law but that have "substantially complied" with it. §9-209(7)(f); *see Tenney*, 142 N.Y.S.3d at 301. When asked how many ballots are nevertheless invalidated, but that would be counted under Plaintiff's requested injunction, Plaintiff admits that "[i]t is impossible to tell." Compl. (Doc. 1) ¶91. Any burden that does exist would be justified by New York's important interests in taking measures to confirm voters' identities, stop double voting, prevent ballot tampering, and protect ballot secrecy. *See Crawford*, 553 U.S. at 196-97 (op. of Stevens, J.); *Penn. Democratic Party v. Boockvar*, 238 A.3d 345, 378-79 (Pa. 2020).

Because the Constitution allows New York to impose these requirements, it does not require New York to let voters cure violations. "The relevant inquiry … is not whether election officials could implement [curing] procedures; the Constitution does not demand that all theoretically possible procedures must be put in place." *Ariz. Democratic Party*, 18 F.4th at 1193. And forcing New York to create more cure procedures has real costs. "Not counting" ballots that violate New York's laws better "induces compliance" with those requirements. *Brnovich*, 141 S. Ct. at 2345. And adding cure procedures would create "administrative burdens" that "outweigh the minimal burden on the voter." *Ariz. Democratic Party*, 18 F.4th at 1192. Especially in the "busy" time "following election day" where election workers are "scrambling" to process all the votes, *id.*, cure procedures require election officials to quickly send the voter multiple notices, administer a cure, quickly determine whether the cure is sufficient, and then amend the vote total, *see* N.Y. Elec. Law §9-209(3)(d)-(f). Those burdens can add up quickly in a large State like New York with millions of voters, a cascading effect that would "complicate the process of tabulation and could lead to disputes and delay." *Brnovich*, 141 S. Ct. at 2346.

Nor does the fact that New York allows some errors to be cured "mea[n] that the State also must permit voters who fail to [follow other laws] an equal cure period." *Ariz. Democratic Party*, 18 F.4th at 1193. It was "rational" for New York to allow some cure procedures but not others, *id.*— namely, to codify the ones that the state board of elections thought were feasible and had already been

implementing via regulations, *see* Mot. 6 (explaining this background). The violations that New York allows voters to cure are also different in kind from, say, a totally unsealed envelope, a double vote, or identifying marks. *See Ariz. Democratic Party*, 18 F.4th at 1193. A voter could not tell whether a ballot was tampered with, or confirm who she meant to vote for, unless she could examine the ballot itself— a major violation of ballot secrecy that the existing cure process doesn't contemplate. *See* N.Y. Elec. Law §9-209(2)(d). And violations of ballot secrecy, like identifying marks, can never be "cured" because secrecy is all or nothing.

In short, cure procedures implicate a host of "policy questions," including "what the precise contours of the procedure would be, how the concomitant burdens would be addressed, and how the procedure would impact the confidentiality and counting of ballots," "all of which are best left to the legislative branch." *Penn. Democratic Party*, 238 A.3d at 374. The balance struck by New York's legislature is one among many permissible options under the Constitution.

## B.    Procedural due process

Plaintiff's procedural-due-process claims are, at best, duplicative. Laws regulating voting must be analyzed under "the *Anderson-Burdick* framework," not the "ordinary procedural due process test articulated in *Eldridge*." *Ariz. Democratic Party*, 18 F.4th at 1195. If Plaintiff is correct that voting is a protected liberty interest that implicates procedural due process, then *every* election case should apply not just *Anderson-Burdick*, but also *Mathews v. Eldridge*. Yet no binding precedent does that. "The Supreme Court repeatedly has assessed challenges to election laws … under … *Anderson/Burdick*," and this "extensive jurisprudence" cannot be "discarded merely by raising the same challenge under the banner of procedural due process." *Id.* at 1195. In fact, the Supreme Court has "command[ed] that lower courts 'considering a Fourteenth Amendment challenge to a state election law *must*' apply the *Anderson/Burdick* framework." *Richardson*, 978 F.3d at 234 (cleaned up; quoting *Burdick*, 504 U.S. at

434); *accord New Ga. Project*, 976 F.3d at 1282. Only that test "appropriately accounts for the state's interest in regulating voting." *Richardson*, 978 F.3d at 235.

