UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DCCC,

                  Plaintiff,

     v.

PETER S. KOSINSKI, in his official capacity as
Co-Chair of the State Board of Elections;
DOUGLAS A. KELLNER, in his official capacity
as Co-Chair of the State Board of Elections;
ANDREW J. SPANO, in his official capacity as
Commissioner of the State Board of Elections;
ANTHONY J. CASALE, in his official capacity
as Commissioner of the State Board of Elections;
TODD D. VALENTINE, in his official capacity
as Co-Executive Director of the State Board of
Elections; and KRISTEN ZEBROWSKI-
STAVISKY, in her official capacity as Co-
Executive Director of the State Board of
Elections,

                Defendants,

and

REPUBLICAN NATIONAL COMMITTEE,
NATIONAL REPUBLICAN CONGRESSIONAL
COMMITTEE, and NEW YORK REPUBLICAN
STATE COMMITTEE,

                Intervenor-Defendants.

No. 1:22-cv-01029 (RA)

---

## PLAINTIFF'S REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ...................................................................................................................... 2

   I.   DCCC is substantially likely to succeed on its claims. ........................................... 2

     A.   DCCC has standing. .......................................................................................... 2

     B.   DCCC's injuries are traceable to the State Defendants, who are the proper defendants. 5

     C.   DCCC is likely to succeed on its substantive due process claim. .................................. 6

     D.   DCCC is likely to succeed on its procedural due process claim. .................................. 8

     E.   DCCC is likely to succeed on its right to vote claim. ..................................................... 9

     F.   DCCC is likely to succeed on its Equal Protection claim. ............................................ 11

     G.   DCCC is likely to succeed on its Civil Rights Act claim............................................... 11

   II.   DCCC will suffer irreparable harm absent an injunction. .................................. 14

   III.  The balance of the equities and public interest favor an injunction. .................................. 14

   CONCLUSION...................................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bell v. Burson*,
  402 U.S. 535 (1971) ................................................................................................9

*Brnovich v. DNC*,
  141 S. Ct. 2321 (2021) ..........................................................................................10

*Bush v. Gore*,
  531 U.S. 98 (2000) ................................................................................................11

*Coates v. City of Cincinnati*,
  402 U.S. 611 (1971) ................................................................................................7

*Crawford v. Marion Cnty. Election Bd.*,
  553 U.S. 181 (2008) ..............................................................................................10

*Democracy N.C. v. N.C. State Bd. of Elections*,
  476 F. Supp. 3d 158 (M.D.N.C. 2020) ...................................................................8

*Democracy N.C. v. N.C. State Bd. of Elections*,
  No. 1:20CV457, 2020 WL 6591396 (M.D.N.C. Sept. 30, 2020) ...........................8

*Democratic Party of Va. v. Brink*,
  No. 3:21-CV-756-HEH, 2022 WL 1159701 (E.D. Va. Apr. 19, 2022)...................2

*Fish v. Schwab*,
  141 S. Ct. 965 (2020) ............................................................................................10

*Fish v. Schwab*,
  957 F.3d 1105 (10th Cir. 2020) ............................................................................10

*Frederick v. Lawson*,
  481 F. Supp. 3d 774 (S.D. Ind. 2020) .................................................................8, 9

*Gallagher v. N.Y. State Bd. of Elections*,
  477 F. Supp. 3d 19 (S.D.N.Y. 2020)........................................................2, 5, 9, 11

*Heindel v. Andino*,
  359 F. Supp. 3d 341 (D.S.C. 2019)......................................................................3, 4

*Heindel v. Andino*,
  No. 19-1204, 2019 WL 7781470 (4th Cir. Nov. 5, 2019) .......................................3

*Landes v. Tartaglione*,
    153 F. App'x 131 (3d Cir. 2005) ........................................................................3

*Landes v. Tartaglione*,
    No. CIV.A. 04-3163, 2004 WL 2415074 (E.D. Pa. Oct. 28, 2004)........................3, 4

*LOWV of N.C. v. North Carolina*,
    769 F.3d 224 (4th Cir. 2014) ............................................................................14

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)..........................................................................................2

*Martin v. Crittenden*,
    347 F. Supp. 3d 1302 (N.D. Ga. 2018) ..............................................................13

*Mathews v. Eldridge*,
    424 U.S. 319 (1976)..........................................................................................9

*McKay v. Thompson*,
    226 F.3d 752 (6th Cir. 2000) ............................................................................12

*Migliori v. Cohen*,
    No. 22-1499, 2022 WL 1701850 (3d Cir. May 27, 2022) ....................................11, 12, 13, 14

