USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 07/13/2022

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DEMOCRATIC CONGRESSIONAL CAMPAIGN COMMITTEE,

        Plaintiff,

v.

PETER S. KOSINSKI, in his official capacity as Co-Chair of the State Board of Elections; DOUGLAS A. KELLNER, in his official capacity as Co-Chair of the State Board of Elections; ANDREW J. SPANO, in his official capacity as Commissioner of the State Board of Elections; ANTHONY J. CASALE, in his official capacity as Commissioner of the State Board of Elections; TODD D. VALENTINE, in his official capacity as Co-Executive Director of the State Board of Elections; and KRISTEN ZEBROWSKI STAVISKY, in her official capacity as Co-Executive Director of the State Board of Elections,

        Defendants,

and

REPUBLICAN NATIONAL COMMITTEE, NATIONAL REPUBLICAN CONGRESSIONAL COMMITTEE, and NEW YORK REPUBLICAN STATE COMMITTEE,

        Intervenor-Defendants.

---

No. 22-CV-1029 (RA)

OPINION AND ORDER

---

RONNIE ABRAMS, United States District Judge:

        Plaintiff Democratic Congressional Campaign Committee ("DCCC") brought this suit against officials of the New York State Board of Elections, alleging that several of New York's election laws and practices disenfranchise DCCC's constituents in violation of their First and Fourteenth Amendment right to vote, Fourteenth Amendment rights to substantive and procedural

due process, and Fourteenth Amendment right to equal protection.  DCCC also alleges that the challenged laws and practices violate the Materiality Provision of the Civil Rights Act, 52 U.S.C. § 10101(a)(2)(B).  Shortly after DCCC filed suit, the Court allowed permissive intervention by the Republican National Committee, the National Republican Congressional Committee, and the New York Republican State Committee ("the Republican Committees").  Defendants and the Republican Committees argue that the challenged laws and practices violate neither the Constitution nor federal law.

DCCC now moves for preliminary injunctive relief, requesting that the challenged laws and practices be enjoined in advance of the August 2022 primary election and November 2022 general election.  For the reasons that follow, the motion is granted in part and denied in part.  Specifically, the Court finds that DCCC is entitled to preliminary injunctive relief to the extent it challenges the rejection, without opportunity for cure, of absentee ballots missing postmarks that are received between two and seven days after Election Day.  The Court orders Defendants to direct local boards of election to offer voters the opportunity to cure such ballots pursuant to the state's existing notice-and-cure process.  All other preliminary relief sought is denied.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    The Challenged Ballot Rejection Practices

DCCC argues that four distinct ballot rejection practices disenfranchised thousands of New Yorkers in prior elections and will continue to do so in the 2022 elections.  According to DCCC, these practices burden "identifiable subgroups" that "are among DCCC's core constituency in New York": "minority voters, young voters, and voters who live in urban areas of the state."  Pl.'s MOL at 2.

A.      Rejection of "Wrong Church" Ballots

DCCC first challenges New York's statutory requirement that "wrong church" ballots—the commonly used term for ballots that are cast by voters in a polling location other than their assigned polling location—be rejected.

For any given election, a New York voter is assigned both an election district and a polling place based on their residential address.  Multiple election districts may be assigned to the same polling place: for instance, a single polling place such as a church might have five separate tables, with each table representing a different election district.  Under New York law, if a voter attempts to vote at a particular election district (*i.e.*, at a particular "table") but does not appear in the record of registered voters for that district, poll workers must obtain the voter's address and ascertain their correct election district and polling location using electronic or hard-copy records, or, if necessary, by contacting the board of elections.  *See* N.Y. Elec. Law § 8-302(3)(e).  If the voter's address is associated with a different polling place and election district, poll workers must "advise the voter of the correct polling place and election district for the residence address provided by the voter"—which could be at a different "table" in the same "church," or at a different "church" entirely.  *Id.*; *see also Tenney v. Oswego County Bd. of Elections*, 71 Misc. 3d 400, 408 (N.Y. Sup. Ct. 2021) ("Election Law § 8-302(3)(e) . . .  require[s] poll workers to . . . advise the voter of the correct polling place and election district for the residence address provided by the voter to such poll clerk.").

If a voter's information does not appear in the records for a particular election district, but the voter nonetheless represents that they live in that election district, officials "shall offer . . . an affidavit to each such voter whose residence address is in such election district."  N.Y. Elec. Law § 8-302(3)(e)(ii).  An individual voting by affidavit ballot must affirm that they are a qualified

voter in the given election district and that their information is not in the relevant records for a specific reason—for instance, because their information appears to be lost or misplaced, or because they recently moved and have not updated their registration.  *See id.*

Whether a voter's affidavit ballot is ultimately counted depends on whether their correct election district was (1) the same district in which they voted; (2) a different district that was assigned to the same polling place; or (3) a different district that was assigned to a different polling place.  The second scenario is known as "wrong pew, right church," and the third scenario is known as "wrong church."  New York law provides that so long as an affidavit ballot was cast in the correct polling place, even if in the incorrect election district, it is counted.  *See* N.Y. Elec. Law § 9-209(7)(d) ("If the central board of canvassers determines that a person was entitled to vote at such election, the board shall cast and canvass such affidavit ballot if such board finds that the voter appeared at the correct polling place, regardless of the fact that the voter may have appeared in the incorrect election district and regardless of whether the voter's name was in the registration poll record.").[1]  But if an affidavit ballot was cast in the wrong polling site—that is, in the "wrong church"—it cannot be counted.  *See Tenney*, 71 Misc. 3d at 408.

One might assume from this statutory framework that "wrong church" ballots would rarely, if ever, be cast, either because poll workers would redirect voters to their correct polling location or because voters whose information was missing from their election district's records for a specified reason would still have their affidavit ballots counted.  But nearly 14,000 affidavit ballots

---

[1] According to an affidavit submitted by the Onondaga County Board of Elections Commissioner, "wrong pew" ballots—ballots that are cast in the wrong election district but the correct polling place—occur "because a poll worker or other election official gave the voter the wrong ballot."  Pl.'s Ex. K ¶ 9.  To cure a "wrong pew" ballot, election officials "complete[] a 'manual redo' of the ballot by copying the voter's vote from one ballot to another to the extent possible.  Those races on the incorrect ballot that do not appear on the correct ballot are not transferred because the voter is not eligible to vote in them.  Those races that appear on only the correct ballot and not on the incorrect ballot are left blank."  *Id.*

in the 2020 presidential election were rejected as "wrong church" ballots. *See* Pl.'s Ex. C ("Meredith Dec.") ¶ 18.

DCCC attributes this high number of "wrong church" ballots to (1) voter confusion in the face of complex election district and polling place configurations and (2) poll-worker error resulting from incomplete and convoluted records or from faulty assumptions regarding a voter's polling place. DCCC relies on an expert analysis by Dr. Marc Meredith, an associate professor of economics, political science, and statistics at the University of Pennsylvania. Dr. Meredith analyzed county-level datasets, voter registration databases, surveys, and other publicly available information in connection with the 2020 presidential election. After doing so, he concluded that "[v]oters are sometimes confused and show up to vote at an incorrect poll site" because New York's "configuration of election districts and poll sites" is often "particularly challenging for voters to navigate." *Id.* ¶ 19. An illustrative example is one Harlem neighborhood in which voters who live on the even-numbered side of a given block on a given street are assigned to vote in polling center A; voters who live on the odd-numbered side of that same block are assigned to vote in polling center B; and voters who live on that same street but one or so blocks down the street are assigned to vote in polling center B—regardless of whether they live on the even-numbered or odd-numbered side of the street. *See id.*

This complex system impacts not only voters who inadvertently go to the wrong polling place, but also poll workers who, when they cannot find a voter in an election district's list of registered voters, "must make an extremely fine distinction between addresses" when attempting to determine the correct election district and polling place based on the address provided by the voter. *Id.* ¶ 20. For instance, Dr. Meredith explains that a resident of 2470 Frederick Douglass Boulevard in Harlem is assigned to one polling place, but a resident of 2471 Frederick Douglass

Boulevard is assigned to a different polling place—meaning that if a poll worker in a given polling place gives the former an affidavit ballot, it will be counted, but if that same poll worker in the same polling place gives the latter an affidavit ballot, it will not be counted. *Id.* Moreover, when poll workers attempt to locate a voter's correct election district and polling place based on a provided address, they are sometimes forced to use paper "poll site list[s], street finder[s], and street locator[s]" rather than electronic records. *Id.* ¶ 24.  As the following images from Dr. Meredith's report illustrate, consulting and cross-referencing these records can easily create confusion for a poll worker:



**Figure 2:  Screenshot of Page 1 of the New York County Poll Site List from the 2020 Presidential Election**

STREET FINDER LIST FOR MANHATTAN          02/21/18                                          PAGE      7

### 8 AVENUE

| FROM | TO | ED | AD | ZIP | CD | SD | MC | CO |
|---|---|---|---|---|---|---|---|---|
| 68 | 78 | 89 | 66 | 10011 | 10 | 27 | 1 | 3 |
| 80 | 100 | 3 | 75 | 10011 | 12 | 27 | 3 | 3 |
| 81 | 125 | 90 | 66 | 10011 | 10 | 27 | 3 | 3 |
| 102 | 120 | 4 | 75 | 10011 | 12 | 27 | 3 | 3 |
| 122 | 142 | 110 | 75 | 10011 | 12 | 27 | 3 | 3 |
| 127 | 159 | 13 | 75 | 10011 | 10 | 27 | 3 | 3 |
| 144 | 176 | 11 | 75 | 10011 | 12 | 27 | 3 | 3 |
| 161 | 195 | 15 | 75 | 10011 | 10 | 27 | 3 | 3 |
| 178 | 196 | 16 | 75 | 10011 | 12 | 27 | 3 | 3 |
| 197 | 215 | 111 | 75 | 10011 | 10 | 27 | 3 | 3 |
| 198 | 214 | 18 | 75 | 10011 | 12 | 27 | 3 | 3 |
| 216 | 234 | 19 | 75 | 10011 | 12 | 27 | 3 | 3 |
| 217 | 235 | 20 | 75 | 10011 | 10 | 27 | 3 | 3 |
| 236 | 278 | 113 | 75 | 10011 | 12 | 27 | 3 | 3 |
| 237 | 259 | 26 | 75 | 10011 | 10 | 27 | 3 | 3 |
| 261 | 279 | 114 | 75 | 10011 | 10 | 27 | 3 | 3 |
| 280 | 296 | 37 | 75 | 10001 | 12 | 27 | 3 | 3 |
| 281 | 299 | 38 | 75 | 10001 | 10 | 27 | 3 | 3 |
| 298 | 320 | 42 | 75 | 10001 | 12 | 27 | 3 | 3 |
| 301 | 321 | 112 | 75 | 10001 | 10 | 27 | 3 | 3 |
| 322 | 418 | 48 | 75 | 10011 | 12 | 27 | 3 | 3 |
| 323 | 381 | 43 | 75 | 10001 | 10 | 27 | 3 | 3 |
| 383 | 401 | 47 | 75 | 10001 | 10 | 27 | 3 | 3 |
| 403 | 419 | 46 | 75 | 10001 | 10 | 27 | 3 | 3 |
| 420 | 456 | 101 | 75 | 10001 | 12 | 31 | 3 | 3 |
| 421 | 459 | 45 | 75 | 10001 | 10 | 31 | 3 | 3 |
| 458 | 498 | 60 | 75 | 10001 | 10 | 31 | 3 | 3 |
| 461 | 499 | 62 | 75 | 10001 | 10 | 31 | 3 | 3 |
| 500 | 516 | 60 | 75 | 10018 | 10 | 31 | 3 | 3 |
| 501 | 563 | 63 | 75 | 10018 | 10 | 27 | 3 | 3 |
| 518 | 536 | 61 | 75 | 10018 | 12 | 31 | 3 | 3 |
| 538 | 598 | 67 | 75 | 10018 | 10 | 31 | 3 | 3 |
| 565 | 617 | 67 | 75 | 10018 | 10 | 31 | 3 | 3 |
| 600 | 638 | 73 | 75 | 10018 | 10 | 27 | 3 | 3 |
| 619 | 637 | 73 | 75 | 10018 | 10 | 27 | 3 | 3 |
| 639 | 679 | 73 | 75 | 10036 | 10 | 27 | 3 | 3 |
| 640 | 678 | 73 | 75 | 10036 | 10 | 27 | 3 | 3 |
| 680 | 788 | 74 | 75 | 10036 | 12 | 27 | 3 | 3 |
| 681 | 715 | 77 | 75 | 10036 | 10 | 27 | 3 | 3 |
| 717 | 731 | 79 | 75 | 10036 | 10 | 27 | 3 | 3 |
| 733 | 789 | 115 | 75 | 10036 | 10 | 27 | 3 | 3 |
| 790 | 844 | 76 | 75 | 10019 | 12 | 27 | 3 | 3 |
| 791 | 813 | 84 | 75 | 10019 | 10 | 27 | 3 | 3 |
| 815 | 829 | 107 | 75 | 10019 | 10 | 27 | 3 | 3 |
| 831 | 847 | 85 | 75 | 10019 | 10 | 27 | 3 | 3 |
| 846 | 908 | 9 | 67 | 10019 | 12 | 27 | 3 | 3 |
| 849 | 909 | 8 | 67 | 10019 | 10 | 27 | 3 | 3 |
| 910 | 956 | 12 | 67 | 10019 | 12 | 27 | 3 | 3 |
| 911 | 929 | 10 | 67 | 10019 | 10 | 27 | 3 | 3 |
| 931 | 947 | 15 | 67 | 10019 | 10 | 27 | 3 | 3 |
| 949 | 971 | 16 | 67 | 10019 | 10 | 27 | 3 | 3 |