Plaintiff trots out a familiar smattering of district-court cases that entertain procedural-due-process challenges to state election laws, *see* Mot.11-12, but the problems with those cases have been well documented. "[N]one of those courts provided reasoning for its selection of the *Eldridge* test." *Richardson*, 978 F.3d at 234 & n.28. All "fail to address the overlap between the *Mathews* and *Anderson-Burdick* standards." *DNC v. Bostelmann*, 488 F. Supp. 3d 776, 815 (W.D. Wis. 2020). And some simply apply *Anderson-Burdick* under a different label. *Richardson*, 978 F.3d at 234 & nn.29-30. Plaintiff notably provides "not a single citation to an appellate court opinion" endorsing their "procedural due process" theory. *Memphis A. Phillip Randolph Inst. v. Hargett*, 482 F. Supp. 3d 673, 691 (M.D. Tenn. 2020). Every appellate authority to address this question goes against them. *See Ariz. Democratic Party*, 18 F.4th at 1195; *Richardson*, 978 F.3d at 234 & n.29; *New Ga. Proj.*, 976 F.3d at 1282.

On a more granular level, New York's laws do not violate procedural due process for two basic reasons. First, these laws do not implicate any "cognizable liberty or property interest." *Richardson*, 978 F.3d at 233. Among "life, liberty, or property," U.S. Const., amend. XIV, voting is only possibly a "liberty" interest. *Id.* at 230 & n.17. Although voting is a fundamental right, it is not a "liberty" interest for purposes of the Due Process Clause. *See id.* at 231 & nn.22-23; *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 479 (6th Cir. 2008); *Hargett*, 482 F. Supp. 3d at 690-91. And "the Supreme Court has unambiguously held that the right to vote *absentee*," in particular, "is not a fundamental interest that triggers Fourteenth Amendment protections." *New Ga. Proj.*, 976 F.3d at 1288 (Lagoa, J., concurring) (citing *McDonald v. Bd. of Election Comm'rs of Chicago*, 394 U.S. 802, 807-08 (1969)); *accord Richardson*, 978 F.3d at 232. Second, even assuming voting is a liberty interest, the challenged laws give voters "all the process they were due." *Jones v. Gov'r of Fla.*, 975 F.3d 1016, 1049 (11th Cir. 2020) (en banc). "When a state deprives persons of liberty or property through *legislative* action," the "affected

persons are not entitled to *any* process beyond that provided by the legislative process." *Id.* (citing *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915)).

Even if a separate procedural-due-process analysis were appropriate, the challenged laws would survive *Eldridge* for the same reasons they survive *Anderson-Burdick*. These two balancing tests are "conceptually duplicative." *New Ga. Proj.*, 976 F.3d at 1282. As in prior cases, Plaintiff cannot explain how these two tests could produce different answers. *See Ariz. Democratic Party*, 18 F.4th at 1195; *Bostelmann*, 488 F. Supp. 3d at 815 n.25. Because New York's laws impose minimal burdens that are justified by sufficient interests, they are constitutional under any test.