*Nat'l Coal. on Black Civic Participation v. Wohl*,
    498 F. Supp. 3d 457 (S.D.N.Y. 2020)................................................................14

*Ne. Ohio Coal. for Homeless v. Husted*,
    696 F.3d 580 (6th Cir. 2012) ............................................................................7

*Ne. Ohio Coal. for the Homeless v. Husted*,
    837 F.3d 612 (6th Cir. 2016) ............................................................................12

*Paul v. Davis*,
    424 U.S. 693 (1976)..........................................................................................8

*Pavek v. Simon*,
    467 F. Supp. 3d 718, 738-44 (D. Minn. 2020)......................................................2

*Pavek v. Simon*,
    967 F.3d 905, 907 (8th Cir. 2020) .....................................................................2

*RNC. v. DNC.*,
    140 S. Ct. 1205 (2020)......................................................................................15

*Schulz v. Kellner*,
    No. 1:07-CV-0943 LEK/DRH, 2011 WL 2669456 (N.D.N.Y. July 7, 2011) ...........4

*Schwier v. Cox,*
    340 F.3d 1284 (11th Cir. 2003) ................................................................12

*Self Advoc. Sols. N.D. v. Jaeger,*
    464 F. Supp. 3d 1039 (D.N.D. 2020)..........................................................7

*Shannon v. Jacobowitz,*
    394 F.3d 90 (2d Cir. 2005)..........................................................................6

*Williams v. Salerno,*
    792 F.2d 323 (2d Cir. 1986)......................................................................14

*Zessar v. Helander,*
    No. 05 C 1917, 2006 WL 642646 (N.D. Ill. Mar. 13, 2006) .......................8

**Statutes**

52 U.S.C. § 10101.............................................................................................11, 12

52 U.S.C. § 10101(a)(2)(B) .........................................................................12, 13, 14

N.Y. Elec. Law § 3-102 .....................................................................................5, 6, 11

N.Y. Elec. Law § 3-107 .........................................................................................6, 11

N.Y. Elec. Law § 3-412 ...........................................................................................11

N.Y. Elec. Law § 3-412(5)..........................................................................................5

N.Y. Elec. Law § 9-209 ...............................................................................................5

**Other Authorities**

U.S. Const. amend. XIV, § 1 .......................................................................................11

## INTRODUCTION

In a state as large as New York, some number of election-related errors—by election officials, USPS, or voters—is inevitable. This case is about what happens when there are systemic errors that cause large-scale disenfranchisement. In election after election, New York has disenfranchised thousands of lawful voters for trivial ballot-related defects that have no bearing on whether the voter is qualified to vote and are often caused by the election officials themselves. Whatever the merit of New York's general election policies, there is no justification for disenfranchising voters because of minor errors, many of which are caused by election officials themselves.

DCCC challenges four specific election practices that systemically and unjustifiably disenfranchise lawful New York voters: (1) the refusal to count Wrong Church Ballots, cast by eligible voters in the wrong polling place, even where the voter is eligible to vote on many of the races in the ballot; (2) the rejection of Wrong County Ballots as untimely, even where election officials in a different New York county received the ballot by the deadline; (3) the rejection of ballots without postmarks, even though it is not the voter's fault their ballot is not postmarked; and (4) the refusal to allow voters to cure many minor technical defects with their ballots, such as the use of an incorrect return envelope (collectively, the "Ballot Rejection Practices").

Those practices have needlessly disenfranchised thousands of lawful voters in past elections and will continue to disenfranchise lawful voters in the future absent relief from this Court. They particularly impact young voters and voters in New York's dense urban areas, including minority voters—all of whom are among DCCC's core constituencies. The Ballot Rejection Practices violate the Due Process Clause, the Equal Protection Clause, the constitutional right to vote, and the Civil Rights Act. The Court should enjoin these practices, forbidding State

Defendants from rejecting ballots cast by lawful voters in races in which they are eligible to vote as a result of the Ballot Rejection Practices.