### 8 AVENUE

| FROM | TO | ED | AD | ZIP | CD | SD | MC | CO |
|---|---|---|---|---|---|---|---|---|
| 958 | 966 | 12 | 67 | 10107 | 12 | 27 | 3 | 3 |
| 968 | 998 | 93 | 75 | 10019 | 12 | 27 | 3 | 3 |
| 973 | 989 | 17 | 67 | 10019 | 10 | 27 | 3 | 3 |
| 991 | 991 | 23 | 67 | 10019 | 10 | 27 | 3 | 3 |
| 1000 | 1002 | 17 | 67 | 10019 | 10 | 27 | 3 | 3 |
| 2000 | 2048 | 2 | 70 | 10026 | 13 | 30 | 7 | 9 |
| 2001 | 2043 | 82 | 69 | 10026 | 13 | 30 | 7 | 9 |
| 2045 | 2091 | 106 | 70 | 10026 | 13 | 30 | 7 | 9 |
| 2050 | 2066 | 3 | 70 | 10026 | 13 | 30 | 7 | 9 |
| 2068 | 2088 | 107 | 70 | 10026 | 13 | 30 | 7 | 9 |
| 2090 | 2106 | 5 | 70 | 10026 | 13 | 30 | 7 | 9 |
| 2093 | 2109 | 91 | 70 | 10026 | 13 | 30 | 7 | 9 |
| 2108 | 2148 | 7 | 70 | 10026 | 13 | 30 | 10 | 9 |
| 2111 | 2151 | 6 | 70 | 10026 | 13 | 30 | 7 | 9 |
| 2150 | 2188 | 11 | 70 | 10026 | 13 | 30 | 10 | 9 |
| 2153 | 2169 | 12 | 70 | 10026 | 13 | 30 | 7 | 9 |
| 2171 | 2185 | 13 | 70 | 10026 | 13 | 30 | 7 | 9 |
| 2187 | 2225 | 19 | 70 | 10026 | 13 | 30 | 7 | 9 |
| 2190 | 2206 | 15 | 70 | 10026 | 13 | 30 | 10 | 9 |
| 2208 | 2226 | 18 | 70 | 10026 | 13 | 30 | 10 | 9 |
| 2227 | 2243 | 19 | 70 | 10027 | 13 | 30 | 7 | 9 |
| 2228 | 2272 | 20 | 70 | 10027 | 13 | 30 | 10 | 9 |
| 2245 | 2327 | 23 | 70 | 10027 | 13 | 30 | 7 | 9 |
| 2274 | 2308 | 22 | 70 | 10027 | 13 | 30 | 10 | 9 |
| 2310 | 2348 | 24 | 70 | 10027 | 13 | 30 | 10 | 9 |
| 2329 | 2349 | 24 | 70 | 10027 | 13 | 30 | 10 | 9 |
| 2350 | 2366 | 25 | 70 | 10027 | 13 | 30 | 10 | 9 |
| 2351 | 2409 | 102 | 70 | 10027 | 13 | 30 | 10 | 9 |
| 2368 | 2398 | 102 | 70 | 10027 | 13 | 30 | 10 | 9 |
| 2400 | 2408 | 30 | 70 | 10027 | 13 | 30 | 10 | 9 |
| 2410 | 2448 | 32 | 70 | 10027 | 13 | 30 | 10 | 9 |
| 2411 | 2425 | 32 | 70 | 10027 | 13 | 30 | 10 | 9 |
| 2427 | 2485 | 33 | 70 | 10027 | 13 | 30 | 10 | 9 |
| 2450 | 2486 | 34 | 70 | 10027 | 13 | 30 | 10 | 9 |
| 2487 | 2525 | 43 | 70 | 10030 | 13 | 30 | 10 | 9 |
| 2488 | 2508 | 42 | 70 | 10030 | 13 | 30 | 10 | 9 |
| 2510 | 2534 | 43 | 70 | 10030 | 13 | 30 | 10 | 9 |
| 2527 | 2563 | 44 | 70 | 10030 | 13 | 30 | 10 | 9 |
| 2536 | 2568 | 44 | 70 | 10030 | 13 | 30 | 10 | 9 |
| 2565 | 2609 | 50 | 70 | 10030 | 13 | 30 | 10 | 9 |
| 2570 | 2608 | 50 | 70 | 10030 | 13 | 30 | 10 | 9 |
| 2610 | 2628 | 52 | 70 | 10030 | 13 | 30 | 10 | 9 |
| 2611 | 2623 | 52 | 70 | 10030 | 13 | 30 | 10 | 9 |
| 2625 | 2641 | 59 | 70 | 10030 | 13 | 30 | 10 | 9 |
| 2630 | 2650 | 59 | 70 | 10030 | 13 | 30 | 10 | 9 |
| 2643 | 2691 | 98 | 70 | 10030 | 13 | 30 | 10 | 9 |
| 2654 | 2668 | 60 | 70 | 10030 | 13 | 30 | 10 | 9 |
| 2670 | 2688 | 61 | 70 | 10030 | 13 | 30 | 10 | 9 |
| 2690 | 2706 | 62 | 70 | 10030 | 13 | 30 | 10 | 9 |
| 2693 | 2725 | 62 | 70 | 10030 | 13 | 30 | 10 | 9 |
| 2708 | 2728 | 15 | 71 | 10030 | 13 | 30 | 10 | 9 |

### 8 AVENUE

| FROM | TO | ED | AD | ZIP | CD | SD | MC | CO |
|---|---|---|---|---|---|---|---|---|
| 2727 | 2763 | 102 | 71 | 10039 | 13 | 30 | 10 | 9 |
| 2730 | 2748 | 14 | 71 | 10039 | 13 | 30 | 10 | 9 |
| 2750 | 2766 | 13 | 71 | 10039 | 13 | 30 | 10 | 9 |
| 2765 | 2785 | 12 | 71 | 10039 | 13 | 30 | 10 | 9 |
| 2768 | 2788 | 12 | 71 | 10039 | 13 | 30 | 10 | 9 |
| 2787 | 2833 | 107 | 71 | 10039 | 13 | 30 | 10 | 9 |
| 2790 | 2800 | 11 | 71 | 10039 | 13 | 30 | 10 | 9 |
| 2802 | 2806 | 21 | 71 | 10039 | 13 | 30 | 10 | 9 |
| 2828 | 2848 | 107 | 71 | 10039 | 13 | 30 | 10 | 9 |
| 2835 | 2925 | 23 | 71 | 10039 | 13 | 30 | 10 | 9 |
| 2850 | 2928 | 68 | 71 | 10039 | 13 | 30 | 10 | 9 |
| 2927 | 2949 | 87 | 71 | 10039 | 13 | 30 | 7 | 9 |
| 2930 | 2988 | 88 | 71 | 10039 | 13 | 30 | 7 | 9 |
| 2951 | 2973 | 88 | 71 | 10039 | 13 | 30 | 7 | 9 |
| 2975 | 3009 | 89 | 71 | 10039 | 13 | 30 | 7 | 9 |
| 2990 | 2998 | 82 | 72 | 10039 | 13 | 30 | 7 | 9 |

### 8 DRIVE

| FROM | TO | ED | AD | ZIP | CD | SD | MC | CO |
|---|---|---|---|---|---|---|---|---|
| 144 | 144 | 94 | 68 | 10035 | 12 | 29 | 8 | 8 |
| 148 | 148 | 94 | 68 | 10035 | 12 | 29 | 8 | 8 |
| 149 | 149 | 94 | 68 | 10035 | 12 | 29 | 8 | 8 |

### 9 AVENUE

| FROM | TO | ED | AD | ZIP | CD | SD | MC | CO |
|---|---|---|---|---|---|---|---|---|
| 1 | 45 | 82 | 66 | 10014 | 10 | 27 | 1 | 3 |
| 2 | 42 | 82 | 66 | 10014 | 10 | 27 | 1 | 3 |
| 44 | 86 | 90 | 66 | 10011 | 10 | 27 | 3 | 3 |
| 47 | 87 | 90 | 66 | 10011 | 10 | 27 | 3 | 3 |
| 88 | 126 | 13 | 75 | 10011 | 10 | 27 | 3 | 3 |
| 89 | 103 | 12 | 75 | 10011 | 10 | 27 | 3 | 3 |
| 105 | 127 | 13 | 75 | 10011 | 10 | 27 | 3 | 3 |
| 128 | 162 | 15 | 75 | 10011 | 10 | 27 | 3 | 3 |
| 129 | 147 | 14 | 75 | 10011 | 10 | 27 | 3 | 3 |
| 149 | 179 | 111 | 75 | 10011 | 10 | 27 | 3 | 3 |
| 164 | 178 | 111 | 75 | 10011 | 10 | 27 | 3 | 3 |
| 180 | 196 | 20 | 75 | 10011 | 10 | 27 | 3 | 3 |
| 181 | 195 | 21 | 75 | 10011 | 10 | 27 | 3 | 3 |
| 195 1/2 | | 21 | 75 | 10011 | 10 | 27 | 3 | 3 |
| 197 | 225 | 23 | 75 | 10011 | 10 | 27 | 3 | 3 |
| 198 | 210 | 26 | 75 | 10011 | 10 | 27 | 3 | 3 |
| 212 | 228 | 114 | 75 | 10011 | 10 | 27 | 3 | 3 |
| 227 | 227 | 25 | 75 | 10011 | 10 | 27 | 3 | 3 |
| 229 | 247 | 39 | 75 | 10001 | 10 | 27 | 3 | 3 |
| 230 | 250 | 114 | 75 | 10001 | 10 | 27 | 3 | 3 |
| 249 | 269 | 41 | 75 | 10001 | 10 | 27 | 3 | 3 |
| 252 | 268 | 112 | 75 | 10001 | 10 | 27 | 3 | 3 |
| 270 | 312 | 44 | 75 | 10001 | 10 | 27 | 3 | 3 |
| 271 | 353 | 45 | 75 | 10001 | 10 | 31 | 3 | 3 |
| 314 | 330 | 43 | 75 | 10001 | 10 | 27 | 3 | 3 |
| 332 | 350 | 47 | 75 | 10001 | 10 | 27 | 3 | 3 |

9 AVENUE

**Figure 3:  Screenshot of Page 8 of the New York County Street Finder from 2018**

```
                STREET FINDER LIST FOR MANHATTAN      02/21/18                                    PAGE  54
   FROM     TO     ED AD  ZIP  CD SD MC CO    FROM      TO   ED AD  ZIP  CD SD MC CO    FROM      TO   ED AD  ZIP  CD SD MC CO
FRAWLEY CIRCLE                               FREDERICK SAMUEL CITY BLDG    1             FREDERICK SAMUEL CITY BLDG   15
   1295   1295    34 68 10029 13 30  8  9                      109 71 10030 13 30 10  9                    17 71 10030 13 30 10  9
FREDERICK DOUGLASS BOULEVARD                 FREDERICK SAMUEL CITY BLDG    2             FREDERICK SAMUEL CITY BLDG   16
   2270   2270    20 70 10027 13 30 10  9                      109 71 10030 13 30 10  9                    17 71 10030 13 30 10  9
   2808   2826    21 71 10039 13 30 10  9    FREDERICK SAMUEL CITY BLDG    3             FREDERICK SAMUEL CITY BLDG   17
   2830   2830   107 71 10039 13 30 10  9                      109 71 10030 13 30 10  9                    17 71 10030 13 30 10  9
FREDERICK DOUGLASS CIRCLE                    FREDERICK SAMUEL CITY BLDG    4             FREDERICK SAMUEL CITY BLDG   18
      1      7    82 69 10026 13 30  7  9                      109 71 10030 13 30 10  9                    17 71 10030 13 30 10  9
      2      6    82 69 10026 13 30  7  9    FREDERICK SAMUEL CITY BLDG    5             FREDERICK SAMUEL CITY BLDG   19
   2042   2042     2 70 10026 13 30  7  9                      109 71 10030 13 30 10  9                    17 71 10030 13 30 10  9
FREDERICK DOUGLASS I HOUSES                  FREDERICK SAMUEL CITY BLDG    6             FREDERICK SAMUEL CITY BLDG   20
                  56 69 10025 13 30  5  7                      109 71 10030 13 30 10  9                    17 71 10030 13 30 10  9
FREDERICK DOUGLASS II HOUSES                 FREDERICK SAMUEL CITY BLDG    7             FREDERICK SAMUEL CITY BLDG   21
                  53 69 10025 13 30  5  7                       17 71 10030 13 30 10  9                    17 71 10030 13 30 10  9
FREDERICK DOUGLASS PLGD                      FREDERICK SAMUEL CITY BLDG    9             FREDERICK SAMUEL CITY BLDG   22
                  53 69 10025 13 30  5  7                       17 71 10030 13 30 10  9                    17 71 10030 13 30 10  9
FREDERICK E SAMUEL CITY                      FREDERICK SAMUEL CITY BLDG   10             FREDERICK SAMUEL CITY BLDG   23
                  17 71 10030 13 30 10  9                      109 71 10039 13 30 10  9                    17 71 10030 13 30 10  9
FREDERICK E SAMUEL CITY COMM CTR             FREDERICK SAMUEL CITY BLDG   11             FREDERICK SAMUEL CITY BLDG   24
                  17 71 10037 13 30 10  9                      109 71 10039 13 30 10  9                    17 71 10030 13 30 10  9
FREDERICK E SAMUEL I MHOP                    FREDERICK SAMUEL CITY BLDG   12             FREDERICK SAMUEL CITY BLDG   25
                  58 70 10030 13 30 10  9                      109 71 10039 13 30 10  9                    17 71 10030 13 30 10  9
FREDERICK E SAMUEL II MHOP                   FREDERICK SAMUEL CITY BLDG   13             FREDERICK SAMUEL CITY BLDG   26
                 100 70 10030 13 30 10  9                      109 71 10039 13 30 10  9                    16 71 10037 13 30 10  9
FREDERICK E SAMUEL III MHOP                  FREDERICK SAMUEL CITY BLDG   14             FREDERICK SAMUEL CITY BLDG   27
                  16 71 10030 13 30 10  9                       17 71 10030 13 30 10  9                    16 71 10037 13 30 10  9
FREDERICK JOHNSON PLAYGROUND
                  21 71 10039 13 30 10  9                                               FREDERICK SAMUEL CITY BL
```

**Figure 4:  Screenshot of Page 54 of the New York County Street Finder from 2018**

Continuing with the example of a voter who lives on Frederick Douglass Boulevard, Dr. Meredith explains that to find such a "registrant's election district, a poll worker would need to know that most, but not all, addresses on Frederick Douglas Blvd. are instead listed in the street finder under the street's historic street name of 8 Avenue," *id.* ¶ 25—meaning that a voter's information might be on either page eight of the street finder (Figure 3) or on page fifty-four of the street finder (Figure 4) depending on precisely which block of the street they reside on.

Based on the complexity of these records, Dr. Meredith concludes that "poll workers will sometimes struggle to identify whether a registrant is at the correct poll site when relying on a poll site list to identify a registrant's poll site or a street finder list to identify a registrant's election

district." *Id.* This difficulty, combined with the fact that multiple election districts are housed in a single poll site, "introduces the possibility that poll workers do not redirect a voter to their correct polling place because they incorrectly conclude that the voter's election district also votes at that poll site" after misinterpreting the relevant records. *Id.* ¶ 22. Dr. Meredith also posits that poll workers may alternatively assume that registrants with missing records are at the correct poll site given the other explanations that exist for missing records, such as a recent move or the exclusion of inactive but eligible registrants from poll books, and thus offer them an affidavit ballot without identifying their correct poll site. *See id.* ¶ 26. Adding to the likelihood of error is the fact that poll workers must make all these complicated assessments in the midst of the time pressures of Election Day. *See id.* ¶ 25. Lastly, DCCC notes that the New York City Board of Elections Basic Poll Worker Manual instructs poll workers to offer a voter an affidavit ballot if they cannot locate their name in an election district's records and the voter insists on voting—but does not clearly explain in conjunction with that instruction that a poll worker should first notify a voter of their correct polling location. *See* Pl.'s Ex. B at 58-60.