### C.    Substantive due process

Plaintiff's substantive-due-process claims are likewise "subsumed" by their *Anderson-Burdick* claims. *Hu v. City of N.Y.*, 927 F.3d 81, 104 (2d Cir. 2019). As the Second Circuit reiterated in *Hu*, substantive due process is limited to "claims that are not covered by other provisions of the Constitution." *Id.* at 103. *Hu* approvingly cited a decision from the Fifth Circuit, where the court dismissed a substantive-due-process claim as duplicative with an *Anderson-Burdick* claim. *Id.* at 104 (citing *Wilson v. Birnberg*, 667 F.3d 591, 599 (5th Cir. 2012)). So too here. Because Plaintiff's substantive-due-process claims "rest on the same set of factual allegations" as their *Anderson-Burdick* claims, the former are improper. *Id.* Plaintiff's allegations can be considered only under the more "specific" *Anderson-Burdick* test. *Id.* And the same reasons why these laws satisfy *Anderson-Burdick* would be reasons why they satisfy due process. *Donald J. Trump for President, Inc. v. Boockvar*, 493 F. Supp. 3d 331, 397 (W.D. Pa. 2020).

Even if their claims were proper, Plaintiff comes nowhere close to showing a likely violation of substantive due process. State elections can be challenged on substantive-due-process grounds in "only the most extraordinary circumstances." *Id.* The State's misconduct must be "'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Velez v. Levy*, 401 F.3d

75, 93 (2d Cir. 2005). Mere unconstitutionality isn't enough. *Id.* at 94. A substantive-due-process violation requires, at a minimum, "intentional state conduct directed at impairing a citizen's right to vote." *Shannon v. Jacobowitz*, 394 F.3d 90, 96 (2d Cir. 2005). Neither "negligent state conduct" nor "'garden variety election irregularities'" count, "'even if they control the outcome of the vote or election.'" *Id.* at 95-96. Yet Plaintiff alleges nothing more than that here. Even accepting its assertions, the errors it identifies are caused by voters' own conduct or officials' mere negligence; and they are not common. According to Plaintiff, after all, these same errors occurred during New York's 2020 election. *See* Mot. 5, 6, 9, 19, 20. But Plaintiff surely doesn't believe that New York's 2020 election was so fundamentally unfair that a federal court should have thrown out the results and ordered a redo—the consequence of an actual violation of substantive due process. *See Bennett v. Yoshina*, 140 F.3d 1218, 1226 (9th Cir. 1998) (explaining that a violation of substantive due process means that "a court will strike down an election" because "the election is invalid"); *e.g.*, *Griffin v. Burns*, 570 F.2d 1065, 1079 (1st Cir. 1978) (ordering a new primary).

Nor could Plaintiff prove such a claim *before* the next election has even taken place. It is no accident that Plaintiff's cases suggesting a violation of substantive due process were all decided post-election. *E.g.*, *Griffin*, 570 F.2d at 1066; *Roe v. Ala. ex rel. Evans*, 43 F.3d 574, 578-79 (11th Cir. 1995); *Gallagher v. N.Y. State Bd. of Elections* (*Gallagher I*), 477 F. Supp. 3d 19, 26 (S.D.N.Y. 2020); *Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 81 (2d Cir. 2005). A court cannot tell whether an election was so fundamentally unfair that it failed to satisfy due process until the election actually occurs. Plaintiff's prediction that voters and election officials will commit widespread violations of state election law in 2022 is "overly speculative." *Gallagher II*, 496 F. Supp. 3d at 850-51. This claim is not ripe until it happens—and then, only if the state courts fail to remedy it through the normal post-election channels. *Shannon*, 394 F.3d at 97.

### D.    Equal protection

Though confessing an overlap with its *Anderson-Burdick* claims, Mot. 21 n.10, Plaintiff also alleges a violation of the equal-protection principle from *Bush v. Gore*. Yet this Court has "warned that *Bush*, if not entirely a one-day ticket, was decided on extraordinary facts, such that its holding 'is limited to the present circumstances.'" *Green Party of N.Y. v. Weiner*, 216 F. Supp. 2d 176, 192 (S.D.N.Y. 2002) (quoting 531 U.S. 98, 109 (2000)). In *Bush*, the Florida Supreme Court ordered a recount that would count ambiguous ballots based on the "'intent of the voter'"—a standard that was guided by "no specific rules" and varied widely "from county to county." 531 U.S. at 106. "Having once granted the right to vote on equal terms," the Supreme Court explained, a State "may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Id.* at 104-05. In other words, *Bush* holds that States "may not take the votes of two voters, similarly situated in all respects, and, for no good reason, count the vote of one but not the other." *Boockvar*, 493 F. Supp. 3d at 387.