## ARGUMENT

**I.    DCCC is substantially likely to succeed on its claims.**

**A.    DCCC has standing.**

DCCC has standing to sue because, in the absence of relief, it faces imminent, concrete, and particularized injury that is traceable to the Defendants and redressable by relief from this Court. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Courts have repeatedly concluded that DCCC and similar political party entities have standing to challenge unconstitutional election laws in advance of elections. *See, e.g.*, *Pavek v. Simon*, 467 F. Supp. 3d 718, 738–44 (D. Minn. 2020), *aff'd in relevant part*, 967 F.3d 905, 907 (8th Cir. 2020); *Democratic Party of Va. v. Brink*, No. 3:21-CV-756-HEH, 2022 WL 1159701, at *4–5 (E.D. Va. Apr. 19, 2022). Here, DCCC alleges that it has had to, and will continue to have to, divert and expend funds from other programs to educating New York voters and mobilizing volunteers to combat the burdensome effects of the Ballot Rejection Practices. Compl. ¶ 18, ECF No. 1. The declaration of Pavitra Abraham confirms that injury. *See* Decl. of Pavitra Abraham ¶¶ 2–9, filed herewith. "Courts have routinely accepted similar allegations of direct injury to prove Article III standing." *Dem. Party of Va.*, 2022 WL 1159701, at *5. Moreover, DCCC also has standing because of its interest in promoting Democratic candidates' electoral victory, as "the possibility that counting [additional ballots] could affect the election results is more than sufficient to establish injury" in the electoral context. *Gallagher v. N.Y. State Bd. of Elections*, 477 F. Supp. 3d 19, 35 (S.D.N.Y. 2020).

In challenging DCCC's standing, the State Defendants argue only that DCCC's injury is speculative rather than certainly impending. State Opp. 9–13, ECF No. 93. (Intervenors do not challenge standing at all.) But absent relief, DCCC's injury is inevitable, not speculative. DCCC

does not challenge one-off errors but rather—in the words of the New York State Senate Elections Committee—"systemic problems that lead to the same challenges arising again and again, year after year." Ex. A at 4, ECF No. 79-1. DCCC's evidence shows that New York's Ballot Rejection Practices led to tens of thousands of otherwise valid votes being rejected in prior elections, chiefly 2020. *See, e.g.*, Exs. A, C–G, ECF Nos. 79-1, -3 to -7. Even if, as the State Defendants argue, it is uncertain which *particular* voters will be disenfranchised due to the same Practices in 2022, State Opp. 9–11, there are millions of New York voters, and both experience and expert evidence show that without relief from the Court, many who would support DCCC's candidates will be disenfranchised by the Ballot Rejection Practices in 2022, just as in 2020 and before. *See* Ex. C ¶ 2, ECF No. 79-3. Once that injury has occurred, it cannot be remedied: those are votes forever lost. DCCC must therefore act now to do its best to counteract the injuries threatened by the Ballot Rejection Practices, to the detriment of its other programs. Compl. ¶ 18. And both DCCC and its members, constituents, and voters face imminent harm when some number of them inevitably fall victim to the Ballot Rejection Practices, with people of color, low-income voters, voters with physical disabilities, and voters whose primary language is not English especially at risk. *Id.* ¶¶ 1, 9 and 34.

In contesting standing, the State Defendants cite three non-analogous cases in which plaintiffs sought to prevent states from using electronic voting systems instead of physical ballots. State Opp. 8–9 (citing *Heindel v. Andino*, 359 F. Supp. 3d 341 (D.S.C. 2019), *judgment vacated, appeal dismissed*, No. 19-1204, 2019 WL 7781470 (4th Cir. Nov. 5, 2019); *Schulz v. Kellner*, No. 1:07-CV-0943 LEK/DRH, 2011 WL 2669456 (N.D.N.Y. July 7, 2011); and *Landes v. Tartaglione*, No. CIV.A. 04-3163, 2004 WL 2415074 (E.D. Pa. Oct. 28, 2004), *aff'd*, 153 F. App'x 131 (3d Cir. 2005)). But in each case, individual plaintiffs sued representing only themselves, and they were

unable to show more than "*some* conceivable risk that [their] votes will be inaccurately counted." *Heindel*, 359 F. Supp. 3d at 366 (emphasis in original); *see also Schulz*, 2011 WL 2669456, at *6–7 (explaining that plaintiffs had not shown their votes would not be counted, and that they sued only on their own behalf); *Landes*, 2004 WL 2415074, at *3 (plaintiff "does not assert that the voting machines in question have actually suffered from these issues in the past or that they will definitively malfunction or be tampered with during the upcoming election"). Here, in contrast, DCCC shows that many of its members, voters, and constituents were disenfranchised by the Ballot Rejection Practices in the past, it is inevitable that some will be in the future, and that it is being forced to divert resources from other activities to combat that inevitable injury.