Declarations from New York voters support DCCC's theory of poll-worker error. For example, one voter explained that when he attempted to vote in the 2020 presidential election, "a poll worker informed [him]" that he was at the "wrong polling location," likely as a result of his recent move, but that he "was able to cast an affidavit ballot at [that location] and it would be counted." Pl.'s Ex. E ("Burke Dec.") ¶ 6. The voter followed these instructions, "[b]elieving the election official to be an authority on the matter"—but has since been informed that his ballot was rejected because he voted at the incorrect polling location. *Id.* ¶¶ 6-7. Had he been told that he was required to vote at another location, he affirms, he would have done so. *Id.* ¶ 8. Similarly, according to a former Vote Everywhere Ambassador at SUNY Binghamton, poll workers

erroneously instructed students during the 2020 presidential election to list their parents' addresses on their affidavit ballots, not their within-district residential addresses, leading to these students' ballots being invalidated as "wrong church" ballots. *See* Pl.'s Ex. D ("Cohen Dec.") ¶ 6. That same affiant also reported that some poll workers at the polling place associated with a voter's current address—that is, a voter's correct polling place—"erroneously sent [those voters] back to campus to vote" under the mistaken understanding that state law requires a voter to vote at their location of registration, even if they have recently moved and not updated their registration. *Id.* ¶ 5. Although Vote Everywhere Ambassadors directed voters back to the polling place that had rejected them, some voters "were so frustrated, they just gave up." *Id.*

Defendants, by contrast, attribute "wrong church ballots" to incalcitrant voters. In support of this theory, they point to a declaration by the Commissioner of Elections for the Onondaga County Board of Elections, which explains that "[t]he Attorney General's Office has provided guidance to county election officials . . . that if a voter presents at the wrong poll site and insists on voting there despite being directed to the correct poll site, election officials should provide the voter with an affidavit ballot." Pl.'s Ex. K ("Czarny Dec.") ¶ 7. Defendants do not, however, produce evidence that any "wrong church" ballots in past elections were the result of a voter's insistence on casting an affidavit ballot over a poll worker's explanation that the voter was in the incorrect polling place, as opposed to being cast in reliance on a poll worker's mistaken advice.

According to Dr. Meredith's demographic and statistical analysis, "racial and ethnic minority voters are more likely than White voters to cast affidavit ballots at an incorrect poll site." Meredith Dec. ¶ 29. This conclusion is based on the observation that the assembly districts with the highest number of "wrong church" ballots in the November 2020 election also had high shares of minority residents. *Id.* ¶ 30. Dr. Meredith further explains that minority groups are (1) more

likely to live in densely populated urban areas in which residents live near the border of multiple election districts and poll sites and (2) more likely to live at an address different from their registration address—both of which can contribute to voter and poll-worker error regarding a voter's correct election district and polling place.  *See id.* ¶¶ 29-36.

The New York Legislature has recently amended the state election law to allow "wrong church" ballots to be counted so long as they are cast within the correct county and correct assembly district.  This new law will go into effect on January 1, 2023.  *See* N.Y. Assembly Bill No.  A00642C/S00284-C, *available at* https://nyassembly.gov/leg/?default_fld=&leg_video= &bn=A00642&term=0&Summary=Y&Text=Y.

### B.      Rejection of "Wrong County" Absentee Ballots[2]

DCCC next challenges the practice of rejecting some absentee ballots that are timely dropped off at a polling place outside of the voter's county but that are not received by the voter's county until after Election Day.

New York law provides that absentee ballots shall be "mailed or delivered to the board of elections of the county or city of [a voter's] residence."  N.Y. Elec. Law § 8-410.  At least one New York court has interpreted § 8-410 as permitting the forwarding of ballots that were dropped off outside a voter's county, explaining that "a ballot dropped off to a polling site or Board of Elections outside of the county or city of the voter's residence that is then timely forwarded to the proper local Board of Elections is nonetheless valid."  *Tenney*, 71 Misc. 3d at 411.  DCCC also cites (1) a 2021 report issued by the New York State Senate Elections Committee, which explains that "[by] law, voters may return their completed absentee ballots to any polling place in New

---

[2] The remaining challenged practices concern absentee ballots, as opposed to ballots cast in person.  "Absentee balloting [has been] expanded to permit any voter at risk of acquiring COVID-19 to obtain an absentee ballot"; this expansion is effective through 2022.  *See* Connolly Dec. ¶ 9.

York State," Pl.'s Ex. A at 24; and (2) 2020 written testimony by three individual Defendants stating that "[a]nyone can drop off a voted absentee ballot envelope by delivering it to any poll site on Election Day, by delivering it to any early voting site during early voting hours, or to any office of any board of elections," Pl.'s Ex. G at 7.

Official instructions given to absentee voters in elections after 2020, however, appear to contradict these official statements.  The instructions on the 2021 absentee ballot form explain that a ballot "can be returned to any Early Voting or Election Day poll site in your county, or to your local Board of Elections by 9:00 pm on Election Day, if delivered in person."  Pl.'s Ex. H.  *See also* Connolly Dec. Ex. D (generic absentee ballot form with identical instructions).  The State Board of Elections' website similarly specifies just four ways to return an absentee ballot for the 2022 elections: (1) "Put it in the mail ensuring it receives a postmark no later than [Election Day]"; (2) "Bringing it to your County Board of Elections Office no later than [9:00 p.m. on Election Day]"; (3) "Bringing it to an early voting poll site in your county between [two and ten days before Election Day]"; or (4) "Bringing it to a poll site in your county by [9:00 p.m. on Election Day]."  *See* New York State Board of Elections, *Absentee Voting*, *available at* https://www.elections. ny.gov/VotingAbsentee.html.  At argument, DCCC conceded that these new instructions no longer permit a voter to submit a "wrong county" ballot.  Argument Tr. at 25:4-8.

During the 2020 presidential election—when official instructions on "wrong county" ballots appeared to allow the practice—such ballots were subjected to differing treatment across the state.  For instance, SUNY Binghamton students received instructions from the Broome County Board of Elections that they could drop off their absentee ballots at a polling place in Broome County, even if they were voting in another county.  *See* Cohen Dec. ¶ 7.  But when those students timely dropped off those ballots, the Board told them that they would not timestamp the ballots

until after polls closed and would not mail them until the following day—meaning that they may have been rejected by students' home counties as untimely. *See id.* ¶ 9. A SUNY Binghamton student affirmed that the Broome County Board of Elections had told students that it had consulted with the State Board of Elections, which had told Broome County that "there was no protocol" for how to handle such ballots. *Id.* ¶ 8. Similarly, a SUNY Albany student explained that he had "asked a poll worker" at the SUNY Albany Campus Center polling location whether he could submit his absentee ballot at that center even though he was registered in a different county, and that the official instructed him to do so. Pl.'s Ex. F ("Gilbert Dec.") ¶ 7. His ballot was, however, "rejected as untimely" because Albany County election officials "did not forward [his] absentee ballot to the board of elections in [his] home county before the close of polls." *Id.* ¶ 8. This student affirmed that had he known his ballot would not have been counted if he had dropped it off on Election Day, he "would have returned it sooner or made other arrangements to vote." *Id.* ¶ 9.

Affidavits from election officials reflect similar confusion about how "wrong county" ballots should be handled. The Onondaga County Board of Elections Commissioner has affirmed that "[i]n previous years, [county officials] typically advised voters who attempted to return Wrong County Ballots that [they] cannot accept them"—but that when the county did receive such ballots notwithstanding that advice, "it was the policy of Onondaga to forward these ballots to the board of elections in the voters' counties of registration as promptly" as possible. Czarny Dec. ¶¶ 11-12. However, because the drop boxes that contained those absentee ballots were not opened until the day after Election Day, none of those ballots were forwarded before the close of polls on Election Day, meaning that they were almost certainly rejected as untimely. *See id.* ¶ 12. There is also evidence that at least two counties rejected absentee ballots received in the 2020 presidential election because they had arrived from another county, without any mention as to whether they

were timely forwarded or received. *See* Meredith Dec. ¶¶ 57-58 (reporting that 87 absentee ballots were rejected by Ulster County because they were "dropped off at other county BOE" and that 597 absentee ballots were rejected by Suffolk County and flagged as "Disqualified - Not Delivered to Suffolk County").

At oral argument, DCCC's counsel explained that absentee ballots that were forwarded from one board of elections to another in the 2020 elections were mailed "in bulk" such that a receiving county was likely aware that those ballots were originally received by another county. Argument Tr. at 6:12-22. As to *when* those ballots are forwarded, Defendants' agency counsel asserted that the State Board of Elections instructs counties to "expeditiously forward" "wrong county" ballots to the correct board of elections but does not "specif[y] the precise manner in which that is to occur." *Id.* at 35:9-13. Agency counsel elaborated that it was "articulated" to local boards that such ballots had to be timely postmarked when forwarded to the receiving county in order to be valid. *See id.* at 38:24-39:7. Counsel then, however, stated that "if [a] ballot . . . was received at a poll site within [a] county"—that is, dropped off at a poll site on Election Day—"the [local] board of elections is not going to inventory and know that they have it until after the polls have closed on Election Day," meaning that it was "virtually certain . . . that those ballots would not get a timely postmark when they're forwarded." *Id.* at 40:8-15. By contrast, "wrong county" ballots that were "received prior to Election Day" would "very likely" be counted. *Id.* at 40:15-16. None of this information appears in the evidentiary record.

### C.   Rejection of Absentee Ballots Without Postmarks That Are Received Between Two and Seven Days After Election Day

DCCC next challenges New York's statutory requirement that absentee ballots missing postmarks be rejected if they are received two or more days after Election Day.

If a mailed absentee ballot arrives at a local board of election after Election Day, whether it is counted depends on the day it arrived and whether it has a United States Postal Service ("USPS") postmark.  If an absentee ballot has a postmark showing that it was mailed on or before Election Day, it is counted as long as it arrives within seven days after Election Day.  But if a ballot is missing a postmark, it is counted only if it arrives by the day after Election Day.  *See* N.Y. Elec. Law § 8-412.  Notably, whether an absentee ballot has a postmark is entirely outside a voter's control.  Although USPS' policy is to ensure that each absentee ballot receives a postmark, this policy is not always effectuated.  *See* Meredith Dec. ¶¶ 45-46.  An audit conducted by USPS prior to the 2020 presidential election, for example, reported that at least 4,000 absentee ballots from a single county that were cast in the 2020 New York primary election did not receive a postmark. *Id.* ¶ 46.  According to this audit, a ballot may fail to receive a postmark due to envelopes sticking together when processed on a machine; errors in manual processing; or employees' lack of awareness that all absentee ballots require postmarks.  *See id.*  A recent state bill confirmed that "[i]n Brooklyn, about 4% of ballots in the primary election of June 2020 were not postmarked." New York State Assembly, *Memorandum in Support of Legislation, Bill No. A10808A, available at* https://assembly.ny.gov/leg/?default_fld=&leg_video=&bn=A10808&term=2019&Memo=Y.

During the 2020 presidential election, twenty-one counties across the state rejected at least 165 absentee ballots for arriving late without a postmark; Dr. Meredith explains that this figure likely underestimates the number of such ballots because survey data does not list this situation as one of the pre-designated reasons for absentee ballot rejection.  *Id.* ¶ 49.  According to the Onondaga County Board of Elections Commissioner, who has served in that role since 2013, "numerous unpostmarked ballots arrive more than one (1) day after the election but before the general seven (7) day deadline for the receipt of mailed absentee ballots every year."  Czarny Dec.

¶ 14.   A student who worked as a college voting ambassador in the November 2020 election affirmed that students she worked with "attempted to return their ballots by mail, only for the ballots not to reach election officials in time to be counted"—although it is not clear whether those untimely ballots had postmarks or not.  Cohen Dec. ¶ 10.

In recognition of USPS delays, the State Board of Elections' website advises absentee voters to mail their ballot seven days ahead of an election.  *See* Connolly Dec. ¶ 21.  That website also advises voters that ballots submitted to USPS after the last posted collection time will not be postmarked until the following business day.  *See id.*  It does not, however, warn voters that USPS may fail to postmark ballots entirely.  Nor is this informal seven-day guidance codified in New York law.

Under USPS' service performance standards, first-class mail, including election mail, has a delivery standard of two days—meaning that a ballot mailed on Election Day will usually arrive two or more days after Election Day.  *See* Pl.'s Ex. I; *see also* Meredith Dec. ¶ 51 (explaining that "the only type of mail that has a USPS delivery standard of one day is presorted local mail" and that absentee ballots are "not presorted" (citing U.S. Postal Service, *Delivering for America* (2021), *available at* https://about.usps.com/what/strategic-plans/delivering-for-america/assets/USPS-FactSheet_FCM-Service-Standard-Change.pdf)).  Defendants counter that, notwithstanding USPS' two-day standard, "it is entirely possible that an absentee ballot mailed on the day after the election would arrive the very next day," but cite no evidence supporting this assertion.  Connolly Dec. ¶ 16.  The Republican Committees, for their part, cite USPS' First-Class Mail webpage, which states that first class mail arrives between one and five business days.  *See* U.S. Postal Service, *First-Class Mail*, *available at* https://www.usps.com/ship/first-class-mail.htm.

### D.     Rejection of Absentee Ballots with Various Technical Defects

DCCC's last challenge is to New York's rejection of absentee ballots with various technical defects, without opportunity for cure.

New York law provides that six specific technical defects on an absentee ballot are subject to the state's notice-and-cure process.  Those six curable defects occur "where the ballot envelope: (i) is unsigned; (ii) has a signature that does not correspond to the registration signature; (iii) has no required witness to a mark; (iv) is returned without a ballot affirmation envelope in the return envelope; (v) has a ballot affirmation envelope that is signed by the person that has provided assistance to the voter but is not signed or marked by the voter; or (vi) contains the signature of someone other than the voter and not of the voter."  N.Y. Elec. Law § 9-209(3)(b).[3]  But other technical defects are not curable.  When an absentee ballot suffers from an incurable defect, officials must notify the voter of that fact and either send them a new ballot or instruct them on how to vote by other means.  *See* N.Y. Elec. Law § 9-209(3)(h)-(i).

In its papers, DCCC cites three specific technical defects that are not curable: ballots that are returned in the incorrect envelope (including in a housemate's outer envelope and in an unofficial outer envelope); ballots that are returned in an unsealed envelope; and identifying information on a ballot.  Dr. Meredith explains that in the 2020 presidential election, 930 absentee ballots were rejected for being in an unofficial envelope and 2,564 absentee ballots were rejected for being in unsealed envelopes.  Meredith Dec. ¶ 43.  He does not, however, specify how many

---

[3] "Ballot envelopes are not invalid and do not require a cure if: (i) a ballot envelope is undated or has the wrong date, provided it is postmarked on or prior to election day or is otherwise received timely by the board of elections; (ii) the voter signed or marked the ballot affirmation envelope at a place on the envelope other than the designated signature line; (iii) a voter used a combination of ink (of any color) or pencil to complete the ballot envelope; (iv) papers found in the ballot envelope with the ballot are materials from the board of elections, such as instructions or an application sent by the board of elections; (v) an extrinsic mark or tear on the ballot envelope appears to be there as a result of the ordinary course of mailing or transmittal; or (vi) the ballot envelope is partially unsealed but there is no ability to access the ballot."  N.Y. Elec. Law § 9-209(3)(g).

ballots were rejected for identifying information or for any other technical defects.  At argument, DCCC clarified that it also challenges the rejection of absentee ballots with any other technical defects that are not currently deemed curable but that, in its view, should be curable.

## II.    Procedural History

DCCC filed this action on February 4, 2022.  On May 13, 2022, the Court granted the Republican Committees' motion to intervene.  On May 27, 2022, DCCC moved for a preliminary injunction, which Defendants and the Republican Committees opposed.  DCCC requested preliminary relief on or before July 13, 2022—one month before early voting is set to begin in the August primary election.  The Court held oral argument on June 27, 2022.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  To obtain a preliminary injunction against governmental action taken pursuant to a statute, a movant must demonstrate "irreparable harm absent injunctive relief," "a likelihood of success on the merits," that the "public interest weigh[s] in favor of granting the injunction," and "that the balance of equities tips in his or her favor."  *Yang v. Kosinski*, 960 F.3d 119, 127 (2d Cir. 2020).[4]  "A plaintiff seeking injunctive relief must justify that application by evidentiary submissions."  *Thurman v. Bun Bun Music*, No. 13-CV-5194 (CM) (MHD), 2015 WL 2168134, at *4 (S.D.N.Y. May 7, 2015).