New York's laws do not implicate *Bush v. Gore*. The challenged laws are "uniform and nondis-criminatory"; they apply "equally to all … voters." *Id.* at 407; *see Lecky*, 285 F. Supp. 3d at 920-21 (no equal-protection violation where procedures were "uniform"). And New York has not "granted the right to vote on equal terms" to voters who, say, send their ballots to the right county versus the wrong county. *Bush*, 531 U.S. at 104. Those voters are not "similarly situated." *Boockvar*, 493 F. Supp. 3d at 387. Nor is New York's decision to treat voters who comply with the challenged laws differently from voters who don't "arbitrary." *Id.* The "minimal burden[s]" imposed by these distinctions are "jus-tif[ied]" by "[t]he State's regulatory interests," as explained above. *League of Women Voters of Ohio v. LaRose*, 489 F. Supp. 3d 719, 740 (S.D. Ohio 2020). Plaintiff's invocation of *Bush v. Gore* thus adds nothing to the analysis.

### E.    Materiality statute

Plaintiff's final source of law is the federal materiality statute. This statute was enacted as part of the Civil Rights Act of 1964. It bans election officials from "deny[ing] the right of any individual to

vote" based on an "error or omission on any record or paper relating to any application, registration, or other act requisite to voting" that is "not material in determining whether such individual is qualified under State law to vote." 52 U.S.C. §10101(a)(2)(B). The challenged laws do not implicate the materiality statute. Three textual features of that statute illustrate why.

**1.** The materiality statute governs ad hoc executive actions that *exceed* state law; it does not dictate the *substance* of state law itself. The statute does not apply at all if the error or omission *is* material to a voter's qualifications "under State law." *Id. Compare Martin v. Crittenden*, 347 F. Supp. 3d 1302, 1308-09 (N.D. Ga. 2018) (practice not required by "Georgia law" was immaterial), *with Org. for Black Struggle v. Ashcroft*, 493 F. Supp. 3d 790, 803 (W.D. Mo. 2020) (requirements embodied in Missouri statutes were material). "[Q]ualified under State law" means "qualified according to the laws … of the State." 52 U.S.C. §10101(e). Because the requirements to vote in the right place, on time, and securely come from New York's statutes, errors regarding these requirements cannot possibly be immaterial "under State law." §10101(a)(2)(B). As Members of Congress explained at the time, the materiality statute is aimed at "registrars" deeming black voters ineligible based on "trivial" "misspelling errors or mistakes in age or length of residence" on their applications. H.R. Rep. No. 88-914 (Nov. 20, 1963), 1964 U.S.C.C.A.N. 2391, 2491. Congress's concerns "come not from discriminatory *laws*," but "'from the discriminatory *application and administration* of apparently nondiscriminatory laws.'" *Id.* (emphasis added). Based on this record, reading the materiality statute to go beyond executive actions and to preempt all sorts of state election laws would bring its constitutionality into serious doubt. *See City of Boerne v. Flores*, 521 U.S. 507, 532 (1997).

**2.** Nor are violations of the challenged laws an "error or omission on any record or paper relating to any application, registration, or other act requisite to voting." 52 U.S.C. §10101(a)(2)(B). The physical act of showing up to the wrong district involves no "error or omission on any *record* or *paper*." *Id.* (emphases added). Neither does the physical act of mailing a ballot late. *See Friedman v. Snipes*,

345 F. Supp. 2d 1356, 1372 (S.D. Fla. 2004). It also abuses the English language to call using the wrong envelope an "*error* or *omission* on [a] *record* or *paper*." 52 U.S.C. §10101(a)(2)(B) (emphases added).