The 2020 Election Reforms do nothing to change this. While New York's Election Law has been amended in some respects, the practices that DCCC challenges were largely or entirely unaffected. The State Defendants argue that non-postmarked ballots will be counted if received the day after election day. State Opp. 12. But DCCC's evidence shows that USPS's two-day delivery standard and frequent delays mean that many timely-mailed ballots will *still* be rejected if they are not postmarked. *See* Pl. DCCC's Mem. in Supp. of Mot. for Prelim. Inj. ("Mem.") at 5–6, ECF No. 79. The State Defendants also argue that voters may now cure additional technical defects with their ballots, State Opp. 12, but DCCC does not challenge those defects—DCCC challenges the other defects that still may not be cured. Mem. 6. In any event, the State Defendants' discussion of the purportedly speculative ways that voters could be disenfranchised as a result of the Ballot Rejection Practices effectively concedes that disenfranchisement as a result of those practices remains just as probable now as in 2020, when DCCC's evidence shows thousands of voters were disenfranchised. *See* State Opp. 9–11.

**B.    DCCC's injuries are traceable to the State Defendants, who are the proper defendants.**

DCCC's injuries are directly traceable to the State Defendants' enforcement of the Ballot Rejection Practices, and the State Defendants are therefore the proper defendants in this case. The State Defendants' contrary arguments rest on a misconception of the relief DCCC seeks. *See* State Opp. 13, 14–15; *see also* Intervenors' Opp. to Mot. for Prelim. Inj. at 1 ("Intervenor Opp."), ECF No. 94. DCCC does not seek an injunction against USPS's failure to postmark some ballots, or against local election officials' errors with respect to Wrong Church or Wrong County ballots. *See* Compl. 41–43. Both USPS and the State Defendants already have policies purportedly designed to prevent those problems. But history demonstrates that errors have nevertheless continued to occur, and with alarming consistency. DCCC therefore seeks an injunction prohibiting the State Defendants—who are the officials responsible for the administration of New York elections—from countenancing the disenfranchisement of voters as a result of these persistent and systemic errors.

The disenfranchisement that results under New York law when systemic election errors occur is directly traceable to the State Defendants, and is redressable by relief against them, because it is a direct result of the election policies and system that the State Defendants administer and enforce. N.Y. Elec. Law § 3-102. The State Board alone has the authority to direct the actions of all local boards of elections and is responsible for "issu[ing] instructions and promulgat[ing] rules and regulations relating to the administration of the election process," *id.*, including those rules and regulations DCCC challenges. It is specifically empowered to 1) oversee and promulgate binding rules governing the counting of absentee and affidavit ballots, *id.* § 9-209; *see also* *Gallagher*, 477 F. Supp. 3d at 36–37, 2) provide training to local boards of elections, N.Y. Elec. Law § 3-412(5), and 3) independently investigate and enforce violations of the state's election

code, N.Y. Elec. Law §§ 3-102, 3-107. The State Defendants therefore have the authority to implement DCCC's requested relief.

### C.    DCCC is likely to succeed on its substantive due process claim.

DCCC's due process claim does not challenge "*unintended* garden variety election irregularities," as the State Defendants and Intervenors erroneously argue. State Opp. 15–16 (emphasis in original); Intervenor Opp. 16. DCCC challenges the systemic rejection of thousands of ballots cast by eligible voters due to the State Defendants' intentional choice to require that ballots not be counted because of technical deficiencies. The decision to reject these ballots is not a passive, negligent act; it is the result of the policies, guidance, and procedures intentionally promulgated and enforced by the State Defendants. Absent an injunction, the Ballot Rejection Practices will continue to violate voters' due process rights.

*Shannon v. Jacobowitz*, 394 F.3d 90 (2d Cir. 2005) does not change the analysis. There, plaintiffs challenged an *accident*—"a voting machine malfunctioned in a local election," causing a "miscount"—that was not the result of any intentional or discriminatory conduct. *Id.* at 94. Here, in contrast, the Ballot Rejection Practices are an intentional choice by the State Defendants to direct election officials to reject thousands of valid, legally cast ballots in the state, due to minor issues that are usually the fault of a third party, not the voter. *See, e.g.*, Compl. ¶¶ 28, 119. In particular:

***Wrong Church Ballots***. Despite state election law, election officials routinely instruct voters to cast provisional "affidavit" ballots instead of directing the voter to the proper polling place. Ex. C ¶¶ 19–27, ECF No. 79-3. The evidence supports this conclusion. *See, e.g.*, *id.*; Ex. E ¶ 6, ECF No. 79-5 ("a poll worker informed me that it was the wrong polling location, but the poll worker told me that I was able to cast an affidavit ballot at the Willowvale Fire House and it would be counted"). This leads to the rejection of the voter's ballot in direct contravention of due process.

*Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 597 (6th Cir. 2012) (holding due process likely violated where "poll-worker error cause[d] thousands of qualified voters to cast" ballots in wrong district that state declined to count).

    ***Wrong County Ballots***. The State Defendants argue that since 2020, New York has made clear that ballots must be returned to voter's own county. State Opp. 17. But neither the Intervenors nor the State Defendants offer any justification for why New York would reject valid ballots that were dropped off by qualified voters on or before election day, simply because they were dropped off in a county other than the one where the voter is registered to vote. The evidence shows that the requirement can impact some groups of voters more than others and that it would be simple for election officials to count these ballots. Ex. K ¶ 11, ECF No. 79-11.

    ***Missing USPS Postmark Ballots***. The State Defendants argue that USPS will not fail to postmark "a large number" of ballots again. State Opp. 18. But it is of no consequence whether the number of voters disenfranchised is small or large; the issue persists, and it remains the case that some voters will be disenfranchised through no fault of their own, in violation of due process. *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971) (holding prohibition that turned on the independent actions of third parties that could not be predicted or controlled violated due process). The State Defendants have the power to remedy this.

    ***Trivial Defect Ballots***. New York's implementation of an incomplete "cure" provision, under which some trivial defects may be cured and others may not, means that New York will continue to reject ballots for errors wholly unrelated to the voters' qualifications to vote. Its passage alone highlights the deprivation voters faced as a result of the State Defendants' non-uniform conduct, and the uncertainty they continue to face in future elections supports the need for a remedy now, before voters are deprived. *Cf. Self Advoc. Sols. N.D. v. Jaeger*, 464 F. Supp. 3d

1039, 1052 (D.N.D. 2020) ("Because there is no possibility of meaningful post[-]deprivation process when a voter's ballot is rejected . . . sufficient pre[-]deprivation process is the constitutional imperative" (citing *Winegar v. Des Moines Indep. Cmty. Sch. Dist.*, 20 F.3d 895, 901 (8th Cir. 1994)).

The Ballot Rejection Practices reflect the State Defendants' intentional decision to disenfranchise voters by directing election officials to reject eligible voters' ballots for minor procedural defects. The fundamental unfairness of that disenfranchisement is heightened because it often occurs when voters follow the instructions of election officials or because of the independent actions of third parties outside the voter's control. Mem. 8–11. Due process requires more for the voters of New York.

### D.    DCCC is likely to succeed on its procedural due process claim.

The State Defendants' and Intervenors' arguments against DCCC's procedural due process claims are similarly wanting. Courts often consider freestanding procedural due process claims for challenges to unfair election procedures. *See, e.g.*, *Frederick v. Lawson*, 481 F. Supp. 3d 774, 792 (S.D. Ind. 2020); *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 229 (M.D.N.C. 2020), *reconsideration denied*, No. 1:20CV457, 2020 WL 6591396 (M.D.N.C. Sept. 30, 2020); *Zessar v. Helander*, No. 05 C 1917, 2006 WL 642646, at *6 (N.D. Ill. Mar. 13, 2006).

While some courts of appeals have recently questioned this line of cases, *see* Intervenor Opp. 13–14, the Second Circuit has never done so. The application of procedural due process analysis makes sense: voting is a critical liberty interest, so "[w]hile the state is able to regulate absentee voting, it cannot disqualify ballots, and thus disenfranchise voters, without affording the individual appropriate due process protection." *Frederick*, 481 F. Supp. 3d at 788; *see also Paul v. Davis*, 424 U.S. 693, 710–11 (1976) (holding that "there exists a variety of interests" protected by the Due Process Clause "by virtue of the fact that they have been initially recognized and

protected by state law"). If the right to hold a drivers' license is protected by the Due Process Clause, as the Supreme Court has held, *see Bell v. Burson*, 402 U.S. 535 (1971), then surely the right to vote must be protected to at least the same extent.