"Where the movant seeks a mandatory injunction (one that will alter the status quo) rather than a prohibitory injunction (one that maintains the status quo), the likelihood-of-success standard is elevated: the movant must show a clear or substantial likelihood of success."  *Hoblock v. Albany County Bd. of Elections*, 422 F.3d 77, 97 (2d Cir. 2005).  This heightened standard also applies

---

[4] Unless otherwise noted, case quotations omit all internal quotation marks, citations, alterations, and footnotes.

where the injunction "will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits." *People ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015). Contrary to DCCC's position, each of the forms of relief it seeks—not merely the relief relating to "wrong church" ballots—alters the status quo, and thus its entire motion is subject to this higher standard.

## DISCUSSION

### I.    Standing

Before turning to the merits, the Court addresses Defendants' challenge to DCCC's standing.[5] It concludes that DCCC has standing to pursue injunctive relief on its challenges to the rejection of (1) "wrong church" ballots and (2) late absentee ballots without postmarks, but has failed to establish standing to pursue injunctive relief on its challenges to the rejection of (1) "wrong county" ballots and (2) absentee ballots with various technical defects.

"To satisfy Article III" standing, a plaintiff must "demonstrate an injury in fact; a causal connection between the injury and the conduct of which [the plaintiff] complains; and that it is likely a favorable decision will provide redress." *Kowalski v. Tesmer*, 543 U.S. 125, 129 n.2 (2004) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). The plaintiff "bears the burden of showing that [it] has standing for each type of relief sought," *Summers v. Earth Island Institute*, 555 U.S. 488, 493 (2009), including for each type of injunctive relief sought, *Salazar v. Buono*, 559 U.S. 700, 731 (2010) (Scalia, J., concurring in the judgment). "[T]o establish standing for a preliminary injunction, a plaintiff cannot rest on . . . mere allegations . . . but must set forth

---

[5] State Defendants also argue that DCCC's claims are not ripe. As they tend to do in other cases, "the Article III standing and ripeness issues in this case boil down to the same question." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 n.5 (2014). *See also Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 688 (2d Cir. 2013) ("[T]o say a plaintiff's claim is constitutionally unripe is to say the plaintiff's claimed injury, if any, is not actual or imminent, but instead conjectural or hypothetical.").

by affidavit or other evidence specific facts that establish" each of the elements of standing. *New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 59 (2d Cir. 2020).

### A.       Injury-in-Fact

The injury-in-fact requirement "ensure[s] that the plaintiff has a personal stake in the outcome of the controversy." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). A movant seeking prospective relief based on the threat of future harm need not show that such harm is "literally certain," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013), but must establish that there is "a substantial risk the harm will occur," *Susan B. Anthony List*, 573 U.S. at 158.[6] In doing so, a movant "cannot rely on past injury to satisfy the injury requirement but must show a likelihood [*i.e.*, a substantial risk] that he or she will be injured in the future." *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998). In addition to demonstrating a substantial risk of future harm, "a plaintiff seeking injunctive relief must demonstrate . . . the existence of an official policy or its equivalent." *Shain v. Ellison*, 356 F.3d 211, 216 (2d Cir. 2004).

### 1.       Risk of Recurrence of the Ballot Rejection Practices

#### a.       DCCC Has Established a Substantial Risk That the Rejection of "Wrong Church" Ballots and Late Ballots Without Postmarks Will Recur in the 2022 Elections

DCCC's evidence establishes that two of the practices it challenges—the rejection of "wrong church" ballots and of late absentee ballots without postmarks—have repeatedly occurred in past elections, and that the "same conditions" that caused those ballots to occur remain in place

---

[6] District courts in this circuit have made clear that the "substantial risk" standard remains applicable beyond cases such as *Susan B. Anthony List* that concern the threat of prosecution. *See Amadei v. Nielsen*, 348 F. Supp. 3d 145, 158 n.6 (E.D.N.Y. 2018); *New York v. U.S. Dep't of Commerce*, 315 F. Supp. 3d 766, 782 (S.D.N.Y. 2018).

today.  Meredith Dec. ¶ 2.  Although a close question, the Court finds this evidence is sufficient to establish a substantial risk that similar rejection of such ballots will recur in the 2022 elections.

"[W]hile a past injury alone is insufficient to establish standing to seek prospective relief, a court may consider a past injury as 'evidence bearing on whether there is a real and immediate threat of repeated injury.'"  *Amadei v. Nielsen*, 348 F. Supp. 3d 145, 158 (E.D.N.Y. 2018) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974)).  *Accord Deshawn E.*, 156 F.3d at 344 (holding that the plaintiffs had standing to seek injunctive relief in part because there was "proof of a pattern of illegality").  Evidence of past injury becomes even more probative, and the threat of future injury less speculative, "when actual repeated incidents are documented."  *Floyd v. City of New York*, 283 F.R.D. 153, 169 (S.D.N.Y. 2012).  Relatedly, evidence as to the "frequency of alleged injuries inflicted by the practices at issue . . . creates a likelihood of future injury sufficient to address . . . standing concerns."  *Id.* at 170 (discussing records of thousands of unconstitutional stops).  This is particularly so when the system that produced the alleged past harms has not changed such that there is "no reason to think [those harms] will not continue."  *Anderson v. Raffensperger*, 497 F. Supp. 3d 1300, 1317 (N.D. Ga. 2020).  Indeed, other circuits have held that standing for injunctive relief may be established through evidence of repeated past harms that resulted from a system or policy that remains in effect.  *See, e.g.*, *Ciudadanos Unidos De San Juan v. Hidalgo County Grand Jury Comm'rs*, 622 F.2d 807, 820-21 (5th Cir. 1980) (finding that "allegations of past illegal conduct" were "sufficient to give rise to a strong inference that the injury will be repeated in the future" when the only requisite inference was that jury commissioners would "act exactly as they have for the past ten years" and when the "very nature of" a state's grand juror selection scheme was "susceptible to abuse as applied"); *31 Foster Children v. Bush*, 329 F.3d 1255, 1266 (11th Cir. 2003) (holding that foster children plaintiffs had alleged an imminent injury because they could

not "avoid exposure to the defendants' challenged conduct" and because "[t]he alleged systemic deficiencies in the Florida foster care system are similar to an injurious policy and different from . . . random act[s]").

DCCC's evidence meets the standards articulated above for two of the ballot rejection practices it challenges. First, it has shown that nearly 14,000 "wrong church" ballots were cast in the 2020 presidential election. Meredith Dec. ¶ 18. At argument, the parties also discussed the factual record developed in *Common Cause/New York v. Brehm*, 432 F. Supp. 3d 285 (S.D.N.Y. 2020), in which then-District Judge Nathan found that 35,000 "wrong church" ballots had been cast in the 2016 general election. *See id.* at 301 (relying on expert evidence to conclude that "[m]ore than 35,000 voters who were not listed in the poll books in the 2016 election cast ballots in the wrong polling location").[7] Moreover, according to Dr. Meredith, the poll-worker error and voter error that produces these "wrong church" ballots are the natural results of two systemic issues, neither of which has changed since the 2016 and 2020 elections: (1) New York's highly confusing organization of election districts and poll sites and (2) records that are incomplete and difficult for poll workers to navigate. Meredith Dec. ¶¶ 19-27. This documentation of "actual repeated incidents" occurring at a high degree of "frequency," *Floyd*, 283 F.R.D. at 169-70, along with DCCC's evidence regarding the "alleged systemic deficiencies" that contributed to these incidents and that remain unchanged, *31 Foster Children*, 329 F.3d at 1266, suffices to establish a substantial risk of similar harm in the future.

---

[7] It is appropriate to consider such evidence on this motion, even though it was introduced in a separate litigation. *See We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 276 n.3 (2d Cir. 2021) (explaining that the Second Circuit has previously "ruled that courts may consider hearsay evidence such as affidavits when determining whether to grant a preliminary injunction" and accordingly "consider[ing] . . . data submitted in affidavits filed in other courts" in ruling on a preliminary injunction appeal); *see also Richardson v. Trump*, 496 F. Supp. 3d 165, 178-79 (D.D.C. 2020) (relying on the evidentiary record in *Jones v. United States Postal Service*, No. 20-cv-6516, a case that considered evidence of nationwide USPS delays, in concluding that there was evidence of similar impending delays that justified injunctive relief in that litigation).

Second, DCCC has produced evidence of a pattern of ballots being rejected for arriving late without postmarks.  Turning first to the 2020 primary election, Dr. Meredith explained that "about 1,200 absentee ballots that lacked a postmark were received within two days of Election Day" in one New York congressional district during that election.  Meredith Dec. ¶ 48.  Indeed, another judge in this district credited evidence that "thousands of absentee ballots cast in the June 23 primary [in New York City] were invalidated because (1) they arrived after the close of polls on June 23 and lacked a postmark, or (2) reflected a postmark with a date later than June 23" and that "at least ten county boards of election outside of New York City" had invalidated hundreds of absentee ballots in the same election "for lack of postmark."  *Gallagher v. New York State Bd. of Elections* ("*Gallagher I*"), 477 F. Supp. 3d 19, 32, 34 (S.D.N.Y. 2020).  These findings are supported by the conclusions of both USPS and New York's legislature: according to the 2020 USPS audit, at least 4,000 ballots from a single New York county were missing postmarks, Meredith Dec. ¶ 46, and commentary on a recent state bill confirmed that "[i]n Brooklyn, about 4% of ballots in the primary election of June 2020 were not postmarked," *Memorandum in Support of Legislation, Bill No. A10808A*.  While the latter two statements do not specify how many of those ballots missing postmarks were rejected for arriving late, it stands to reason that a significant number of them arrived two days after Election Day, given USPS' two-day service standard for unsorted first-class mail such as election mail, Meredith Dec. ¶ 46.  Turning next to the 2020 presidential election, DCCC has established that at least hundreds of ballots across at least twenty-one New York counties were again rejected for arriving late without a postmark—even after New York had passed a new law allowing ballots without postmarks to be counted if received one day after Election Day.  *Id.* ¶ 49.[8]  Beyond these two elections, the Onondaga County Board of

---

[8] Instances of ballots improperly missing postmarks, moreover, occurred nationwide during the 2020 election cycle, with hundreds of such ballots recorded in Milwaukee, Madison, and Pennsylvania.  Meredith Dec. ¶ 47.

Elections Commissioner, who has served in that role from 2013 to the present and overseen twenty-four elections, has affirmed that "numerous unpostmarked ballots arrive more than one (1) day after the election but before the general seven (7) day deadline for the receipt of mailed absentee ballots every year."  Czarny Dec. ¶ 14.

The recurrence of such ballots makes sense in light of the evidence presented on USPS service standards: DCCC has shown that USPS has a two-day delivery standard for unsorted mail such as absentee ballots, meaning that voters who mail their ballot on Election Day will very likely not have their ballot counted if it is not postmarked.  Moreover, the delays in USPS delivery times that were highlighted during the 2020 elections have persisted beyond that year.  *See* Pl.'s Ex. J (2021 statement of position by various states before the Postal Regulatory Commission).  Indeed, the agency's quarterly performance report shows that it met its two-day delivery standard just 87% of the time in the New York metro area in late 2021.  *See* Pl.'s Ex. I.  This data strongly suggests that even some of those voters who mail their absentee ballots the day before Election Day will still be impacted by the combination of USPS delays and postmarking failures.  These "actual repeated incidents" of the rejection of late ballots without postmarks, together with evidence that USPS will usually take two or more days to deliver absentee ballots, create a strong inference that similar delays and postmarking failures will recur, resulting in the rejection of ballots.

In short, DCCC's standing burden as to these ballot rejection practices is satisfied through its showing that "defendants [are] continu[ing] to apply the same policy that had caused [the alleged] harm in the past," which will lead to "predictable results."  *Cf. Gallagher v. New York State Bd. of Elections* ("*Gallagher II*"), 496 F. Supp. 3d 842, 851 (S.D.N.Y. 2020).[9]  To be sure,

---

[9] *Gallagher II*'s holding—that voter and candidate plaintiffs had failed to establish standing to support injunctive relief ordering the counting of late ballots without postmarks in the 2020 general election—is distinguishable from this Court's standing analysis on this issue for several reasons. First, *Gallagher II* cited as a relevant change in law New York's new practice of accepting ballots with missing postmarks that are received one day after Election Day.  496 F.

in *Clapper v. Amnesty International*, the Supreme Court expressed a "reluctan[ce] to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment." 568 U.S. at 413. But DCCC has provided evidence strongly suggesting that the third-party actions that contribute to these particular ballot rejection practices are the predictable results of systemic deficiencies, rather than independent and unpredictable choices. That is, the Court would not characterize as "exercises of judgment" voters and poll workers misidentifying a voter's polling place in response to an excessively confusing system, or USPS employees or machines failing to postmark ballots in contravention of established policy.

In arguing otherwise, Defendants rely on *Shelby Advocates for Valid Elections v. Hargett*, 947 F.3d 977 (6th Cir. 2020), in which the Sixth Circuit denied an application for an injunction that would guard against anticipated poll-worker error, holding that "[f]ear that individual mistakes will recur, generally speaking, does not create a cognizable imminent risk of harm." *Id.* at 981 (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 105-06 (1983), which held that a victim of an unlawful chokehold by an LAPD officer could not establish that he would likely be harmed again in the same manner). But the Court does not find *Shelby* persuasive to the extent it relies primarily on *Lyons*, which featured a single plaintiff who feared the recurrence of unlawful conduct by police officers. Although it may indeed be speculative to conclude that any specific individual will be impacted by one or more of the challenged practices, it is not speculative on the current record to conclude that some voters will be so impacted in the upcoming elections—and the relevant inquiry

---

Supp. 3d at 852. But this does nothing to address the rejection of ballots received two or more days after Election Day that were likely timely posted, which DCCC has shown continues to occur notwithstanding the change in law. Second, *Gallagher II* mentioned state law reforms that allow voters to receive their absentee ballots well ahead of Election Day. *Id.* But this change would be relevant to the standing analysis only if a voter is no longer likely to wait until Election Day to mail their ballot, an assumption this Court is unwilling to make. Third, *Gallagher II*'s standing analysis rested on the fact that the candidate plaintiff was running in a county outside New York City, and the evidence before the court suggested that the postmarking errors in the prior election were largely confined to New York City. *Id.* at 851. Here, though, DCCC seeks statewide relief, and has produced evidence that ballots without postmarks have repeatedly arrived late in counties both in and outside of New York City.

for purposes of assessing harm to DCCC is whether the challenged conduct will recur with respect to *any* Democratic voter. *Cf. Amadei*, 348 F. Supp. 3d at 161 (distinguishing *Lyons* from the instant case by noting that plaintiffs "have shown that they are more likely than simply any other citizen to be subjected to" injury). Arguably, the more speculative conclusion under these circumstances would be that "[n]o injury may occur at all." *Shelby*, 947 F.3d at 983. *Cf. Sandusky County Democratic Party v. Blackwell*, 387 F.3d 565, 574 (6th Cir. 2004) (per curiam) (holding that a political organization had standing to seek injunctive relief despite the fact that it could "not identif[y] specific voters who will seek to vote at a polling place that will be deemed wrong by election workers" and concluding that while "mistakes cannot be specifically identified in advance . . . [it] is inevitable . . . that there will be such mistakes").