**3.** The materiality statute is also limited to practices that keep individuals from being "qualified to vote," *id.*; it is not concerned with laws that dictate whether ballots cast by concededly qualified voters are valid. In New York, the qualifications for voting are citizenship, age, residency, and non-felon status. *See* N.Y. Elec. Law §5-102; §5-104; §5-106. They are determined through the process of voter registration. §5-100. Laws regulating the mechanics of voting do not "deny *the right* of any individual to vote" by, for example, preventing them from registering. 52 U.S.C. §10101(a)(2)(B) (emphasis added). Nor do they deem anyone not "qualified" to vote. *Id.* They specify certain requirements that *already qualified* voters must follow to ensure their ballot is *counted.* The materiality statute simply does not cover these run-of-the-mill regulations of the mechanics of voting. *See Friedman*, 345 F. Supp. 2d at 1371 ("Nothing in my review of the case law in this jurisdiction or in other jurisdictions indicates that [the materiality statute] was intended to apply to the counting of ballots by individuals *already deemed qualified to vote*."); *Ritter v. Lehigh Cnty. Bd. of Elections*, 2022 WL 16577, at *9 (Pa. Commw. Ct. Jan 3) (similar), *appeal denied*, 271 A.3d 1285 (Pa. 2022).

Finally, even if Plaintiff could state a violation of the materiality statute, it has no private right of action to enforce that statute. Plaintiff will cite 42 U.S.C. §1983, but §1983 is not available if Congress "did not intend that remedy" for the statutory right in question. *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 120 (2005). For the materiality statute, Congress included a public judicial remedy for "the Attorney General" of the United States. 52 U.S.C. §10101(c). That remedy is contained in the same statute and is highly detailed—dictating who can be the defendant, creating special forms of relief, articulating rebuttable evidentiary presumptions, creating new federal jurisdiction, eliminating exhaustion requirements, appointing and compensating private referees, specifying fast deadlines, assigning counsel to defendants, and creating jurisdiction for three-judge district courts and direct

19

appeals to the Supreme Court. *See* §10101(c)-(g). The "'express provision of one method of enforcing a substantive rule,'" especially a "'comprehensive enforcement scheme'" like this one, "'suggests that Congress intended to preclude others.'" *Rancho Palos Verdes*, 544 U.S. at 120-21. Hence why "the majority of courts"—including this one—hold that the materiality statute "is only enforceable by the United States in an action brought by the Attorney General." *Hayden v. Pataki*, 2004 WL 1335921, at *5 (S.D.N.Y. June 14); *accord Dekom v. New York*, 2013 WL 3095010, at *18 (E.D.N.Y. June 18), *aff'd*, 583 F. App'x 15 (2d Cir. 2014).

The Third Circuit recently rejected some of these conclusions in *Migliori v. Cohen*, but that case provides little support for Plaintiff. The opinion offers no textual analysis of the materiality statute, let alone an explanation for how that statute could cover laws that regulate the validity of ballots. *See Ritter v. Migliori*, No. 21A772 (U.S. June 9, 2022) (Alito, J., dissental). Even assuming its correctness, the Third Circuit held only that a law requiring voters to *date* their mail ballots violated the materiality statute. The court held that Pennsylvania's *deadline* for mail ballots—the same kind of law that Plaintiff challenges here—was material and thus did not implicate the materiality statute. *See* 2022 WL 1701850, at *1 (3d Cir. May 27). And the plaintiffs in *Migliori* stressed that the kinds of laws challenged here were not undermined by the Third Circuit's decision:

> The Materiality Provision … does not apply to rules concerning when or where to vote at all. Nor does it apply to polling place conduct, or voter assistance, … or numerous other rules concerning the manner of voting itself, by mail or otherwise. It would not apply to a requirement that a mail ballot be placed in a secrecy envelope, because that is not "an error or omission on a record or paper," 52 U.S.C. §10101(a)(2)(B).