On the merits, the Ballot Rejection Practices cannot survive the balancing test required by due process. *See Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976). The "notice" the State Defendants say New York gives voters is insufficient to satisfy the requirements of procedural due process. State Opp. 18–19. For example, the State Defendants list examples of steps New York takes to inform voters of appropriate voting methods and deadlines *before* an election takes place. *Id.* But none of these give a voter "notice . . . or a meaningful opportunity to cure" their ballot if an election official has decided to reject it after it has been cast; "the ballot is simply tossed out and not counted." *Frederick*, 481 F.Supp.3d at 793–94. The evidence shows this leads to high rates of voter disenfranchisement despite the notice the State Defendants purport to already give and the fact that voters would cure ballots marked for rejection if given the chance. Mem. 14–15. The mass voter disenfranchisement is also unjustifiable given the relatively minor burdens New York would face to provide affected voters with sufficient procedures after the errors have occurred. *Id.*

**E.    DCCC is likely to succeed on its right to vote claim.**

DCCC is also likely to succeed on its right-to-vote claim. The Ballot Rejection Practices are not reasonable but "overinclusive," *Gallagher*, 477 F. Supp. 3d at 43, and not sufficient to overcome the state's purported interests. There is a negligible risk that ballots received without a postmark two days after election were mailed *after* election day given the evidence of USPS two-day minimum delivery standard and substantial delays. Ex. C at 51, ECF No. 79-3; Ex. I, ECF No. 79-9; Ex. J at 7, ECF No. 79-10. Voters are typically eligible to vote in almost all the races that appear on their Wrong Church Ballot, *see, e.g.*, Ex. C at 26, yet their ballot is thrown out in its entirety. Existing cure procedures can easily be expanded to include persistent technical errors, yet

New York instead throws out thousands of ballots. And "there is no burden or logistical hurdle to counting Wrong County Ballots so long as they are received within the same seven (7) daytime period following the election allowed for the return of other mailed absentee ballots." Ex. K ¶ 13, ECF No. 79-11. The current procedures are overinclusive and thus lead to mass denial of a fundamental constitutional right. Mem. 16–21. Moreover, the burdens impact voters differently, for example, racial minorities and urban voters are more likely to be disenfranchised than white or rural voters because of the Wrong Church Ballot rejection practice, and students are likely to be disenfranchised because of the Wrong County practice. *id.* 17–18; Ex. K ¶ 11, ECF No. 79-11. Defendants fail to explain why the state interests they identify make it "*necessary* to burden voters' rights," *Fish v. Schwab*, 957 F.3d 1105, 1133 (10th Cir. 2020) (emphasis added), *cert. denied*, 141 S. Ct. 965 (2020), particularly in light of narrower remedies that will meet the state's interest without overburdening the right to vote. Mem. 2.

Intervenors rely primarily on *Brnovich v. DNC*, 141 S. Ct. 2321 (2021), but that is a case under the Voting Rights Act, not the Constitution, and its analysis turned in substantial part on the history and language of that statute. *Id.* at 2330–33, 2336–39; 2341. Intervenors' reliance on *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008) is also misplaced, because DCCC's challenge is not to policies involving the "usual burdens of voting" but about policies the State Defendants control that lead to the rejection of thousands of valid ballots once voting has already concluded. *Id.* at 198.

Voters should not be disenfranchised as a result of inevitable, systemic errors by election officials or USPS, and Defendants offer only generalized justifications for why refusing to provide exceptions for cases of election official or USPS error serves any important state interest, as would be necessary to justify the resulting complete disenfranchisement of thousands of voters.

**F.**    **DCCC is likely to succeed on its Equal Protection claim.**

The Equal Protection Clause of the Fourteenth Amendment prohibits states from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Pursuant to this provision, states cannot value one voter's vote over another. *See Bush v. Gore*, 531 U.S. 98, 104-05 (2000); *Gallagher*, 477 F. Supp. 3d at 46 (quoting *Hadley v. Junior Coll. Dist. of Metro. Kan. City*, 397 U.S. 50, 54 (1970)) (cleaned up). Principles of equal protection ensure "the equal weight accorded to each vote and the equal dignity owed to each voter," and require "specific rules designed to ensure uniform treatment" to prevent "arbitrary and disparate treatment to voters" based on the county or local jurisdiction in which they vote. *Bush,* 531 U.S. at 104–06. Thus, "a voting process where arbitrary factors lead the state to valuing one person's vote over that of another [is] the kind of process specifically prohibited[.]" *Gallagher*, 477 F. Supp. 3d at 48 (holding that "inconsistent treatment of ballots that [are] timely cast" violates equal protection).

Despite Defendants' contention, the Ballot Rejection Practices *do not* treat all voters the same, State Opp. 24; *see also* Intervenor Opp. 17, and instead have the effect of treating similarly situated voters differently. Mem. 22–24. Ballots that are timely cast can either be counted or rejected, including because a voter receives misguided instructions from officials or because of errors they neither control nor are made aware of. *Id*. 21–24. This disparate treatment is a direct result of the policies Defendants are charged with administering and enforcing. N.Y. Elec. Law §§ 3-102, 3-107, 3-412; Compl. ¶ 21.