Instructive to the Court's standing analysis for both of the challenged practices discussed above is *Common Cause Indiana v. Lawson*, 937 F.3d 944 (7th Cir. 2019), in which the Seventh Circuit affirmed a grant of injunctive relief to organizational plaintiffs challenging an Indiana law that allowed the removal of double-registered voters from the state's registration rolls without notice to the voter. The plaintiffs there asserted that based on "their experience assisting people who were erroneously dropped from the rolls," they "expect[ed] that if [the law was] allowed to go into effect and the state start[ed] removing eligible voters from the rolls without notice, errors [would be] inevitable, and the Organizations [would] be forced to spend resources cleaning up the mess." *Id.* at 951. They further "predict[ed] that some of the very voters they registered [would] be erroneously unregistered." *Id.* An important part of the plaintiffs' predictions of future injury was their prior experience assisting individuals who had already been removed from the rolls in the past. *See id.* at 952. The court deemed the plaintiffs' evidence of "the enhanced risk of erroneous voter removal" based on the impending law non-speculative and sufficient to establish

injury in fact for purposes of injunctive relief. *Id.* at 951.  This Court finds DCCC's evidence-based expectation of a substantial risk of harm similar to that discussed in *Common Cause*.  "While the Court cannot know with absolute certainty whether" these challenged ballot rejection practices will recur in the 2022 elections with similar frequency as in prior elections, it "is persuaded that there is a very substantial risk" that they will.  *Pavek v. Simon*, 467 F. Supp. 3d 718, 744 (D. Minn. 2020) (holding that plaintiffs had established substantial risk of future harm based on expert evidence that a state's practice of placing certain political parties higher up on the ballot had harmed specific parties in previous years and would continue to do so in the future).

Accordingly, the Court finds that DCCC has established a substantial risk that the rejection of "wrong church" ballots and of late absentee ballots without postmarks will recur in the 2022 elections.

> **b.    DCCC Has Failed to Establish a Substantial Risk That the Rejection of "Wrong County" Ballots or the Rejection of Ballots with Various Technical Defects Will Recur in the 2022 Elections**

DCCC has not, however, establishing standing to pursue injunctive relief on the other two ballot rejection practices it challenges: the rejection of "wrong county" ballots and of absentee ballots with various technical defects.

First, DCCC has not shown that it faces imminent injury based on the rejection of "wrong county" ballots because it has failed to demonstrate a substantial risk that "wrong county" ballots will be cast by voters in the 2022 elections in the first instance.  DCCC has presented statistical data and voter affirmations that "wrong county" ballots were cast and rejected in the 2020 presidential election.  *See* Meredith Dec. ¶¶ 57-58; Gilbert Dec. ¶¶ 7-8.  But it appears undisputed that after 2020, the instructions on absentee ballot forms were changed to explicitly instruct a voter to drop off an absentee ballot within their county, as opposed to anywhere in the state.  *See* Pl.'s

Ex. H (2021 absentee ballot); Connolly Dec. Ex. D (generic absentee ballot); Argument Tr. at 25:4-8. Accordingly, the Court cannot rely on events from the 2020 election cycle to assess the risk of "wrong county" ballots recurring. *See Anderson*, 497 F. Supp. 3d at 1309 (concluding that "[t]he predictive value of Georgia's past elections is simply too limited to tell us (with the requisite certainty) what will happen in" a subsequent election when "Georgia revamped its voting equipment and voting processes in 2020"). And the only evidence regarding the existence of "wrong county" ballots after the change in absentee ballot instructions is a statement from the Onondaga County Board of Elections Commissioner that "Onondaga County did *not* receive any Wrong County ballots during the recent 2021 election cycle." Czarny Dec. ¶ 11 (emphasis added). This statement, taken along with that official's discussion of "wrong county" ballots the county had received prior to 2021, *see id.* ¶¶ 11-13, strongly suggests that the recent change to the absentee ballot form has impacted whether voters submit "wrong county" ballots in the first instance. At argument, DCCC's only response to the intervening change in absentee ballot instructions was that voters are "creatures of habit" and will thus cast "wrong county" ballots again notwithstanding instructions to the contrary. Argument Tr. at 35:9-12. This unsupported assertion, particularly in light of an election official's contrary observation, is "too speculative for Article III purposes," *Clapper*, 568 U.S. at 409. Because "recently adopted . . . policies make the injuries less likely," *Gallagher II*, 496 F. Supp. 3d at 851, the Court finds that DCCC has not established standing with respect to its challenge to the rejection of "wrong county" ballots.

Nor has DCCC established imminent injury with respect to its challenge to the rejection of absentee ballots with various technical defects. DCCC has shown that in the 2020 presidential election, 930 absentee ballots were rejected statewide for arriving in an unofficial envelope and 2,564 absentee ballots were rejected statewide for arriving in an unsealed envelope. Meredith Dec.

¶ 43.  It offers no data, though, regarding how many—if any—ballots have been rejected in any past election for any other technical defect.  Although "there is no *per se* rule requiring more than one past act, or any prior act . . . as a basis for finding a likelihood of future injury," *Roe v. City of New York*, 151 F. Supp. 2d 495, 503 (S.D.N.Y. 2001), DCCC has provided no explanation for why these technical defects are likely to recur, in contrast to its explanation for "wrong church" ballots and late absentee ballots without postmarks.  Indeed, it appears that the existence of technical defects on absentee ballots results exclusively from "the random unauthorized acts of a third party," which is "too speculative to satisfy standing requirements."  *31 Foster Children*, 329 F.3d at 1266.  In other words, unlike the third-party acts at issue in the context of "wrong church" ballots and late ballots missing postmarks, there is no indication that errors that result in ballots with technical defects stem from systemic deficiencies; rather, they appear to be exercises of judgment that are entirely within a voter's control.  This hampers the Court's ability to meaningfully assess the risk of such incidents recurring.

Also problematic for standing purposes with respect to this final challenge is the fact that DCCC does not offer a complete list of the technical defects it seeks to be deemed curable.  DCCC's papers discuss three specific technical defects: ballots that are returned in the incorrect envelope (including in a housemate's outer envelope and in an unofficial outer envelope); ballots that are returned in an unsealed envelope; and identifying information on a ballot.  But at argument, DCCC clarified that it is seeking a "broad[] injunction" under which "if something else happens that is analogous to [those defects] and could be cured, that a voter be allowed to cure" those defects as well.  Argument Tr. at 8:19-21.  It then predicted that future disputes over what qualifies as "curable" would return to this Court for adjudication.  *Id.* at 9:8-10.  The Court cannot, however, meaningfully assess the likelihood of a particular injury occurring when it cannot define the injury

in the first instance.  DCCC acknowledges this uncertainty by admitting that "it's not possible in the abstract to necessarily think of everything that could possibly go wrong and cause a ballot to be rejected that could be cured," *id.* at 8:24-9:1—but nevertheless seeks an injunction that guards against anything that "could possibly go wrong."  Mere possibility, of course, does not rise to the level of "substantial risk," *Susan B. Anthony List*, 573 U.S. at 158.[10]

Accordingly, the Court finds that DCCC has established standing for its challenges to the rejection of (1) "wrong church" ballots and (2) late absentee ballots without postmarks, but has not established standing for its challenges to the rejection of (1) "wrong county" ballots and (2) absentee ballots with various technical defects.

### 2.    Imminent Harm to DCCC

In addition to establishing a substantial risk that two of the challenged ballot rejection practices will cause New York voters, including members of DCCC's constituency, to be disenfranchised in the 2022 elections, DCCC has adequately established that it will suffer injury by diverting its resources away from fulfilling its organizational mission and toward combatting those practices.  In *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), the Supreme Court held that an organization can establish injury in fact by proving "concrete and demonstrable injury to [its] activities—with the consequent drain on [its] resources."  *Id.* at 379.  Pursuant to this standard, an organization shows the requisite injury if it "spend[s] money to combat activity that harms its organization's core activities."  *Centro de la Comunidad Hispana de Locust Valley v. Town of*

---

[10] Separately, an injunction that would require the Court to preside over future litigation challenging determinations made by local boards of election regarding which of a potentially infinite list of errors should be deemed "curable" would "thrust [the Court] into the details of" at least two future elections, thereby "tinkering with the state's election machinery . . . for all manner of error and insufficiency."  *Powell v. Power*, 436 F.2d 84, 86 (2d Cir. 1970).  Such an injunction would also likely fall short of Rule 65's requirement that an injunction "state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required."  Fed. R. Civ. P. 65(d)(1); *see Schmit v. Lessard*, 414 U.S. 473, 476 (1974) (per curiam) (explaining that these standards are "designed to prevent uncertainty and confusion on the part of those faced with injunctive orders" and that "basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed").

*Oyster Bay*, 868 F.3d 104, 111 (2d Cir. 2017).  In so doing, an organization must "divert money from its other current activities."  *Id.* at 110.

DCCC's National Organizing Director has affirmed that "[t]o combat the burdens of the Ballot Rejection Practices on its members and constituents, DCCC has had to and will continue to have to divert resources away from engaging and mobilizing voters in New York and elsewhere to educating voters about the Ballot Rejection Practices and mobilizing volunteers to assist those who may be at risk, as DCCC did in 2020."  Abraham Dec. ¶ 7.  She further explains that the imminent recurrence of the challenged ballot rejection practices, which harm Democratic Party voters, *see id.* ¶ 9, will "frustrate DCCC's ability to fulfill its mission of electing Democratic candidates to the U.S. House," *id.* ¶ 6.  These assertions are sufficient to support organizational standing—as multiple courts have held when determining DCCC's standing specifically.  *See Pavek*, 467 F. Supp. 3d at 739 ("DCCC ha[s] made a sufficient showing of injury-in-fact in the form of both a diversion of resources, and harm to electoral prospects."); *Democratic Party of Virginia v. Brink*, No. 21-CV-0756 (HEH), 2022 WL 1159701, at *4-5 (E.D. Va. Apr. 19, 2022) (determining that DCCC had alleged direct injury based on resource diversion in response to state regulations).[11]

### B.   Causation and Redressability

The Court closes its standing discussion by briefly explaining why causation and redressability are satisfied with respect to the ballot rejection practices on which DCCC has shown imminent injury—the rejection of "wrong church" ballots and the rejection of late absentee ballots without postmarks.  "The burden of showing that an injury is linked to a defendant's conduct . . .

---

[11] "The fact that the added cost has not been estimated and may be slight does not affect standing, which requires only a minimal showing of injury."  *Crawford v. Marion County Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008).

is 'relatively modest,' and a plaintiff need not show that 'defendant's actions are the very last step in the chain of causation.'"  *Gallagher I*, 477 F. Supp. 3d at 36 (quoting *Bennett v. Spear*, 520 U.S. 154, 169 (1997)).  "Rather, it is sufficient for a plaintiff to show 'injury produced by determinative or coercive effect upon the action of someone else.'"  *Id.* (quoting *Bennett*, 520 U.S. at 169).

Under New York's statutory scheme, the State Board of Elections "has 'jurisdiction of, and is responsible for, the execution and enforcement of . . . statutes governing campaigns, elections and related procedures.'"  *Schulz v. Williams*, 44 F.3d 48, 61 n.13 (2d Cir. 1994) (quoting N.Y. Elec. Law § 3-104); *see* N.Y. Elec. Law § 3-102(1) ("[T]he state board of elections shall have the power and duty to . . . issue instructions and promulgate rules and regulations relating to the administration of the election process . . . consistent with the provisions of law."); *id.* § 3-102(17) ("[T]he state board of elections shall have the power and duty to . . . perform such other acts as may be necessary to carry out the purposes of this chapter.").  Indeed, the Second Circuit has explicitly stated that the State Board of Elections has "the requisite special relation to [contested provisions of state election law] to render them proper defendants" in suits challenging the application of those provisions.  *Schulz*, 44 F.3d at 61 n.13.  It is true that some of the challenged ballot rejection practices involve the actions of third parties, such as local poll workers and USPS. But this does not mean that the injuries of which DCCC complains are not "linked" to Defendants' conduct: because Defendants are responsible for the enforcement of the election laws, including those laws that require the rejection of certain ballots, any injuries resulting from failing to count those ballots are "produced by determinative . . . effect upon the action[s]" of Defendants. *Gallagher I*, 477 F. Supp. 3d at 36 (quoting *Bennett*, 520 U.S. at 169).

In short, Defendants have the ultimate responsibility for enforcing the election laws; have the power to dictate the procedures by which poll workers administer elections; and have the power

to instruct local boards of election whether and how to count ballots.  Their arguments that causation and redressability are lacking are, therefore, unavailing.[12]

## II.  Entitlement to a Preliminary Injunction

### A.  Likelihood of Success on the Merits

#### 1.  Legal Frameworks

DCCC alleges that the challenged ballot rejection practices violate five distinct legal rights: (1) the right to vote; (2) the right to substantive due process; (3) the right to procedural due process; (4) the right to equal protection; and (5) the protections for voters enshrined in the Materiality Provision of the Civil Rights Act.

##### a.  Right to Vote

The right to vote, which derives from the First and Fourteenth Amendments, is "a fundamental political right, because [it is] preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1885).  Constitutional challenges to a state's election laws are governed by the framework set forth in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992).  Under that framework, courts must first "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." *Anderson*, 460 U.S. at 789.  Of course, all "[e]lection laws will invariably impose some burden upon individual voters." *Burdick*, 504 U.S. at 433.  But if the right to vote is severely burdened by a state statute, the law is subject to strict scrutiny, meaning that it must be "narrowly drawn to advance a state interest of compelling importance." *Id.* at 434.

---

[12] Defendants relatedly argue that additional necessary parties must be joined, such as local boards of election, USPS, and even state candidates.  The Court disagrees with these arguments for the same reasons as those expressed in *Gallagher I*. *See* 477 F. Supp. 3d at 38-39.

If, by contrast, the "burden [on the right to vote] is minor, but non-trivial, *Burdick*'s balancing test is applied." *Price v. New York State Bd. of Elections*, 540 F.3d 101, 109 (2d Cir. 2008. "This latter, lesser scrutiny is not pure rational basis review." *SAM Party of New York v. Kosinski*, 987 F.3d 267, 274 (2d Cir. 2021). "Rather, the court must actually weigh the burdens imposed on the plaintiff against the precise interests put forward by the State, and the court must take into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.* A state's "reasonable and nondiscriminatory restrictions will generally be sufficient to uphold [a] statute" that imposes a minor burden on the right to vote "if they serve important state interests." *Price*, 540 F.3d at 109.