Opp. to Stay 26, *Ritter v. Migliori*, No. 21A772 (U.S. May 2022), bit.ly/3NrwnUV. This Court should not follow *Migliori*. But if it does, it should not expand that decision beyond what even the plaintiffs in that case were willing to argue.

## II.     Under the *Purcell* principle, the equities alone defeat Plaintiff's motion.

Preliminary injunctions are always "extraordinary and drastic," *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997), but they are especially disfavored in election cases. These injunctions cause the "seriou[s] and irreparabl[e] harm" of preventing a State from "conducting [its] elections pursuant to a statute enacted by the Legislature." *New Ga. Proj.*, 976 F.3d at 1283. And they undermine "[c]onfidence in the integrity of our electoral processes" and "the functioning of our participatory democracy." *Purcell*, 549 U.S. at 4. They cause "voter confusion" and drive citizens "away from the polls." *Id.* at 4-5. They also disrupt a state's electoral machinery and burden election administrators. *Wis. State Legislature*, 141 S. Ct. at 31 (Kavanaugh, J., concurral). "Even seemingly innocuous late-in-the-day judicial alterations … can interfere … and cause unanticipated consequences." *Id.* So it is no small thing for a "federal court to swoop in and re-do a State's election laws in the period close to an election." *Milligan*, 142 S. Ct. at 881 (Kavanaugh, J., concurral).

The Supreme Court has "often" stayed "lower federal court injunctions that contravened" this so-called *Purcell* principle. *Id.* at 880; *e.g.*, *supra* n.*. So have the circuit courts, including just last month in a case out of Florida. *LWVF*, 2022 WL 1435597; *supra* n.*. The two most recent decisions applying *Purcell* clarify the answer to the crucial question, "When is an election sufficiently 'close at hand' that the *Purcell* principle applies?" *LWVF*, 2022 WL 1435597, at *3. In *Milligan*, the Supreme Court stayed an injunction where the next election was still "about four months" away. 142 S. Ct. at 888 (Kagan, J., dissental). And in *League of Women Voters of Florida*, the Eleventh Circuit stayed an injunction where absentee voting was "set to begin in less than four months." 2022 WL 1435597, at *3. Four months before voting, the Eleventh Circuit concluded, "*easily* falls within the time period that trigger[s] *Purcell*." *Id.* at *3 n.5 (emphasis added).

This motion likewise falls within *Purcell*'s window. The hearing on this motion is scheduled for June 27. Even if this Court issues an injunction that same day, it will fall only *one day* before New

York's June 28 primary election. If this Court waits and issues an injunction on June 29, then the August 23 primary would be less than two months away. Early in-person voting would be only 45 days away. N.Y. Elec. Law §8-600(1). And absentee voting would start in *nine days*. §10-108(1)(a). These windows are far too tight under *Purcell. See, e.g., North Carolina v. League of Women Voters of N.C.*, 574 U.S. 927 (2014) (32 days); *Husted v. Ohio State Conference of NAACP*, 573 U.S. 988 (2014) (61 days); *Purcell*, 549 U.S. 1 (33 days). In fact, absentee voting for the November election would start in only three months—still too tight under *Purcell*, especially given the extensive changes that Plaintiff wants New York to implement. *E.g., LWVF*, 2022 WL 1435597, at *3 (four months before start of voting). The time it takes the Court to decide this motion and the time it will take to litigate the inevitable appeal will only tighten these already-too-tight windows.