**G.**    **DCCC is likely to succeed on its Civil Rights Act claim.**

DCCC has a private right of action under 52 U.S.C. § 10101, as the Third Circuit recently held. *Migliori v. Cohen*, No. 22-1499, 2022 WL 1701850, at *4–5 (3d Cir. May 27, 2022). When Congress unambiguously confers an individual right, as it did with the Materiality Provision of the

Civil Rights Act, 52 U.S.C. § 10101(a)(2)(B), it is presumed enforceable by private plaintiffs except in exceptional cases where a defendant can show that congress specifically foreclosed the remedy under § 1983. *Migliori*, 2022 WL 1701850, at \*3–4. Based on a detailed analysis of the text and history of the statute, the Third Circuit properly concluded that the text and enforcement scheme of § 10101 do not preclude, and in fact contemplate, private parties bringing claims to enforce the Materiality Provision, and that the Attorney General's enforcement power under the statute is not enough to preclude a private right of action, especially since the Attorney General's enforcement is not mandatory nor exclusive. *Id.*

The Eleventh Circuit, conducting a similarly extensive analysis of the statutory language, legislative history, and Supreme Court precedent, also determined that Congress unambiguously conferred an individual right under the statute that was not precluded by the statute's lack of a provision for a private right of action nor by the Attorney General's enforcement authority. *Schwier v. Cox*, 340 F.3d 1284, 1294–97 (11th Cir. 2003). As part of its analysis, the Eleventh Circuit analyzed and disputed the Sixth Circuit's (the only other circuit to address private right of action as to the Materiality Provision) conclusion that enforcement power lay exclusively with the Attorney General. *Id.* at 1294–95 (finding that the Sixth Circuit's holding in *McKay v. Thompson*, 226 F.3d 752, 756 (6th Cir. 2000) relied entirely on a 1978 Kansas case whose analysis ran afoul of the statute's language and of binding Supreme Court precedent). The Sixth Circuit later, citing only to *McKay* and conducting no independent analysis or responding to the many issues the *Schwier* court identified, again held that § 10101 precludes a private right of action. *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 629 (6th Cir. 2016). This Court should follow the precedent set by the Third and Eleventh Circuits' careful consideration of statute and precedent rather than the Sixth Circuit's brief, conclusory, and unsatisfying analysis.

DCCC is further likely to succeed on the merits of this claim. In *Migliori*, the Third Circuit considered a question similar to the one DCCC raises here: whether a board of elections' "refusal to count Voters' ballots" violated the Materiality Provision. 2022 WL 1701850, at *6. At issue was Pennsylvania's requirement that voters include a handwritten date on the outside of ballot-containing envelopes. *Id.* at *1–2. As the Third Circuit explained, the operative question courts must ask is "whether th[e] requirement is material in determining whether [the] individual is qualified to vote under" state law. *Id.* at *6. The Third Circuit found that appellees failed to show how the date writing requirement helped the board determine whether a voter was qualified to vote. *Id.* It then held that the board had to count the ballots or face violating "the Materiality Provision by denying Voters their right to vote based on an omission immaterial to determining their qualifications to vote." *Id.* at *6–7.

The State Defendants "cannot offer a persuasive reason for how" the Ballot Rejection Practices help determine whether voters are qualified to vote in New York. *Id.* at *6. Yet, election officials nonetheless refuse to count ballots based on errors that are immaterial to determining a voter's qualifications, denying voters their right to vote in violation of the Materiality Provision. Intervenors attempt to distinguish *Migliori*, but a plain reading of the text shows that the Materiality Provision applies "to any application, registration, *or other act requisite to voting*," which can extend to regulating the validity of ballots. 52 U.S.C. § 10101(a)(2)(B) (emphasis added). Courts like *Migliori* have in turn evaluated the validity of practices under the provision. *See, e.g.*, *Martin v. Crittenden*, 347 F. Supp. 3d 1302 (N.D. Ga. 2018). Nor are the statutory interpretations of plaintiff's in *Migliori* relevant or binding on this or any court.