## b. Substantive Due Process

"Without question, courts have found due process violations in voting cases before." *Shannon v. Jacobowitz*, 394 F.3d 90, 96 (2d Cir. 2005). A substantive due process violation, however, requires both a finding of "fundamental unfairness" in the election process, *Hoblock*, 422 F.3d at 98; and a finding of "intentional state conduct directed at impairing a citizen's right to vote," *Shannon*, 394 F.3d at 96; *see also Daniels v. Williams*, 474 U.S. 327, 328 (1986) ("[T]he Due Process Clause is simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty, or property."). By contrast, "garden variety election irregularities do not violate the Due Process Clause, even if they control the outcome of the vote or election." *Shannon*, 394 F.3d at 96.[13]

---

[13] The Republican Committees contend that DCCC does not have a substantive due process claim available to it because "where another provision of the Constitution provides an explicit textual source of constitutional protection, a court must assess a plaintiff's claims under that explicit provision and not the more generalized notion of substantive due process." *Hu v. City of New York*, 927 F.3d 81, 104 (2d Cir. 2019). This theory ignores the fact that the Second Circuit has repeatedly assessed challenges to election procedures and ballot invalidations under substantive due process. *See, e.g.*, *Hoblock*, 422 F.3d at 97-98; *Shannon*, 394 F.3d at 96. Indeed, some of DCCC's claims—namely, its challenge to the rejection of "wrong church" ballots—seem better suited to a substantive due process analysis than to an *Anderson-Burdick* analysis to the extent DCCC challenges erroneous official conduct rather than New York law. *See* Argument Tr. at 56:6-8 ("[W]e're not disputing the general requirement that . . . voters vote at their assigned

c.     **Procedural Due Process**

The Due Process Clause also protects against deprivations of constitutionally protected interests in life, liberty, or property that occur without due process of law. "[T]o determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate." *Zinermon v. Burch*, 494 U.S. 113, 126 (1990). In evaluating whether a state's process is adequate, "the Supreme Court has distinguished between (a) claims based on established state procedures and (b) claims based on random, unauthorized acts by state employees." *Hellenic American Neighborhood Action Committee v. City of New York*, 101 F.3d 877, 880 (2d Cir. 1996). "When the state conduct in question is random and unauthorized, the state satisfies procedural due process requirements so long as it provides meaningful post-deprivation remedy." *Rivera-Powell v. New York City Bd. of Elections*, 470 F.3d 458, 465 (2d Cir. 2006). "In contrast, when the deprivation is pursuant to an established state procedure" such that a post-deprivation remedy does not automatically satisfy due process, courts balance the following three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 466 (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). Although the Fifth, Ninth, and Eleventh Circuits have held that the *Anderson-Burdick* framework controls in challenges to voting restrictions to the exclusion of the procedural due process framework, *see Ariz. Democratic Party*

---

polling place."); *Lecky v. Virginia State Bd. of Elections*, 285 F. Supp. 3d 908, 919 (E.D. Va. 2018) (explaining that in *Anderson-Burdick* cases, courts "consider[] the constitutionality of state statutes, regulations, or policies that burden the right to vote, not accidental mistakes on the part of election officials in administering an election"). Because none of the Court's conclusions turn on whether one legal framework controls over another, it assesses DCCC's challenges under both an *Anderson-Burdick* framework and a substantive due process framework when necessary to do so.

*v. Hobbs*, 18 F.4th 1179, 1195 (9th Cir. 2021) (mem.); *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 233-35 (5th Cir. 2020); *and New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1282 (11th Cir. 2020), the Second Circuit has not directly addressed this question.

### d.  Equal Protection

"The right to vote is protected in more than the initial allocation of the franchise.  Equal protection applies as well to the manner of its exercise.  Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another."  *Bush v. Gore*, 531 U.S. 98, 104-05 (2000) (per curiam).  Under this "one person, one vote" theory of equal protection, "[c]ourts have generally found equal protection violations where a lack of uniform standards and procedures results in arbitrary and disparate treatment of different voters" who are otherwise similarly situated.  *Lecky v. Virginia State Bd. of Elections*, 285 F. Supp. 3d 908, 920 (E.D. Va. 2018).

### e.  Materiality Provision

Finally, the Materiality Provision of the Civil Rights Act provides that "[n]o person acting under color of state law shall[] . . . deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election."  52 U.S.C. § 10101(a)(2)(B).  The circuits are split as to whether § 10101(a)(2)(B) confers a private right of action.  *Compare Migliori v. Cohen*, 36 F.4th 153, 159-62 (3d Cir. 2022), *and Schwier v. Cox*, 340 F.3d 1284, 1294-97 (11th Cir. 2003), *with Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 630 (6th Cir. 2016).  While the Second Circuit has not weighed in on the split, several district courts in this circuit have concluded that the statute does not confer such a right.  *See, e.g.*, *Hayden v. Pataki*, No. 00-CV-

8586 (LMM), 2004 WL 1335921, at *5 (S.D.N.Y. June 14, 2004); *Dekom v. New York*, No. 12-CV-1318 (JS) (ARL), 2013 WL 3095010, at *18 (E.D.N.Y. June 18, 2013).

### 2.    Analysis

The Court next assesses DCCC's claims on which it has standing—the rejection of "wrong church" ballots and of late absentee ballots without postmarks—to determine whether it has shown a clear likelihood of success on those claims under the legal frameworks it advances.

As a threshold matter, however, the Court will not analyze either of these challenges under the rubric of a procedural due process claim.  The parties dispute whether such a claim is cognizable in this case, or whether the *Anderson-Burdick* framework controls to the exclusion of the procedural due process framework.  Notably, three circuits "evaluating procedural due process challenges to a voting restriction . . . have held, on review of a preliminary injunction," that "the *Anderson/Burdick* approach is better suited to the context of election laws than is the more general [*Mathews v.*] *Eldridge* test."  *Ariz. Democratic Party*, 18 F.4th at 1195 (citing *Richardson*, 978 F.3d at 233-35, and *New Ga. Project*, 976 F.3d at 1282).  Although the Second Circuit has not spoken directly on this issue, it has previously considered a distinct type of election-law challenge—namely, a candidate's challenge to the process by which election officials removed her from the ballot—under a procedural due process theory.  *See Rivera-Powell*, 470 F.3d at 464-68.

Without weighing in on whether a procedural due process claim is indeed cognizable in this particular context, the Court finds that DCCC's procedural due process claims effectively collapse into its *Anderson-Burdick* claims.  As at least one district court has noted, there is considerable "overlap between the *Mathews* and *Anderson-Burdick* standards."  *Democratic Nat'l Comm. v. Bostelmann*, 488 F. Supp. 3d 776, 815 (W.D. Wis. 2020).  That is particularly true here, where DCCC "alleges no additional deprivation of [due process] interests independent from the

deprivation that forms the basis of [its *Anderson-Burdick*] claim[s]" such that those sets of claims are "virtually indistinguishable" from each other.   *Cf. Rivera-Powell*, 470 F.3d at 468. Accordingly, the Court's analysis of DCCC's claims under *Anderson-Burdick* obviates the need to analyze those same claims under *Mathews*.

a.  **"Wrong Church" Ballots**

Of all the ballot rejection practices DCCC challenges, the one that has resulted in the greatest number of invalidated ballots—at least in the most recent elections—is the rejection of "wrong church" ballots.   DCCC rightly emphasizes the troubling likelihood of poll-worker error, and the even more troubling consequences of such error.   But equally deserving of emphasis is the fact that the voter makes the initial error in arriving at the wrong polling place before any poll worker can compound on that error by failing to redirect them to the correct location.   *See Tenney*, 71 Misc. 3d at 408 ("[R]egardless of what the poll worker did, it was still the voter's error in going to the wrong polling site in the first place that resulted in her casting an invalid ballot.").   In other words, voters face no risk of casting a "wrong church" ballot if they go to the correct polling place.

In the Court's view, this fact precludes a finding that DCCC is clearly likely to succeed on either its *Anderson-Burdick* claim or its substantive due process claim.   Turning first to the *Anderson-Burdick* analysis, the burden imposed by New York's law is not, as DCCC asserts, the burden of disenfranchisement if a voter has the bad luck of receiving mistaken advice; rather, it is more accurate to characterize the burden as finding the correct polling place, because this is the only relevant hurdle a voter must overcome in order to effectively cast their vote.   As the Supreme Court has recently reiterated, "[h]aving to identify one's own polling place and then travel there to vote does not exceed the 'usual burdens of voting.'"   *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2344 (2021) (quoting *Crawford v. Marion County Election Board*, 553 U.S. 181, 198

(2008)).[14]  New York lightens this burden further by notifying a voter of their polling place in advance through the mail.  *See* Connolly Dec. ¶ 47.  On the other side of the *Anderson-Burdick* equation, a state has an important interest in ensuring that individuals vote in the correct polling place, not least because such a rule reduces administrative burdens on election officials by limiting traffic at poll sites.  *See, e.g.*, *Common Cause/New York*, 432 F. Supp. 3d at 316 ("New York has an important interest in ensuring that only voters who are properly registered to vote in a location vote in that location . . . and . . . in prohibiting voters from voting in locations where they do not reside.").[15]  And while it would certainly be possible to subject "wrong church" ballots to the same partial cure procedure as "wrong pew" ballots, doing so would likely impose significant additional administrative burdens on election officials, which the state has an important interest in reducing.  *See Ariz. Democratic Party*, 18 F.4th at 1190; *see also id.* at 1193 ("The relevant inquiry . . . is not whether election officials could implement such procedures; the Constitution does not demand that all theoretically possible procedures must be put in place.").

To be sure, DCCC has produced evidence that thousands of New York voters are effectively burdened by the law by inadvertently traveling to the wrong polling place, and that these errors are the product of confusing election district and polling place systems that are difficult for voters to navigate.  But the Supreme Court has made clear that the mere fact that a voting regulation "prevent[s] a significant number of" voters from participating in elections does not automatically invalidate that restriction.  *Crawford*, 553 U.S. at 190.  Conducting the balancing that *Anderson-Burdick* requires, the Court concludes that DCCC has not shown that the burden

---

[14] Although *Brnovich* was a Voting Rights Act case, in reaching this conclusion the Supreme Court quoted *Crawford*, an important *Anderson-Burdick* precedent—strongly suggesting that it views this burden as minimal even in the constitutional context.

[15] Indeed, DCCC agrees that requiring voters to vote in the correct polling place is a legitimate state interest.  Argument Tr. at 22:23-23:1.

New York's law poses on voters outweighs the state's interests in regulating where ballots may be cast.

Nor does the upcoming change in New York law—which will allow "wrong church" ballots to be counted as long as they are cast in the correct county and assembly district—alter the Court's view for two reasons. First, an assembly district covers far less ground than a county (which is the only geographic limitation on "wrong-church" ballots that DCCC seeks). *See, e.g.*, Board of Elections in the City of New York, *NYC District Maps*, *available at* https://vote.nyc/page/nyc-district-maps (listing thirteen assembly districts in New York County, eleven assembly districts in Bronx County, and twenty-one assembly districts in Kings County). This indicates that the state continues to prioritize its interest in a voter casting a ballot that is effective in as many local races as possible. Second, the fact that New York has chosen to ease the burden on voters, while laudable, does not suggest that its current scheme is unconstitutional: states may choose to structure their voting laws in a manner more permissive than what the First Amendment demands.

Accordingly, the Court finds that DCCC has not shown a clear or substantial likelihood of success that New York's polling-place requirement, either in the abstract or in the context of voter error and poll-worker error, impermissibly burdens the right to vote.

Turning to DCCC's substantive due process claim, the first hurdle DCCC faces in obtaining relief is the long-standing rule that "garden variety election irregularities do not violate the Due Process Clause, even if they control the outcome of the vote or election." *Shannon*, 394 F.3d at 96. Rather, a due process violation "require[s] intentional state conduct directed at impairing a citizen's right to vote." *Id.* Specific election-related errors that, according to the Second Circuit, have not implicated due process include: accidentally allowing non-party members

to vote in a congressional primary, *see Powell v. Power*, 436 F.2d 84, 88 (2d Cir. 1970); human error in programming voting machines resulting in the miscounting of votes, the presence of ineligible candidates on a ballot, and the delay in arrival of voting machines, *see Gold v. Feinberg*, 101 F.3d 796, 801 (2d Cir. 1996); "mechanical and human error in counting votes," *Shannon*, 394 F.3d at 96 (citing *Bodine v. Elkhart County Election Bd.*, 788 F.2d 1270, 1272 (7th Cir. 1986)); and the "arbitrary rejection of ten ballots," *id.* (citing *Johnson v. Hood*, 430 F.2d 610, 612-13 (5th Cir. 1970)).   Other circuits have adopted similar standards, explaining that "[w]hether [an] irregularity amounts to a constitutional claim depends on its severity, whether it was intentional or more of a negligent failure to carry out properly the state election procedures and whether it erodes the democratic process."   *Hendon v. N.C. State Bd. of Elections*, 710 F.2d 177, 182 (4th Cir. 1983).   In canvassing decades of substantive due process decisions in the voting rights context, including those of the Second Circuit, the Ninth Circuit has identified an implicit framework under which "[m]ere . . . mistake will not render an election invalid."   *Bennett v. Yoshina*, 140 F.3d 1218, 1226 (9th Cir. 1998).   Instead, there must exist "(1) likely reliance by voters on an established election procedure and/or official pronouncements about what the procedure will be in the coming election; and (2) significant disenfranchisement that results from a change in the election procedures."   *Id.* at 1226-27.   *See also Lecky*, 285 F. Supp. 3d at 917 (distinguishing substantive due process cases featuring "flawed officially sponsored election policy" from those featuring mere errors).

Consistent with this framework, election officials' errors tend to result in due process violations only when those errors are manifested through official policy or instruction and when voters cast invalid ballots in reliance on those errors.   For instance, in *Griffin v. Burns*, 570 F.2d 1065 (1st Cir. 1978), "[a]lmost ten percent of the qualified and voting electorate was . . . denied

its vote" in a close election.  *Id.* at 1078.  The Secretary of State had "advertised, issued, and sanctioned the use of" absentee ballots and shut-in ballots, which had long been accepted in the state as valid methods of voting.  *See id.* at 1078-79.  But "after the results of the election were in," the Rhode Island Supreme Court held that the use of such ballots was invalid.  *Id.* at 1079.  Remarking that federal courts intervene in state elections only when "confronted with an officially-sponsored election procedure which, in its basic aspect, was flawed," the First Circuit held that a substantive due process violation had occurred through the invalidation of those ballots.  *Id.* at 1078.  Similarly, in *Hoblock*, local election officials mistakenly sent absentee ballots to voters who, pursuant to a prior court order, should have filed a new request for absentee ballots.  422 F.3d at 81-82.  Voters cast the ballots that they were issued in reliance on that official action—but the ballots were later invalidated after a court deemed that they had been issued in violation of the prior order.  *Id.* at 82.  The district court entered a preliminary injunction enjoining the county from certifying the election without counting those ballots.  The Second Circuit affirmed, holding that the local board's "decision not to count" those absentee ballots, "despite at least arguably having misled the voters into not filing new absentee-ballot applications by issuing the ballots, could be seen as sufficiently intentional to meet the threshold requirement for a constitutional [due process] violation."  *Id.* at 98.  The *Hoblock* court approvingly cited *Griffin*'s statement that "fundamental unfairness" is necessary to make out a due process violation, indicating that it discerned such unfairness there.  *See id.*

The Court is not persuaded—at least, not persuaded to the degree of finding certain or substantial likelihood of success on the merits—that the poll-worker errors described in DCCC's papers transcend the "garden variety" errors that this circuit has carved out from constitutional scrutiny, *Shannon*, 394 F.3d at 96, and rise to the "broad-gauged unfairness permeat[ing] an

election" that justified federal intervention in *Griffin* and *Hoblock*, 570 F.2d at 1077. The errors complained of here are not errors that are incorporated into official election procedures; rather, they are inadvertent mistakes made by poll workers following state laws, procedures, and policies that DCCC does not appear to challenge.