Once a motion implicates *Purcell*, that principle is a sufficient basis to deny a preliminary injunction. *See id.* at *2. In other words, this Court should deny Plaintiff's motion even if it thinks that New York's laws are unconstitutional. The Supreme Court has invoked the *Purcell* principle while expressing "no opinion" on the merits, *Purcell*, 549 U.S. at 5; where the plaintiffs had "a fair prospect of success," *Milligan*, 142 S. Ct. at 881 n.2 (Kavanaugh, J., concurral); and even where the challenged law was "invalid," *Reynolds v. Sims*, 377 U.S. 533, 585 (1964). District courts, too, often decline to issue injunctions based on *Purcell* where all the other factors would favor relief. *See, e.g., Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, 2022 WL 633312, at *76 (N.D. Ga. Feb. 28) (holding that plaintiffs were likely to succeed on the merits and suffer irreparable harm, but denying a preliminary injunction because "[t]he Court is unable to disregard the *Purcell* principle").

For Plaintiff to overcome *Purcell*, it must satisfy "at least" the following four factors:

1. the underlying merits are entirely clearcut in their favor;
2. they would suffer irreparable harm absent the injunction;
3. they have not caused undue delay; and
4. their requested changes are feasible before the election without significant cost, confusion, or hardship.

*Milligan*, 142 S. Ct. at 881 (Kavanaugh, J., concurral). If any one of these four factors is not met, then the motion must be denied. *See LWVF*, 2022 WL 1435597, at *4 n.8 ("Justice Kavanaugh provided three additional factors—*all* of which must be satisfied to justify an injunction under *Purcell*."). Plaintiff cannot satisfy any of them here.

As to factor one, the merits of Plaintiff's case, "at the very least, aren't 'entirely clearcut.'" *Id.* at *6. Plaintiff would have this Court strike down the same election laws that appear in most States and that federal courts have widely upheld. *See supra* I.A.

As to factor two, Plaintiff faces no irreparable harm. The only harm it cites is the right to vote, which incorrectly assumes that Plaintiff is likely to succeed on the merits. Even if Plaintiff were likely to succeed, the many cases that grant stays under *Purcell* prove that this harm is insufficient to justify a preliminary injunction. Under *Purcell*, the harm to *some* voters from having the challenged laws in place is outweighed by the harm to *most* voters from last-minute injunctions—orders that burden administrators, confuse voters, lower voter confidence, cause voters to stay home, and harm "[t]he public's interest in orderly elections." *Silberberg*, 216 F. Supp. 3d at 421-22. And none of the challenged laws prevent New Yorkers from *voting* writ large, given all the alternative ways that New Yorkers can vote and cure defective ballots. *See id.* at 422. Plaintiff's prediction that voters and election officials will necessarily violate New York law is also speculative, as explained above. *See Conservative Party*, 2010 WL 4455867, at *2. Nor are these kinds of harms irreparable. If the challenged laws truly make the 2022 elections unfair, then the New York courts are open to hear and vindicate that claim. *See Shannon*, 394 F.3d at 97. New York law also creates a post-election process that allows Plaintiff to force the counting of any ballot where "ministerial error by the board of elections or any of its employees caused [a] ballot envelope not to be valid on its face." N.Y. Elec. Law §9-209(2)(f); *accord* §16-106(1).

Factor three independently forecloses relief. *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018). A "political party … with long experience in New York elections is surely on notice" of the State's

election laws, so "[t]here is no good reason … for plaintiffs to bring this request for injunctive relief now when, because of the imminence of election, all the potential harms postulated by the defendants are at their maximum." *Conservative Party*, 2010 WL 4455867, at *2. None of the laws that Plaintiff challenges were passed recently, and some have existed for as long as New York has had elections. *See, e.g.*, *Panio v. Sunderland*, 14 A.D.3d 627, 630 (App. Div. 2005) (rejecting ballots cast in the wrong district because "the election district is the heart of our electoral system and the lynchpin of the Election Law" (cleaned up)). According to Plaintiff, the errors it identifies were all present in the 2020 election. Yet Plaintiff did not file this suit until more than a year later. And then it waited four more months (until the middle of primary season) to file this motion.