Contrary to Intervenors' argument, the Third Circuit did not hold that Pennsylvania's mail ballot deadline "did not implicate the materiality statute." Intervenor Opp. 20. The court did not

13

conduct *any* analysis as to the materiality of the deadline requirement and only discussed the deadline insofar as it notes which ballots in Pennsylvania were considered timely and to say that plaintiff voters cast their ballots by the deadline. *Migliori*, 2022 WL 1701850, at *1, *3, *6–7. In any case, DCCC does not challenge New York's voting deadlines, but rather, the intentional rejection of otherwise valid ballots by state officials for defects that have no bearing on a voter's qualification to vote nor the validity of their ballot. Intervenors' contention that the Ballot Rejection Practices do not constitute an "error or omission on any *record* or *paper*" as required by the statute are similarly lacking. Intervenor Opp. 18–19 (emphasis added). The practices DCCC challenges center on voters casting paper affidavit ballots and paper absentee ballots (like those in *Migliori*) with non-material defects that are all "requisite to voting" but nonetheless rejected. 52 U.S.C. § 10101(a)(2)(B).

## II.    DCCC will suffer irreparable harm absent an injunction.

Intervenors do not deny that DCCC will suffer irreparable harm absent an injunction, and the State Defendants' sole argument against irreparable harm is that DCCC's injury is speculative. As explained above, *supra* Part I.A., it is not. Once an election is over, "there can be no do-over and no redress" for voters whose rights were violated. *LOWV of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014). Courts therefore "routinely deem restrictions on fundamental voting rights irreparable injury." *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 473 (S.D.N.Y. 2020) (quoting *LOWV of N.C.*, 769 F.3d at 247); *see also Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986).

## III.    The balance of the equities and public interest favor an injunction.

Contrary to Defendants' arguments, *Purcell* does not require denial of an injunction here. The relief DCCC seeks is narrow and would not "require a substantial diversion of resources" or

otherwise substantially burden Defendants' administrative capabilities, even in light of the upcoming elections. State Opp. 26. Unlike in the redistricting cases on which Intervenors principally rely, relief in this case would not alter the candidates running for election, the contents of the ballot, or the counting of the vast majority of votes cast. Rather, DCCC seeks discrete remedies to prevent the disenfranchisement of tens of thousands of lawful voters who would otherwise be disenfranchised. In some instances, this would require only instructing officials to count otherwise entirely valid ballots rather than reject them. Several states routinely count the votes on Wrong Church Ballots in the races in which the voter is eligible to vote; there is no reason New York could not adopt similar procedures. Mem. 15, n.6. In fact, New York has *already* developed a process to partially count ballots cast in the right polling place but wrong election district (sometimes called "Wrong Pew" ballots), which it could use for Wrong Church Ballots. *See id.* 15–16 (citing *Ga. Muslim Voter Project*, 918 F.3d at 1273 (Pryor, J., concurring) (concluding failure to allow curing for signature mismatch rejections violated procedural due process in part because cure "procedures are already statutorily in place for absentee ballot application and absentee ballot defects other than signature mismatches" and extending them would "not require the creation of a new system"); *see also* Ex. K ¶ 10, ECF No. 79-11; Ex. C ¶ 28, ECF No. 79-3. In other instances, New York could simply expand its existing affidavit-based cure processes, including to voters with trivial ballot defects or whose ballots were not postmarked by USPS. *See, e.g.*, Ex. K ¶ 15, ECF No. 79-11. Such relief is feasible before the election without significant cost or confusion, so there is no concern of "judicially created confusion" in the run-up to Election Day. *RNC. v. DNC.*, 140 S. Ct. 1205, 1207 (2020).

## CONCLUSION

DCCC respectfully requests that the Court grant its Motion for a Preliminary Injunction.

15

Dated: June 17, 2022                    Respectfully Submitted,

                                        */s/ Aria C. Branch*
                                        Marc E. Elias*
                                        Aria C. Branch*
                                        David R. Fox**
                                        Joshua L. Harris*
                                        Daniela Lorenzo
                                        **ELIAS LAW GROUP LLP**
                                        10 G Street NE, Suite 600
                                        Washington, DC 20002
                                        Phone: (202) 968-4513
                                        Facsimile: (202) 968-4498
                                        melias@elias.law
                                        abranch@elias.law
                                        dfox@elias.law
                                        jharris@elias.law
                                        dlorenzo@elias.law

                                        Andrew G. Celli, Jr.
                                        Nairuby L. Beckles
                                        **EMERY CELLI BRINCKERHOFF**
                                        **ABADY WARD & MAAZEL LLP**
                                        600 Fifth Avenue, 10th Floor
                                        New York, New York 10020

                                        *Attorneys for Plaintiff DCCC*

                                        *Admitted Pro Hac Vice*
                                        ** *Pro Hac Vice Forthcoming*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 17, 2022, I served the foregoing on all counsel of record by electronic mail.


<u>*/s/ Aria C. Branch*</u>

Aria C. Branch