In arguing that the poll-worker errors here nonetheless constitute a due process violation, DCCC relies on *Northeast Ohio Coalition for the Homeless v. Husted*, 696 F.3d 580 (6th Cir. 2012) (per curiam), in which the Sixth Circuit considered Ohio's disqualification of 14,000 ballots that were cast in the wrong precinct (that is, "wrong pew" ballots). The court there found no error in the district court's factual finding that most of those "right-place/wrong-precinct ballots result[ed], and w[ould] continue to result, from poll-worker error"—specifically, from poll workers giving voters who had arrived at the right polling place incorrect ballots. *Id.* at 594-95. This error contravened "poll workers' statutory duty to direct voters to the correct" precinct—which, under Ohio law, is the "ultimate responsibility" of poll workers rather than voters. *Id.* at 593. Noting that there was no evidence in the record that any factors *other* than poll-worker error caused wrong-precinct ballots, *see id.* at 594-95, the court thus held that the plaintiff had established a likely due process violation, observing that "[t]o disenfranchise citizens whose only error was relying on poll-worker instructions appears . . . to be fundamentally unfair," *id.* at 597. Assuming for purposes of argument that intentional conduct was required to find a due process violation, the court concluded that there was "sufficient indicia of purposeful conduct in the State's intent to enforce its strict disqualification rules without exception, despite the systemic poll-worker error identified in this litigation and others" that put the state on notice of those errors. *Id.* (citing *Shannon*, 394 F.3d at 96). *Northeast Ohio* is not the first instance in which the Sixth Circuit has suggested that due process violations may arise in part from systemic poll-worker error: in *League*

*of Women Voters of Ohio v. Brunner*, 548 F.3d 463 (6th Cir. 2008), the court held that the plaintiff had stated a plausible substantive due process claim through allegations that asserted a host of errors in three decades' worth of elections, and that state officials "knew of these problems yet failed to act despite their authority to do so." *Id.* at 469. Notably, however, the court's due process reasoning considered the cumulative effect of the alleged errors:

> [R]egistered voters were denied the right to vote because their names were missing from the rolls. Inadequate provision of voting machines caused 10,000 Columbus voters not to vote. Poll workers improperly refused assistance to disabled voters. Provisional ballots were not distributed to appropriate voters, causing voters to be denied the right to vote. At the same time, provisional ballots were provided to other voters without proper instructions, causing 22% of provisional ballots cast to be discounted. These allegations, if true, could support a troubling picture of a system so devoid of standards and procedures as to violate substantive due process.

*Id.* at 478.

Even assuming the Court were inclined to follow the Sixth Circuit's reasoning, both *Northeast Ohio* and *League of Women Voters* concluded that poll-worker error rose to the level of a due process violation only when it was accompanied by a total absence of voter error. DCCC has cited, and the Court can find, no case holding that an election becomes "fundamentally unfair" when disenfranchisement occurs because a voter makes an initial mistake. Even if *Hoblock* can be read to stand for the proposition that a voter's error (there, in not filing a new absentee-ballot application) does not preclude a due process violation, there is no question that any voter error in that case was induced by an initial official error. Here, though, the risk of a "wrong church" ballot arises only if a voter makes the first mistake of going to the wrong polling place. Although DCCC has offered reasonable explanations for why this voter error occurs, this fact pattern is difficult to reconcile with the conclusion that the prevalence of "wrong church" ballots is a sign of "patent and fundamental unfairness" in New York's election procedures. *Griffin*, 570 F.3d at 1077.

Notwithstanding the foregoing analysis, the Court remains deeply troubled by the sheer frequency at which voters err in locating their polling places and at which poll workers err in their statutorily mandated task of redirecting voters to their correct polling places.  The facts DCCC raises suggest both a significant failure in education, training, and resources and negligence in failing to remedy a flawed system—issues that Defendants will hopefully address.  But at bottom, the conduct alleged appears, at least on this record, to amount essentially to a "negligent failure to carry out properly the state election procedures," *Hendon*, 710 F.2d at 182, and does not rise to a clearly likely substantive due process violation.

DCCC's Equal Protection claim is similarly unavailing at this stage.  It argues that because some poll workers properly direct a voter to their correct polling place while others mistakenly give a voter an affidavit ballot that will certainly be invalidated, "a lack of uniform standards and procedures results in arbitrary and disparate treatment of different voters" who are otherwise similarly situated.  *Lecky*, 285 F. Supp. 3d at 920.  For this proposition, DCCC relies on *Bush v. Gore*, in which the Supreme Court held that Florida's 2000 presidential election recount procedure did "not satisfy the minimum requirement for nonarbitrary treatment of voters necessary to secure the fundamental right" of voting.  531 U.S. at 105.  As the Court explained, while "Florida's basic command" that recounters "consider the intent of the voter" was "unobjectionable as an abstract proposition and a starting principle," the recount suffered from an "absence of specific standards to ensure [that principle's] equal application."  *Id.* at 105-06.  In ordering relief, the Court explained that "[t]he formulation of uniform rules to determine intent" was "necessary" in order for the state to comply with constitutional standards.  *Id.* at 106.

The problem with DCCC's reliance on *Bush v. Gore* is that its case, at least on the record presented, "lacks the concern with arbitrary or disparate standards that motivated *Bush*."  *Wise v.*

*Circosta*, 978 F.3d 93, 100 (4th Cir. 2020).[16]  New York law requires the rejection of all "wrong church" ballots, without exception or discretion.  And more to the point, all poll workers across the state share the same statutory mandate to inform a voter of their correct polling place if they have presented at the wrong location.  DCCC does not contest the existence of those uniform standards, nor does the record establish that some poll workers or some polling places apply different standards or procedures.  Instead, DCCC argues only that some poll workers act mistakenly when applying the same standards and procedures.  While this situation clearly suggests the necessity of better training tools and resources for poll workers, it does not present "the absence of specific standards" or the use of "varying standards" in weighing or evaluating votes.  *Bush*, 531 U.S. at 106, 107.  In other words, any difference in the treatment of two voters does not appear to be the "result of specific election procedures."  *Democratic Nat'l Comm.*, 488 F. Supp. 3d at 816 (finding that allegations of "disparate treatment" that were "rooted in poll closings and poll-worker shortages, lack of adequate personal protective equipment at some polling locations[,] and disparate treatment regarding voter registration and requests for absentee ballots" did not state a claim under *Bush v. Gore* because such disparate treatment was not the "result of specific election procedures"); *cf. Bush*, 531 U.S. at 106-07 (concluding that the Florida recount process lacked "sufficient guarantees of equal treatment" when three different "members of [one] county canvassing board applied different standards in defining a legal vote" and when "one county changed its evaluative standards during the counting process").[17]  Contrary to

---

[16] For purposes of this discussion, the Court assumes that *Bush v. Gore* has precedential value notwithstanding the Court's emphasis that its "consideration [was] limited to the present circumstances," 531 U.S. at 109.

[17] The Court does not understand the foregoing analysis to be inconsistent with the equal protection analysis in *Gallagher I*.  There, the court held that an earlier version of New York's "postmark requirement . . . in the context of (1) Executive Order 202.26 directing that absentee ballots be mailed to voters with a postage-paid return envelope, (2) *the inconsistent application of postmarks to absentee ballots depending on where voters live*, and (3) Defendants' refusal to count such ballots . . . created a voting process where the State by later arbitrary and disparate treatment, values one person's vote over that of another."  477 F. Supp. 3d at 46 (emphasis added).  Critical to the court's decision

DCCC's assertion at argument, New York's standards and procedures do not "call[] for arbitrary treatment," Argument Tr. at 57:25-58:1; they simply cannot guarantee against arbitrary mistakes, as no standard can do.[18]

Lastly, the Court finds that DCCC has not shown a clear likelihood of success on its claim that the rejection of "wrong church" ballots violates the Materiality Provision. That statute provides that states shall not "deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual

---

appeared to be the evidence that ballots from some geographic areas were likely treated differently than were ballots from other areas. *See id.* ("The inconsistent treatment of ballots that were timely cast, *especially when considering the prevalence of ballots lacking postmarks in Brooklyn as compared to the other boroughs*, raises issues indistinguishable from those in *Bush v. Gore*.") (emphasis added); *id.* at 47 (finding "strong evidence that USPS locations in Brooklyn handled absentee ballots differently than postal service locations in the other boroughs"). The court also found that absentee ballots were effectively treated differently based on the respective speeds of the post offices that transmitted those ballots. *See id.* at 47-48. *Gallagher I*'s equal protection analysis thus hinged on evidence of different standards and procedures across various USPS locations, and consequent unequal treatment of ballots by election officials based on where those ballots had originated. This analysis is consistent with those of other district courts that have found viable equal protection challenges under a *Bush v. Gore* theory. *See, e.g.*, *Black v. McGuffage*, 209 F. Supp. 2d 889, 897-99 (N.D. Ill. 2002) (holding that the plaintiffs had stated an equal protection claim where they alleged that votes in some counties were statistically less likely to be counted than votes in other counties because some local election authorities chose "a system with less accuracy than others"); *Common Cause S. Christian Leadership Conference of Greater L.A. v. Jones*, 213 F. Supp. 2d 1106, 1108-10 (C.D. Cal. 2001) (holding that the defendants were not entitled to judgment on the pleadings where the plaintiffs alleged that some counties had adopted more reliable voting procedures than others).

Here, by contrast, the Court cannot determine on the current record that any disparity in outcomes among voters who initially appear at the wrong polling place is the result of the implementation of different standards or procedures. While Dr. Meredith suggests that some "wrong church" ballots might occur because certain poll workers choose not to apply standard procedures, *see* Meredith Dec. ¶ 26 (positing that some poll workers might offer voters affidavit ballots without locating their correct polling place because they wrongly assume the voters are at the right location), this is speculative: on the record DCCC provides, it is equally possible that any disparate outcomes result instead from poll workers applying the same standards and some poll workers making mistakes when applying those standards, or from voters mistakenly believing that they are eligible to vote in a particular election district notwithstanding their absence from the records and thus requesting an affidavit ballot. If later development of the record supports the conclusion that different standards and procedures are in place across New York's various polling places, the Court will consider revisiting its equal protection analysis with respect to this claim.

[18] This is not to say that a "one person, one vote" claim that proceeds under a *Bush v. Gore* theory requires a showing of discriminatory purpose. *See Jones v. United States Postal Service*, 488 F. Supp. 3d 103, 130 (S.D.N.Y. 2020) ("[T]he Supreme Court has consistently declined to require a showing of discriminatory purpose in the context of one person, one vote cases."); *Hunter v. Hamilton County Bd. of Elections*, 635 F.3d 219, 234 (6th Cir. 2011) (explaining that "a showing of intentional discrimination has not been required in" several voting rights cases raising equal protection challenges, including *Bush v. Gore*).

is qualified under State law to vote in such election."   § 10101(a)(2)(B).   Assuming without

deciding that the statute confers a private right of action—an issue that the Second Circuit has not

decided and on which other circuits are split, *see supra* at 37-38—the Court agrees with the

Republican Committees that it would stretch the law well beyond its plain meaning to hold that

the error of casting a ballot from an incorrect polling place is an error "on any record or paper . . .

relating to any . . . act requisite to voting" of the kind that the statute contemplates.   To the contrary,

courts have deemed the Materiality Provision to be applicable to errors such as missing

handwritten dates on absentee ballot envelopes, *Migliori*, 36 F.4th at 163-64, or the inclusion of

social security numbers on voter registration forms, *Schwier*, 340 F.3d at 1297.   A ballot that is

cast in a polling place at which a voter is ineligible to vote is not analogous to those errors or

omissions.

　　　　Accordingly, DCCC has not shown a clear or substantial likelihood of success on the merits

of its challenge to the rejection of "wrong church" ballots.   Again, this finding may well change

later in the litigation depending on further development of the factual record.   But giving proper

deference to the heavy burden DCCC faces at this juncture, the Court concludes that it has not met

that burden.

### b. Absentee Ballots Without Postmarks That Are Received Between Two and Seven Days After Election Day

　　　　DCCC next challenges New York's law requiring that absentee ballots without postmarks

be rejected if they are received between two and seven days after Election Day.   It requests relief

in the form of instructions that local boards of election (1) automatically count such ballots if they

are received two days after Election Day and (2) subject such ballots to the state's notice-and-cure

process if they are received between three and seven days after Election Day (mirroring the

existing requirement that postmarked ballots be received by seven days after Election Day).   Here,

the Court finds DCCC has shown a clear or substantial likelihood of success on its claim that the rejection of these ballots, without any attempt to cure ballots that were timely cast, impermissibly burdens the right to vote.

Unlike the other practices DCCC challenges, this issue is not one of first impression in this district.  In *Gallagher I*, Judge Torres granted relief very similar to what DCCC seeks here, ordering that the State Board of Elections count absentee ballots missing postmarks that were received two days after Election Day in the June 2020 primary election.  *See* 477 F. Supp. 3d at 51-52.  In so doing, Judge Torres credited evidence, including USPS testimony, that mail is virtually never delivered within one day—meaning that it was reasonable to assume that ballots received two days after Election Day were mailed on or before Election Day.  *See id.* at 44 ("[C]redible USPS testimony established that (1) the flow of mail does not allow for one-day delivery, even within a borough, under normal circumstances, and (2) over 98 percent of mail will arrive two days after being placed in a mailbox or delivered to a post office.").  Judge Torres also observed that ballots cast in the June 2020 primary across the state were invalidated for arriving late with no postmark.  *See id.* at 32-34.  She thus found that voters' "accepting the state's offer to vote by absentee ballot and following the state's instructions to vote timely, nonetheless resulted in their ballots not being postmarked, and, consequently, invalidated under § 8-412."  *Id.* at 45. "Under these circumstances," the court concluded that "the policy embodied by the postmark rule, deliberately adopted and intentionally applied to those ballots, [was] sufficient to establish a violation of the Due Process Clause and the First Amendment."  *Id.*

The reasoning of *Gallagher I* is both persuasive and applicable to the facts of this case, at least with respect to the court's *Anderson-Burdick* analysis.  As in that case, the "question before the Court is not whether § 8-412 . . . is [likely] constitutional in the abstract, but rather whether it

is [likely] unconstitutional as applied under the circumstances of this case." *Id.* at 43.   In the abstract, New York's law "merely impose[s] a time deadline" on the receipt of absentee ballots— a requirement that ordinarily does not create a substantial burden, even for those voters that fail to meet the deadline. *See Rosario v. Rockefeller*, 410 U.S. 752, 757 (1973) (holding that voters who missed an enrollment deadline were not "disenfranchised").   But as applied to the circumstances of this case, New York's law disenfranchises voters who *do* meet the deadlines imposed by state law by invalidating their ballots that, through no fault of their own, are not postmarked and are delivered two or more days after Election Day.   The Court finds that these circumstances likely constitute a severe burden on the right to vote, meaning that the state's interest must be compelling and its regulation narrowly drawn to serve that interest.  *See Burdick*, 504 U.S. at 434.