The whole point of a preliminary injunction is to avoid "*imminent* harm," so "by sitting on [their] rights for even a few months"—let alone a year, and on the eve of several elections—Plaintiff has "squandered any corresponding entitlement to [that] relief." *Alabama v. U.S. Dep't of Com.*, 546 F. Supp. 3d 1057, 1073-74 (M.D. Ala. 2021) (collecting cases); *accord Kishore v. Whitmer*, 972 F.3d 745, 751 (6th Cir. 2020) (similar). Plaintiff's delay is no mere foot fault: By waiting, it allowed New York to conduct elections under the challenged laws, including the statewide primaries happening now. Since "all of the challenged provisions are already the law" and election administrators "have implemented them," Plaintiff's request to "change the law" for the general election exacerbates the harms identified in *Purcell. Coalition for Good Governance v. Kemp* (*CGG*), 2021 WL 2826094, at *3 (N.D. Ga. July 7). "Requiring Defendants to make substantial changes to election policies at the eleventh hour is simply unreasonable, particularly given the fact that the plaintiffs could have brought their challenge several months or years ago." *Silberberg*, 216 F. Supp. 3d at 421.

Factor four also independently forecloses relief because an injunction would cause significant confusion and hardship. *Milligan*, 142 S. Ct. at 881 (Kavanaugh, J., concurral). Plaintiff's only response is that their requested relief would "not 'alter the election rules'" because it would merely "require

election officials to count (or, as appropriate, permit the cure of) ballots that were rejected due to trivial defects or errors facilitated or caused by election officials themselves." Mot. 26-27. That assertion is false. Plaintiff's injunction would require this Court to alter many longstanding election rules, including the law disqualifying ballots cast in the wrong district, the law disqualifying ballots submitted to the wrong county, the deadline for receiving mail ballots, and every other absentee-voting requirement that is currently uncurable. Calling these errors "trivial" runs roughshod over the judgment of the New York legislature. And calling a small number of voters not following basic instructions "election official error" runs roughshod over the English language.

As Plaintiff ultimately admits, its requested injunction would require New York to create a slate of new cure procedures, change when and where ballots can be sent, develop procedures for partial counting and out-of-county reporting, redraft and reissue new guidance documents, retrain poll workers, and more. *See* Am. Notice 2. It is no understatement to say that New York would have to fundamentally rewrite its election code and redesign the way it runs elections, all while it conducts and prepares for other elections. The resulting turmoil would cause the public to lose "[c]onfidence in the integrity of our electoral processes." *Purcell*, 549 U.S. at 4. And it would burden state officials who must educate the confused public, answer calls from voters, and "grapple with a different set of rules." *CGG*, 2021 WL 2826094, at *3.

In sum, even if Plaintiff's arguments had merit, its motion for a preliminary injunction must be denied because it asks this Court to interfere with New York's laws in the middle of election season. *Purcell* does not mean that Plaintiff will ultimately *lose* this case. 549 U.S. at 5. But it means that Plaintiff's case must "proceed without an injunction suspending the [challenged election] rules." *Id.* at 6.

## CONCLUSION

This Court should deny Plaintiff's motion for a preliminary injunction.

Respectfully submitted,

Dated: June 10, 2022                       _*s/ Cameron T. Norris*_

Paul DerOhannesian II (PD0523)         Tyler Green (pro hac vice)
DEROHANNESIAN & DEROHANNESIAN    Cameron T. Norris (pro hac vice)
159 Wolf Road, Suite 305              James P. McGlone (pro hac vice)
Albany, NY 12207                   CONSOVOY MCCARTHY PLLC
(518) 465-6420                     1600 Wilson Blvd., Ste. 700
Fax: (518) 427-0614               Arlington, VA 22201
paul@derolaw.com                 (703) 243-9423
                              cam@consovoymccarthy.com

*Counsel for RNC, NRCC, and NYGOP*

## CERTIFICATE OF SERVICE

I filed this opposition via ECF, which will email everyone requiring notice.

Dated: June 10, 2022                       _*s/ Cameron T. Norris*_