While the state's interest in counting only those ballots that are completed by Election Day is certainly compelling, *see Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (explaining that "[e]xtending the date by which ballots may be cast . . . fundamentally alters the nature of the election"), that interest cannot justify disenfranchising voters who complied with that requirement when the state has available alternatives that will serve that interest equally well without disenfranchising those voters.   "State action is not narrowly drawn if it is overinclusive, meaning that it regulates conduct that does not meaningfully advance the state interest at issue." *Gallagher I*, 477 F. Supp. 3d at 44.  Indeed, even if the burden on voting created by the application of § 8-412 is more modest such that *Anderson-Burdick*'s more deferential balancing test applies, *see SAM Party of New York*, 987 F.3d at 274, New York's law would still likely fail that less stringent test, because a significant part of the law does not "actually advance[]" the proffered state interest.  *See Common Cause/New York*, 432 F. Supp. 3d at 310-11 (concluding that New York's "refusal to maintain the inactive list [of voters] at polling locations" and to instead

use certain proxies to identify inactive voters did not advance any legitimate state interest because the proxies were "overinclusive, capturing thousands of voters who" were active); *see also Lerman v. Bd. of Elections in City of New York*, 232 F.3d 135, 149 (2d Cir. 2000) ("The fact that . . . asserted interests are important in the abstract does not necessarily mean that [a state's] chosen means of regulation will in fact advance those interests.").[19]  New York's exclusion of ballots without postmarks that arrive two or more days after Election Day will, by its very design, capture voters who voted by Election Day.  In doing so, it disenfranchises those voters without advancing the articulated state interest in preventing untimely ballots, and thus very likely impermissibly burdens the right to vote.[20]

The Court therefore finds that injunctive relief is warranted on this claim, but orders a modified version of the relief DCCC requests.  Unlike the court in *Gallagher I*, this Court does not have the benefit of contemporaneous USPS testimony or other evidence establishing that the same degree of USPS service delays exist today—that is, that a ballot mailed the day after Election Day in 2022 will virtually never arrive at its destination one day later, as appeared to be the case in the summer of 2020.  All DCCC has presented is evidence that absentee ballots still fall under USPS' two-day delivery standard, which does not eliminate the possibility that those ballots could be delivered within one day.  Accordingly, to avoid any risk of counting ballots that were filled out after the close of polls, the Court orders Defendants to direct local boards of election that, when

---

[19] The fact that there is not a "general constitutional right to obtain absentee ballots," *Price*, 540 F.3d at 112, does not immunize any restriction relating to absentee ballots from constitutional scrutiny.  *See id.* at 108-12 (holding that a state law prohibiting absentee ballots in county committee elections impermissibly burdened the right to vote and rejecting the district court's conclusion that "restrictions on access to absentee ballots do not severely burden the right to vote, so long as the class of voters to whom absentee ballots are denied are not thereby deprived of their only method of voting").  Relatedly, Defendants' argument that absentee voters can avoid the risk of USPS delays by mailing their ballots well in advance of Election Day merely reinforces the fact § 8-412 poses some burden on absentee voters— and thus that § 8-412 must actually advance the state's articulated interests to pass constitutional scrutiny.

[20] Because the Court concludes that DCCC has shown a clear likelihood of success on its *Anderson-Burdick* claim, it does not assess this challenge under the other legal frameworks DCCC advances.

they receive absentee ballots that (1) arrive between two and seven days after Election Day—mirroring the receipt deadline for postmarked ballots—and (2) are missing postmarks, they shall offer the voters who submitted those ballots "the same notice and pre-rejection opportunity to cure" those ballots that is currently given to voters who submit absentee ballots with "technical deficiencies [that are] currently deemed curable."  Pl.'s Corrected Notice of Motion at 2.

### B.   Equitable Factors

#### 1.   Irreparable Harm

It is beyond question that "the alleged violation of a constitutional right triggers a finding of irreparable injury."  *Conn. Dep't of Env't Prot. v. OSHA*, 356 F.3d 226, 231 (2d Cir. 2004); *accord Statharos v. N.Y. City Taxi & Limousine Comm'n*, 198 F.3d 317, 322 (2d Cir. 1999); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996).  Specifically, "[c]ourts routinely deem restrictions on fundamental voting rights irreparable injury."  *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014).

For its claim on which DCCC has shown a clear or substantial likelihood of success on the merits, it has also established irreparable harm.  Not only does DCCC allege such harm arising from impending violations of its constituents' right to vote, Abraham Dec. ¶ 9, it also asserts that in order to combat the disenfranchisement that will likely recur in the 2022 elections, it will have to expend funds and resources it would otherwise devote to programs aimed at locating, contacting, persuading, and mobilizing voters in New York and elsewhere to vote in the 2022 elections, *id.* ¶ 7.  These assertions suffice to show the requisite irreparable harm.  *See Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 474 (S.D.N.Y. 2020), *reconsideration denied*, 2020 WL 6365336 (S.D.N.Y. Oct. 29, 2020) (concluding that "[t]he harm [an organization] suffered when it had to divert its resources away from Census-related programming to address Defendants'

robocalls [that infringed on the right to vote] cannot be remedied monetarily because the Census has ended"); *see also Ariz. Democratic Party v. Ariz. Republican Party*, No. 16-CV-0375 (PHX) (JJT), 2016 WL 8669978, at *11 (D. Ariz. Nov. 4, 2016) (concluding that "if potential members of the electorate suffer intimidation, threatening conduct, or coercion such that their right to vote freely is abridged, or altogether extinguished, Plaintiff [state Democratic party] would be irreparably harmed").

### 2.   Public Interest and Balance of the Equities

Finally, the Court has little trouble concluding that the public interest tips in DCCC's favor for the claim on which it has established a clear or substantial likelihood of success. "[S]ecuring First Amendment rights is in the public interest." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013). *Accord League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("[T]he public interest further favors a preliminary injunction because, absent an injunction, there is a substantial risk that citizens will be disenfranchised in the present . . . election cycle."); *Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012) ("The public interest . . . favors permitting as many qualified voters to vote as possible.").

Turning to the balance of the equities, however, the Court has an obligation to address the *Purcell* principle, pursuant to which "lower federal courts should ordinarily not alter the election rules on the eve of an election" on the logic that doing so often unduly burdens states and voters alike. *Republican Nat'l Comm.*, 140 S. Ct. at 1207 (citing *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam)). According to the Republican Committees, granting preliminary relief just one month before early voting begins in the primary election and just three months before early voting begins in the general election runs afoul of *Purcell*. The Court disagrees. Although it is cognizant of the importance of maintaining stability in state elections, it concludes that, on the facts of this

particular case, granting the limited relief it orders on this timeframe will not lead to the inequities that *Purcell* is intended to prevent.

Neither the Supreme Court nor the Second Circuit has set out a bright-line rule that a specific time period between an injunction and an election automatically violates *Purcell*.  And even if there were a specific timeframe that always triggered *Purcell*, the doctrine does not preclude the grant of an injunction requested on the eve of an election—rather, it sets a very high bar for doing so.  In a recent stay of an election-related injunction, Justice Kavanaugh explained that

> the *Purcell* principle . . . might be overcome even with respect to an injunction issued close to an election if a plaintiff establishes at least the following: (i) the underlying merits are entirely clearcut in favor of the plaintiff; (ii) the plaintiff would suffer irreparable harm absent the injunction; (iii) the plaintiff has not unduly delayed bringing the complaint to court; and (iv) the changes in question are at least feasible before the election without significant cost, confusion, or hardship.

*Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (mem.) (Kavanaugh, J., concurral).  The Court has already found that, for its claim regarding late absentee ballots without postmarks, DCCC has established a clear likelihood of success on the merits and irreparable harm.  And, contrary to the Republican Committees' assertion, DCCC has not unduly delayed in bringing this case.  The recurring nature of the alleged harm stemming from this practice became apparent only after the November 2020 election.  The Court credits DCCC's explanation that ballot rejection data for that election did not become available until well after the election, and that DCCC required time to research the complex factual allegations underlying its claims (including the factual allegations underlying the claims on which the Court has declined to grant injunctive relief).  Moreover, as DCCC noted at argument, it was not unreasonable for it to wait, both in filing this case and in filing its preliminary injunction motion, to see if New York would solve these issues on its own

through legislative reform, as it has recently done in this area.  Under these circumstances, waiting approximately a year to bring this case does not constitute "undue delay."

The remaining question is the feasibility of ordering relief now.  The Court recognizes that the one-month window between this injunction and the start of early voting in the August primary resembles the time periods that have previously been deemed excessively short under *Purcell*. Indeed, in *Purcell* itself, the Supreme Court stayed an injunction that was issued approximately one month before an election.  *See* 549 U.S. at 3.  Citing this history, the Republican Committees issue a warning (accompanied by a lengthy string cite) that no court has ever granted injunctive relief this close to an election without that injunction being stayed by a higher court.  As an initial matter, successfully issuing an injunction one month before an election is not unprecedented.  *See, e.g.*, *Harris v. McCrory*, 159 F. Supp. 3d 600 (M.D.N.C. 2016) (February 5 ruling enjoining a state from using its enacted map and ordering the general assembly to draw a new congressional district plan despite a mid-March primary), *stay denied*, 577 U.S. 1129 (2016); *see also Yang v. Kosinski*, 805 F. App'x 63 (2d Cir. 2020) (May 19 order affirming the district court's grant of a preliminary injunction that ordered the state to hold a primary on June 23 and to reinstate candidate names to the ballot for that primary); *Jones*, 488 F. Supp. 3d 103 (September 21 ruling enjoining USPS from taking certain actions in advance of the November general election).

More importantly, the cases that "raise[] concerns that [an] injunction will disrupt the election process, create confusion and delays, pose administrative challenges, and cause waste . . . have circumstances risking voter confusion or involving complicated changes in voting procedures that are not present here."  *Nat'l Ass'n for Advancement of Colored People, Spring Valley Branch v. E. Ramapo Cent. Sch. Dist.*, 464 F. Supp. 3d 587, 590 (S.D.N.Y. 2020).  Notably, Defendants have previously "represented that, to the extent that relief consist[s] of certain instructions or

directives to County Boards of Election that [do] not require extensive technical changes, such directives could be issued and implemented within thirty days" of a ruling from this Court.  May 16, 2022 Joint Letter.  It is true that Defendants do invoke cost and hardship in connection with implementing such relief, arguing that "Plaintiff's demand that local boards create and implement a last-minute notice and cure process for ballots with missing postmarks . . . would require a substantial diversion of resources."  Defs.' MOL at 26.  But the Court finds this contention unpersuasive.  First, the burden of implementing such a process would not occur "before the election," which is the focus of *Purcell*'s feasibility concerns.  *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurral).  Second, unlike the typical situations in which *Purcell* feasibility concerns arise—redistricting injunctions that require states to draw new maps, or injunctions that change the contents of ballots or the election procedures that a voter must navigate—the changes the Court is ordering with respect to late absentee ballots without postmarks boils down to instructing election officials to apply existing notice and cure procedures to a discrete additional group of ballots they will already be receiving.  Contrary to Defendants' position that such relief would require local boards to create and implement a last-minute notice and cure process, "there [appears to be] no reason the notice and cure process that currently exists for other absentee ballot defects could not be extended to these ballots," Czarny Dec. ¶ 15.  Nor would implementing this relief require complicated technical procedures, such as reprogramming voting machines.  *Cf. Conservative Party of New York State v. New York State Bd. of Elections*, No. 10-CV-6923 (JSR), 2010 WL 4455867, at *1-2 (S.D.N.Y. Oct. 15, 2010).  Although instructions will certainly have to be promulgated to apprise officials of these changes, the Court does not view those instructions as onerous or confusing to election officials such that the equities tip in Defendants' favor.[21]

---

[21] At argument, the Republican Committees cited the Supreme Court's stay of an injunction that, among other things, ordered Alabama "not to enforce the state's de facto prohibition on curbside voting" during an upcoming election.

Nor do the other values that *Purcell* promotes counsel against granting relief now. Rather than causing "voter confusion," *Purcell*, 549 U.S. at 4-5, the relief the Court orders will likely have no effect on a voter's state of mind, because it impacts only the conduct of election officials after they receive a cast ballot; that is, it does not alter any "voter-facing" aspects of the upcoming elections. Argument Tr. at 54:6. For similar reasons, the Court is doubtful that voter confidence will be undermined by the requested relief. To the contrary, the record in this case indicates that injunctive relief will give voters more security that their timely ballots will be counted notwithstanding third-party failures outside their control. Finally, the relief DCCC seeks does not undermine voter confidence by increasing the risk of fraudulent voting, because it protects only the votes of eligible and qualified voters who vote on time.[22] In short, the relief ordered here is highly unlikely to create "a disruption of the election process." *Reynolds v. Sims*, 377 U.S. 533, 585 (1964). Accordingly, the Court believes this is the "extraordinary case where an injunction—

---

*People First of Alabama v. Merrill*, 467 F. Supp. 3d 1179, 1227 (N.D. Ala. 2020). But enjoining a prohibition on curbside voting would require counties choosing to implement curbside voting to create and implement new procedures, which would include "the use of e-poll books or alternatively the transport of polling lists from inside the polling place to the curb, additional tabulation machines to preserve ballot secrecy, and additional poll workers to staff the curbside voting stations," *id.* at 1223 n.47. Again, the Court is not persuaded that the injunctive relief ordered here will require Defendants or local boards of election to create entirely new procedures.

The Republican Committees also cite *Democratic National Committee v. Wisconsin State Legislature*, 141 S. Ct. 28 (2020) (mem.), in which the Supreme Court denied an application to vacate the stay of an injunction in which a district court "extended the deadline for receipt of absentee ballots by six days . . . so long as the ballots [were] postmarked on or before election day." *Id.* at 30 (Kavanaugh, J., concurring in denial of application to vacate stay). The Court does not see this case as analogous, because the injunctive relief it orders does not extend the existing state deadline for the receipt of absentee ballots. Rather, it simply puts absentee ballots missing postmarks on equal footing with absentee ballots containing postmarks, such that both ballots are subject to New York's existing seven-day receipt deadline and to New York's existing timeline for curing absentee ballots.

[22] To the extent Defendants suggest that allowing late ballots with missing postmarks to be cured will introduce the possibility of fraudulent cure affidavits, the Court agrees with DCCC that this theory assumes a "long and implausible chain of events," Argument Tr. at 26:13-14: namely, that a voter will fill out a ballot after polls close on Election Day; backdate the affirmation; place that ballot in the mail after the final collection time on Election Day in the hopes that it does not receive a postmark and arrives two or more days later; and complete a fraudulent affidavit swearing that they timely filled out the ballot.

despite its issuance on the eve of the election"—not only "might be proper," but is proper. *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1372 n.7 (11th Cir. 2022).

## CONCLUSION

"Only in extraordinary circumstances will a challenge to a state . . . election rise to the level of a constitutional deprivation." *Shannon*, 394 F.3d at 94. With one exception, DCCC has failed to make the evidentiary showing necessary for this Court to conclude, at least at this early stage of the litigation, that such extraordinary circumstances are likely present. DCCC's motion for a preliminary injunction is thus granted in part and denied in part. Defendants are ordered to instruct local boards of election that, for the August 2022 primary election and the November 2022 general election, the existing notice and cure procedure provided by state law for absentee ballots with curable technical defects shall be applied to absentee ballots missing postmarks that are received between two and seven days after Election Day. All other preliminary relief sought is denied. The Clerk of Court is respectfully directed to terminate the motion at docket number 78.


SO ORDERED.

Dated: July 13, 2022
New York, New York

_____
Hon. Ronnie Abrams
United States District Judge